UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

vs.                                                              CASE NO.: 2:11-Cr-114-FtM-29SPC

DEBRA ROGGOW

DEFENDANT'S MOTION FOR THE COURT TO TAKE JUDICIAL NOTICE

COMES NOW, the Defendant, DEBRA ROGGOW, and respectfully requests this

Honorable Court, pursuant to F.R.E. 201(d), to take judicial notice of the following federal

regulations and Florida Administrative Codes section, and as grounds therefore would state as

follows:

1. Defendant is presently charged by indictment with ten counts of dispensing Schedule

II and IV controlled substances outside the scope of professional practice, and is set for jury trial

beginning June 12, 2012.

2. The defendant's theory of defense is that she acted in good faith, in the course of

professional practice, and for a legitimate medical purpose in dispensing controlled substances,

and she anticipates using the following provisions in arguing her case, copies of which are

attached:

a) 21 CFR §1306.04

b) F.A.C. 64B14-14.005 eff. 3/9/00; as amended 11/14/06; as amended 11/10/11.

_____3. 21 CFR §1306.04 is relevant because it sets forth the federal standard for the issuance

of prescriptions.

_____4. F.A.C. 64B14-14.005 is relevant because it states the Standards for the Use of

Controlled Substances for Treatment of Pain for osteopathic physicians, and the three versions

are necessary to show amendments made to the Code provision.

## MEMORANDUM OF LAW

F.R.E. 201(b)(2) allows a court to judicially notice adjudicative facts that "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Federal courts can take judicial notice of CFRs under 44 U.S. Code §1507. The Court can take judicial notice of Florida Administrative Code provisions. "[A] Court may take judicial notice of the rules, regulations and orders of administrative agencies issued pursuant to their delegated authority. *Carter v. American Telephone & Telegraph Co.*, 365 F.2d 486 (C.A. 5, 1966); *Interstate Natural Gas Co. v. Southern California Gas Co.*, 209 F.2d 380 (C.A. 9, 1953). *United States v. Rice*, 176 F.2d 373 (C.A. 3, 1949); *Lilly v. Grand Trunk Western Railroad Co.*,317 U.S. 481, 63 S.Ct. 347, 87 L.Ed. 411 (1943)." *Int'l Broth. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Zantop Air Transp. Corp.*, 394 F.2d 36, 40 (6th Cir. 1968)

WHEREFORE, Defendant respectfully requests the Court grant this motion, and take judicial notice of the cited  provisions.

Respectfully submitted,

_____
LEE HOLLANDER, ESQUIRE
Law Office of Hollander and Hanuka
2681 Airport Road, S., Suite C-101
Naples, Florida 34112
(239)530-1800
Florida Bar No. 288705

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been forwarded by ( ) regular U.S. Mail, ( ) hand-delivery, (X) CM/ECF, and/or ( ) fax to counsel of record,

this 9th  day of June, 2012.

_____
LEE HOLLANDER, ESQUIRE

Code of Federal Regulations
   Title 21. Food and Drugs
      Chapter II. Drug Enforcement Administration, Department of Justice
         Part 1306. Prescriptions (Refs & Annos)
            General Information

21 C.F.R. § 1306.04

§ 1306.04 Purpose of issue of prescription.

Effective: July 25, 2005

Currentness

(a) A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

(b) A prescription may not be issued in order for an individual practitioner to obtain controlled substances for supplying the individual practitioner for the purpose of general dispensing to patients.

(c) A prescription may not be issued for "detoxification treatment" or "maintenance treatment," unless the prescription is for a Schedule III, IV, or V narcotic drug approved by the Food and Drug Administration specifically for use in maintenance or detoxification treatment and the practitioner is in compliance with requirements in § 1301.28 of this chapter.

**Credits**
[36 FR 7799, Apr. 24, 1971. Redesignated at 38 FR 26609, Sept. 24, 1973, and amended at 39 FR 37986, Oct. 25, 1974; 70 FR 36343, June 23, 2005]
SOURCE: [36 FR 7799, April 24, 1971; 36 FR 13386, July 21, 1971; Redesignated at 38 FR 26609, Sept. 24, 1973; 51 FR 5316, Feb. 13, 1986; 74 FR 15624, April 6, 2009, unless otherwise noted], unless otherwise noted.

AUTHORITY: 21 U.S.C. 821, 829, 831, 871(b), unless otherwise noted.

Notes of Decisions (53)

Current through May 31, 2012; 77 FR 32380.

End of Document
© 2012 Thomson Reuters. No claim to original U.S. Government Works.

**64B15-14.005 Standards for the Use of Controlled Substances for Treatment of Pain.**

(1) Pain management principles.

(a) The Board of Osteopathic Medicine recognizes that principles of quality medical practice dictate that the people of the State of Florida have access to appropriate and effective pain relief. The appropriate application of up-to-date knowledge and treatment modalities can serve to improve the quality of life for those patients who suffer from pain as well as reduce the morbidity and costs associated with untreated or inappropriately treated pain. The Board encourages osteopathic physicians to view effective pain management as a part of quality medical practice for all patients with pain, acute or chronic, and it is especially important for patients who experience pain as a result of terminal illness. All osteopathic physicians should become knowledgeable about effective methods of pain treatment as well as statutory requirements for prescribing controlled substances.

(b) Inadequate pain control may result from an osteopathic physician's lack of knowledge about pain management or an inadequate understanding of addiction. Fears of investigation or sanction by federal, state, and local regulatory agencies may also result in inappropriate or inadequate treatment of chronic pain patients. Osteopathic physicians should not fear disciplinary action from the Board or other state regulatory or enforcement agencies for prescribing, dispensing, or administering controlled substances including opioid analgesics, for a legitimate medical purpose and that is supported by appropriate documentation establishing a valid medical need and treatment plan. Accordingly, these guidelines have been developed to clarify the Board's position on pain control, specifically as related to the use of controlled substances, to alleviate physician uncertainty and to encourage better pain management.

(c) The Board recognizes that controlled substances, including opioid analgesics, may be essential in the treatment of acute pain due to trauma or surgery and chronic pain, whether due to cancer or non-cancer origins. Osteopathic physicians are referred to the U.S. Agency for Health Care Policy and Research Clinical Practice Guidelines for a sound approach to the management of acute and cancer-related pain. The medical management of pain including intractable pain should be based on current knowledge and research and includes the use of both pharmacologic and non-pharmacologic modalities. Pain should be assessed and treated promptly, and the quantity and frequency of doses should be adjusted according to the intensity and duration of the pain. Osteopathic physicians should recognize that tolerance and physical dependence are normal consequences of sustained use of opioid analgesics and are not synonymous with addiction.

(d) The Board of Osteopathic Medicine is obligated under the laws of the State of Florida to protect the public health and safety. The Board recognizes that inappropriate prescribing of controlled substances, including opioid analgesics, may lead to drug diversion and abuse by individuals who seek them for other than legitimate medical use. Osteopathic physicians should be diligent in preventing the diversion of drugs for illegitimate purposes.

(e) The Board will consider prescribing, ordering, administering, or dispensing controlled substances for pain to be for a legitimate medical purpose if based on accepted scientific knowledge of the treatment of pain or if based on sound clinical grounds. All such prescribing must be based on clear documentation of unrelieved pain and in compliance with applicable state or federal law.

(f) Each case of prescribing for pain will be evaluated on an individual basis. The Board will not take disciplinary action against an osteopathic physician for failing to adhere strictly to the provisions of these guidelines, if good cause is shown for such deviation. The osteopathic physician's conduct will be evaluated to a great extent by the treatment outcome, taking into account whether the drug used is medically and/or pharmacologically recognized to be appropriate for the diagnosis, the patient's individual needs including any improvement in functioning, and recognizing that some types of pain cannot be completely relieved.

(g) The Board will judge the validity of prescribing based on the osteopathic physician's treatment of the patient and on available documentation, rather than on the quantity and chronicity of prescribing. The goal is to control the patient's pain for its duration while effectively addressing other aspects of the patient's functioning, including physical, psychological, social, and work-related factors. The following guidelines are not intended to define complete or best practice, but rather to communicate what the Board considers to be within the boundaries of professional practice.

(2) Definitions.

(a) Acute Pain. For the purpose of this rule, "acute pain" is defined as the normal, predicted physiological response to an adverse chemical, thermal, or mechanical stimulus and is associated with surgery, trauma, and acute illness. It is generally time-limited and is responsive to opioid therapy, among other therapies.

(b) Addiction. For the purpose of this rule, "addiction" is defined as a neurobehavioral syndrome with genetic and environmental influences that results in psychological dependence on the use of substances for their psychic effects and is

characterized by compulsive use despite harm. Addiction may also be referred to by terms such as "drug dependence" and "psychological dependence." Physical dependence and tolerance are normal physiological consequences of extended opioid therapy for pain and should not be considered addiction.

(c) Analgesic Tolerance. For the purpose of this rule, "analgesic tolerance" is defined as the need to increase the dose of opioid to achieve the same level of analgesia. Analgesic tolerance may or may not be evident during opioid treatment and does not equate with addiction.

(d) Chronic Pain. For the purpose of this rule, "chronic pain" is defined as a pain state which is persistent.

(e) Pain. For the purpose of this rule, "pain" is defined as an unpleasant sensory and emotional experience associated with actual or potential tissue damage or described in terms of such damage.

(f) Physical Dependence. For the purpose of this rule, "physical dependence" on a controlled substance is defined as a physiologic state of neuro-adaptation which is characterized by the emergence of a withdrawal syndrome if drug use is stopped or decreased abruptly, or if an antagonist is administered. Physical dependence is an expected result of opioid use. Physical dependence, by itself, does not equate with addiction.

(g) Pseudoaddiction. For the purpose of this rule, "pseudoaddiction" is defined as a pattern of drug-seeking behavior of pain patients who are receiving inadequate pain management that can be mistaken for addiction.

(h) Substance Abuse. For the purpose of this rule, "substance abuse" is defined as the use of any substances for non-therapeutic purposes or use of medication for purposes other than those for which it is prescribed.

(i) Tolerance. For the purpose of this rule, "tolerance" is defined as a physiologic state resulting from regular use of a drug in which an increased dosage is needed to produce the same effect, or a reduced effect is observed with a constant dose.

(3) Guidelines. The Board has adopted the following guidelines when evaluating the use of controlled substances for pain control:

(a) Evaluation of the Patient. A complete medical history and physical examination must be conducted and documented in the medical record. The medical record should document the nature and intensity of the pain, current and past treatments for pain, underlying or coexisting diseases or conditions, the effect of the pain on physical and psychological function, and history of substance abuse. The medical record also should document the presence of one or more recognized medical indications for the use of a controlled substance.

(b) Treatment Plan. The written treatment plan should state objectives that will be used to determine treatment success, such as pain relief and improved physical and psychosocial function, and should indicate if any further diagnostic evaluations or other treatments are planned. After treatment begins, the osteopathic physician should adjust drug therapy to the individual medical needs of each patient. Other treatment modalities or a rehabilitation program may be necessary depending on the etiology of the pain and the extent to which the pain is associated with physical and psychosocial impairment.

(c) Informed Consent and Agreement for Treatment. The osteopathic physician should discuss the risks and benefits of the use of controlled substances with the patient, persons designated by the patient, or with the patient's surrogate or guardian if the patient is incompetent. The patient should receive prescriptions from one osteopathic physician and one pharmacy where possible. If the patient is determined to be at high risk for medication abuse or have a history of substance abuse, the osteopathic physician may employ the use of a written agreement between physician and patient outlining patient responsibilities, including, but not limited to:

1. Urine/serum medication levels screening when requested;

2. Number and frequency of all prescription refills; and

3. Reasons for which drug therapy may be discontinued (i.e., violation of agreement).

(d) Periodic Review. At reasonable intervals based on the individual circumstances of the patient, the osteopathic physician should review the course of treatment and any new information about the etiology of the pain. Continuation or modification of therapy should depend on the osteopathic physician's evaluation of progress toward stated treatment objectives such as improvement in patient's pain intensity and improved physical and/or psychosocial function, i.e., ability to work, need of health care resources, activities of daily living, and quality of social life. If treatment goals are not being achieved, despite medication adjustments, the osteopathic physician should reevaluate the appropriateness of continued treatment. The osteopathic physician should monitor patient compliance in medication usage and related treatment plans.

(e) Consultation. The osteopathic physician should be willing to refer the patient as necessary for additional evaluation and treatment in order to achieve treatment objectives. Special attention should be given to those pain patients who are at risk for misusing their medications and those whose living arrangements pose a risk for medication misuse or diversion. The management of

pain in patients with a history of substance abuse or with a comorbid psychiatric disorder may require extra care, monitoring, documentation, and consultation with or referral to an expert in the management of such patients.

(f) Medical Records. The osteopathic physician is required to keep accurate and complete records to include, but not be limited to:

1. The medical history and physical examination;

2. Diagnostic, therapeutic, and laboratory results;

3. Evaluations and consultations;

4. Treatment objectives;

5. Discussion of risks and benefits;

6. Treatments;

7. Medications (including date, type, dosage, and quantity prescribed);

8. Instructions and agreements; and

9. Periodic reviews.

Records must remain current and be maintained in an accessible manner and readily available for review.

(g) Compliance with Controlled Substances Laws and Regulations. To prescribe, dispense, or administer controlled substances, the osteopathic physician must be licensed in the state and comply with applicable federal and state regulations. Osteopathic physicians are referred to the *Physicians Manual: An Informational Outline of the Controlled Substances Act of 1970,* published by the U.S. Drug Enforcement Agency, for specific rules governing controlled substances as well as applicable state regulations.

*Specific Authority 459.005(1) FS. Law Implemented 459.003(3), 459.015(1)(g), (x) FS. History–New 3-9-00.*

**64B15-14.005 Standards for the Use of Controlled Substances for Treatment of Pain.**

(1) Pain management principles.

(a) The Board of Osteopathic Medicine recognizes that principles of quality medical practice dictate that the people of the State of Florida have access to appropriate and effective pain relief. The appropriate application of up-to-date knowledge and treatment modalities can serve to improve the quality of life for those patients who suffer from pain as well as reduce the morbidity and costs associated with untreated or inappropriately treated pain. The Board encourages osteopathic physicians to view effective pain management as a part of quality medical practice for all patients with pain, acute or chronic, and it is especially important for patients who experience pain as a result of terminal illness. All osteopathic physicians should become knowledgeable about effective methods of pain treatment as well as statutory requirements for prescribing controlled substances.

(b) Inadequate pain control may result from an osteopathic physician's lack of knowledge about pain management or an inadequate understanding of addiction. Fears of investigation or sanction by federal, state, and local regulatory agencies may also result in inappropriate or inadequate treatment of chronic pain patients. Osteopathic physicians should not fear disciplinary action from the Board or other state regulatory or enforcement agencies for prescribing, dispensing, or administering controlled substances including opioid analgesics, for a legitimate medical purpose and that is supported by appropriate documentation establishing a valid medical need and treatment plan. Accordingly, these guidelines have been developed to clarify the Board's position on pain control, specifically as related to the use of controlled substances, to alleviate physician uncertainty and to encourage better pain management.

(c) The Board recognizes that controlled substances, including opioid analgesics, may be essential in the treatment of acute pain due to trauma or surgery and chronic pain, whether due to cancer or non-cancer origins. Osteopathic physicians are referred to the U.S. Agency for Health Care Policy and Research Clinical Practice Guidelines for a sound approach to the management of acute and cancer-related pain. The medical management of pain including intractable pain should be based on current knowledge and research and includes the use of both pharmacologic and non-pharmacologic modalities. Pain should be assessed and treated promptly, and the quantity and frequency of doses should be adjusted according to the intensity and duration of the pain. Osteopathic physicians should recognize that tolerance and physical dependence are normal consequences of sustained use of opioid analgesics and are not synonymous with addiction.

(d) The Board of Osteopathic Medicine is obligated under the laws of the State of Florida to protect the public health and safety. The Board recognizes that inappropriate prescribing of controlled substances, including opioid analgesics, may lead to drug diversion and abuse by individuals who seek them for other than legitimate medical use. Osteopathic physicians should be diligent in preventing the diversion of drugs for illegitimate purposes.

(e) The Board will consider prescribing, ordering, administering, or dispensing controlled substances for pain to be for a legitimate medical purpose if based on accepted scientific knowledge of the treatment of pain or if based on sound clinical grounds. All such prescribing must be based on clear documentation of unrelieved pain and in compliance with applicable state or federal law.

(f) Each case of prescribing for pain will be evaluated on an individual basis. The Board will not take disciplinary action against an osteopathic physician for failing to adhere strictly to the provisions of these guidelines, if good cause is shown for such deviation. The osteopathic physician's conduct will be evaluated to a great extent by the treatment outcome, taking into account whether the drug used is medically and/or pharmacologically recognized to be appropriate for the diagnosis, the patient's individual needs including any improvement in functioning, and recognizing that some types of pain cannot be completely relieved.

(g) The Board will judge the validity of prescribing based on the osteopathic physician's treatment of the patient and on available documentation, rather than on the quantity and chronicity of prescribing. The goal is to control the patient's pain for its duration while effectively addressing other aspects of the patient's functioning, including physical, psychological, social, and work-related factors. The following guidelines are not intended to define complete or best practice, but rather to communicate what the Board considers to be within the boundaries of professional practice.

(2) Definitions.

(a) Acute Pain. For the purpose of this rule, "acute pain" is defined as the normal, predicted physiological response to an adverse chemical, thermal, or mechanical stimulus and is associated with surgery, trauma, and acute illness. It is generally time-limited and is responsive to opioid therapy, among other therapies.

(b) Addiction. For the purpose of this rule, "addiction" is defined as a neurobehavioral syndrome with genetic and environmental influences that results in psychological dependence on the use of substances for their psychic effects and is

characterized by compulsive use despite harm. Addiction may also be referred to by terms such as "drug dependence" and "psychological dependence." Physical dependence and tolerance are normal physiological consequences of extended opioid therapy for pain and should not be considered addiction.

(c) Analgesic Tolerance. For the purpose of this rule, "analgesic tolerance" is defined as the need to increase the dose of opioid to achieve the same level of analgesia. Analgesic tolerance may or may not be evident during opioid treatment and does not equate with addiction.

(d) Chronic Pain. For the purpose of this rule, "chronic pain" is defined as a pain state which is persistent.

(e) Pain. For the purpose of this rule, "pain" is defined as an unpleasant sensory and emotional experience associated with actual or potential tissue damage or described in terms of such damage.

(f) Physical Dependence. For the purpose of this rule, "physical dependence" on a controlled substance is defined as a physiologic state of neuro-adaptation which is characterized by the emergence of a withdrawal syndrome if drug use is stopped or decreased abruptly, or if an antagonist is administered. Physical dependence is an expected result of opioid use. Physical dependence, by itself, does not equate with addiction.

(g) Pseudoaddiction. For the purpose of this rule, "pseudoaddiction" is defined as a pattern of drug-seeking behavior of pain patients who are receiving inadequate pain management that can be mistaken for addiction.

(h) Substance Abuse. For the purpose of this rule, "substance abuse" is defined as the use of any substances for non-therapeutic purposes or use of medication for purposes other than those for which it is prescribed.

(i) Tolerance. For the purpose of this rule, "tolerance" is defined as a physiologic state resulting from regular use of a drug in which an increased dosage is needed to produce the same effect, or a reduced effect is observed with a constant dose.

(3) Guidelines. The Board has adopted the following guidelines when evaluating the use of controlled substances for pain control:

(a) Evaluation of the Patient. A complete medical history and physical examination must be conducted and documented in the medical record. The medical record should document the nature and intensity of the pain, current and past treatments for pain, underlying or coexisting diseases or conditions, the effect of the pain on physical and psychological function, and history of substance abuse. The medical record also should document the presence of one or more recognized medical indications for the use of a controlled substance.

(b) Treatment Plan. The written treatment plan should state objectives that will be used to determine treatment success, such as pain relief and improved physical and psychosocial function, and should indicate if any further diagnostic evaluations or other treatments are planned. After treatment begins, the osteopathic physician should adjust drug therapy to the individual medical needs of each patient. Other treatment modalities, including osteopathic manipulative treatment and applications, or a rehabilitation program may be necessary depending on the etiology of the pain and the extent to which the pain is associated with physical and psychosocial impairment.

(c) Informed Consent and Agreement for Treatment. The osteopathic physician should discuss the risks and benefits of the use of controlled substances with the patient, persons designated by the patient, or with the patient's surrogate or guardian if the patient is incompetent. The patient should receive prescriptions from one osteopathic physician and one pharmacy where possible. If the patient is determined to be at high risk for medication abuse or have a history of substance abuse, the osteopathic physician may employ the use of a written agreement between physician and patient outlining patient responsibilities, including, but not limited to:

1. Urine/serum medication levels screening when requested;

2. Number and frequency of all prescription refills; and

3. Reasons for which drug therapy may be discontinued (i.e., violation of agreement).

(d) Periodic Review. At reasonable intervals based on the individual circumstances of the patient, the osteopathic physician should review the course of treatment and any new information about the etiology of the pain. Continuation or modification of therapy should depend on the osteopathic physician's evaluation of progress toward stated treatment objectives such as improvement in patient's pain intensity and improved physical and/or psychosocial function, i.e., ability to work, need of health care resources, activities of daily living, and quality of social life. If treatment goals are not being achieved, despite medication adjustments, the osteopathic physician should reevaluate the appropriateness of continued treatment. The osteopathic physician should monitor patient compliance in medication usage and related treatment plans.

(e) Consultation. The osteopathic physician should be willing to refer the patient as necessary for additional evaluation and treatment in order to achieve treatment objectives. Special attention should be given to those pain patients who are at risk for

misusing their medications and those whose living arrangements pose a risk for medication misuse or diversion. The management of pain in patients with a history of substance abuse or with a comorbid psychiatric disorder may require extra care, monitoring, documentation, and consultation with or referral to an expert in the management of such patients.

(f) Medical Records. The osteopathic physician is required to keep accurate and complete records to include, but not be limited to:

1. The medical history and physical examination;

2. Diagnostic, therapeutic, and laboratory results;

3. Evaluations and consultations;

4. Treatment objectives;

5. Discussion of risks and benefits;

6. Treatments;

7. Medications (including date, type, dosage, and quantity prescribed);

8. Instructions and agreements; and

9. Periodic reviews.

Records must remain current and be maintained in an accessible manner and readily available for review.

(g) Compliance with Controlled Substances Laws and Regulations. To prescribe, dispense, or administer controlled substances, the osteopathic physician must be licensed in the state and comply with applicable federal and state regulations. Osteopathic physicians are referred to the *Physicians Manual: An Informational Outline of the Controlled Substances Act of 1970,* published by the U.S. Drug Enforcement Agency, for specific rules governing controlled substances as well as applicable state regulations.

*Specific Authority 459.005(1) FS. Law Implemented 459.003(3), 459.015(1)(g), (x) FS. History–New 3-9-00, Amended 11-14-06.*

**64B15-14.005 Standards for the Use of Controlled Substances for Treatment of Pain.**

(1) Pain management principles.

(a) The Board of Osteopathic Medicine recognizes that principles of quality medical practice dictate that the people of the State of Florida have access to appropriate and effective pain relief. The appropriate application of up-to-date knowledge and treatment modalities can serve to improve the quality of life for those patients who suffer from pain as well as reduce the morbidity and costs associated with untreated or inappropriately treated pain. The Board encourages osteopathic physicians to view effective pain management as a part of quality medical practice for all patients with pain, acute or chronic, and it is especially important for patients who experience pain as a result of terminal illness. All osteopathic physicians should become knowledgeable about effective methods of pain treatment as well as statutory requirements for prescribing controlled substances.

(b) Inadequate pain control may result from an osteopathic physician's lack of knowledge about pain management or an inadequate understanding of addiction. Fears of investigation or sanction by federal, state, and local regulatory agencies may also result in inappropriate or inadequate treatment of chronic pain patients. Osteopathic physicians should not fear disciplinary action from the Board or other state regulatory or enforcement agencies for prescribing, dispensing, or administering controlled substances including opioid analgesics, for a legitimate medical purpose and that is supported by appropriate documentation establishing a valid medical need and treatment plan. Accordingly, these guidelines have been developed to clarify the Board's position on pain control, specifically as related to the use of controlled substances, to alleviate physician uncertainty and to encourage better pain management.

(c) The Board recognizes that controlled substances, including opioid analgesics, may be essential in the treatment of acute pain due to trauma or surgery and chronic pain, whether due to cancer or non-cancer origins. Osteopathic physicians are referred to the U.S. Agency for Health Care Policy and Research Clinical Practice Guidelines for a sound approach to the management of acute and cancer-related pain. The medical management of pain including intractable pain should be based on current knowledge and research and includes the use of both pharmacologic and non-pharmacologic modalities. Pain should be assessed and treated promptly, and the quantity and frequency of doses should be adjusted according to the intensity and duration of the pain. Osteopathic physicians should recognize that tolerance and physical dependence are normal consequences of sustained use of opioid analgesics and are not synonymous with addiction.

(d) The Board of Osteopathic Medicine is obligated under the laws of the State of Florida to protect the public health and safety. The Board recognizes that inappropriate prescribing of controlled substances, including opioid analgesics, may lead to drug diversion and abuse by individuals who seek them for other than legitimate medical use. Osteopathic physicians should be diligent in preventing the diversion of drugs for illegitimate purposes.

(e) The Board will consider prescribing, ordering, administering, or dispensing controlled substances for pain to be for a legitimate medical purpose if based on accepted scientific knowledge of the treatment of pain or if based on sound clinical grounds. All such prescribing must be based on clear documentation of unrelieved pain and in compliance with applicable state or federal law.

(f) Each case of prescribing for pain will be evaluated on an individual basis. The Board will not take disciplinary action against an osteopathic physician for failing to adhere strictly to the provisions of these guidelines, if good cause is shown for such deviation. The osteopathic physician's conduct will be evaluated to a great extent by the treatment outcome, taking into account whether the drug used is medically and/or pharmacologically recognized to be appropriate for the diagnosis, the patient's individual needs including any improvement in functioning, and recognizing that some types of pain cannot be completely relieved.

(g) The Board will judge the validity of prescribing based on the osteopathic physician's treatment of the patient and on available documentation, rather than on the quantity and chronicity of prescribing. The goal is to control the patient's pain for its duration while effectively addressing other aspects of the patient's functioning, including physical, psychological, social, and work-related factors. The following guidelines are not intended to define complete or best practice, but rather to communicate what the Board considers to be within the boundaries of professional practice.

(2) Definitions.

(a) Acute Pain. For the purpose of this rule, "acute pain" is defined as the normal, predicted physiological response to an adverse chemical, thermal, or mechanical stimulus and is associated with surgery, trauma, and acute illness. It is generally time-limited and is responsive to opioid therapy, among other therapies.

(b) Addiction. For the purpose of this rule, "addiction" is defined as a neurobehavioral syndrome with genetic and environmental influences that results in psychological dependence on the use of substances for their psychic effects and is

characterized by compulsive use despite harm. Addiction may also be referred to by terms such as "drug dependence" and "psychological dependence." Physical dependence and tolerance are normal physiological consequences of extended opioid therapy for pain and should not be considered addiction.

(c) Analgesic Tolerance. For the purpose of this rule, "analgesic tolerance" is defined as the need to increase the dose of opioid to achieve the same level of analgesia. Analgesic tolerance may or may not be evident during opioid treatment and does not equate with addiction.

(d) Chronic Pain. For the purpose of this rule, "chronic pain" is defined as a pain state which is persistent.

(e) Pain. For the purpose of this rule, "pain" is defined as an unpleasant sensory and emotional experience associated with actual or potential tissue damage or described in terms of such damage.

(f) Physical Dependence. For the purpose of this rule, "physical dependence" on a controlled substance is defined as a physiologic state of neuro-adaptation which is characterized by the emergence of a withdrawal syndrome if drug use is stopped or decreased abruptly, or if an antagonist is administered. Physical dependence is an expected result of opioid use. Physical dependence, by itself, does not equate with addiction.

(g) Pseudoaddiction. For the purpose of this rule, "pseudoaddiction" is defined as a pattern of drug-seeking behavior of pain patients who are receiving inadequate pain management that can be mistaken for addiction.

(h) Substance Abuse. For the purpose of this rule, "substance abuse" is defined as the use of any substances for non-therapeutic purposes or use of medication for purposes other than those for which it is prescribed.

(i) Tolerance. For the purpose of this rule, "tolerance" is defined as a physiologic state resulting from regular use of a drug in which an increased dosage is needed to produce the same effect, or a reduced effect is observed with a constant dose.

(3) Guidelines. The Board has adopted the following guidelines when evaluating the use of controlled substances for pain control:

(a) Evaluation of the Patient. A complete medical history and physical examination must be conducted and documented in the medical record. The medical record shall document the nature and intensity of the pain, current and past treatments for pain, underlying or coexisting diseases or conditions, the effect of the pain on physical and psychological function, and history of substance abuse. The medical record also shall document the presence of one or more recognized medical indications for the use of a controlled substance.

(b) Treatment Plan. The written treatment plan shall state objectives that will be used to determine treatment success, such as pain relief and improved physical and psychosocial function, and shall indicate if any further diagnostic evaluations or other treatments are planned. After treatment begins, the osteopathic physician shall adjust drug therapy, if necessary, to the individual medical needs of each patient. Other treatment modalities, including osteopathic manipulative treatment and applications, or a rehabilitation program may be necessary depending on the etiology of the pain and the extent to which the pain is associated with physical and psychosocial impairment.

(c) Informed Consent and Agreement for Treatment. The osteopathic physician shall discuss the risks and benefits of the use of controlled substances with the patient, persons designated by the patient, or with the patient's surrogate or guardian if the patient is incompetent. The patient shall receive prescriptions from one osteopathic physician and one pharmacy where possible. If the patient is determined to be at high risk for medication abuse or have a history of substance abuse, the osteopathic physician shall employ the use of a written agreement between physician and patient outlining patient responsibilities, including, but not limited to:

1. Urine/serum medication levels screening when requested;

2. Number and frequency of all prescription refills; and

3. Reasons for which drug therapy may be discontinued (i.e., violation of agreement).

(d) Periodic Review. Based on the individual circumstances of the patient, the osteopathic physician shall review the course of treatment and any new information about the etiology of the pain. Continuation or modification of therapy shall depend on the osteopathic physician's evaluation of progress toward stated treatment objectives such as improvement in patient's pain intensity and improved physical and/or psychosocial function, i.e., ability to work, need of health care resources, activities of daily living, and quality of social life. If treatment goals are not being achieved, despite medication adjustments, the osteopathic physician shall reevaluate the appropriateness of continued treatment. The osteopathic physician shall monitor patient compliance in medication usage and related treatment plans.

(e) Consultation. The osteopathic physician shall be willing to refer the patient as necessary for additional evaluation and treatment in order to achieve treatment objectives. Special attention must be given to those pain patients who are at risk for misusing

their medications and those whose living arrangements pose a risk for medication misuse or diversion. The management of pain in patients with a history of substance abuse or with a comorbid psychiatric disorder may require extra care, monitoring, documentation, and consultation with or referral to an expert in the management of such patients.

(f) Medical Records. The osteopathic physician is required to keep accurate and complete records to include, but not be limited to:

1. The complete medical history and a physical examination, including history of drug abuse or dependence, as appropriate;

2. Diagnostic, therapeutic, and laboratory results;

3. Evaluations and consultations;

4. Treatment objectives;

5. Discussion of risks and benefits;

6. Treatments;

7. Medications (including date, type, dosage, and quantity prescribed);

8. Instructions and agreements;

9. Drug testing results; and

10. Periodic reviews. Records must remain current, maintained in an accessible manner, readily available for review, and must be in full compliance with Rule 64B15-15.004, F.A.C., and Section 459.015(1)(o), F.S.

(g) Compliance with Controlled Substances Laws and Regulations. To prescribe, dispense, or administer controlled substances, the osteopathic physician must be licensed in the state and comply with applicable federal and state regulations. Osteopathic physicians are referred to the *Physicians Manual: An Informational Outline of the Controlled Substances Act of 1970,* published by the U.S. Drug Enforcement Agency, for specific rules governing controlled substances as well as applicable state regulations.

*Rulemaking Authority 459.005(1) FS. Law Implemented 459.003(3), 459.015(1)(g), (x) FS. History–New 3-9-00, Amended 11-14-06, 11-10-11.*