UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO. 2:11-CR-114-FTM-29SPC

---

THE UNITED STATES OF AMERICA,

              Plaintiff,

vs.                                Fort Myers, Florida
                                June 20, 2012

DEBRA ROGGOW,               9:00 A.M.

              Defendant.

---

TRANSCRIPT OF EXCERPT OF JURY TRIAL DAY 7 OF 10
(Testimony of Howard Heit)

BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT JUDGE

FOR THE GOVERNMENT:    Office of the United States Attorney
                         U.S. Courthouse
                         2110 First Street, Room 3-137
                         Fort Myers, Florida  33901
                         239/461-2200
                         BY:  DOUGLAS MOLLOY, A.U.S.A.

FOR THE DEFENDANT:     Fox & Ramunni, PA
                         2211 Widman Way, Suite 250
                         Fort Myers, Florida  33901
                         239/791-3900
                         BY:  AMIRA DAJANI FOX

                         Hollander & Hanuka
                         2325 Stanford Court
                         Naples, Florida  34112
                         239/530-1800
                         BY:  LEE HOLLANDER

APPEARANCES (Cont'd)

                              The J. Bolen Group, LLC
                              14875 Buttermilk Road
                              Lenoir, TN  37771
                              865/368-3472
                              BY:  JENNIFER BOLEN


REPORTED BY:                  R. JOY STANCEL, RMR-CRR
                              Federal Official Court Reporter
                              U.S. Courthouse
                              2110 First Street
                              Fort Myers, Florida  33901
                              239/461-2064

```
 1              (Call to Order of the Court)
 2              (Proceedings took place that are not included in
 3   this excerpt, after which, proceedings continued as
 4   follows:)
 5              MS. BOLEN:  Yes, sir.  Your Honor, the defense
 6   calls Dr. Howard Heit.
 7              THE COURT:  Come forward, please.
 8              DEPUTY CLERK:  If you would, raise your right
 9   hand, please.
10              (The Witness is Sworn)
11              DEPUTY CLERK:  You may have a seat.  If you would,
12   state your full name, spelling your last.
13              THE WITNESS:  All right.  Just let me get settled
14   here.  My name is Howard, H-O-W-A-R-D, Allen, A-L-L-E-N,
15   Heit, H-E-I-T.
16              MS. BOLEN:  May I proceed, Your Honor?
17              THE COURT:  You may.
18                        HOWARD A. HEIT,
19        a witness herein, after having been duly sworn,
20        was examined and testified under oath as follows:
21                      DIRECT EXAMINATION
22   BY MS. BOLEN
23   Q.    Dr. Heit, would you please tell the jury a little bit
24   about yourself, including your qualifications if you would,
25   please?
```

1   A.      Okay.   I went to undergraduate college at the

2   University of Pittsburgh from 1963 to 1967, and from 1967 to

3   1971, I went to the University of Pittsburgh Medical School.

4   I did my first year internship at George Washington

5   University and my second year -- first year residency also

6   at George Washington University, and then I did my second

7   year medical residency at Walter Reed Army Medical Center.

8   Then that continued on to the two year fellowship in

9   gastroenterology at Walter Reed Army Medical Center, and

10  that was followed by my last two years in the Army where I

11  was Assistant Chief of GI and in charge of the clinical

12  service of gastroenterology for Walter Reed Medical

13  Hospital.

14  Q.      Let me stop you there, Dr. Heit.   Are you, in fact,

15  an M.D., a medical doctor?

16  A.      Yes, I am.

17  Q.      And gastroenterology is the practice of what?

18  A.      Gastroenterology, in layman's terms, is the study of

19  anything you put in your mouth and how it comes out the

20  other end, and also the study of the liver.

21  Q.      Did you ultimately, in your medical career, get

22  involved in the fields of addiction and pain medicine?

23  A.      Yes, I did.

24  Q.      Did you also get involved in internal medicine?

25  A.      Yes, I did.

1  Q.     Would you please explain to the jury your

2  qualifications in that regard.

3  A.     Well, my qualifications is the following, is that

4  after I got done with the Army, I went into private practice

5  in northern Virginia in gastroenterology.  And then, as fate

6  would have it, around in 1986, March 28th, 8:15 at night --

7  who remembers -- I was going to the NIH to go to a liver

8  journal club and I was hit head-on in a car crash.  This

9  resulted in a very severe muscle disorder, which you heard

10  about with one of the patients, called axial, up and down,

11  spastic, meaning squeezing, torticollis, which is twisting.

12  Secondary to that diagnosis, I became a chronic pain

13  patient.

14  Q.     You may want to back just away a little bit because

15  you have a loud speaking voice and that mic's pretty close.

16  A.     I became a chronic pain patient in regards to this.

17  At that time, I weighed 212 pounds and then I went down to

18  my birth weight of 170 pounds, the pain was so bad.  And in

19  my traveling of seeing various doctors and not sitting in my

20  usual customary chair, it became apparent to me that my

21  fellow physicians knew little about pain management, let

22  alone addiction medicine.

23         At that time, obviously I was disqualified

24  medically, legally, and physically of doing endoscopic

25  procedures, meaning doing procedures for the patient to look

1   in their stomach or look in their colon diagnostically or

2   therapeutically, and my ambulation or my walking was

3   severely limited, just to a couple steps or I'd go into

4   massive spasms.  So over the next 20 years, I was

5   essentially in a wheelchair, in a special wheelchair.

6          Now, I had -- I didn't want to just stay on

7   disability, you know, and collect disability for the rest of

8   my life and so I had to think of what I could go into, as a

9   physician, that I felt that was -- that would give me

10  passion and make me happy and put my life complete.  And I

11  had to pick a profession that I could sit behind a desk,

12  write prescriptions, and do what we call cognitive service,

13  talk to the patient, because I couldn't do procedures.

14         As a result of that, I started to study addiction

15  medicine, and gastroenterology and liver disease has a lot

16  to do with addiction medicine because you see the ravages of

17  addiction medicine, you see the ravages of the patients with

18  GI disease such as liver disease with Hepatitis B, Hepatitis

19  C, secondary to intravenous drug use or GI bleeding

20  secondary to alcohol.  And so I then supplemented that.  I

21  went into what the CATS program in Fairfax Hospital which is

22  a comprehensive addiction treatment center and I bartered.

23  I said, "I will teach you GI and liver disease; you teach me

24  addiction medicine."  And I did that for a number of hours

25  that qualified me to take a certifying exam in addiction

```
 1   medicine, which I passed.  And then eventually, because of
 2   my publications, I was named a Diplomat in Addiction
 3   Medicine by the American Society of Addiction Medicine.
 4   Q.     Now stop there and tell us what it means to be a
 5   diplomat.
 6   A.     Well, I'm a diplomat in two areas.  I'm a diplomat in
 7   internal medicine.  That means I'm allowed to put Howard
 8   Heit, M.D., FACP, Fellow of the American College of
 9   Physicians.  So before I became a gastroenterologist, is
10   that I distinguished myself with publications and teaching
11   that allowed me to be selected to be a Fellow of the
12   American College of Physicians.
13   Q.     And by publications, you're talking about materials
14   that you write and submit to journals; is that a fair
15   statement?
16   A.     Yes.
17   Q.     All right.  And those journals are reviewed by peers
18   in connection with that college?
19   A.     Yes, they are.
20   Q.     And peers means other physicians?
21   A.     Not connected with the mat -- with the journal.  In
22   other words, an independent review of your writing and
23   whether it is worthwhile to publish, or be revised and then
24   looked at again, or outright rejected.
25   Q.     Are you required to continue publication to maintain
```

1  a diplomat status?

2  A.      No, you're not.

3  Q.      All right.  And so that's how you got into addiction

4  medicine and pain medicine; correct?

5  A.      Right.  And I'm also a Fellow of the American Society

6  of Addiction Medicine, again distinguished because of

7  teaching and publications in the area of interface of pain

8  and addiction.

9  Q.      What do you mean by the interface of pain and

10  addiction?

11  A.      Well, in my opinion, to do good pain management is

12  that you have to know addiction medicine, and to do good

13  addiction medicine, you have to be at least a talented

14  amateur in pain management and I came up with this idea

15  which was very new to learn both fields in order to serve my

16  patients in my community in my private practice, which was

17  very unique.

18  Q.      Well, let me ask you this, in terms of your continued

19  training and work in the area of pain and addiction, did you

20  maintain a private practice?

21  A.      Yes.  As I mentioned, I had a very unique private

22  practice.  By unique, I mean my patient population consisted

23  of the following, patients who had pain only, patients who

24  had addiction only, and patients who had pain and addiction

25  whether active in recovery or in recovery, if they are

1    willing to work a program for their pain management and

2    willing to work a program for their addiction.

3    Q.    And is this something that you set up in a private

4    practice?

5    A.    Yes, I did, in northern Virginia.

6    Q.    In where -- okay, in Virginia?

7    A.    In northern Virginia.

8    Q.    All right.  And this was separate from an academic

9    institution?

10   A.    Yes, it was, but I did have an academic appointment

11   to Georgetown University School of Medicine as an assistant

12   clinical professor.

13   Q.    And did you have privileges at any of the hospitals?

14   A.    No.  I did have privileges, but I gave up my

15   privileges because my lack of am -- I just couldn't have

16   the -- I couldn't move from Point A to Point B without

17   severe pain, and therefore, my practice was a hundred

18   percent outpatient.

19   Q.    And I know everybody noticed that you walked into the

20   courtroom today.  How is it that you went from the

21   wheelchair to walking?

22   A.    Well, most of the people in the court are not going

23   to believe this, but it was a hard decision that I made.  In

24   December of 2007, I went under a very unusual procedure

25   called deep brain stimulation because my pain was so bad.

1   And deep brain stimulation, the following is done to you.

2   They put you in a Stryker frame in order to keep your head

3   and neck without movement, do the best MRI that they can in

4   order to see your brain.  You're taken to the OR and two

5   holes are drilled in the top of your head and a probe is put

6   deep in your brain to the area called the globus pallidus,

7   and this is done bilaterally, on both sides.  These wires

8   are taken -- come out and are under my scalp and you could

9   feel them, go behind my ear to under my clavicle is planted

10  a Medtronic stimulator, and this is on 24 hours a day, 24/7,

11  never gets turned off, and by mechanisms that nobody knows,

12  this has reduced my pain remarkably and has allowed me to

13  give my wheelchairs away to charity.

14  Q.     So you set up this private practice; is that correct?

15  A.     Yes.

16  Q.     And are you still practicing, sir?

17  A.     No, I'm not.  My practice closed around August, 2010,

18  secondary to the sudden death of my wife from a subarachnoid

19  hemorrhage.  She was my office manager and she also edited

20  my papers.  And my practice was so unique, I didn't even

21  have malpractice insurance.  That's how unique it was in

22  seeing this high -- these high risk patients.  And

23  therefore, I quit.  I couldn't continue it economically or

24  emotionally without my wife of over 40 years.

25  Q.     I'm sorry for your loss on that, Dr. Heit.

```
1    A.      Thank you.

2    Q.      So you closed the doors of your practice in August of

3    '10, but you practiced privately from -- beginning in what

4    year in the area of pain and addiction, until that point?

5    A.      Could I make one comment about the closing of my

6    practice is, as a gastroenterology, if I continued as a

7    gastroenterology, I personally could close my practice on

8    Thursday and have all my patients taken care of by Friday.

9    By closing my practice, it took me over four months to make

10   sure every one of my patients had a doctor to go to and a

11   continuation of their prescriptions, because if they didn't

12   have their prescriptions, they would get sick, secondary to

13   physical dependence and withdrawal, which we'll go into a

14   little bit later.

15   Q.      You keep using the word secondary to.  That's like a

16   doctor phrase.  Can you just clarify that to make sure we're

17   all on the same page?

18   A.      Well, if you take A and you take A for a period of

19   time and you take A away, then something will happen to you.

20   You'll have symptoms in -- whether it be nausea, vomiting,

21   abdominal pain, goose bumps, diarrhea, things of that

22   nature.

23   Q.      So you started your private practice in addiction and

24   pain medicine in what year?

25   A.      Oh, about 20 years ago, about 1991, 1992.
```

```
 1   Q.      So you were prescribing controlled medications during
 2   the period of time at least covered by the indictment in
 3   this case?
 4   A.      Yes, I was.
 5   Q.      And you did prescribe controlled medications for
 6   patients that had pain; correct?
 7   A.      Absolutely.
 8   Q.      And for those that had pain and also had the disease
 9   of addiction?
10   A.      Yes.
11   Q.      Now, you talked about your publications just
12   generally.  Can you give the jury an idea of the areas that
13   you published in, the specific areas with regard to pain and
14   addiction?  And I just mean by the topic headings.  I don't
15   need a journal by journal recitation.
16   A.      I have over 30 publications in what we call peer
17   review journals, like we defined a peer review is that you
18   submit a manuscript and somebody outside the journal agrees
19   to review your -- your work and to see whether it's valid
20   enough to be published in a peer reviewed journal.  I have
21   over 30 publications in peer review journals of the
22   interface of pain and addiction, risk management, urine drug
23   testing, and seven chapters in various textbooks, including
24   two chapters in what we feel is the most prestigious
25   textbook, called Bonica, a textbook of pain, and I have two
```

1   chapters in that with my co-writer Dr. Douglas Gourlay,

2   Toronto, Canada, on risk management and urine drug testing.

3   Q.      And what are you doing right now?

4   A.      Right now I'm doing consulting for pharmaceutical

5   companies.  I'm doing medical writing.  I'm finishing up a

6   monograph on urine drug tests which is the Fifth Edition of

7   this particular monograph.  Also I'm doing a little bit of

8   medical legal work, and I emphasize a little bit of medical

9   legal work.  And also, I consult with various pharmaceutical

10  companies in regards to educational projects.

11  Q.      Have you participated in the writing or advisory

12  committee work associated with the creation of any

13  guidelines in the use of controlled medications for the

14  treatment of pain?

15  A.      Yes, I have.  I was --

16  Q.      Tell us about that, please?

17  A.      Excuse me.  I was instrumental because just even now,

18  but certainly about, you know, in the beginning of 1990s and

19  beginning of the this century is the pain community and the

20  addiction community didn't talk very much, didn't

21  communicate very much with each other, and so I was

22  instrumental in a consensus document of making definitions

23  of what addiction, physical dependence, and tolerance is,

24  and I was instrumental in bringing these groups together in

25  order to publish a consensus document of just what these

1    terms are.  And this consensus document has been cited in

2    many publications, peer review journals, books, across the

3    country.

4              I've also now presently working with a -- working

5    to edit the new edition of the Federation of State Medical

6    Boards.  They have a 2004 edition of this policy statement

7    and because this is such a very new field, there's more that

8    we don't know than we do know, is that this needed to be

9    updated and I'm on one of the committees.  I'm one of many

10   on this committee to update this particular Federation of

11   State Medical Board Policy Statement that goes to every

12   state board in the country.

13   Q.     State Board of Medicine?

14   A.     State Board of Medicine.

15   Q.     And other boards that have relevance to the use of

16   controlled medications?

17   A.     Well again, yes.  The answer is yes.

18   Q.     Including like pharmacy and osteopathic boards?

19   A.     Yes, it is.

20   Q.     Now, we're going to get into your role here as an

21   expert, but tell the jury whether -- whether or not you've

22   testified before as a medical expert in the context of pain

23   management and addiction.

24   A.     I've only testified in the context of pain management

25   and addiction one time, a couple years ago, and I testified

1    on behalf of my patient in a divorce proceeding and child

2    custody proceeding in which it was alleged that he was

3    addicted to his medicine as opposed to physically dependent

4    on the medicine, and with the testimony that I gave, he got

5    joint custody with his children.

6    Q.      Have you ever testified in a criminal case before?

7    A.      No.

8    Q.      Let me ask you one last question here, do you

9    currently belong to any professional societies that are

10   national in nature relating to the area of pain management

11   and/or addiction?

12   A.      Yes, I do.  Yes, I am.

13   Q.      Tell us which ones.

14   A.      I'm a member of the American Society of Addiction

15   Medicine.  I'm a member of the American Pain Society and the

16   American Academy of Pain Management.  The last two are the

17   biggest organizations or the most prestigious organizations

18   in regards to education of our peers, the public, in regards

19   to pain.  And the American Society of Addiction Medicine is

20   one of the main areas for education of doctors in the world

21   of addiction medicine.

22   Q.      Do you regularly participate in the activities of

23   those academies?

24   A.      Yes, I do.

25   Q.      And how do you participate?

1    A.    Well, I've lectured extensively across the country on

2    the interface of pain and addiction.  I've participated in

3    their conferences over the years and been an integral part

4    of it, including founding for the American Society of

5    Addiction Medicine early in 2000 a course called Common

6    Threads, and it was, to my knowledge, only the second

7    teaching course in the country that brought together people

8    of pain and addiction discipline in a conference to teach

9    the attendees the interface of pain and addiction.  That

10   particular conference, Common Threads, I was chair of for

11   five years and it was the most best attended course in the

12   American Society of Addiction Medicine's history, and

13   obviously, the most lucrative as far as attendees paying to

14   come to the course.

15   Q.    With regard to your experience privately as a

16   physician and also in the capacities you've just described,

17   have you become familiar with the federal regulations

18   associated with the prescribing of controlled substances?

19   A.    Yes, I am.

20   Q.    And are you also familiar with various state

21   materials related to the same, to include the standards in

22   the state of Florida?

23   A.    Well, let me go back to the federal regulations

24   first.  Oh, a number of years ago, I read in what we call

25   the Federal Registry where all what is written, the

1    regulations, federal regulations of prescribing controlled

2    substance.  I read it, I read it, and I found it hard to

3    understand.  And so I took about six months to put it in

4    about 35 Power Point slides.  I called the DEA, Drug

5    Enforcement Agency, to review these slides to make sure they

6    were accurate, and once they were reviewed and accurate, I

7    used them for teaching and publication and they were placed

8    on three web sites for teaching physicians or anybody who --

9    who accessed this web site on American Pain Society,

10   American Academy of Pain Medicine, American Society of

11   Addiction Medicine, so they could be more familiar and

12   up-to-date in regards to federal regulations.  In other

13   words, I felt very strongly in order to play the game, you

14   had to know the rules of the game.

15           As far as the Florida regulations, is I came down

16   in the last -- latter part of 2011 and participated in three

17   programs where -- with lawyers in regards to the new

18   federal -- new state regulations of Florida, but coming down

19   here, and I've been here obviously sitting back here all

20   this period of time, is that I became familiar with the

21   Florida state regulations that are germane to this

22   particular case.

23   Q.    So you've actually done live educational programs

24   here in the state of Florida; correct?

25   A.    Yes.

```
 1   Q.     And you were called in by just generally what type of
 2   companies or people to present those?
 3   A.     Well, it could be -- it could be pharmaceutical
 4   companies, it could be companies that do urine drug testing.
 5   But you have to realize, these are CME programs, that means
 6   Continual Medical Education programs, and doctors have to
 7   have so many CME points or hours in order to keep their
 8   license valid.  And in order to keep the CME programs honest
 9   so they're ethical is there's a fire wall between the
10   pharmaceutical company that provides the money, grant money
11   for the program and there's a CME company, and therefore,
12   you only get contact with the CME company -- CME company so
13   that you're not biased or influenced by the -- by who's
14   giving the grant for that particular program.  In other
15   words, the pharmaceutical company that pays for the meeting
16   has absolutely no input into what I say or don't say.
17   Q.     Means you get to make the decision about what you
18   tell people; right?
19   A.     Absolutely.
20   Q.     All right.  Now you were asked do give your expert
21   opinion by Dr. Roggow in this case; is that correct?
22   A.     Yes, I was.
23   Q.     And just briefly go over who was it that asked you to
24   come down and give the opinion and what steps you took to
25   prepare it.
```

1  A.      I was called early in January by one of the

2  attorneys, Ms. Fox, where we talked on the phone for about

3  an hour and she explained, you know, what she thought was

4  the -- let me put it this way, what was in -- what was in

5  dispute, as far as these indictments.  She explained to me

6  what these indictments were about and then I agreed to be an

7  expert witness on the defendant's behalf.

8  Q.      Did Ms. Fox send you some materials to review?

9  A.      Yes, she sent me a thumb drive, which is something

10 that you put in a computer, and you get all of the -- you

11 put a lot of information on the thumb drive.  She sent me a

12 couple CD-ROMs, and I also reviewed the report of

13 Dr. Creamer.

14 Q.      Did you have an opportunity while you've been here,

15 either in the courtroom or in the evenings, to look at

16 copies of the physical medical charts associated with the

17 individuals named in this indictment?

18 A.      Yes.  During my time here, I had an opportunity to

19 look at the hard copies of approximately ten charts on --

20 not ten charts but charts on ten patients.

21 Q.      And when you went through your review, I just want

22 you to tell the jury what steps you took to arrive at your

23 opinion.  Not your opinion yet, but what you actually did in

24 sitting down and looking at these records, what you were

25 looking for, that sort of thing.

1    A.     Well, these charts were reviewed in a different way.

2    I reviewed them to make sure that each separate prescription

3    was issued for a legitimate medical purpose by an individual

4    physician or individual practitioner practicing in his

5    usual, customary way in regards to practice and -- let me

6    read it, because I think that's been confusing all between

7    the -- everybody.

8            I reviewed it for a lawful prescription for

9    controlled substance, each separate prescription is issued

10   for a legitimate medical purpose by an individual

11   practitioner acting in the usual course of their

12   professional practice.  And I reviewed it keeping that in

13   mind.

14   Q.     With regard to each of the patients that we've been

15   talking about; correct?

16   A.     Yes.

17   Q.     And with regard to the files and the relationship

18   that they had overall with Dr. Roggow?

19   A.     Yes.

20   Q.     And you arrived at an opinion with regard to each of

21   these; is that a fair statement?

22   A.     Yes, I did.

23   Q.     And you captured that in a report; correct?

24   A.     Yes, I did.

25   Q.     And a lot of the issues relating to your opinion have

1  come out through the course of this testimony; is that a

2  fair statement?

3  A.      Absolutely.

4  Q.      All right.  Now, with regard to your opinion, just

5  tell the jury right now, what it was you believe in terms of

6  your review and your findings.

7  A.      In a nutshell, I don't think -- I think that

8  Dr. Roggow wrote a legitimate medical prescription for a --

9  acting in the usual course of her professional practice, and

10  I base that on review of all the charts and all the

11  information that was given to me.  The main reason that I

12  did that was, to my knowledge and any research that I did,

13  just number of milligrams, what you prescribe, is not a

14  criminal behavior.

15  Q.      Let's talk about that --

16          MR. MOLLOY:  Excuse me for just a second.  I

17  assume that counsel is now going to establish the foundation

18  for this particular opinion in that the end result came out

19  before the foundation was laid.  I have an objection as to

20  lack of foundation unless counsel intends on going forward

21  and doing that now.

22          THE COURT:  All right.  Well, I guess I'll take

23  the objection under advisement.

24          MR. MOLLOY:  Yes, sir.

25          THE COURT:  All right.  You may proceed.

1  BY MS. BOLEN

2  Q.     You raised the issue of quantity of prescribing.  And

3  with regard to your review of this case, did you look at the

4  quantities involved in terms of making your evaluation and

5  arriving at your opinion?

6  A.     Yes, I did.

7  Q.     All right.  With regard to -- since you have been a

8  prescriber, with regard to quantity, what special knowledge

9  and understanding do you have as a physician as to how

10  quantities tie in to any prescription for a controlled

11  substance?

12  A.     Well, the quantities -- and this is with direct

13  talking to Patricia Goode, who is head of the DEA Diversion

14  Division, and subsequently Mark Donnelly, who took her spot

15  in the head of Diversion of the DEA.  And the DEA, you have

16  to understand, their main office is in Northern Virginia --

17  Northern Virginia, about 15 minutes from my practice and 15

18  minutes from my home, and I had an excellent relationship

19  with the DEA.

20         And so what I found out and discussed with them,

21  although by federal regulations you could prescribe whatever

22  quantity that you think is appropriate for the patient using

23  your judgment, and to the best of my knowledge, there's no

24  state regulation in Florida limiting what you could

25  prescribe, just your judgment.  But -- and there's always

1    the but -- that if you prescribe a high amount, you may come

2    under scrutiny of a regulatory agency in order to

3    investigate whether you're prescribing for legitimate

4    medical purpose in the usual course of your professional

5    practice.

6    Q.    And are there any --

7            MR. MOLLOY:  Excuse me.

8            MS. BOLEN:  I'm sorry.

9            MR. MOLLOY:  For clarification, is this knowledge

10   that he has gained from his conversations with the DEA

11   person that he mentioned or -- if it is, then it's hearsay.

12   Or is it something he learned from facts other than --

13   sources other than the ones, the conversations that he said

14   he had?

15           THE COURT:  Come to sidebar, please.

16           (At sidebar, Court, counsel, and defendant

17   present)

18           THE COURT:  Mr. Molloy, if you have an objection,

19   make it, as opposed to asking questions.  Presumably

20   counsel, since I don't know the answers to the questions, if

21   it's hearsay objection, you can make it.  If not --

22           MR. MOLLOY:  Understood, Your Honor, and I

23   shouldn't have done that.  I won't do it again.

24           THE COURT:  All right.  But we're not done.  Is

25   there objection or not?

```
1              MR. MOLLOY:  The objection is that I believe it
2    was difficult for me to tell where he was concluding this
3    information from because I didn't understand whether it was
4    hearsay coming from the conversations he had with, as he
5    described it, excellent relationship with the head of the
6    DEA.
7              THE COURT:  Almost had to be.  Didn't it?
8              MS. BOLEN:  I didn't know you were going to say
9    that.  Yeah, I can tie his independent knowledge, Your
10   Honor, without any problem.  I just --
11             THE COURT:  I don't think you can elicit hearsay
12   on direct.  Cross is a different matter, but that's fine,
13   just --
14             MS. BOLEN:  Thank you, Your Honor.
15             (Sidebar concluded)
16             THE COURT:  You may proceed.
17             MS. BOLEN:  Thank you, Your Honor.
18   BY MS. BOLEN
19   Q.    Doctor Heit, I want to talk about your personal
20   knowledge of the DEA regulations pertaining to quantity and
21   prescribing, and I'm assuming you do have personal
22   knowledge; is that correct?
23   A.    Yes, I do.
24   Q.    And that personal knowledge comes from what, besides
25   any connection or conversations with any other person?
```

1    A.     I participated in many programs with the DEA in

2    conjunction with the treatment of interface of pain and

3    addiction to teach attendees or physicians or nurses,

4    whomever is in the health care profession, how to do it

5    correctly and how to do it right.  So I heard this both from

6    the podium in many meetings, in addition to what I said as a

7    personal meeting, just knowing the people who are involved.

8    Q.     As part of your practice as a physician, have you

9    ever reviewed the regulations associated with prescribing?

10   A.     Yes, I have.

11   Q.     And would that include any of the DEA materials that

12   are published in the Federal Register relating to

13   prescribing and quantity, mailing, that sort of thing?

14   A.     As I stated, I made -- I went through the Federal

15   Register, which is like reading Chinese, okay, and I took

16   time to make Power Point slides and I've used those in

17   lectures and publications about the federal regulations on

18   prescribing a controlled substance.  So I'm very well

19   knowledgeable about prescribing controlled substances as far

20   as federally.

21   Q.     Do you know anywhere in any of the materials that you

22   reviewed where there are quantity limits in terms of

23   prescribing?

24   A.     Well, not only are there not quantity limits, federal

25   regulations state specifically that quantity is not an

```
 1   issue, that it's a matter of judgment in the federal
 2   regulations.
 3   Q.     Is that something consistent with the clinical world
 4   or the professional pain management world?
 5   A.     Yes.  It has to do with your judgment in this
 6   regards.  There's such a thing in medicine called the art of
 7   medicine and the science of medicine.  Let's talk about
 8   pain.  The science of medicine, the science of pain has to
 9   do with how the opioids work, how they get absorbed, the
10   hand bone connected to the knee bone.  Nobody's disputing
11   that.  But the art of medicine in pain management is the
12   patient suffering, how the pain is affecting their life, and
13   that's where you generally make your choices of what to do,
14   and that's the clinical judgment of the particular
15   prescriber.
16   Q.     And has this science and art always been around with
17   regard to chronic pain management?
18   A.     It's evolving.  At one end, when I first started in
19   pain management and addiction medicine and started in this
20   field, it was almost let's put opioids in the drinking
21   water, okay, that everybody should be prescribed opioids for
22   pain for very little supervision.  It was thought that they
23   were safe and effective.  And the pendulum, like anything
24   else in this young field, is swinging over here where
25   regulations are being determined of what you should do with
```

1   a pain patient.  So it's a very, very young field with

2   evolving, what we call, standard of care.  And as I speak to

3   you now, what is standard of care?  Standard of care is what

4   a reasonable and prudent physician would do in a

5   circumstance.  What would 51 percent of physicians do faced

6   with a particular problem.

7          And in that area, there is no standard of care in

8   pain management because it's so new.  There's no published

9   data and peer reviewed data journals or what we call P-data.

10  P-data are -- basically look at data and if it's

11  statistically insignificant or not or the data would finally

12  just happen by merely chance.  So everything in pain

13  management now is what we call best clinical practices,

14  which is far below standard of care.

15  Q.     Let me ask you this, are you familiar with the

16  reference to the Decade of Pain Control and Research?

17  A.     Yes.

18  Q.     And before you go into that description on that did

19  that Decade of Pain Control and Research take place in

20  connection or not in connection with this case but during

21  the time frame that we're dealing with in this particular

22  case?

23  A.     Yes it did.  In 19 --

24  Q.     Can you identify the time frame please?

25  A.     The Decade of Pain was declared by the government for

1   the last decade from 2000 to 2010 and that was the Decade of

2   Pain in which the government encouraged, for appropriate

3   reason, the appropriate treatment of chronic pain, as well

4   as acute pain but there wasn't really a controversy with

5   acute pain.  And also in the year before in 1999, the

6   government passed what was called the Fifth Vital Sign.

7   What is that?  And especially this was applicable to VA

8   hospitals or Veteran administration hospitals.  What is the

9   Fifth Vital Sign.  When any of you of go in the hospital,

10  four vital signs are taken always.  There's blood pressure,

11  pulse, temperature, respiration, meaning how many times you

12  breathe per minute.  And now the government added the fifth

13  vital sign.  You must ask about pain.  You're not obligated

14  to treat it but you must document it in the chart that

15  you're treating pain.  So here we have the Government, in

16  this very new field advocating for the treatment of pain.

17  And I might say in the background, a very little or no

18  training, either then or now, of health care professionals

19  in the discipline of pain management and/or addiction

20  medicine, for that matter.

21  Q.      So as this Decade of Pain Control proceeds forward,

22  did you participate in the education, as I think you've

23  already hinted at?

24  A.      I participated by giving multiple, multiple lectures

25  at CME, regional meetings and national meetings.

1   Q.    All right.  I want to focus specifically on some

2   information we've been talking about in the courtroom.  Did

3   part of this education include a new effort to talk about

4   the distinctions between addiction, physical dependence, and

5   tolerance?

6   A.    Yes.

7   Q.    All right.  Let's take them one at a time and let's

8   have you give that definition and any particular resource

9   you have for it, to include anything in the Florida

10  standards.  And you can pick the definition to start with.

11  A.    Okay.  Let's talk about addiction.  Addiction is

12  defined as a neuro behavior syndrome, meaning it's a disease

13  of the brain.  It's not a moral failing.  It's a disease of

14  the brain and it's secondary to genetic background, meaning

15  that if you have a mom or dad or grandparents who have the

16  disease of addiction, you have a greater chance of having

17  that addiction, yourself.  Or if you're in a bad

18  environment, you have a greater chance of the disease of

19  addiction.  If you grow up near crack houses, well most

20  likely, you're going to sample the product that's next to

21  your house.  If your father was an alcoholic and always in

22  the bar and you are in the bar, then you've got a greater

23  chance of being exposed to this particular area and having

24  the disease of addiction.

25          So it's a brain disease and it's marked by loss of

1   control of the drug or alcohol, continued use despite harm,

2   impulsive use and cravings.  It's a distinct disease.

3          Now I think it's very important to note that all

4   through the birth of what we call the treatment of

5   non-cancer pain there has been confusion in my profession,

6   and I'm saying my profession, physicians, confusion by my

7   profession, the public, and the media of the difference

8   between physical dependence and addiction.

9   Q.    Go ahead and then explain the -- your understanding

10  of the phrase physical dependence.

11  A.    Physical dependence means that you take a certain

12  drug and your brain gets used to it and if you take that

13  drug away very quickly, you will go into withdrawal

14  symptoms, like nausea, vomiting, diarrhea, abdominal cramp,

15  goose bumps, in regards to certain medicines.  Now, this

16  could occur with opioid medication but it also, physical

17  dependence could occur with certain antidepressants such as

18  Paxil, Effexor.  It could occur with certain heart medicines

19  such as beta blockers or calcium channel blockers.  It could

20  occur with certain seizure medicine such as Neurontin, which

21  is called Gabapentin generically.  So physical withdrawal is

22  not just associated with -- with opioid medication.

23          Let me give you an example of that, okay?  That

24  would make it clear, that I use when I lecture.  Let's say

25  that I seal the doors of this court and I cancel your

1    personal, social, and professional schedule over the next

2    two weeks.   One-third of you, I put on Methadone, another

3    third I put on morphine, and another third, I put on

4    corticosteroids or Prednisone.   Now because I'm kind of

5    liberal, from Washington, D.C., I'll give everybody a minute

6    or two if you want to switch to a different group.   The

7    point that I'm making is I'll make every one of you in this

8    room physically dependent on the medication, safely wean you

9    off the medicine, and you'll go back to your wife or husband

10   or practice and profession and say wasn't that a neat

11   experiment, and not one of you, not one of you will get the

12   disease of addiction unless you have a genetic or

13   environmental or what we call a neurochemical,

14   neuropsychological makeup for the disease of addiction.

15   Q.     Let me stop you right there.   So if I'm understanding

16   you, do people that just simply take these medications

17   automatically get addicted?

18   A.     Absolutely not.

19   Q.     And do people that take these --

20   A.     They get physically dependent, though.

21   Q.     Okay, thank you.   And they get physically dependent

22   because their body is used to having it in the system?

23   A.     That's right.

24   Q.     Is that a little bit like, maybe, caffeine?

25   A.     Absolutely.   You know, anybody who drinks caffeine --

 1   I personally don't take coffee, I'm probably the only
 2   physician on the planet earth who's never had a cup of
 3   coffee, but if you're used to taking three, four cups of
 4   coffee in the day, especially in the morning you're going to
 5   get a headache, as a withdrawal, as part of the withdrawal
 6   syndrome from the caffeine.
 7   Q.      So this Decade of Pain Control, the teachings were to
 8   separate the concepts of addiction and physical dependence;
 9   is that a fair statement?
10   A.      Right.
11           MS. BOLEN:  Now, Your Honor, may I -- oh, she
12   disappeared.  I was going to ask to have the overhead on.
13   That's all right.  I can just talk about it.  I think he's
14   got a copy up there with him.  May I approach the witness,
15   Your Honor?
16           THE COURT:  You may.
17           MS. BOLEN:  I'm using what's already admitted into
18   evidence as Defense Exhibit J1.  I've shown it to counsel.
19           THE COURT:  Thank you.
20   BY MS. BOLEN
21   Q.      Dr. Heit, do you have a copy of the Florida Standards
22   For The Use of Controlled Substances for the Treatment of
23   Pain, the 2000 version?
24   A.      Yes.
25   Q.      All right.

```
1    A.      I believe I do.  2000 -- yes, I do, right there.
2    Q.      If you'll just follow along because we don't have the
3    reading up, does this exhibit contain a definition of
4    addiction and physical dependence?
5    A.      Yes, it does.
6    Q.      And would you just carefully -- I'm trying to say
7    don't read fast.  Read the definition of addiction for the
8    jury.
9    A.      Read it word for word or interpret it?
10   Q.      No, read it word for word.
11   A.      Addiction, for the purpose of this rule, addiction is
12   defined as a neural behavior syndrome with genetic and
13   environmental factors influencing -- with genetic and
14   environmental influences that result in psychological
15   dependence on the use of substances for their psychic
16   effects and is characterized by compulsive use despite harm.
17   Addiction may also be referred to by terms such as drug
18   dependence and psychological dependence.
19   Q.      What's the difference between psychological
20   dependence and physical dependence?
21   A.      Well truly, I don't believe -- I mean, to be very
22   honest, and I'm under oath, is I had a debate when we made
23   up the definitions in certain publications of psychological
24   dependence, and they're using that as a sort of like similar
25   to addiction.  You know, I -- I just don't like the term.
```

1    So it's hard for me to advocate, meaning psychological

2    dependence means that you -- that psychologically you're

3    thinking of the medicine, you want the medicine.

4    Q.    And the last sentence of this Defense Exhibit J1 on

5    Page 2 at the top, if we'll just get this focused in here a

6    second, I don't think you had a chance to read that part of

7    it?

8    A.    The last part of it?

9    Q.    The last sentence in the definition of addiction in

10   the --

11   A.    I think this is extremely, extremely important, this

12   last sentence.  Physical dependence and tolerance are normal

13   physiological consequences of extended opioid therapy for

14   pain and should not be considered addiction.

15   Q.    And physiological consequences means what?

16   A.    Means that the body gets used to it.  It's a natural

17   event that happens when you use a certain class of drug such

18   as opioid, beta blocker, calcium channel blockers,

19   corticosteroids, Prednisone to treat asthma.  Again, you

20   don't call it insulin addicted diabetes; you call it insulin

21   dependent diabetes.  Your body gets used to it and there'll

22   be consequences if you're not educating the physician how to

23   take the person off the medicine or you do it yourself.

24   Q.    And the Florida standard contains a definition of

25   physical dependence.  Do you see it there?

1   A.    Yes, it's F.

2   Q.    I'm going to focus it in a little bit without running

3   out of the page.  Is that definition consistent with your

4   understanding, as a physician, of the phrase "physical

5   dependence"?

6   A.    Yes.  Do you want me to read it?

7   Q.    Go ahead and read it.

8   A.    Physical dependence, for the purpose of this rule,

9   physical dependence on a controlled substance is defined as

10   physiological state of neuro-adaptation that is

11   characterized emergence of withdrawal syndrome if the drug

12   use is stopped or abruptly -- decreased abruptly or if an

13   antagonist is administered -- which I'll explain at the end

14   of this.  Physical dependence is an expected result of

15   opioid use.  Physical dependence, by itself, does not --

16   does not equate with addiction.

17   Q.    There's some language in there about when physical --

18   what happens if a drug is stopped and someone has been

19   physically dependent.  Could you put that into normal

20   language?

21   A.    Which do you want me to --

22   Q.    The explanation, what they're talking about there,

23   they're talking about a withdrawal symptom if somebody stops

24   the drug abruptly?

25   A.    What happens if you stop the drug abruptly, you could

1    get nausea, vomiting, abdominal cramps, sweating, diarrhea

2    that will last for a finite period of time.

3    Q.      And if somebody gets that for stopping a drug

4    abruptly, does that mean that they're an addict?

5    A.      Absolutely not.

6    Q.      And do you find, in your practice, that people, your

7    patients, have confused the concepts of physical dependence

8    and addiction?

9    A.      I think it's confused all the time.

10   Q.      And does there remain today, as you zoom forward in

11   this Decade of Pain Control and Research, efforts to train

12   on these topics, to your knowledge?

13   A.      There's efforts to do it, but it's still not reaching

14   the general public or my profession as much as it should be.

15   Q.      Now, there's another term that we've heard in the

16   courtroom and that is the phrase "tolerance".  Do you recall

17   hearing that through this testimony?

18   A.      Tolerance, yes, I do.

19   Q.      Without reading the rule here, first just tell us

20   what tolerance means, from your understanding as an expert?

21   A.      Tolerance means that you get used to the particular

22   drug over time in which you need more of the drug in order

23   to achieve the same effect, but key to this definition is

24   all other things remain constant, meaning that the disease

25   doesn't progress.  If you have to increase the medicine

```
 1   because the disease progressed, that's not tolerance.
 2   That's disease progression.  Or your function is increasing
 3   on these medicines.  In order to maintain this function or
 4   even increase the function even further, you may have to
 5   increase the dose.  That is not tolerance.
 6              Tolerance is the effect of the drug decreases over
 7   time with all other things remaining constant.  But
 8   generally speaking, that's a tough term because things don't
 9   remain the same over years.  As we sit here, we're all
10   degenerating.  Some of you are degenerating at different
11   rates but we're all degenerating as we sit here.
12   Q.    All right.  And with regard to the phrase tolerance
13   and physical dependence, when you were reviewing the
14   records, did you take those things into consideration as you
15   formulated your opinion in this matter?
16   A.    Yes, I did.
17   Q.    Were there any other definitions in the Florida rule
18   that you looked to in connection with your opinion?
19   A.    I looked at substance abuse.
20   Q.    Tell us about that.
21   A.    Substance abuse is using a medicine for its
22   non-intended purpose or for some other purpose.  That means
23   using the medicine like a pain medication for another
24   purpose.  For example, you get -- you have chronic pain.
25   You have an argument with your husband or wife that night.
```

1   You get very agitated and upset, and therefore, your pain

2   goes up.  It goes up.  There's no question that your pain

3   goes up when you're emotionally upset, but then you use the

4   opioid medication in order to decrease your pain.  That's

5   the inappropriate use of the opioid and that's called a

6   chemical coper.  So you have to understand the different

7   areas that this is used.

8   Q.      And is a chemical coper the same as an addict?

9   A.      Absolutely not.

10  Q.      And have you dealt with the issue -- issues of

11  chemical coping in your practice as a physician?

12  A.      Yes, I have.

13  Q.      And did you look in the records to see whether or not

14  that factored into your opinion?

15  A.      It factored into my opinion because a lot of these

16  people that we -- that I reviewed had a lot of stress in

17  their life secondary to their pain.  As someone who's a

18  chronic pain patient, it is very, very rare for somebody

19  with chronic pain not to have sleep problems, some

20  depression, some anxiety.  It's a terrible, terrible place

21  to be because you can't escape it.

22  Q.      Before we go actually into the substance of your

23  findings with regard to the standards, tell us about the

24  difference between the phrases "weaning" and

25  "detoxification", if you would, and give examples, please.

```
1   A.      Well, these terms should be used properly in a

2   medical legal record.  You wean a pain patient off their

3   pain medicine.  You detox somebody with the disease of

4   addiction.  And so words are very important medically,

5   legally.  And so you want to wean your pain patient and

6   according to such, you're weaning them off the opioids.  If

7   a person is addicted to the opioids, that's called a detox

8   from the opioids.  Two different things for two different

9   purposes.

10  Q.      Now, back to the front page of Defense Exhibit J1, if

11  you would, Dr. Heit.  In the front of this here, there's an

12  area that would, I think, fairly be considered an

13  introduction.  Do you see that there?

14  A.      Is this called In The 2000?

15  Q.      In The 2000, yes, sir.

16  A.      Yes.

17  Q.      And is there a repeated comment in Paragraph C

18  related to not confusing basic terminology that's defined in

19  the rule, itself?  You see where my pen is pointing?  I'm

20  sorry, I just shoved it off the side.  Paragraph C at the

21  bottom, the last sentence.

22  A.      Pain --

23  Q.      Sorry, I keep moving it the wrong way.  See where it

24  says "osteopathic physicians"?

25  A.      Yes.  I'll tell you, it's hard to turn my neck
```

1   because of the torticollis.

2   Q.      That's fine.  Do whatever you need to do.

3   A.      It says osteopathic physicians should recognize that

4   tolerance and physical dependence are normal consequences of

5   sustained use of opioid analgesia and are not synonymous

6   with addiction.

7   Q.      That's essentially the same sentence that's on Page 2

8   of Defense Exhibit J1 where my pen -- at the tail end of the

9   definition of addiction?

10  A.      Yes.

11  Q.      Now, in reviewing the materials, did you look for

12  certain, I guess, specific topic areas to determine -- to

13  form the foundation of your opinion?  Did you look at things

14  like the history and the physical evaluation of the patient?

15  A.      Yes.

16  Q.      Why don't you go ahead and tell us about those

17  general areas that you looked at in connection with the

18  review of the records in this case, and we'll talk

19  individually about them.

20  A.      Okay.  When I reviewed the records, I wanted to see

21  whether there was a history, whether there was a physical,

22  whether there was a differential diagnosis in regard to what

23  could cause the pain, what the -- was there a treatment plan

24  or at least a plan, was there at least information about

25  talking to the patient in regards to informed consent,

1    either written -- and sometimes it doesn't have to be

2    written; it could be verbal.  A review of, if it was

3    available to the doctor, review of past records, any

4    diagnostic tests that should be done that haven't been done

5    in order to confirm your diagnosis, and most importantly,

6    once you make your decision, are you having follow-up with

7    the patient in what we call progress notes, and based on the

8    new information of how the patient's doing on the particular

9    medicine or new information that comes to your -- to your

10   clinical situation, what changes do you make in the progress

11   note.  Are you keeping good records of your interaction with

12   the patient, are you establishing a doctor/patient

13   relationship.

14   Q.     Are physicians mandated to use any particular type of

15   recordkeeping system?

16   A.     Not to my knowledge.

17   Q.     Are they mandated with regard to pain management,

18   outside of the list that's in the Florida rule, to have any

19   particular words or magic language in their medical records?

20   A.     No.  The field is too young to have certain mandates.

21   They're all suggestions, guidelines, or protocols.

22   Q.     Now, with regard to Defense Exhibit J1, again, this

23   time on Page 3, if you'd just turn there, please, did you

24   consider the medical recordkeeping requirement listed in

25   this particular Florida rule as you reviewed through the

1    charts?

2    A.      Yes, I did.  I looked at 1 through 9.

3    Q.      Okay.  And let me just zoom in here and have you --

4    I'm sorry, I can't get the whole thing on the page.  So --

5    A.      Well, I could read it from my chart.  It's for their

6    benefit.

7    Q.      Let's talk about it.  It says here the osteopathic

8    physician is required to keep accurate and complete records

9    to include -- and then go ahead with that list.

10   A.      Okay.  Number one, a medical history and physical

11   exam, which I found in each and every chart.  Diagnostic,

12   therapeutic, and laboratory results, which I found in every

13   chart --

14   Q.      Let me stop you there.  Did you find each of the

15   items Number 1 and 2 across the breadth of the patient

16   relationship with Dr. Roggow?

17   A.      Well, I found there were excellent progress notes and

18   follow-up notes when she saw the patients.

19   Q.      Did you find that there were physical examinations

20   repeated throughout the contact with the patient?

21   A.      Yes, there were.

22   Q.      And did you find a smattering of diagnostic,

23   therapeutic, and laboratory results?

24   A.      Yes, there were.

25   Q.      All right.  And go ahead with the next, let's say,

1    three of them.

2    A.      Well, she did an evaluation, and in some patients,

3    she did consultations.  There were treatment objectives.

4    She discussed in her agreement, treatment agreement, risk

5    and benefits.  She documented very clearly what her

6    treatment was by xeroxing the prescriptions, which everybody

7    has seen.  She's xeroxing, she's making it for the world to

8    know what she's doing.  She's not hiding anything.  And she

9    also -- the charts clearly showed what medications they were

10   on, including the date, the type, the dosage, and the

11   quantity prescribed.  Again, all xeroxed in the chart.  And

12   there are instructions of how to use it on the

13   prescriptions, and she had what we call periodic reviews

14   called progress notes.

15   Q.      Did you find multiple ways of keeping track of

16   encounters with patients in Dr. Roggow's records?

17   A.      Yes, like any office.

18   Q.      I want to come back to something you said about this

19   treatment agreement and have you explain to the jury your

20   understanding of treatment agreement and whether or not you

21   used one in your practice.

22   A.      Number one, I use a treatment agreement in my

23   practice, but having said that, a treatment agreement is to

24   enhance the doctor/patient relationship.  It's not to be

25   used as punitive.  It's not to be used that if you don't do

1    this or if you do this, then you're thrown out of the

2    practice.  That is not a good doctor/patient relationship.

3    What it is is to enhance the relationship with your patient

4    and to increase the conversation and communication with your

5    patient.  You may not always record what you say with the

6    patient, but you want to teach the patient in regards to the

7    treatment agreement.

8         Now having said that is during, you know, this

9    period of time, there's no consensus of what should be on a

10   treatment agreement.  There's no national consensus of what

11   should be on a treatment agreement, so my treatment

12   agreement somebody would like and maybe somebody wouldn't

13   like.  Somebody may like Dr. Roggow's treatment agreement;

14   somebody may not.

15        And what's interesting about treatment agreements,

16   and this is an article that was published in June of 19 --

17   of 2010 in the Annals of Internal Medicine -- the Annals of

18   Internal Medicine are just as prestigious as the New England

19   Journal of Medicine which I'm sure everybody in the room has

20   heard of.  There was an article going over treatment

21   agreements.  Somebody reviewed all the literature on

22   treatment agreements in drug testing and although I think

23   they should be done, there was not one paper -- excuse me,

24   there was no evidence that they decrease abused diversions

25   of these valuable medicine.  Secondary to this article, the

1   Annals of Internal Medicine called me and asked would I
2   write an editorial based on that article.  And so I called
3   my writing partner to join me and we published and editorial
4   to that article and we said, although there's no hard
5   evidence that treatment agreements decrease abuse,
6   addiction, or diversion of medication, we still think they
7   should be done, but most importantly, there should be a
8   concerted effort to teach and have a uniform teaching
9   agreement and study it in the future.  Just because we don't
10  have evidence today doesn't mean that we won't have evidence
11  tomorrow that is effective.
12  Q.     And you found treatment agreements in your review of
13  the record?
14  A.     Yes, I did.
15  Q.     Did you in some cases find multiple treatment
16  agreements over a period of several years?
17  A.     Yes, I did.
18  Q.     And in considering your comments about treatment
19  agreements, did you also look to whether or not the Florida
20  standards made any comment about them?
21  A.     Yes, I did.
22  Q.     All right.  I'm going to point you to Defense
23  Exhibit J1 and have you look at the section called Informed
24  Consent and Agreement For Treatment.  Is that the section
25  you used?

1    A.      Which page?  Oh, yeah, I see.

2    Q.      Under Number C?

3    A.      Yes, it's Informed -- it's Number C, Informed Consent

4    and Agreement For Treatment.

5    Q.      What do you understand informed consent to mean,

6    Dr. Heit?

7    A.      That's to tell the patient the risks and benefits of

8    whatever you're trying to do, whether it be a procedure,

9    whether it be ordering a test, or whether prescribing a

10   particular medication.

11   Q.      Would it do go into things like side effects and

12   using medication according to prescribing, things like that?

13   A.      Right, exactly.

14   Q.      Did you have similar rules or guidelines in the state

15   of Virginia?

16   A.      No, we don't.

17   Q.      All right.  And do you know whether or not you have

18   any today?

19   A.      As I sit here, I do not think that we have it.

20   Q.      Now, with regard to the treatment agreement, can you

21   point us to the language that you looked at as you evaluated

22   Dr. Roggow's files?

23   A.      I read everything in that Florida has in regards to

24   this, in regards to the treatment agreements, both in the --

25   in the 2000 and the 2006 version.

Q.      Let me interrupt you there.  For purposes of the
record, 2000 is Defense Exhibit J1 and 2006 is Defense
Exhibit J-2.
A.      Well, what I found is near the last sentence is the
osteopathic physician may employ the use of a written
agreement between the physician and patient outlining the
patient's responsibility, including but not limited to --
and then they name about three things.
Q.      And that's in the context of -- what's the first part
of that sentence, before it gets to the "may"?  If the
patient --
A.      If the patient is determined to be high risk for
medication -- medication abuse or have a history of
substance abuse, the osteopathic physician may -- the key
word is "may" -- doesn't have to, it's not mandated.  It's
using clinical judgment.  I want to emphasize as strongly as
I can we can't take away the clinical judgment of a health
care provider.  If we do that, it's going to be all chaos
out there.  Everybody's going to be treated all in a rigid,
very rigid way and the public or the patient is gong to
suffer for it.
Q.      Let me ask you this, do you know it to be a standard
nationally that people -- that physicians have to use these
treatment agreements with every single patient that they
have?

1    A.    I know for a fact that they do not have to use a
2    treatment agreement.
3    Q.    All right.  And the fact that they would use a
4    treatment agreement with all of their patients, would that
5    indicate to you that the person is at high risk,
6    necessarily?
7    A.    No, because I would use the treatment agreement in
8    somebody who is 18 years old or a 108 years old as part of
9    the protocol of my practice.
10   Q.    Now, could you just tell us a little bit more about
11   your understanding of the intent behind a treatment
12   agreement, as to whether it's meant for encouragement,
13   punitive that sort of thing?
14   A.    Absolutely.  The treatment agreement should enhance
15   the doctor/patient relationship.  It should not ever be used
16   punitively against the patient that if you do this, I will
17   do that, because what'll happen is you'll just circulate the
18   problem in your community.  In other words, the only reason
19   that I would sort of like use it -- that I used it in my
20   practice in regards that I would discharge a patient if they
21   committed a crime, such as diverting the medication.  But
22   all other issues of not following the contract or not
23   following the agreement are medical issues, and medical
24   issues could be solved in the great majority of times by
25   bringing in the patient and talking to them and enhancing

1   the doctor/patient relationship through education of both

2   parties.

3   Q.     Did you look at the charts for evidence of educating

4   of the patient and taking steps to enhance that relationship

5   between Dr. Roggow and the individuals in this case?

6   A.     Yes, I did.  But also, let me say this, a lot of

7   times, because of what has happened, you don't record it in

8   the chart, that is you're not required to record everything

9   in the chart of your encounter with a patient, and many

10  times you won't put it in the chart because it could be used

11  punitively against a patient by insurance companies, their

12  employers, or anybody else who gets the chart.  There's such

13  a thing as HIPAA, which is privacy of the patient in regards

14  to medical records.  In my estimation, that's a figment of

15  everybody's imagination.

16  Q.     And I think I asked this, but I just want to make

17  sure I captured it.  Did you find any magic language in the

18  Florida standard that had to be in any of the treatment

19  agreements?

20  A.     No, I did not.

21  Q.     And did you find any requirement that the physician

22  automatically discharge a patient if there has been some

23  sort of infraction of a boundary or a term of an agreement?

24  A.     No, I did not.

25  Q.     And is that consistent with your understanding as an

1   educator in this area?

2   A.      Absolutely.

3   Q.      Now, I got myself out of whack here.  Going back to

4   the Page 3 of Defense Exhibit J1, you did tick off the rest

5   of the list, but I want to go back and talk about treatment

6   objectives and have you explain that concept to the jury

7   based on your understanding and physician work, and then

8   we'll come back to the terms of it, of the Florida standard

9   and what you found.

10  A.      Well, the goal of pain management -- the goal of pain

11  management is to decrease pain, increase function, and do

12  not have unacceptable side effects.  And I'm saying

13  everything's a balance with a patient, as far as what they

14  get out of a medicine.  And do they get relief of pain at

15  the cost of certain side effects that are noted with the

16  opioid medication and is it worth it, those side effects?

17  So everything is a balance.

18  Q.      And when you looked at the materials, did you find

19  treatment plans and objectives?

20  A.      Yes, I did.

21  Q.      And was that in one case, every case, some of them?

22  Tell us your finding in that regard.

23  A.      I found them in every case that they were mostly

24  called "plan".  Dr. Roggow wrote what we call SOAP notes,

25  and SOAP notes are progress notes that are subjective,

1    meaning what you're doing in talking to the patient, what

2    you're doing objectively with the patient, and that's

3    generally a physical exam or going over a laboratory or

4    x-ray results or MRI results, an assessment, that's A, and P

5    is a plan.  So she had what I thought were quite extensive

6    progress notes.  Probably the majority of progress notes

7    were a full typed page.

8    Q.     And with regard to other information in the progress

9    notes, can you characterize your findings with regard to

10   whether or not you found personalization toward each of

11   these patients?

12   A.     I found that she was, you know, at least again, from

13   reviewing the chart, that she was a caring physician and

14   probably too caring in regards to how she prescribed her

15   medicines, that she was very caring, that she didn't want

16   her patients to go -- to suffer withdrawal, and she went to

17   the end of the earth to try to prevent it, and probably

18   that's why she's sitting here today.

19   Q.     Did you find information related to Number 6, the

20   requirement of documenting treatments?

21   A.     Oh, she documented treatments quite -- quite readily

22   in her SOAP notes.

23   Q.     Let's brake that down so we know what we're talking

24   about here.  First of all, when you're talking about

25   treatments, just generally, in chronic pain management, what

1  general categories of treatments are available, especially

2  during this time frame, 2000 to 2010?

3  A.     Different modalities of the office?

4  Q.     Yes.

5  A.     Well, there's non-prescription medicine, such as

6  aspirin, Tylenol, over-the-counter non-steroidal

7  anti-inflammatory agents.  There are prescription medicines

8  of the Schedule II and Schedule III opioid medications, and

9  there are also other controlled prescription medicines that

10  are called adjunctive medications that are used to control

11  pain.  What's an adjunctive medication?  That's a medication

12  that helps enhance the working of the opioids and decrease

13  the pain.  And then there's such modalities as physical

14  therapy, injections, pumps, stimulators and if all else

15  fails, then you could go to surgery but even that may not

16  help your patient and they may need opioid therapy or

17  chronic pain management even after surgery.

18  Q.     And these are the things that you said were

19  documented in the treatment plan?

20  A.     Yes.

21  Q.     All right.  And you found those in the records?

22  A.     If they were pertinent to the patient, yes.

23  Q.     I'd like to refer you to Page 2 of Defense

24  Exhibit J1, and in particular, the paragraph marked B for

25  treatment plan.  It's about right in the middle of the page.

1  A.     B, I see it.

2  Q.     Do you have it?

3  A.     Yeah.

4  Q.     Where it says:  Written treatment plans should state

5  objectives that will be used to determine treatment success.

6  Can you tell us what your understanding of that is, as a

7  physician?

8  A.     Well in simple terms, is the medicine doing more for

9  you, which is positive, than to you, which is negative?

10  That's the simple terms.  In other words, are you getting a

11  benefit.  The risk/benefit of opioids, there's certain --

12  there's side effects that you can't -- that you don't get

13  tolerant to, like constipation.  There's other side effects

14  that you may get tolerant to, such as sedation, you may or

15  may not get tolerant to that particular side effect.  So

16  everything's a balance in regards to whether the medicine's

17  doing more to you, which is negative, or for you which is

18  positive.  In other words, is it improving your quality of

19  life?  What are you able to do which you weren't able to do

20  before you started on this class of medication?  In other

21  words, what was your -- how did this medicine change your

22  life?  And it's your duty to determine whether it's changing

23  your life and you have to believe the patient until proven

24  otherwise.  Is your quality of life, taken in totality,

25  improved by chronic pain management or not?

1   Q.      Is pain relief an objective?

2   A.      Absolutely.

3   Q.      And tell us about how a physician measures that and

4   what you found with regard to Dr. Roggow's records and

5   patient relationship.

6   A.      Well this is where pain management is very difficult.

7   It would make my life and Dr. Roggow's life easy if I could

8   stick my head in what we called a certain type of PET scan

9   that that's a special scan where the pain centers light up.

10  You have to believe the patient.  So it's a very subjective

11  encounter.  It's not easy like taking care of diabetes where

12  you do a fasting blood sugar and hemoglobin A1c and then you

13  determine based on objective numbers whether you should

14  increase or decrease the particular medication.  It's all

15  done subjectively and so it's a very difficult field and

16  that's why very few people want to do it.

17  Q.      Did you find indications written down about pain

18  relief in the treatment plan for each of the patients?

19  A.      Yes I did.

20  Q.      And based on your recollection, how was that written

21  in these records?

22  A.      Well, it was written in the progress note that the

23  patient had relief or had decrease.  Now, what you have to

24  understand with chronic pain, you're never going to take the

25  pain a hundred percent away.  So the point is, are you going

1   to improve the pain or decrease the pain?  Because it's been

2   shown in the literature that if you decrease the pain by 20

3   to 30 percent, which doesn't sound like a lot, you make a

4   major difference in the patient's life.

5   Q.      And with regard to decreasing pain levels, is a

6   physician required to stop prescribing when somebody's pain

7   level hits their stated goal?

8   A.      To stop prescribing?

9   Q.      Yes.

10   A.      No, that would be like taking -- you get -- somebody

11   comes in with diabetes and then you get the glucose under

12   control after three, four weeks of trying to get it under

13   control, you finally get it under control, you say I got it

14   under control, and then taking the insulin away.  You

15   wouldn't do that.  The same thing with blood pressure.  It

16   may take weeks or months to get the blood pressure under

17   control and once you get the blood pressure under control,

18   you're not going to take away the blood pressure medicine.

19   You're going to continue it.  Again, evaluating the risk and

20   benefit of that particular medicine.

21   Q.      Is pain relief individualized or is there some sort

22   of standard way of defining that from person to person?

23   A.      It's very individualized.  Everybody has a different

24   pain level for the same -- I could take a -- let me put it

25   this way.  Everybody acts -- acts in reaction to the pain

```
 1    differently based on their psychological background, their
 2    coping skills, et cetera, things of that nature.  So it has
 3    to be treated individually and that's what makes it so
 4    difficult.  Nobody's going to argue with you or not going to
 5    be a debate how to treat diabetes or hypertension.  But
 6    everybody -- but there's no standard of how to treat chronic
 7    pain, and therefore, it's very individualized for the
 8    patient and the physician or the prescriber has to use his
 9    or her judgment.
10    Q.    I want to go -- in just a minute I want to come back
11    to Page 2 of Defense Exhibit J1 but I want to flip over to
12    the first page, if you will, and kind of come back to this
13    integration of prescribing in a treatment plan and focus you
14    on -- if I could just get my note.  Just a second, please.
15    I lost my note.  I'll find it here.  One moment, Your Honor.
16              (Pause in place)
17              Front page of Defense Exhibit J1 and have you
18    look, Dr. Heit, at Paragraph G in terms of the Florida
19    standard on how prescribing is evaluated.  Do you see that
20    there?
21    A.    Yes, I do.
22    Q.    Would you just read the first line to us, please?
23    A.    Here?
24    Q.    First sentence, I'm sorry.
25    A.    The Board will judge the validity of prescribing
```

1    based on the osteopathic physician's treatment of the

2    patient and on available documentation rather than on the

3    quantity or chronicity of prescribing.

4    Q.      What do you understand the quantity and chronicity of

5    prescribing to refer to?

6    A.      It's a clinical judgment of the doctor/patient

7    relationship of the dose and how long you should be on the

8    medication.  It's a judgment call.

9    Q.      And the second -- second sentence, second and third

10   sentences, would you just read those allowed please?

11   A.      The goal is to control the patient's pain for its

12   duration while effectively addressing other aspects of the

13   patient's functioning, including physical, psychological,

14   social, and work-related followers.  The following

15   guidelines are not intended to define or complete best

16   practices, again because there is no single standard, but

17   rather to communicate what the Board considers to be within

18   the boundaries of a professional practice.  That sentence is

19   very important.

20   Q.      Did you use that in connection with the review you

21   performed to give your opinion?

22   A.      Yes, I did.

23   Q.      All right.  And would you just give us a little

24   description of how you used that directive from the Florida

25   Board to guide you in what you were looking for?

1    A.     Well, what I did is I looked at the history and

2    physical, and subsequently, the progression of the progress

3    notes and was the patient -- again, you have to trust the

4    patient, is was the patient improving on the particular

5    treatment or were certain things called -- you know,

6    consults called in for the particular patient, were certain

7    tests done for the particular patient, were certain other

8    modalities done to help the patient have a better life, such

9    as injection therapy, and you've heard about botox

10   injections and steroid injections into treatment plans.  In

11   other words using a multi-modality approach to treating

12   chronic pain.

13   Q.     Let me stop you there and ask you if you found other

14   indicators of Dr. Roggow's efforts to address the physical

15   aspects of her patients' functioning in a non-drug manner?

16   A.     Yes, I did.

17   Q.     Would you plain those to us?  You've already talked

18   about injections.  You've already talked a little bit about

19   physical therapy.  What other findings did you have with

20   regard to your review of the charts?

21   A.     Meaning that she used to talk to the patient, which

22   is very healing and I think --

23   Q.     Tell me; they're your findings.

24   A.     Okay.  Well, it's very clear that Dr. Roggow talked

25   to the patient.  Just talking to the patient is very, very

1    good and helps the patient in regards to the treatment of

2    their -- of their pain.

3    Q.    What aspect of functioning would communication and, I

4    guess maybe counseling the patient, how does that address

5    what's stated here in the Florida rule?

6    A.    Well, the progress notes showed clearly that in the

7    patients that we're talking about, the function improved and

8    some were able to do better at home, some were better to do

9    at work, some were able to continue work, in regards to the

10   decrease of their pain.

11   Q.    What about the --

12   A.    In other words, their quality of life.

13   Q.    I'm sorry.  What about with regard to your findings

14   and Dr. Roggow's efforts to address the patients'

15   psychological functioning?

16   A.    Well, sometimes what she did, she referred the

17   patients -- not all the patients, but she referred some

18   patients to get counseling and whether they went or not,

19   that was up to the patient.

20   Q.    And would it be your position that just counseling a

21   patient in your office is part of helping that aspect of

22   functioning?

23   A.    That's called cognitive therapy, and that takes time

24   to do, and that's extremely important.  Now, the insurance

25   companies don't recognize cognitive therapy.  They don't

1    recognize talking to the patient.  Well, if I hand them --

2    if I cut off your arm and hand to it the insurance company,

3    they'll pay me big money but they won't pay me money to talk

4    to the patient, and that's why we have such a poor record in

5    this country of preventive care.  And so it was obvious by

6    the progress note that the patient -- that Dr. Roggow took

7    time to talk to the patient.

8    Q.    What area of addressing a patients' functioning would

9    consultations regarding weight loss fall into, be put into?

10   A.    That's, again, in the chart I have found evidence of

11   weight loss, suggesting weight loss, suggesting exercise, in

12   one case suggesting a smoking cessation that would help,

13   help you.  In other words, life-style changes that will

14   improve your life, irrespective of whether you're on opioids

15   or not.

16   Q.    In flipping back over again to the treatment plan and

17   the adjustment of the drug therapy to individual medical

18   needs, what were your findings in that regard?

19   A.    She -- she adjusted the medications.  Now again,

20   depending upon what side you're looking at -- I wasn't

21   there -- but to me, the doses were -- were high.  I'm going

22   to give you that.  The doses were high.  But she was there

23   and I was not.  She used her clinical judgment.

24   Q.    And when it comes into dosing and selection of

25   medication, why don't you give us a little background on how

1    a physician goes about doing that?

2    A.      Well again, there's multiple -- there's both economic

3    and medical reasons.  Number one, do you have insurance or

4    do you not have insurance?  And that may determine what type

5    of medicine that you prescribe, whether you prescribe a

6    brand that -- brand or immediate release medication --

7    excuse me, a brand medication or whether you prescribe what

8    we call 24/7 medicine, such as Oxycontin, which is very

9    expensive versus immediate release, Oxycodone.  So what

10   there is, there's an economic issue.

11          There's also an issue of can the patient swallow

12   the medicine correctly.  In other words, do they have

13   anything wrong with their esophagus or GI tract that would

14   prevent them swallowing or absorbing the medicine.  In that

15   case, then, maybe you'd use the Fentanyl patch or use a

16   patch in order to give pain treatment.

17          So you go over what economically and financially

18   is best for the patient and then you make a choice based on

19   your physical exam and your history what drug or medication

20   is best for your patient.

21          Now let me say, there is no data to say that

22   Hydromorphone is better than morphine that's better than

23   Methadone better than Hydrocodone, et cetera.  You just make

24   a choice and then you start a therapeutic trial and see the

25   patient back and assess the therapeutic trial, your success

1  or failure with that particular medicine and that particular

2  dose.

3  Q.    Are you aware of any -- as a physician, yourself, who

4  prescribed, aware of any DEA regulation, clinical national

5  standard, or Florida standard that requires you to pick a

6  long-acting opioid over a short-acting opioid?

7  A.    Okay, now being a teacher, I have to correct

8  everybody that we always use what we called long-acting

9  opioids.  There's only one long-acting opioid that

10  Dr. Roggow could prescribe and that's -- that's

11  intrinsically long-acting.  That's Methadone, which was used

12  very little, I think, in her ten patients, if at all.  And

13  what you're describing a immediate release opioid and

14  immediate release opioid in a clever delivery system.  Let

15  me give you an example.  You've heard about Roxicodone,

16  Oxy IR.  Those are immediate release, meaning they get

17  absorbed in 36 minutes, but the duration of action is maybe

18  three hours.  If you're lucky, four hours, but generally

19  three hours.  That's why you have to dose multiple times a

20  day.  While the Oxycontin is still the Oxycodone, same pain

21  medication in a clever delivery system that delivers the

22  medicine or the pain medication over 12 hours, and therefore

23  you have to dose it twice a day and dose it less frequently.

24        Now, there's a debate whether you should always

25  use long-acting or 24/7 medicine and just supplement it with

1   maybe 20 to 30 percent of immediate release, and it makes

2   sense to do that to have steady -- what we call steady state

3   blood levels over a 24 hour period.  But again, there's no

4   paper to show this.  There's no paper that shows in the peer

5   review literature that doing this, using long-acting

6   predominantly as opposed to immediate release predominantly,

7   one is better than the other.

8           What we could do is look at the world, itself.  We

9   are very, very fortunate in this country, and I emphasize

10  very fortunate that we have -- and you heard it today and

11  over the last week -- a wide selection of opioids to use.

12  Well, other countries of the world such as Africa, Asia, and

13  I found this very clear when I went to the World Congress of

14  Pain, they're lucky if they have morphine sulfate immediate

15  release.  They feel they're fortunate in towns in India,

16  in -- yeah, in India, okay, and Africa and Asia.  And you

17  didn't create a continent of people with the disease of

18  addiction using morphine sulfate immediate release.

19  Remember, I said to get the disease of addiction, it's a

20  triad of the environment, neurochemical disposition, meaning

21  how the drug hits you, and your -- and your genetic

22  background.

23          So again, we may look at the -- at the prescribing

24  of Dr. Roggow, I may do it differently, somebody else may do

25  it differently, but it was her choice to do it and that's

1    why they call it choices.

2    Q.      All right.  Back to my question, are you aware of any

3    directive in the federal regulations or Florida regulations

4    that would require Dr. Roggow to pick one drug over another?

5    A.      No, I'm not.

6    Q.      I want to talk a little bit, Dr. Heit, as we're still

7    on the subject of dosing, and have you explain to the jury

8    briefly, if you would, the concept of prn dosing versus some

9    other form of dosing any medication.

10   A.      Well, prn is a Latin term and it means "as needed".

11   So it gives the patient discretion to take the pill or not

12   to take the pill as -- as needed.  And I know as a

13   physician, and I know as a chronic pain patient some days my

14   pain is a lilt bit worse, some days it's a little bit

15   better, some days I would fall asleep before my last dose of

16   medication and certainly I'm not going to be woken up to

17   take a dose of medication.  So prn means you take it as

18   needed within a certain parameter.  And the certain

19   parameter is generally how many pills that you have per unit

20   of time, how many pills do you have per month, how many

21   pills you have per two months, how many pills you should

22   have or use for three months.  And you may vary it.  On

23   Monday, you may have a horrible day and let's say it says

24   prn two tablets three times a day.  So you -- again, per

25   month you have six times 30, 180 tablets.  So one day you

may use eight and some day you may use four.  In my area,
some days the weather would be cold and snow, and that may
affect your pain level.  Another day, you may have an
argument with your mate or son or daughter or wife and you
may use more.  The point being, it gives you discretion.
It's not rigidly done and there's no way that I could
ascertain, even if I did say take the pill three times a
day, two pills three times a day, take it at 8:00, take it
at four hours -- eight hours later at 4:00.  Take it at
midnight.  There's no way I could say, "I'd like you to be
adhered to that schedule."  I hope that you adhere to that
schedule, but there's no way that I can know that you're
adhering to that schedule unless I go home with you and
watch you swallow the pill each day, and that's not --
obviously not feasible.
Q.    What's been your experience with regard to patients
calling in to ask about dose adjustments?
A.    I think it's very -- it's not uncommon that they
would call in because pain is a dynamic situation and pain
changes depending upon what you're doing.  Let's say it's
early spring and you have to lay mulch or you have to do,
you know, you have to cut the lawn or your wife gets sick
and you have to then pick up the kids at school or you have
to lift something or you have to go to work an extra hour,
or something of that nature.  Pain changes.  It's not --

1    it's not static and so you have to give the patients a

2    little bit of leeway and you have to be available when they

3    call and answer their phone calls, which I found in the

4    charts there was a way that Dr. Roggow did communicate with

5    her patients by telephone.

6    Q.     I want to shift gears for just a minute and talk

7    about the actual writing of prescriptions, and in doing so,

8    I want you to talk about the technical components of writing

9    a prescription first.

10   A.     Okay.  When you write a prescription -- and let's

11   talk about Schedule II medications.

12   Q.     Your pick.

13   A.     Okay, let's talk about Schedule II medications.

14   Schedule II medications cannot be refilled.  In other words,

15   whatever you write -- I could write, by federal, state

16   regulations, one million doses units.  Would that be

17   appropriate?  No.  Could I do it, legally?  The answer is

18   yes.  So when you're writing a prescription, let's say, for

19   Schedule II, you put the date in the right upper-hand

20   corner, which is the date of issue of that prescription.

21   You put your name -- the patient's name, then you put the

22   drug name that you're prescribing, then you put the

23   milligram strength of the -- of the drug that you're

24   prescribing, then you put the quantity in the next area, and

25   then the directions how to use, and then you put refills,

1    zero refills for Schedule II, and then you sign the

2    prescription.  The difference between a Schedule II --

3    excuse me, a Schedule III through Schedule V, you do

4    everything that I just said but then it's your discretion

5    whether you put refill once, twice, three times.  Up to six

6    months that prescription can be used.

7    Q.    Now, before I go further in talking about the writing

8    of the prescription, are there certain schedules of

9    medication that can be phoned in?

10   A.    Yes.

11   Q.    Which ones?

12   A.    Well, the ones that could be phoned in are

13   Schedule II through Schedule V.  But you could also phone in

14   a Schedule II medicine so it's prepared so it's ready for

15   the patient, but then you have to fax that information or --

16   you know, to the pharmacist, but before that medicine is

17   dispensed by the pharmacist, the patient has to present a

18   hard copy of the prescription.

19   Q.    All right.  I want to clarify something for the

20   record.  I heard you say you could phone in Schedule II

21   through V, and then I heard you say Schedule II again.

22   A.    Excuse me, I meant you can phone in Schedule III

23   through V and the pharmacy will take that as a valid

24   prescription.  But you -- and you could also phone in a

25   Schedule II so the pharmacist could get a head start in

1    preparing the prescription and find out whether they have

2    that particular medicine, but before that pharmacist could

3    dispense that medicine, the patient has to present a hard

4    copy of that medication [SIC].

5    Q.      The original prescription?

6    A.      The original prescription.

7    Q.      All right.  Now, with regard to the information we've

8    been talking about throughout the trial, you've seen

9    references to do-not-fill prescriptions.  Are you familiar

10   with those?

11   A.      Yes, I am.

12   Q.      All right.  Tell us briefly about your understanding

13   of do-not-fill medication -- prescriptions?

14   A.      Let me give you an example.  That would be -- let's

15   say you want to see the patient every three months.  You

16   feel in your clinical situation, in your clinical judgment,

17   you only have to see him every three months.  The

18   do-not-fill allows you to provide up to 90 days worth of

19   medicine in the following way.  The first prescription, you

20   write out just like I said, date in the right upper-hand

21   corner, patient's name, drug to be used, the quantity, the

22   milligram strength of the drug, the directions, and your

23   signature.

24            On the second prescription, you write everything

25   exactly the same but then you put do not fill until 30 days

 1  after the date in the right upper-hand corner.

 2          On the third prescription, you write it again,

 3  exactly the same as you did the first prescription, but then

 4  you write do not fill approximately 60 days after the date

 5  in the right upper-hand corner.  That way, the patient saves

 6  money by not having to come to your office.  You have an

 7  open slot in order to see patients, especially with chronic

 8  pain management because it's very hard to get in to see a

 9  chronic pain doctor, and most importantly, the insurance

10  companies are very happy because they get their three

11  co-payments.

12  Q.    Are you familiar, Dr. Heit, with the office of

13  Diversion Control of the Drug Enforcement Administration's

14  frequently asked questions on the issue of do-not-fill

15  prescriptions?

16  A.    Yes.

17          MS. BOLEN:  Your Honor, may I approach the

18  witness?

19          THE COURT:  You may.

20          MS. BOLEN:  For the record, I've already shown

21  this to counsel.

22  BY MS. BOLEN

23  Q.    Doctor Heit, let me show you what's been marked for

24  identification as Defense Exhibit P3 and ask if you have

25  familiarity with the document reflected in the copy?

A.      Yes.

Q.      All right.  And is that pertaining to the do-not-fill
prescription?

A.      Yes.  That answers questions about how to do it
correctly in compliance with federal regulation of
prescribing a Schedule II medication.

Q.      Is that something that you relied on as a physician
when you prescribed during the period 2000 to 2010?

A.      Absolutely.

Q.      Does it relate --

A.      Let me just say for a period of time, you know, the
DEA didn't allow it, and then they reinstated it.  I don't
know the exact time.  They realized that this was to the
benefit of the doctor and the patient.

          MS. BOLEN:  I will ask you about that in just a
second.  Let me have this back, please.  Your Honor, we'll
offer Defense Exhibit P3.

          THE COURT:  Any objection?

          MR. MOLLOY:  May I voir dire the witness, Your
Honor?

          THE COURT:  You may.

                    VOIR DIRE EXAMINATION

BY MR. MOLLOY

Q.      Doctor, this is off the internet; right?

A.      Yes, sir.

1    Q.    And you did not have any hand in writing these or

2    cannot verify the sources for these requirements; is that

3    correct?

4    A.    Well sir, I had -- I had a part, a small part in

5    reinstating a do-not-fill when the DEA took it away in

6    regards to writing and publishing why this was a very

7    important way and very important concept for the pain doctor

8    to have.  So I know it was on the internet but I also know

9    personally I had personal dealings with the DEA in regards

10   to the do-not-fill and how important it was in explaining to

11   the DEA in person that this was not a refill.  Each separate

12   prescription stood by itself, and the pharmacists cannot --

13   cannot refill the second or third prescription before the

14   date that's on the do-not-fill.  They have to wait to that

15   date or they could fill at any time after, but they can't

16   fill the prescription before that do-not-fill date.

17   Q.    Doctor, I'm only asking the questions about this

18   particular document.  This is a document that's taken off

19   the internet.  Is it a document that you had a hand in

20   compiling?

21   A.    No, sir.

22         MR. MOLLOY:  Your Honor, the Government's going to

23   object to foundation.

24         THE COURT:  Any additional questions for

25   foundation?

```
 1              MS. BOLEN:  Sure, Your Honor.
 2                   DIRECT EXAMINATION (Continued)
 3   BY MS. BOLEN
 4   Q.     Doctor Heit, would you often use the DEA's internet
 5   web site to get information about do-not-fill prescriptions?
 6   A.     Do-not-fill, and other information also.
 7   Q.     Is that --
 8   A.     Internet is the way, you know, the way to get
 9   information now.
10   Q.     Is that one of the ways that physicians, during the
11   period of at least 2000 to 2010, would get information from
12   the DEA?
13   A.     Yes.  They wouldn't put it on the internet if nobody
14   looked at it.
15   Q.     Did you have any reason to believe that this didn't
16   come from the DEA's web site?
17   A.     No, I have no reason that -- to believe that this is
18   not a valid posting on the internet by the DEA.
19   Q.     And is it your understanding that Defense Exhibit, as
20   it's marked for identification, P3 somehow relates to a
21   formal Federal Register publication in August of 2005 tied
22   to clarification of do-not-fill prescriptions?
23   A.     Could I see that?
24              MS. BOLEN:  Your Honor, may I approach?
25              THE COURT:  You may.
```

1   BY MS. BOLEN

2   Q.     Let me show you what's been marked for identification

3   as Defense Exhibit P2 and have you take a look at that,

4   without going on to comment on it.

5   A.     I'm familiar with this, okay.

6   Q.     And so repeating my question, are you familiar with

7   the Federal Register statement connected to the do-not-fill

8   issue with Schedule II controlled substances?

9   A.     Yes, I am.

10  Q.     And does Defense Exhibit P2 tie into not only Defense

11  Exhibit P3 but also the entire concept of do-not-fill

12  prescriptions?

13  A.     Yes, it does.

14          MS. BOLEN:  Your Honor, now we'll offer both

15  Exhibit P2 and P3.

16          THE COURT:  Show Mr. Molloy P2.

17          MS. BOLEN:  Yes, sir, I've done that.

18                  VOIR DIRE EXAMINATION

19  BY MR. MOLLOY

20  Q.     Just since they're being moved in together, what is

21  the P3, which is the internet question and answers?  You say

22  it ties into this Department of Justice, the certification

23  of existence requirements under the Controlled Substance

24  Act.  When you said that it tied in, I'm not following you.

25  How do they tie into each other?

1   A.      Could I see the exhibit that's in your hand?

2             MR. MOLLOY:  Of course.  If I might approach?

3             THE COURT:  You may.

4             THE WITNESS:  What it does, I could read it, but

5   it says -- it sort of like explains many of the comments

6   that the DEA received were from patients who said they had

7   been receiving Schedule II controlled substances for several

8   years, for example for the treatment of severe pain or

9   attention deficit hyperactivity disorders.

10  BY MR. MOLLOY:

11  Q.     I'm sorry to interrupt you, Doctor.  At this stage,

12  I'm just interested in how they tie into each other.

13  A.      Well, it's explaining how the patients were

14  inconvenienced by not having this available to them.  In

15  other words, let's say your son or daughter went away to

16  college and they needed a stimulant because of ADD,

17  attention deficit disorder.  How would they get the medicine

18  if they didn't have this do-not-fill?

19  Q.     I understand what you're saying, Doctor, but I'm

20  asking a very different question.  How does one tie into the

21  other?  Does one reference the other?  Does one quote the

22  other?

23  A.      What it says is that you -- it says that you do not

24  have to see the patient every month for them to receive a

25  controlled substance.

1   Q.      I understand, Doctor.

2   A.      I understand what you're saying.

3   Q.      Excuse me.  I understand that you're reading it.  I'm

4   asking, does one document have a relationship to the other?

5   A.      Well, I think they do.

6   Q.      Does one reference the other?

7   A.      Yes, it does.  It says on Number 1, it's an interim

8   policy statement for a physician to prepare multiple

9   prescriptions for a Schedule II controlled substance on the

10  same with instructions to fill on different dates is

11  paramount to writing prescription authorization refills of a

12  Schedule II controlled substance.  To do so conflicts with

13  the provision of the C -- C -- Controlled Substance Act,

14  with regard to a prescription for a controlled substance in

15  a Schedule II medicine may be refilled.  So what it says

16  here is that there was a period, with the interim policy

17  statement in which I stated that the do-not-fill was not

18  available to the physician and then it was reinstated.  This

19  was stated -- what it, you know, the interim policy and

20  that's how it relates to the do-not-fill.  That was

21  downloaded from the internet.

22          MR. MOLLOY:  If I might approach the witness, Your

23  Honor?

24          THE COURT:  You may.

25

```
 1   BY MR. MOLLOY
 2   Q.      If I might have it, Doctor?  That one, too.  I'm
 3   sorry, I'm publishing them.  Let me be real specific.
 4   Does -- in P3, which is the internet questions and answers,
 5   is there any specific reference to P2, which is the
 6   clarification of existing requirements of the Controlled
 7   Substance Act?
 8   A.      There's no direct reference.
 9   Q.      And is there any direct reference in P2 to the
10   internet article, questions and answers?
11   A.      No, sir.
12   Q.      Last question, this -- the clarification on P2, as
13   defense counsel's already pointed out, and again it's
14   entitled Clarification of Existing Requirements Under the
15   Controlled Substances Act by Prescribing Schedule II
16   Controlled Substances.  It's dated -- I'm sorry defense
17   counsel indicated it's dated August 26th, 2005.  To your
18   knowledge, in the -- your background and conversations that
19   you had, do you know if there is an updated one from seven
20   years ago?
21   A.      That allows somebody to do a do-not-fill
22   prescription?
23   Q.      No, sir.  I'm talking about this particular document.
24   A.      That's the federal registration.  Is there an update
25   on the federal registration?
```

1  Q.      Yes, sir.

2  A.      Of someone on the do-not-fill prescription?

3  Q.      I'm asking is there an update on this document?

4  A.      Yes, there is.

5  Q.      And what year was that update, sir?

6  A.      I do not know.  But I do know this, in order to

7  prescribe and use the do-not-fill, it has to be in the

8  Federal Register because that's the rules.  The rules have

9  to be published somewhere so the doctor knows what to do.

10 Q.      Doctor, I'm not arguing with you.  I was just asking

11 if there was an updated version of this particular document.

12 A.      Yes, there is.

13          MR. MOLLOY:  Government's going to object to both

14 documents.  One, there's no foundation, and two, this

15 particular document has been updated.

16          THE COURT:  Bring both to sidebar, please.

17          (At sidebar, Court, counsel, and defendant

18 present.

19          THE COURT:  Is the objection authentication?

20          MR. MOLLOY:  Yes, sir.

21          MS. BOLEN:  I believe the Court can take judicial

22 notice.

23          THE COURT:  If that's the objection, it's

24 overruled as to each of the two documents, unless you have

25 some basis to suggest that either copies are --

 1              MR. MOLLOY:  I'm not saying that the copies are

 2    not -- are inaccurate.  I don't believe there's proper

 3    foundation for this one, and this one's been updated.

 4    That's the source of my objection.

 5              THE COURT:  Well, it may well have been updated

 6    but to the extent that it is dated August of 2005, that's

 7    the time period within the scope of the indictment, and so

 8    it was obviously in effect for part of this case, so the

 9    Court will allow P2 and P3.

10              MR. MOLLOY:  And my only request, Your Honor,

11    since they will be allowed in, is provide a clean copy as

12    opposed to a highlighted copy.

13              MS. BOLEN:  I have one, Your Honor.  Just making

14    it easier for Dr. Heit to read.

15              THE COURT:  Provide one.

16              MS. BOLEN:  I will, Your Honor.  They're on both

17    sides.

18              MR. MOLLOY:  Could we approach just one more time.

19              MS. BOLEN:  You ran away before I was done.

20              THE COURT:  I'm sorry, she was asking --

21              MS. BOLEN:  I do have a clean copy and I know

22    we've been using back and forth highlighted versions.  If

23    I'm going to have time to publish it today, it will just

24    take me a second to find the clean version.  I know I have

25    one.  Otherwise, I'm at a good stopping point, if that's the

```
 1   next question that the prosecutor has, but it's up to the
 2   Court.  I can continue going.  I don't have a lot more with
 3   this witness.
 4              THE COURT:  If I gave you 15 to 20 minutes, would
 5   you finish?  Let's try to get him done on direct, at least.
 6              MS. BOLEN:  Okay, that's fine.  Then may I have a
 7   moment to find a clean copy?  It's right by me.
 8              THE COURT:  You can use that as far as I'm
 9   concerned and substitute later.
10              MS. BOLEN:  Yes, sir.
11              (Sidebar concluded)
12              THE COURT:  You may proceed.
13                  DIRECT EXAMINATION (Continued)
14              MS. BOLEN:  Your Honor, we'll offer Defense
15   Exhibit P2 and P3.
16              THE COURT:  All right.  For the reasons stated at
17   sidebar, P2 and P3 will be admitted and may be published.
18              (Defense Exhibits P2 and P3 admitted)
19   BY MS. BOLEN
20   Q.    Dr. Heit, I'm going to publish these exhibits to you
21   and to the jury and we're going to start with the one that
22   is oldest in time, that being Defense Exhibit P2, and I'm
23   going to cover -- show that and then uncover it.  You see
24   the date at the top, August 26th of 2005?
25   A.    Yes, yes, I do.
```

1    Q.      And we've highlighted it to help everybody read here.

2    Is this a statement that you're familiar with?

3    A.      Yes, I am.

4    Q.      And just briefly tell the jury, without going into

5    all the detail right now, just tell the jury what you

6    understand this document to be.

7    A.      This is from the Federal Register in regards to the

8    regulation of prescribing a controlled substance, a

9    Schedule II controlled substance, and it has to do that on

10   the top line says no prescription for a controlled substance

11   in Schedule II may be refilled.

12            THE COURT:  Doctor, may I suggest you move the

13   microphone?  And you can hold it if that's necessary.  I

14   think it's hard for us to hear when you're looking at the

15   screen.

16            THE WITNESS:  Sorry, Judge.

17            MS. BOLEN:  I got to find out where you're reading

18   here.

19            THE WITNESS:  From the top.

20   BY MS. BOLEN

21   Q.      Before you go into it, Dr. Heit, did you use the

22   Federal Register as a physician to kind of keep up with the

23   stuff that DEA was doing?

24   A.      Yes, I did, but I was one of the few physicians that

25   did -- that did do that.

```
1    Q.      All right.  And did you use their web site?

2    A.      Yes, I do.

3    Q.      And this particular document deals with the substance

4    that we were just talking about, the do-not-fill or multiple

5    Schedule II prescriptions; correct?

6    A.      Yes.

7    Q.      All right.  And I just want you to look -- I believe

8    you started to testify about patients who were concerned

9    about not getting their medications; is that a fair

10   statement?

11   A.      Yes.

12   Q.      All right.  And I just want you to read -- just tell

13   me what you think this document is and what you understood

14   it as a physician.

15   A.      Let me read it again.

16           (Pause in place)

17           I believe this is when -- the time when the

18   do-not-fill was not allowed and patients were confused of

19   when they could go and -- you know, how they could get their

20   medicines, would they have to go to the office every four

21   weeks now and let's say they were in college, you know,

22   thousand miles away, and this gives permission that the

23   physician, if he's writing a legitimate prescription, could

24   mail the prescription to the particular -- to the particular

25   person that it's written to.
```

1  Q.    All right.  Do you know of any requirements on you as
2  a physician that you have to absolutely see your patients
3  every single month before you give them a Schedule II
4  controlled substance?
5  A.    No, I -- I don't know any requirement that says that.
6  That's clinical judgment.
7  Q.    All right.  I want you to read in Defense Exhibit P2
8  where my pen is pointing and just read this paragraph in
9  terms of requirements and the -- I'm going to go up a little
10 bit where it says "DEA wishes".
11 A.    DEA wishes to make clear that the interim policy does
12 not state that such physicians -- that such patients must
13 visit their physician's office every month to pick up a new
14 prescription.  There's no such requirement in this CSA or
15 DEA regulation.  What is -- what is required in each
16 instance where a physician issues a prescription for any
17 controlled substance is that the physician properly
18 determine there is a legitimate medical purpose for the
19 patient to prescribe that controlled substance and that
20 physician be acting in the usual course of their
21 professional practice.
22 Q.    And from that, does this have ultimately a connection
23 to the use of do-not-fill prescriptions?
24 A.    I think it does.
25 Q.    All right.  And tell us how you think it does.

```
1    A.      Well, what it says here is that, you know --
2    Q.      You want me to put it back?
3    A.      -- as I interpret it is that the Government or the
4    DEA got letters from patients as saying what would -- what
5    should we do, does that mean that I have to go to the office
6    every month to pick up my prescription or can the doctor
7    mail the prescription?
8    Q.      And then I want to show you what's been admitted as
9    Defense Exhibit P3, and again, just to clarify, you do have
10   familiarity with the DEA web site and its FAQs; correct?
11   A.      Yes.
12   Q.      And what does this FAQ address, please?
13   A.      Could you tell me the date of the first one and then
14   the date of the second one, please?
15   Q.      August.
16   A.      August 26th, okay.
17   Q.      And this one was printed 6/19/12, 4:47 p.m.
18   A.      Okay.  What this does is, again, documentation by the
19   internet, by the DEA that the do-not-fill is now allowable,
20   that they realized that this helped the patients, helped
21   control the controlled substance and it was not a refill in
22   the true sentence.  Each prescription stood by itself.  And
23   so it made allowable the do-not-fill.
24   Q.      And I'm referring to Page 2 of Defense Exhibit P3 and
25   on the top part of that, does this document, D-3, give an
```

1    effective date of the rule change?

2    A.      Yes, it does.  December 19th, 2007.

3    Q.      And is it your recollection that the final statement

4    on multiple IIs came out in or about that period of time?

5    A.      Yes, it does.  It was probably during -- there's

6    always a comment period before they, you know, really make

7    it official.

8    Q.      And then finally, does Defense Exhibit P3 also go

9    into the number of days' supply that you can give out in

10   your initial -- in a series of do-not-fill prescriptions

11   and -- go ahead with that if you understood my question.

12   A.      Yes, I did understand your question.  You could give

13   up to 90 days of do-not-fill.  In other words, 30 -- three

14   prescription, one for each month, or you could write a

15   prescription, if you so wish, you could write 90

16   prescriptions if you so wish and just have the patient go

17   each day with a prescription to the -- to the pharmacist for

18   dispensing the medication.  So this allows do-not-fill up to

19   90 days from the date of issue that's in the right

20   upper-hand corner of the first and second and third

21   prescription.

22   Q.      And I want you to read where my pen's stated here on

23   the second Q on Page 2 of Defense Exhibit P3.  You see that?

24   A.      Yes.

25   Q.      What does it say?

1    A.      It says there's no -- there is -- is there -- the

2    question is, is there a limit on the number of Schedule II

3    dosage unit a practitioner can prescribe to a patient.  And

4    the answer is, again, from the DEA, there's no federal limit

5    as the amount of controlled substance a practitioner can

6    legally prescribe.  However, as a registered practitioner --

7              THE COURT:  Wait a second.

8              THE WITNESS:  I'm sorry?

9              THE COURT:  You need to read that again.

10             MS. BOLEN:  Let me focus a little more.  My eyes

11   are tired.  I can't see it.  Go ahead.

12             THE WITNESS:  There's no federal limit as to the

13   amount of a controlled substance a practitioner can

14   legitimately prescribe.  However, if a registered

15   practitioner issues multiple Schedule II prescriptions, he

16   or she is limited to the combined effect of allowing a

17   patient to receive, over time, up to 90 day supply of a

18   particular Schedule II controlled substance.

19   BY MS. BOLEN

20   Q.      And is that a -- your understanding as a physician,

21   is that a one strike, you can do one set of do-not-fills, or

22   can you use them throughout your relationship with the

23   patient?

24   A.      The latter.  You could use it throughout your

25   relationship with the patient.

1   Q.      And have you used, personally, do-not-fill

2   prescriptions?

3   A.      Absolutely.

4   Q.      And did you find references to do-not-fill

5   prescriptions in the files that you reviewed for Dr. Roggow?

6   A.      Yes, I did.

7   Q.      I'm going to shift gears on you now, Dr. Heit, and

8   talk to you about -- as soon as I flip my page -- we've

9   heard some talk about drug testing.  Do you recall the --

10  A.      Yes.

11  Q.      -- information that's gone before this Court and

12  jury?  All right.  And when you reviewed the Florida rules

13  in connection with this case, did you find a mandate for any

14  particular amount of drug testing or quantity, frequency?

15  A.      No, it was up to the -- you may, they use the word

16  "may".  So you zero drug test or do a hundred drug tests.

17  Q.      Do you know of any mandate in federal law that

18  physicians drug test either prior to or in connection with

19  the issuance of controlled substances for the treatment of

20  pain?

21  A.      No, there is no federal regulation in regard to urine

22  drug test.

23  Q.      Now, before we get into the details with regard to

24  your findings, are there different types of drug testing

25  platforms?

```
 1    A.      Yes, there are.
 2    Q.      And I want you to briefly describe the two different
 3    drug testing platforms you found in connection with
 4    Dr. Roggow's practice.
 5    A.      Well, there are two different drug testing parts.
 6    There's point of care, that's done by what we call
 7    immunoassay.  Now immunoassay is good; it's a two-edged
 8    sword.  It gives you information quickly but it doesn't give
 9    you all of the information that you want.  Immunoassays will
10    be positive, will only tell you the class of medication,
11    like opiate, but it won't tell you which one unless the kit
12    is directed toward that particular molecule, and that has
13    varied as far as improving these particular point of care
14    kits.
15    Q.      Let me stop you?
16    A.      What does that mean?
17    Q.      Let -- you're using molecule and kit --
18    A.      Let me explain that.
19    Q.      Give us an example.
20    A.      Example, let's say I give you directions to go to a
21    certain block.  You go to Block H and each house on that
22    block is numbered 1 through 25.  The immunoassay will get
23    you to Block H but won't tell you which house.  It won't
24    identify which house you should go to.
25    Q.      All right.
```

1    A.    And also -- let me just complete it.  Is so that it

2    will pick up also illicit drugs very readily but only a

3    limited amount, such as THC which is the active ingredient

4    in marijuana and cocaine.  So you get a quick screen on your

5    patient by immunoassay either by point of care or sending it

6    to the laboratory where they do immunoassay assays, which I

7    did in my practice.

8    Q.    All right.  So you can have it point of care or you

9    can have it at the laboratory.  And what were your findings

10   with regard to whether or not Dr. Roggow did any of those

11   type of tests?

12   A.    She did.

13   Q.    Both types or just one?

14   A.    She did both types.

15   Q.    And with regard to the time period, 2000 to 2010,

16   tell us whether or not you have familiarity with any of the

17   changes as it relates to drug testing during that period.

18   A.    Well, the changes are is that -- is that the

19   literature has shown very clearly that drug testing in about

20   ten years ago was done maybe about six to eight percent of

21   the time and the physicians were fairly poorly knowledgeable

22   of how to interpret urine drug tests.  Now fast forward

23   about up until now, and there was a paper couple years ago

24   that showed that maybe you're up to 30 percent of physicians

25   using urine drug tests, but still the knowledge of how to

1    interpret the tests is still lacking for most health care

2    professionals.

3    Q.     Are there any barriers that you're aware of to the

4    use of drug testing in medical practice?

5    A.     Well, I think the biggest barrier is the cost.  The

6    costs could be tremendous, especially if you go to what we

7    call identification tests, which is called GCMS, gas

8    chromatography mass spectrometry, which I could explain if

9    you like.

10   Q.     Please explain it.

11   A.     Okay.  This is a test that is usually to identify the

12   specific drugs in the urine.  And think of it in the

13   following way, it's MS -- excuse me.  Gas chromatography,

14   mass spectrometry.  The gas chromatography does the

15   following.  Let's say you have five Legos and you put them

16   all together and each color, each Lego has a different

17   color.  The gas chromatography part of the test will

18   determine you put Legos in the analyzing machine.  The mass

19   spectrometry then will tell you which color each Lego is.

20   So the GCMS identifies the specific drug that's in the urine

21   as opposed to class of drugs.  Class is opioids.  Specific

22   drug could be Hydromorphone, Hydrocodone, Methadone, et

23   cetera.

24        Also, immunoassays are rather insensitive to pick

25   up what we called semi-synthetic opioids.  What do I mean by

```
 1   semi-synthetic?  Well, we had a nice explanation of the

 2   pharmacologist yesterday.  Synthetic is half manmade or

 3   womanmade -- I don't want to be sexist -- and half

 4   artificial.  And the immunoassays, as they exist, are not

 5   reliable in picking semi-synthetic opiates up.  They may or

 6   may not.  And they definitely don't pick up synthetic

 7   opioids which are totally man- or womanmade, such as

 8   Methadone or Fentanyl.

 9   Q.     Do you participate in the ongoing education in this

10   particular area that you're discussing?

11   A.     Yes.

12   Q.     And are you aware of any requirement that you

13   reviewed in connection with your expert opinion here that

14   would say a physician has to boot a patient out of their

15   practice or stop prescribing if they have a drug test that

16   might be, let's say, positive for marijuana?

17   A.     No.

18   Q.     And are you aware of any requirement that you

19   reviewed in connection with this case that would require the

20   Florida physician, Dr. Roggow or any similarly situated

21   physician, to just simply turn the patient over as an addict

22   to another professional?

23   A.     No.

24   Q.     I want to ask about medication counts briefly, in a

25   similar series of questions.  Are you aware, Dr. Heit, of
```

1   any federal regulation that requires you to perform

2   medication counts when you issue controlled substances?

3   A.     No, I'm not aware of any regulation that requires a

4   pill count.

5   Q.     Are you aware -- and you're referring to them as pill

6   counts.  Is there a reason why you call them a pill count

7   and I call them medication counts?

8   A.     No, same thing.

9   Q.     And if you were counting patches, you would count it

10  as a patch count?

11  A.     Yes.

12  Q.     And with regard to them, did you look at the Florida

13  standard to determine whether or not there was any specific

14  requirement for medication counts?

15  A.     I did not find any specific regulation for medication

16  or pill counts in the Florida regulations.

17  Q.     Tell the jury whether or not you found anything in

18  connection with the Florida standard regarding utilization

19  monitoring of medication, in general.  And in doing so, I'm

20  going to publish what's been admitted as Defense Exhibit J1

21  and focus your attention, Dr. Heit --

22  A.     Well, it -- go ahead.  I'm sorry.

23  Q.     Go ahead?

24  A.     Go on.

25  Q.     I want to make sure I'm getting the right area -- on

1  two areas, Number 1, Paragraph D, periodic review which

2  we've briefly talked about, and have you refer to any other

3  areas.

4  A.      The periodic review is the progress note.

5  Q.      Is there anything in connection with periodic review

6  that would focus on monitoring utilization of medicine?

7  Maybe just looking at the last sentence?

8  A.      Well, they should monitor patient's compliant and

9  medication usage and related treatment plans, but there's no

10  evidence that -- there's no data that they actually have to

11  do a pill count or the patient has to bring in a bottle of

12  pills for you to count.

13  Q.      Are there other ways to monitor medication usage and

14  the patient's connection to the treatment plan?

15  A.      There are, but they're -- but they're not foolproof.

16  They're just tools that you use.  The pill count is just a

17  tool.  The urine drug test is just a tool.  And you have to

18  know the strength or -- you have to know the strength or

19  limitations of each tool that you use.  You could also call

20  the patient in the middle of the -- of the prescribing

21  period and have them bring all their medicines in at that

22  time.  So there are many ways to do it, but none of them are

23  foolproof.

24  Q.      Did you find any evidence in your review of

25  Dr. Roggow's charts in this case of her attempts and efforts

1   to at least look at patient medication usage?

2   A.      Well, she looked at patient's medication uses in

3   regards to the prescriptions that she wrote.  And she didn't

4   want her patients to run out of the controlled substances.

5   Q.      Did you make any findings with regard to her

6   follow-up progress and inquiries about their use of

7   medication?

8   A.      Right, she inquired how they used the medication and

9   that's how she determined whether to change the therapeutic

10  regimen or not, to change the dose of the medicine or the

11  frequency of the medicine and that would be monitoring

12  medical therapeutic uses.

13  Q.      And in your opinion, that's consistent with the

14  standards in the state of Florida?

15  A.      Yes, it is.

16  Q.      And also consistent with at least the evolving

17  national arena?

18  A.      Evolving is the key word.

19  Q.      Now, couple of last questions here, Dr. Heit.  Tell

20  the Ladies and Gentlemen of the Jury what you found with

21  regard to your review of Dr. Roggow's files in terms of

22  ordering diagnostic testing and studies.

23  A.      She ordered appropriate diagnostic studies on her

24  patients and she did the appropriate diagnostic procedures

25  on her patients, such as botox injections, trigger

1   injections with steroids, and things of that nature.

2   Ordering also noninvasive tests such as physical therapy,

3   collars for the patient in regards to form of traction.

4   Q.     And with regard to Dr. Roggow's records and practices

5   on consultations, tell us what your findings were there.

6   A.     She ordered consultations when she thought in her

7   judgment that they were needed.

8   Q.     And you found evidence of the consultations in the

9   records?

10   A.     Yes, I did.

11   Q.     And how about with regard to your finding on

12   Dr. Roggow's addressing of the whole versus part of the

13   patient and other conditions such as depression, anxiety,

14   and sleep dysfunction?

15   A.     Well, the -- she treated the patients in what we call

16   a bio-psychosocial manner.  Not only did she treat their

17   pain but she asked about their anxiety, the depression, and

18   sleep and prescribed in her judgment accordingly.

19   Q.     Did you find evidence of Dr. Roggow's coordination of

20   care with other physicians in the patient's medical team, if

21   you will?

22   A.     Yes, I did.

23   Q.     Tell us about that.

24   A.     Well she -- in certain patients, she had records from

25   the referring doctor, she visited the patients in the

```
 1    hospital, and she tried to coordinate care with other people

 2    that had to do with her -- with other modalities that she

 3    thought would benefit the patient, such as physical therapy.

 4    Q.      And once again, in your review, you used both the

 5    federal materials and the Florida rule as representative in

 6    Defense Exhibit J1, the 2000 version, and J2, the 2006

 7    version?

 8    A.      Yes.

 9    Q.      And are there big differences, Dr. Heit, in your

10    opinion, between Defense Exhibit J1 from 2000 and Defense

11    Exhibit J2 from 2006?

12    A.      I tried to find differences and I had a hard time.

13    There was one minor difference, but essentially, it's the

14    same document.

15    Q.      From a substantive point?

16    A.      Yes, from a substance point of view.

17            MS. BOLEN:  Your Honor, may I have just one

18    moment, please?

19            THE COURT:  You may.

20            (Discussion off record)

21    BY MS. BOLEN

22    Q.      All right, Dr. Heit, one last quick series of

23    questions for you.  I want you now to tell the jury your

24    final opinion on whether or not it's your belief that

25    Dr. Roggow prescribed controlled substances as alleged in
```

```
 1   this case and in the patient files represented in the usual
 2   course of her professional medical practice.
 3   A.      She prescribed controlled substances in the usual
 4   course of her professional practice, in my strong opinion.
 5   Q.      And just for the record, did you find a legitimate
 6   medical purpose for the prescribing as it connects to the
 7   diagnoses of the patients?
 8   A.      She prescribed for a legitimate medical purpose,
 9   which is the pain and related disorders.
10   Q.      And were those items set forth in the records you
11   reviewed?
12   A.      Yes, they were.
13           MS. BOLEN:  Your Honor, I pass the witness.
14           THE COURT:  All right.  We'll recess for the
15   evening, beginning tomorrow morning at 9:00.  Please do not
16   discuss the case among yourselves or allow anyone to discuss
17   it with you or in your presence.  See you at 9:00.
18           COURT SECURITY OFFICER:  All rise.
19           (Jury out)
20           THE COURT:  Ms. Bolen, turn the overhead back on,
21   please, and you may be seated.  And while it's warming up,
22   if you would, put your P2 up there for me, please.
23           MS. BOLEN:  Yes, sir.
24           THE COURT:  And the section that you had the
25   Doctor read, the last highlighted portion, the Doctor read
```

1    incorrectly.  For the record, when it talks about a

2    physician, that the physician be acting in the usual course

3    of professional practice, he inserted the word their.  So he

4    said it read usual course of their professional practice.

5              MS. BOLEN:  I didn't hear that but I understand

6    what the Court's saying.

7              THE COURT:  Which it does not.  Do what you will,

8    but the record should reflect that.

9              MS. BOLEN:  Thank you, sir.

10             THE COURT:  We'll be in recess until 9:00.

11             (Recess at 5:25 p.m.)

12

13

14                         CERTIFICATE

15   I CERTIFY THAT THE FOREGOING TRANSCRIPT IS A TRUE AND

16   ACCURATE TRANSCRIPT FROM THE ORIGINAL STENOGRAPHIC RECORD IN

17   THE ABOVE-ENTITLED MATTER.

18

19        Dated this 10th day of October, 2012.

20

21             /s/ R. Joy Stancel
               _____

22                  R. JOY STANCEL, RMR-CRR
               FEDERAL OFFICIAL COURT REPORTER

23

24

25