UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO. 2:11-CR-114-FTM-29SPC

---

THE UNITED STATES OF AMERICA,

    Plaintiff,

vs.            Fort Myers, Florida
              June 21, 2012
DEBRA ROGGOW,        9:00 A.M.

    Defendant.

---

TRANSCRIPT OF EXCERPT OF JURY TRIAL DAY 8 OF 10
(Testimony of Howard Heit)


BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT JUDGE


FOR THE GOVERNMENT:  Office of the United States Attorney
          U.S. Courthouse
          2110 First Street, Room 3-137
          Fort Myers, Florida  33901
          239/461-2200
          BY:  DOUGLAS MOLLOY, A.U.S.A.


FOR THE DEFENDANT:   Fox & Ramunni, PA
          2211 Widman Way, Suite 250
          Fort Myers, Florida  33901
          239/791-3900
          BY:  AMIRA DAJANI FOX

          Hollander & Hanuka
          2325 Stanford Court
          Naples, Florida  34112
          239/530-1800
          BY:  LEE HOLLANDER

APPEARANCES (Cont'd)

                              The J. Bolen Group, LLC
                              14875 Buttermilk Road
                              Lenoir, TN  37771
                              865/368-3472
                              BY:  JENNIFER BOLEN


REPORTED BY:                  R. JOY STANCEL, RMR-CRR
                              Federal Official Court Reporter
                              U.S. Courthouse
                              2110 First Street
                              Fort Myers, Florida  33901
                              239/461-2064

```
 1               (Call to Order of the Court)

 2               (Proceedings took place on prior days that are not

 3     included in this excerpt, after which, proceedings continued

 4     as follows:)

 5               THE COURT:  Good morning.  Both sides ready?

 6               MR. MOLLOY:  Yes, sir.

 7               MS. FOX:  Yes, Your Honor.

 8               THE COURT:  Have the jury step in and have the

 9     witness come forward, please.

10               COURT SECURITY OFFICER:  Yes, sir.

11               (Jury in)

12               COURT SECURITY OFFICER:  Please be seated.

13               THE COURT:  Good morning, ladies and gentlemen.

14     Mr. Molloy, you may proceed.

15               MR. MOLLOY:  Good morning, Dr. Heit.

16               THE WITNESS:  Good morning, sir.

17                       CROSS EXAMINATION

18     BY MR. MOLLOY

19     Q.    Doctor, I believe you testified that you analyzed the

20     files in this case.  You sat through the entire trial.

21     You've heard all the evidence.  You've heard every witness.

22     How much are your services in testifying for the defendant

23     in this case?

24     A.    I didn't hear the last part.

25     Q.    How much do you cost?
```

```
1   A.       $450 an hour.
2   Q.       And how much time did you spend analyzing the files?
3   A.       I would say at least 80 hours, but didn't charge that
4   much.
5   Q.       How much did you charge?
6   A.       $450 an hour.
7   Q.       I understand that.  Maybe I misspoke.  You say you
8   didn't charge for the 80 hours.  How much did you charge?
9   How many hours did you charge for the review of those files?
10  A.       I've been paid approximately -- I have been paid a
11  retainer up to $60,000.
12  Q.       And for you observing the trial, that was also $450
13  an hour; is that correct?
14  A.       No, sir.
15  Q.       Please correct me.
16  A.       Is -- is -- because of observing and obviously the
17  expense to the defendant, it was $3,000 a day, which is far
18  below what I usually charge.
19  Q.       And $3,000 a day, you indicate, is far below what you
20  usually charge?
21  A.       To go to court, yes, sir.
22  Q.       Now speaking of that, you described to the defense
23  attorney what you're doing now, talked about your
24  consulting, talked about your writing.  You left out
25  testifying for the defense.  Is that also part of what
```

1   you're doing now?  When I say the defense, I mean

2   defendants.

3   A.     Yes, sir.

4   Q.     How much of your practice is that now,

5   percentage-wise?

6   A.     This is only the second time -- well, it's the third

7   trial that I've been involved in over the last ten years.

8   Q.     And do you know or how was it communicated to you as

9   to how you were chosen?  I understand Ms. Fox called you.

10  Do you have any idea as to how you were chosen for this

11  assignment?

12  A.     No, sir.  I get calls all the time to be an expert

13  witness, but most of the time, I decline.

14  Q.     Now, you indicated you've been involved in three

15  trials.  I also believe you said that this was your first

16  criminal trial?

17  A.     Yes, sir.

18  Q.     And in your first criminal trial, you gave a judgment

19  under direct examination that you've decided that she did --

20  meaning she, the defendant, did nothing criminal?

21  A.     Absolutely.

22  Q.     Absolutely.  When this is the first time you've

23  testified in a criminal trial, you decided she did nothing

24  criminal?

25  A.     Is that a question or an answer?

```
1   Q.      Question.

2   A.      Repeat the question, please.

3   Q.      In your first participation in a criminal trial, you

4   have told this jury that you have decided that this

5   defendant has done nothing criminal?

6   A.      Are you intimating that a rookie and person in

7   practice for over 20 years can't make a decision?

8   Q.      I'm not intimating anything, Doctor.  I'm asking a

9   question.

10  A.      Please ask the question again.

11  Q.      In your first criminal trial, having reviewed all of

12  the evidence here, you have decided and told the jury, I

13  believe in your strong opinion -- I believe that's how you

14  put it -- that this defendant has done nothing criminal?

15  A.      Absolutely.  In my strong opinion, this defendant did

16  nothing wrong.

17  Q.      Doctor, you also heard the testimony that these

18  patients ended up with overdoses, addictions.  You heard

19  testimony about the destruction of their families, loss of

20  jobs, missing years with children because of the

21  prescriptions that the doctor wrote, that they gave, and

22  they became addicts.  Again, is it your position that she

23  did nothing wrong?

24  A.      I think your question mischaracterizes what was

25  taking place over the last ten days.  You're assuming that
```

1  these patients are addicts.  I do not think that they have

2  the disease, I say the disease of addiction, rather than the

3  pejorative term addict.  These patients were physically

4  dependent on the class of medicine and everyone in this

5  courtroom would get physically dependent on these medicines

6  if I gave them to them whether they had pain or not.

7  Q.    They described themselves as addicts.  Each one

8  described themselves as addicts.  Are you saying their

9  description of themselves, their description of their

10 addiction to these drugs is incorrect?

11 A.    Absolutely.

12 Q.    That you know better than they as to whether they are

13 addicts or not?

14 A.    Let's put it this way, sir, nobody has evaluated them

15 for the disease of addiction.  So at best, we could say

16 probably not having the disease of addiction, might have the

17 disease of addiction but they haven't been evaluated for

18 that particular disease.

19 Q.    They haven't been evaluated, but the things that have

20 happened in their life, the withdrawal that they went

21 through, that they all described as horrific, in order to be

22 considered an addict, they would have to be -- I'm sorry,

23 you said evaluated as an addict?  I'm not trying to put

24 words in your mouth.  What would they have to do to be

25 considered an addict?

1    A.      What they would have to do, again, I say as strongly

2    as I can say, physical dependence is neither necessary or

3    needed to make a diagnosis of the disease of addiction.  And

4    proof of that is that you have a couple of patients who wean

5    themselves off, no matter how difficult, off the opioids and

6    stayed off the opioids for a period of time.  It wasn't

7    compulsive behavior to drug seek.  There wasn't loss of

8    control.  There wasn't continued use despite harm.  There

9    wasn't craving for the medicines.  And then we had one

10   patient, one of the defendants trying to make a hard

11   decision whether to go back on opioid medication because of

12   the stigma associated with it that everybody thinks that if

13   you're on this class of drugs, or many people who think that

14   you're on this class of drugs, including my profession, the

15   media, the public, that you have the disease of addiction.

16   We need education of the public.

17   Q.      Stigma?  I think one of the reasons -- and correct me

18   if I'm wrong -- that there was hesitancy about going on,

19   back onto the opiates was because of what the opiates did to

20   his life, not the stigma.  Do you honestly believe that none

21   of these people were addicted?

22   A.      I can't say, sir.  I didn't evaluate them.  As a

23   diplomat in addiction medicine, I didn't evaluate them.

24   Q.      When you were on the telephone with Ms. Fox on your

25   initial conversation, during that telephone conversation, is

1    that when you agreed to be a witness for the defense?

2    A.      Yes.

3    Q.      And you agreed to be a witness for the defense before

4    you saw one file?

5    A.      Yes.

6              MR. MOLLOY:   If I might approach the witness, Your

7    Honor?

8              THE COURT:   You may.

9    BY MR. MOLLOY

10   Q.      I'm going to show you what counsel has introduced

11   through your testimony as P2.  Do you remember that document

12   from yesterday?

13   A.      Yes, sir.

14   Q.      Could you read Number 1?  I think actually you've

15   already read it, but could you read Number 1 at the top of

16   the far right-hand column?

17   A.      As an interim policy statement for physician to

18   prepare multiple prescriptions for a Schedule II controlled

19   substance on the same day with instructions to fill on a

20   different date, is tantamount to writing prescriptions

21   without -- is tantamount to writing a prescription

22   authorization of a Schedule II controlled substance.  To do

23   so conflicts with the provision of the C -- CSA which

24   provides no prescription for a controlled substance in the

25   Schedule II may be refilled.

1              MR. MOLLOY:  If I might again?

2              THE COURT:  You may.

3    BY MR. MOLLOY

4    Q.     Based on your review of the files, Doctor, is that

5    exactly what the defendant did, wrote multiple prescriptions

6    on the same day?  From your review of the files, didn't she

7    write multiple prescriptions on the same day?

8    A.     To the best of my knowledge, under federal

9    regulations, she did it when you were allowed to do it.

10   Q.     Well the document here, which is 2005, in the period

11   of time of the indictment, doesn't what you've just read say

12   you can't do it?

13   A.     Let me explain, sir.  You had the period of time

14   where you can write the do-not-fill prescription.  Then you

15   had a period of time where it took under advisement that the

16   DEA said you could not do it, and then they realized that it

17   was better to do it and they reinstated it.  That, what

18   you're reading now, is some of the letters that they got in

19   regards to the doctor not being able to do the do-not-fill,

20   and to make it clear that the patient did not have to come

21   to the office to get a prescription for his controlled

22   substance, especially a Schedule II and that prescription

23   could be mailed to the patient.

24   Q.     Didn't that document, written in 19 -- I'm sorry,

25   2005, specifically say that the defendant could not do what

1    she did, which is write multiple prescriptions on the same

2    day?

3    A.    To the best of my knowledge, she did not do it during

4    that time period.

5    Q.    To the best of your knowledge, she did not write

6    multiple prescriptions on the same day during this time

7    period; is that correct?

8    A.    To the best of my knowledge.

9    Q.    I believe you testified yesterday that you have to

10   trust the patient in regard to their pain.  Is that an

11   accurate statement of what you said?

12   A.    Yes.  Certainly you have to believe, trust the

13   patient.  I call it betting on the patient.  Believe,

14   evaluate, treat and re-evaluate.

15   Q.    When you're betting on the patient and the patient

16   tells you that his medication was stolen or his dog ate them

17   or they went down the sink, aren't those concerns that you

18   would have that you could not trust the patient, that you

19   could not bet on the patient?

20   A.    No.  It means that the patient needs education.  I

21   think that's a medical condition and what I do is bring the

22   patient in, and Dr. Roggow did the same thing, bring the

23   patient in and discuss the situation so that you could

24   educate the patient to keep their medicine safe.  That's all

25   you could do is try to educated your patients.  You're

1    dealing with a group of people and patients that generally

2    the community or the community of physicians do not want to

3    take care of.  We're taking care of the patients that nobody

4    wants to take care of because of their certain things in

5    their personality, their diseases, their syndromes, and the

6    idea -- we're practicing the only type of medicine that we

7    have the white elephant in the room.  We're practicing the

8    only type of medicine that has a police person looking over

9    your shoulder, the DEA looking over your shoulder, the

10   prosecutors looking over your shoulder.  There are no

11   insulin police people.  There are just opioid police people.

12   And we're headed towards a difficulty that everybody in the

13   room is aging and as we age, we're going to degenerate and

14   you're going to need a pain doctor and that pain doctor may

15   not be available if, you know, it becomes so onerous and so

16   difficult to practice the art of pain medicine.  And notice

17   I said the "art" of pain medicine, not the "science" of pain

18   medicine.

19   Q.    So if I understand your testimony this morning, if I

20   understand that correctly, you're saying that psychiatrists,

21   other people involved in the medical profession do not have

22   concerns about agencies policing their misdeeds, prosecutors

23   involved when they commit criminal acts?  Are you saying

24   that the other professions do not have that same concern,

25   that you're the only group of professionals who have

1    regulations that law enforcement enforces and prosecutors

2    prosecute?

3    A.      There's no absolutes in life.  But of all the

4    professions, whether it be psychiatrists, orthopedic

5    surgeons, et cetera, I think the pain doctor is under the

6    most scrutiny by the public, by the law enforcement agency

7    as opposed --

8    Q.      And is the reason -- I'm sorry.

9    A.      As far as -- as far as criminal behavior.

10   Q.      And one of the reasons that -- not agreeing with you,

11   not suggesting that what you're saying is true --

12   A.      I wouldn't expect you to.

13   Q.      -- but is one of the reasons that you do face

14   regulation is because of the highly addictive, dangerous

15   nature of the drugs that you prescribe?

16   A.      I take exception, marked exception of saying

17   addictive drug.  It's a drug that could cause physical

18   dependency, and if a patient as a genetic

19   neuropsychological, environment disposition they may -- and

20   I emphasize may -- become addicted to the drug.  But the

21   literature shows that if you treat chronic pain and do it,

22   you know, in a compassionate manner, the chances of you

23   creating the disease of addiction is very, very small.  And

24   any medicine that any doctor prescribes could be part of the

25   solution, part of the problem, or both.  And it's your job

1    to try to balance the risk and benefit of any medicine that

2    you prescribe.

3    Q.    Do you feel that the medicines in this case were part

4    of a solution?

5    A.    Yes.

6    Q.    Again, you've heard testimony as to what happened to

7    their jobs, their families, their lives, that they spent

8    years -- one of the -- one of the people testified walking

9    around like a zombie, and these prescriptions they were not

10   part of the problem; is that correct?

11   A.    What they did is have a side effect to a certain

12   medication and they made a clinical choice that rather --

13   that they didn't get tolerant and get used to the medicine

14   and get -- not get sedated, but they made a clinical choice

15   to continue the medicine.  You didn't hear one patient say,

16   "I got euphoric or high on the medicine."  You used the term

17   on a patient, but the patient did not come into this

18   courtroom euphoric or high and saying, "Boy, oh, boy this is

19   a lot of fun being on these medicines."  Nobody wants to be

20   on these medicines, but you make a choice.  Everything is a

21   choice, a choice, a free will of whether your life is going

22   to be better on or off the medicine and you heard it.  It

23   was one of your witnesses struggling who was on the medicine

24   and then was off the medicine for a period of time, Jeff --

25   and I'll pronounce his name wrong -- Giompalo, is struggling

1   whether -- with his wife and discussing whether he should go

2   back on the medicine or not despite the stigma associated

3   with the medicine.  He's debating this.  He's debating it

4   with his wife.  He's debating it with himself, whether he

5   should go back on this medicine because the medicine gave

6   him a better quality of life than he has without the

7   medicine.

8   Q.    Now, you indicated when you were talking on direct

9   that there is no ceiling of what a doctor can prescribe in

10  terms of pain pills.  I believe you said you could prescribe

11  a hundred -- a million pain pills -- a million units and it

12  wouldn't be illegal?

13  A.    It would be not illegal but it would be

14  inappropriate.

15  Q.    Inappropriate?  Wouldn't that cause someone's death?

16  A.    That was just a figure of speech, sir.

17  Q.    I understand.  How about 250,000?

18  A.    I don't put a number on it.  You can't say that a

19  certain number is good and if you go below that certain

20  number -- excuse me a certain number is bad.  If you go

21  above that number, a certain number is good.  It's an art.

22  It's not an exact number.  It's not like blood sugar.  It's

23  not like you give insulin and try to get the blood sugar

24  between 80 and 120 throughout the day.

25  Q.    So there is no --

1    A.      You're trying to make it very simple, a very complex

2    encounter with a patient.  You're trying to make it simple,

3    that you just go for a number and if you just go for that

4    number, then that's all you have to do and you can't go

5    beyond that number.  Doesn't work that way in the real

6    world.  I'm talking about the real world and these patients

7    are in the real world trying the best they can despite, you

8    know, their histories, various histories.  They're trying to

9    make it in the real world.

10   Q.      Certainly, Doctor, in the real world these

11   prescriptions caused a great deal of damage to their lives;

12   wouldn't you agree?

13   A.      No, sir.

14   Q.      And you're saying that there is no ceiling, that you

15   can prescribe as much as you want and if you were to

16   prescribe a million pills, 250,000 pills, it might be

17   inappropriate, is that the word you used?

18   A.      No, what I'm saying is I think the jury --

19   Q.      Excuse me, Doctor, isn't that the word you used?

20   A.      Yes, it's a pharmacological principal which I was

21   saying, which I would be happy to explain to the jury to

22   make it perfectly clear.  This pharmacological principal

23   with the mu-agonist that because there's no -- there's no

24   ceiling on the dose, there's no -- there's no limit

25   secondary to a pharmacological principal.  A pharmacological

1   principal is how the drug works.  Most drugs have -- you

2   can't keep on prescribing and keep on doubling and doubling

3   and doubling because there will be toxic side effects.  You

4   can't just increase the insulin and increase the insulin or

5   the patient would get hypoglycemia, which is blow blood

6   sugar, and seize and die.  You can't keep increasing a

7   diuretic, keep on increasing and increasing a diuretic

8   because the patient will get electrolyte imbalance and have

9   muscle cramps and again, may die.  But opioids, you can't,

10  by a pharmacological principle, they're called mu-agonist

11  medicines.  Mu stands for the receptor site in the brain

12  that they go.  Agonist, and you have to speak of the

13  mu-agonist medicine that we've heard about, the Dilaudids of

14  the world, the Hydrocodones of the world, the morphines of

15  the world, the Methadones that we heard are mu-agonist

16  medicines.  And what the person does, takes it in their

17  mouth, swallowed, it gets absorbed and what the body does to

18  the drug is called pharmacokinetics and what the drug does

19  to the body is called pharmacodynamics.  And what happens,

20  the drug goes to a receptor site in the brain like a key in

21  a lock, called mu receptor site.  This is the agonist.  The

22  mu-agonist, which is the drug, goes into the receptor site,

23  which is the mu-agonist and what it does is release certain

24  chemicals that give you analgesia or pain relief.

25          Now it was taught very early in pain management

1  that -- and this was taught by CME professors, meaning at

2  meetings at regional, national meetings that -- that if --

3  and CME means Continuing Medical Education.  It was taught

4  very strongly that if two didn't work then you go to four,

5  if four didn't work you go to eight.  In other words, there

6  was no ceiling in the medicine.

7          As we progressed in knowledge and everything's

8  changing, just like one of the prosecutor's witness, the

9  pharmacologist said, what was true yesterday is not

10 necessarily true today or tomorrow and just only recently --

11 recently have we realized that that principle, which is a

12 physiological principle, has to be looked at again in

13 regards to the doses that we use on patients, and that's

14 recent.

15 Q.    The events, Doctor, that happened in these people's

16 lives were not necessarily recent.  Some of these people

17 have been on the doctor's prescriptions for over a decade.

18 Isn't it true, from you hearing the testimony, that the only

19 reason that they stopped was because their doctor got

20 stopped?  The only reason that they stopped taking pills was

21 because she had her license emergency suspended?  I guess

22 the question is, Doctor, where does it stop?  Where does it

23 stop when you just keep doubling and doubling and doubling?

24 Where does it end?

25 A.    It ends when a -- it ends or it doesn't end with a

1    consultation of a doctor/patient relationship and them both

2    making a decision together.  The fact that the doctor lost

3    his license is horrible and patients went through horrible

4    withdrawal because they couldn't have access to their

5    medicine that they were physically dependent on, not

6    addicted to.

7    Q.    Is -- one last question, Doctor.  Before you saw the

8    first file, before you saw the first piece of paper in those

9    files, you agreed to become a defense witness; is that

10   correct?

11   A.    Yes, after Dr. Fox [SIC] explained the issues of the

12   indictment, absolutely.

13            MR. MOLLOY:  No further questions.

14            THE COURT:  Ms. Bolen?

15            MS. BOLEN:  Just a little bit, Your Honor.  Good

16   morning, Dr. Heit.

17            THE WITNESS:  Good morning.

18                 REDIRECT EXAMINATION

19   BY MS. BOLEN

20   Q.    Do, in your experience, people with untreated chronic

21   pain end up with some of the strife that you heard testified

22   about?

23   A.    Absolutely.  And I think it gets exacerbated with

24   untreated chronic pain.

25   Q.    And by exacerbated, you mean what?

1    A.      It gets increased, and then you have people who don't

2    get treated for chronic pain appropriately, then go to the

3    street to illicitly get medication in order to relieve their

4    pain.   And then you have people who are in recovery from the

5    disease -- disease of addiction who don't get treated for

6    their pain because of the stigma of having the disease of

7    addiction and nobody wants to take care of them.   It would

8    be wonderful if the person with disease of addiction didn't

9    have pain.   But if they don't get pain treatment, they have

10   a lot of stress, obviously, with the chronic pain, and

11   stress is a major factor of relapsing to your drug or drink

12   of choice.

13   Q.      And just to clarify, to make sure that the concept of

14   withdrawal attached to physical dependence, is that what any

15   of us that took these medicines for a long period of time

16   would go through, if we stopped taking the drug

17   automatically?

18   A.      Absolutely.

19   Q.      And so had somebody that was on medication,

20   regardless of the dose, and they've been on it for several

21   years, if they stop their medicine, would they experience

22   symptoms of withdrawal?

23   A.      Which medicine are you talking about?

24   Q.      Any controlled medication that's used for pain

25   management as an opioid analgesic?

1   A.      Absolutely.  They would go into withdrawal.  It's not
2   dose dependent.
3           MS. BOLEN:  And Your Honor, may we approach for a
4   minute?
5           THE COURT:  Me?
6           MS. BOLEN:  Yes, sir.
7           THE COURT:  Sure.
8           (At sidebar, Court, counsel, and defendant
9   present)
10          MS. BOLEN:  On the cross examination, Government
11  counsel raised the issue of the do-not-fill prescriptions
12  again and intimated that perhaps the defendant wasn't doing
13  it right during the time.  I did not introduce this during
14  the direct because I didn't feel it would be appropriate,
15  but now that it's been opened, I intend to go into the "dear
16  DEA" letter series that was published by this doctor in a
17  peer review pain medicine journal where he wrote a letter to
18  the DEA and the DEA wrote a letter back.  The letter's
19  captured and relates directly to the multiple Schedule II.
20  The DEA answers in 2004 that it is appropriate for it to be
21  done.  I'd like to introduce it for that limited purpose.
22  There are other letters attached to it.  This is the full
23  document that I showed Government counsel and I'll happy to
24  redact so that only that letter is in so we don't confuse
25  the issue.  But it doesn't matter to us whether all the

1    letters are in.

2             THE COURT:  It looks like this is in a journal.

3             MS. BOLEN:  Peer reviewed medical journal called

4    Pain Medicine, and he is the author of the question to DEA.

5    He was the recipient of the letter from DEA.  And that is

6    the peer reviewed public article that this doctor pulled off

7    of the --

8             THE COURT:  And this relates to the time period

9    within the scope of the indictment?

10            MS. BOLEN:  Yes, sir.  Yes, sir, it was published

11   in 2004, asked in 2004, and answered by the DEA in that

12   period.

13            THE COURT:  And how does this relate, time-wise,

14   to P2?

15            MS. BOLEN:  P2 was in August of 2005.  So it

16   actually -- this predates the P2 by about a year.  I can't

17   see the -- I don't remember the exact date in 2004 that that

18   letter was published but it is directly relevant to the

19   cross examination.

20            THE COURT:  All right.  Mr. Molloy?

21            MR. MOLLOY:  Your Honor, I don't understand how a

22   document written by the doctor can be introduced into

23   evidence, to bolster his testimony.  Certainly the defense

24   attorney can ask about the specific part that he read, but

25   to use a letter that he wrote to say that he was right

1    doesn't strike me as something that one can adduce.

2          MS. BOLEN:  There's a response letter from DEA

3    that says -- that characterizes what the doctor can and

4    cannot do by Patricia Good, who I believe was the chief for

5    the Liaison Division of Diversion for DEA and that was her

6    responsibility to communicate back to doctors and that's why

7    they published this in this peer reviewed journal.

8          THE COURT:  All right.  Do I understand that you

9    really want the first series of letters as opposed to the

10   second and third?

11         MS. BOLEN:  Yes, sir.  I don't think the second

12   and third have relevance.  I just wanted to give Mr. Molloy

13   a complete document.

14         THE COURT:  All right.

15         MS. BOLEN:  And if the Court is concerned about

16   the peer reviewed journal, it would take me a minute to go

17   into the web site and I believe I can find the "dear DEA"

18   series on the DEA web site but it would take me a little bit

19   of time, so I went with the peer reviewed journal.

20         THE COURT:  You say the DEA web site.  You mean

21   they published it as well as --

22         MS. BOLEN:  Yes, sir.  They have a series of

23   publications and information that doctors can go to and this

24   is one of the, ones if I'm not mistaken, in their

25   publication area.

1          THE COURT:  All right.  In terms of the exhibit,
2     the second and third series will be redacted.  I understand
3     that's not being offered.  With regard to the first letter
4     and the response, the Court would admit the response from
5     the DEA.  It doesn't seem to me from my reading that it's
6     necessary to have the letter from the doctor in order to
7     have the response make sense.
8          MS. BOLEN:  I'm happy to redact that, Your Honor.
9     I think the doctor can testify that he sent a letter in,
10    give the general characteristics, and then we can admit the
11    response in a redacted format which we'll have to do on a
12    break.  There's not a real way for me to publish it to the
13    jury but I think I can just simply have him read that
14    section.
15         THE COURT:  I agree, it would be hard to redact
16    and publish it now.  So the Court's ruling is the objection
17    is partially sustained but the Court will admit the letter
18    response from Ms. Good for the first letter.
19         MR. MOLLOY:  And I believe defense counsel has
20    indicated pre-redaction that she'll have the defendant read
21    or defense counsel read the section that the Court's
22    admitted?
23         MS. BOLEN:  Yes, sir, but I would like to have a
24    little bit of latitude in explaining it to this witness to
25    make sure he understands not to go into the details, however

```
 1    the Court's pleasure on that.  Maybe you want me to take it
 2    up now or do it through questioning and pointing it out to
 3    him.
 4              THE COURT:  I figure you just do it through
 5    questions.
 6              MS. BOLEN:  Yes, sir.
 7              THE COURT:  You can testify that -- have him
 8    testify he sent a letter and this was the response.
 9    Shouldn't be a problem.
10              MS. BOLEN:  Yes, sir.
11              (Sidebar concluded)
12              MS. BOLEN:  Your Honor, if I might just have a
13    moment to make sure I'm oriented on the page?
14              THE COURT:  Yes.
15              (Pause in place)
16    BY MS. BOLEN
17    Q.    Doctor Heit, were you involved in -- without going
18    into tremendous detail, were you involved in sending an
19    inquiry to the DEA about the use of these do not fill
20    prescriptions sometime in 2004?
21    A.    Yes.
22    Q.    Do you recall the approximate time frame that you got
23    involved in that, whether it was before or after August of
24    2004?
25    A.    I could only say that I became involved when the DEA
```

1    rescinded that regulation that you could not do the

2    do-not-fill and the DEA at that time considered it a refill,

3    refill of a Schedule II prescription.  I thought, and many

4    of my colleagues thought that was a wrong interpretation of

5    the do-not-fill.

6    Q.    Did you, in fact, send a letter to DEA asking them

7    about their position on do-not-fills?

8    A.    Yes.

9    Q.    And just to reorient everybody to the do-not-fill

10   that we discussed late yesterday, could you just give a

11   simple explanation of it, please?

12   A.    Yes, I can.  A do-not-fill allows a physician who has

13   a registration -- well, wait.  I'll be simple.  Do not fill

14   allows you to fill -- write multiple prescriptions on the

15   same date to be dispensed by the pharmacist on different

16   days.  In other words, usually the insurance company will

17   pay for your medicine every 30 days.  In order to save you

18   money and time that you don't have to go to the doctor's

19   office, the doctor is allowed to write three prescriptions

20   absolutely the same with the date in the right upper-hand

21   corner, the date of issuance.  And then on the second

22   prescription write "do not fill" 30 days after that date in

23   the right upper-hand corner.  In the third prescription,

24   write 60 days after the date in the right upper-hand corner,

25   and that's a legal way to prescribe a controlled II

```
 1   medication.  That's call sequential prescriptions, and you
 2   can do that up to including 90 days and the pharmacist
 3   cannot, under the regulation, fill the second or third
 4   prescription until that do-not-fill date or after that
 5   do-not-fill date.
 6   Q.     Did you receive a response from the DEA?
 7   A.     Yes, I did.
 8   Q.     And did you -- were you part of a group that had that
 9   published in a peer reviewed journal?
10   A.     Yes, I did.
11   Q.     Which peer reviewed journal was that?
12   A.     I think it was Pain Medicine, but I'm not exactly
13   sure.
14          MS. BOLEN:  Your Honor, may I approach the
15   witness?
16          THE COURT:  You may.
17   BY MS. BOLEN
18   Q.     Dr. Heit, I'm going to show you what's been marked
19   for identification as Defendant's Exhibit P4.  Is this
20   part -- is this that document you're referring to?
21   A.     Yes.  These --
22   Q.     Don't go into the detail, please.  So it is the
23   document; correct?
24   A.     Yes.
25   Q.     And can you identify the time frame of the material
```

1    for us, please?

2    A.        November 3rd, 2004.

3    Q.        Does that say Number 3 or November 3?

4    A.        Oh, that's -- excuse me, it's Number 3.

5    Q.        Is there a date at the top in 2004?

6    A.        Yeah, August 24th, 2004.

7    Q.        All right, and --

8    A.        I'm sorry.

9    Q.        And does Defense Exhibit P4 contain the DEA's

10   response to your letter?  Yes or no is what I'm looking for

11   there.

12   A.        Yes.

13           MS. BOLEN:  And without -- Your Honor, we'll offer

14   Defense Exhibit P4 pursuant to the --

15           MR. MOLLOY:  I'm sorry?

16           MS. BOLEN:  We'll offer Defense Exhibit P4

17   pursuant to the Court's ruling.

18           MR. MOLLOY:  Pursuant to the Court's ruling, no

19   objection.

20           THE COURT:  The Court will admit the portion of P4

21   we discussed at sidebar.

22           MS. BOLEN:  Now Dr. Heit, I don't want you to

23   go -- may I publish it, sir, through him?

24           THE COURT:  You may.

25           MS. BOLEN:  I only want you to read the response

1   you received from DEA as it relates to the do-not-fill

2   prescriptions.  And Your Honor, may I publish this up on the

3   screen, too -- I can't do both, I think.  We'll read it

4   together on the screen.  Let me have this back.  Thank you,

5   my bad.

6           And I do believe, Your Honor, I can cover it up

7   and take care of the problem.

8           THE COURT:  That's fine.

9   BY MS. BOLEN

10  Q.    Can you see that, Dr. Heit?

11  A.    Yes, I can.  I just want to clarify, this is the peer

12  reviewed article that the second author is Patricia Good,

13  who's head of DEA Diversion at that time.

14  Q.    All right.  I want you to just kind of go with me and

15  read aloud here, starting with "Dear Dr. Heit"?

16  A.    Dear Dr. Heit --

17  Q.    That's you; right?

18  A.    Yes, it is.

19  Q.    Okay.

20  A.    This is in response to your correspondence regarding

21  the DEA's policy concerning the legality of a practitioner

22  issuing several Schedule II prescriptions on the same date

23  for the same medication for a stable patient or for other

24  clinical reasons.

25          THE COURT:  I'm sorry, counsel, come to sidebar,

1   please.

2              (At sidebar, Court, counsel, and defendant

3   present)

4              THE COURT:  He talked about the other author being

5   Patricia Good.  I want to make sure these are real letters

6   and real correspondence and not just fictional exchange --

7              MS. BOLEN:  Yes, sir.  I'll clarify that, then,

8   yes, sir.

9              THE COURT:  Okay.

10             (Sidebar concluded)

11  BY MS. BOLEN

12  Q.    Before we continue reading, Dr. Heit, do you know a

13  real person named Patricia M. Good?

14  A.    Yes, I do.

15  Q.    Did you know her back in 2004?

16  A.    Yes, I did.

17  Q.    And how do you know Ms. Good?

18  A.    I knew Ms. Good participating with meetings with the

19  DEA, continuing medical education meetings with the DEA, and

20  I also know her as when I called her initially, in other

21  words --

22  Q.    Don't go into any of your conversations with her,

23  please.  I think I can go on from there.  Is this the same

24  Patricia Good you referred to yesterday in your direct

25  testimony?

1    A.      Yes.

2    Q.      And this information that's in this, the journal

3    here, this is -- particularly her response, tell us whether

4    or not this was a real letter that you received from

5    Patricia Good.

6    A.      This was a real letter and Patricia Good knew that I

7    was going to use it for a publication and for teaching.

8    Q.      All right.  And did you personally receive this

9    letter?

10   A.      Yes, I did.

11   Q.      Was anything changed about the letter in the

12   publication?

13   A.      The essence is the same.  Whether words were changed

14   because of space limitations and rewriting it, but

15   essentially it was the same information.

16   Q.      Do you know whether or not Ms. Good had a chance to

17   look at it before the editorial markings were made?

18   A.      Oh, absolutely.

19          MS. BOLEN:  Your Honor, may I continue?

20          THE COURT:  You may.

21   BY MS. BOLEN

22   Q.      I think you left off at the second part where it says

23   "the DEA regulations"?

24   A.      The DEA regulations do not prohibit a practitioner

25   from issuing more than one prescription at a time if, in

1   keeping with the practitioner's professional medical

2   judgment, multiple prescriptions are issued at a time each

3   must bear the actual date that the prescriptions were issued

4   and signed as well as directions for dispensing.  For

5   example, if three prescriptions each for 30 day supply are

6   issued on January 9, 2003, each prescription must be dated

7   January 9, 2003.  In addition, the prescription to be filled

8   at later dates must include directions for dispensing

9   pharmacists such as "do not dispense before February 9,

10  2003, and do not dispense before March 9th, 2003".  Although

11  Title 1 of the Code of Federal Regulations Section 1306.12,

12  parentheses, 21 CFR 1306.12, end of parentheses, prohibits

13  the refilling of a prescription for a Schedule II controlled

14  substance, the DEA does not, and -- does not consider

15  multiple prescriptions in the scenario outlined above as

16  refill and has authorized this practice provided that it's

17  not in violation of the laws of the state in which the

18  practitioner is licensed.

19  Q.     I'll have you stop there.

20  A.     Exactly what I said.

21         MS. BOLEN:  Your Honor, may I just have a moment?

22         THE COURT:  You may.

23         (Discussion off record)

24         MS. BOLEN:  Pass the witness.

25         THE COURT:  Mr. Molloy, anything further?

1                    MR. MOLLOY:  Just one question.

2                         RECROSS EXAMINATION

3    BY MR. MOLLOY

4    Q.     I believe counsel established that that letter was

5    written in 2004.  Do you remember what year, what year

6    this --

7    A.     The original letter?

8    Q.     Well, what she had you read.

9    A.     It's -- it's on the top there.  You could see it.  I

10   mean, if counsel would give it back to me, I could tell you.

11                   MR. MOLLOY:  If I might approach, Your Honor?

12                   THE COURT:  You may.

13                   THE WITNESS:  Yes, 2004.

14   BY MR. MOLLOY

15   Q.     And if you recall, defendant's other exhibit

16   addressing this issue was written in 2005.  Do you recall?

17   A.     Yes.

18   Q.     It was written in 2005?

19   A.     Right.

20   Q.     With within the time period of this indictment?

21   A.     Yes.

22   Q.     You're familiar with the indictment.  And I

23   understand this might be stating the obvious, but the last

24   patient or the last charge alleges 2010 and so the

25   defendant's document that was written in 2005, there's still

```
 1   five years before the end of the indictment.  Would you say
 2   that's true?
 3   A.      Could you repeat the question?
 4   Q.      If this is written in 2005 and the last criminal act
 5   alleged is in 2010, wouldn't you agree that there's a five
 6   year span in there?
 7   A.      Yes, sir.
 8                MR. MOLLOY:  Nothing further.
 9                THE COURT:  Ms. Bolen?
10                MS. BOLEN:  Yes, Your Honor, may we approach the
11   bench?
12                THE COURT:  You may.
13                (At sidebar, Court, counsel, and defendant
14   present)
15                MS. BOLEN:  This is --
16                THE COURT:  Show me P2, please.
17                (Document provided to the Court)
18                THE COURT:  All right, thank you.  Go ahead.
19                MS. BOLEN:  Your Honor, the document that I just
20   handed you marked for identification as P5, I believe, is an
21   official federal register document published by the DEA I
22   believe in December or November of 2007.  The document
23   refers to a final policy statement published by the DEA at
24   that time that put into effect its proposed rule published
25   in 2006, related to the use of multiple Schedule II
```

1    controlled substances.  In effect, what's happened here is

2    in 2004, DEA said multiple Schedule II prescriptions were

3    allowed.  Then they took it back, then they put it back out

4    in a proposed rule, then they've published a final rule.

5    All of this is coming within the time frame of the

6    indictment.  The document that I handed you marked for

7    identification as Defendant's Exhibit P5 is a rather

8    extensive DEA reiteration of all of the public comment that

9    they received in connection with the multiple IIs.  I'm not

10   sure that all of that is relevant for the jury.  It is

11   directly relevant to what's going on here but might

12   complicate the issue.  It would be my intent to ask this

13   witness whether or not he is aware of this and whether or

14   not there was this back and forth during this time frame

15   that was created through the go and take it, put it out,

16   take it back, put it out, take it back.  But it is relevant

17   to Mr. Molloy's recross of this witness, given what he

18   asked.

19           THE COURT:  So are you going to be moving the

20   production of this or just using --

21           MS. BOLEN:  Your Honor, I think the proper way to

22   do this would be to ask the Court to take judicial notice of

23   it and give counsel time to come up with a summary that

24   either attaches the front cover sheet of that document or

25   some fair characterization of all of the convoluted

 1   information.  If counsel wants the entire document in, I
 2   don't believe we have any objection to it.  I'm just afraid,
 3   without a very careful reading over and over again, it would
 4   be unfair to either party and to the jury to take that
 5   stuff.  We'll leave that to the Court's discretion.
 6           THE COURT:  Mr. Molloy?
 7           MR. MOLLOY:  I think it's a little difficult to
 8   offer this -- this document as the standard for what you can
 9   and can't do with DEA.  I think what happened is
10   underneath -- not highlighted.
11           THE COURT:  Wait a second.  You're referring to
12   P2, which I already admitted.
13           MR. MOLLOY:  Yes, sir.
14           THE COURT:  All right, go ahead.
15           MR. MOLLOY:  This document was referred to as the
16   standard in clarification of existing requirements under the
17   Controlled Substance Act, in terms of prescribing Schedule
18   II controlled substances.  This is offered as the standard.
19   Underneath this paragraph that's not highlighted that the
20   doctor has testified -- that the doctor has testified, and
21   this was read to him, I believe, and he said that that's
22   exactly what the letter did.
23           Now we have a letter that predates this that says
24   this is what the standard is and now we have this that
25   postdates this that says this is what the standard is.  My

1  problem with P2, it was offered as the standard and so

2  that's where my difficulty lies.

3          MS. BOLEN:  May I offer a brief response, Your

4  Honor?

5          THE COURT:  I'm thinking.

6          MS. BOLEN:  Okay.

7          THE COURT:  Not about that question.  Let me just

8  think out loud a little bit.  It seems to me that even if P2

9  was offered as the standard, there has been testimony that

10 the standard has changed over time.  We now have the -- as

11 you say, the letter that predates P2, we have P2, and the

12 proposed exhibit is P5 which postdates this and purports to

13 be the final rule effective at the end of 2007 dealing with

14 this same area.  There may be different rules and procedures

15 and standards, but so be it.  So to the extent the objection

16 is based upon that they had initially sought P2 as the

17 standard and now they want to change that with P5, the dates

18 are different, I don't see any problem there.  I don't think

19 the Government has voiced any objection to authenticity of

20 this federal regulation.

21         MR. MOLLOY:  That's correct, Your Honor.

22         THE COURT:  The only issue may become it's fairly

23 long and has information that may not be useful to this

24 particular issue.  Having said that, I think P5 is

25 admissible.  If the parties want to summarize it or if you

1    want to just elicit from this witness that there is a

2    Federal Register document consistent with this, without

3    admitting the document, that's strategy.  That's up to you.

4    But I would admit P5 if it was offered and I will allow this

5    witness to testify about its contents, ask for his

6    understanding of the contents, and that's my thought.  You

7    were going to say something?

8          MS. BOLEN:  I was just simply going to say, Your

9    Honor, that all of these documents, with the exception of

10   Ms. Good's letter, are part of the rule-making process that

11   DEA goes through.  There's several other pieces and you

12   know, in good faith, there's a lot of stuff that could be

13   put in here but I think it's appropriate to have the final

14   rule in place.  The final rule is Defense Exhibit identified

15   for P5.  It refers to the interim policy and it makes a

16   complete picture.  P2 and P5 are actually different topics.

17   P2 is related to the quantity and the mailing and things

18   like that and it was -- has a place in time with the DEA and

19   the changes in this area.

20         THE COURT:  All right.  Well, I think my ruling is

21   if you wish to admit P5, go ahead and do so, I will admit

22   it.  If not, that's your call.

23         MS. BOLEN:  Yes, sir.

24         MS. FOX:  Your Honor, after we finish this

25   witness, which I think may be soon, could we have a recess

1    so we can discuss the motion in limine we made at the very

2    beginning of the trial with Dr. Roggow's health situation?

3         THE COURT:  Refresh my memory as to your motion in

4    limine.

5         MS. FOX:  It I believe it was the Government's

6    motion in limine.

7         THE COURT:  Oh, breast cancer.

8         MS. FOX:  Yes, sir.

9         THE COURT:  Sure.

10        MS. FOX:  Thank you.

11        (Sidebar concluded)

12        THE COURT:  You may proceed.

13        MS. BOLEN:  Your Honor, I just have a brief

14   series, here.

15   BY MS. BOLEN

16   Q.    Dr. Heit, are you familiar with the DEA interim

17   and -- or excuse me, proposed rule and final rule on the

18   issuance of multiple prescriptions for Schedule II

19   controlled substances.

20   A.    In a general sense, yes.

21   Q.    To your knowledge, was that final rule discussed and

22   published in a document called the Federal Register?

23   A.    Yes.

24        MS. BOLEN:  Your Honor, may I approach?

25        THE COURT:  You may.

1    BY MS. BOLEN

2    Q.    Dr. Heit, I'm going to show you what's been marked

3    for identification as Defense Exhibit P5 ask you to just

4    take a look without talking about the document to see if you

5    recognize that item and the substance discussed within it.

6    A.    Yes, I'm familiar with this.  I read this multiple --

7    you know, not only -- multiple times, yes.

8    Q.    And the time frame of the document is what year, sir?

9    A.    November 19th, 2007.

10   Q.    Does this relate to the multiple prescriptions for

11   Schedule II controlled substances?

12   A.    Yes, it does.

13           MS. BOLEN:  Your Honor, we'll offer Defense

14   Exhibit P5.

15           THE COURT:  Same position as at sidebar?

16           MR. MOLLOY:  Yes, sir.

17           THE COURT:  P5 will be admitted.

18           MS. BOLEN:  May I just briefly publish the front

19   page of it, Your Honor?

20           THE COURT:  You may.

21   BY MS. BOLEN

22   Q.    And just quickly summarize your understanding of

23   Defense Exhibit P5, that is this final rule on issuance of

24   multiple prescriptions.

25   A.    In essence what it says is they're now allowing the

```
 1   practitioner to prescribe sequential prescriptions of
 2   Schedule II medications effective a certain date.  I think
 3   it's December that you're allowed to do it again.
 4   Q.     So they allowed it, didn't allow it, and allowed it
 5   again?
 6   A.     You got it.
 7              MS. BOLEN:  No further questions, Your Honor.
 8              THE COURT:  Mr. Molloy?
 9              MR. MOLLOY:  If I may have a moment, Your Honor?
10              THE COURT:  You may.
11          (Discussion off record)
12                      RECROSS EXAMINATION
13   BY MR. MOLLOY
14   Q.     Just a couple questions, Doctor.  In order to write
15   the prescriptions on the same day, what are the requirements
16   that you have to actually write on that prescription in
17   order for it to be legal?
18   A.     You have to write the date in the right upper-hand
19   corner, the name of the patient, the medication to be
20   prescribed, the dose -- the dose, the individual dose of the
21   medicine to be prescribed, how many should be dispensed by
22   the pharmacist, and directions how to use it and your
23   signature.
24   Q.     Would you also have to write on it "do not fill"?
25   A.     That's not the question you asked, sir.
```

1   Q.     Doctor, I'm not debating you.  I'm asking you when

2   you write prescriptions on the same day in the manner that

3   you've described, do they have to write on one of the

4   prescriptions "do not fill"?

5   A.     If you're doing the sequential prescriptions, the

6   first one you do not have to write that.  The second and

7   third prescription, you do have to write that.

8   Q.     From your examination of the files in this case,

9   isn't it true that the doctor did not do that?

10  A.     To the best of my knowledge, she did do it.

11         (Discussion off record)

12         MR. MOLLOY:  No further questions.

13         THE COURT:  Anything further?

14         MS. BOLEN:  No, sir.

15         THE COURT:  You may stand down.  Thank you.

16         (Witness excused)

17         (Proceedings continued, EXCERPT concluded)

18

19                    CERTIFICATE

20  I CERTIFY THAT THE FOREGOING TRANSCRIPT IS A TRUE AND
    ACCURATE TRANSCRIPT FROM THE ORIGINAL STENOGRAPHIC RECORD IN
21  THE ABOVE-ENTITLED MATTER.

22     Dated this 11th day of October, 2012.

23
                          /s/ R. Joy Stancel
24                        _____
                            R. JOY STANCEL, RMR-CRR
25                        FEDERAL OFFICIAL COURT REPORTER