UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO. 2:11-CR-114-FTM-29SPC

---

THE UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                          Fort Myers, Florida
                                             June 19, 2012
DEBRA ROGGOW,                                9:30 A.M.

        Defendant.

---

TRANSCRIPT OF EXCERPT OF JURY TRIAL DAY 6 of 10
(Testimony of Paul Doering)

BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT JUDGE


FOR THE GOVERNMENT:     Office of the United States Attorney
                        U.S. Courthouse
                        2110 First Street, Room 3-137
                        Fort Myers, Florida  33901
                        239/461-2200
                        BY:  DOUGLAS MOLLOY, A.U.S.A.


FOR THE DEFENDANT:      Fox & Ramunni, PA
                        2211 Widman Way, Suite 250
                        Fort Myers, Florida  33901
                        239/791-3900
                        BY:  AMIRA DAJANI FOX

                        Hollander & Hanuka
                        2325 Stanford Court
                        Naples, Florida  34112
                        239/530-1800
                        BY:  LEE HOLLANDER

APPEARANCES (Cont'd)

```
                        The J. Bolen Group, LLC
                        14875 Buttermilk Road
                        Lenoir, TN  37771
                        865/368-3472
                        BY:  JENNIFER BOLEN


REPORTED BY:            R. JOY STANCEL, RMR-CRR
                        Federal Official Court Reporter
                        U.S. Courthouse
                        2110 First Street
                        Fort Myers, Florida  33901
                        239/461-2064
```

```
 1                  (Call to Order of the Court)
 2                  THE COURT:  Have the jury step in, please.
 3                  COURT SECURITY OFFICER:  Yes, sir.
 4                  (Jury in)
 5                  COURT SECURITY OFFICER:  Please be seated.
 6                  THE COURT:  Good morning, ladies and gentlemen.  I
 7     apologize for the delay in getting started.  It's my fault,
 8     not the lawyers, so you're going to have to blame me.
 9     Mr. Molloy, you may proceed.
10                  MR. MOLLOY:  Your Honor, the Government would be
11     calling Paul Doering.
12                  DEPUTY CLERK:  If you'd raise your right hand,
13     please?
14                  (The Witness is Sworn)
15                  DEPUTY CLERK:  You may have a seat.  State your
16     full name, spelling your last.
17                  THE WITNESS:  My full name is Paul Louis Doering,
18     D-O-E-R-I-N-G, and Louis is L-O-U-I-S.
19                          PAUL L. DOERING,
20          a witness herein, after having been duly sworn,
21          was examined and testified under oath as follows:
22                          DIRECT EXAMINATION
23     BY MR. MOLLOY
24     Q.    Mr. Doering, good morning.
25     A.    Good morning, sir.
```

1    Q.      What do you do for a living?

2    A.      I am actually now a retired Professor of Pharmacy at

3    the University of Florida.  I am -- my official title is

4    Distinguished Service Professor Emeritus, College of

5    Pharmacy, University of Florida.

6    Q.      Give us an idea of your educational background, sir.

7    A.      Yes, sir.  I graduated from the University of

8    Florida's College of Pharmacy in 1972 with a bachelors

9    degree in pharmacy, and thereupon, I entered the study of

10   what was called clinical pharmacy.  Clinical pharmacy is

11   less than mixing and making of drugs and more how the drugs

12   work in the human body.  At that time, the highest degree in

13   that area was the Masters of Science in Clinical Pharmacy,

14   and I achieved that degree in August of 1975.

15   Q.      And after August of 1975, what profession did you

16   pursue?

17   A.      Well, I immediately went to work for the College of

18   Medicine at the University of Florida.  My specialty at that

19   time was drug effects in pregnancy and breast feeding.

20   Studied under a grant from the United States Food and Drug

21   Administration.  Funding priorities changed at that time and

22   two years into that project, I found myself in search of a

23   job.  It was fortuitous that a position came open in the

24   College of Pharmacy as a full-time professor of pharmacy and

25   in January of 1976, I began what's now been a 35 year

```
 1   career, starting first as an assistant professor and then at
 2   five year intervals being promoted to associate professor to
 3   full professor, and then I was fortunate to be named
 4   Distinguished Service Professor, and I'm the only one in the
 5   history of our college that's been promoted to that level.
 6   Q.     I'm going to ask you some questions and would it be
 7   appropriate to refer to you as Professor Doering?
 8   A.     Yes, sir.  I'm not Dr. Doering because there was no
 9   such program.  Sometimes I get asked what would it take for
10   you to get your doctorate and I somewhat sarcastically say
11   I'd have to take the courses I now teach and even though I
12   give myself all As, the university doesn't allow me to do
13   that.  So I finished my career as Mr. Doering or Professor
14   Doering.
15   Q.     Professor, I'm going to ask you some questions about
16   pain medication.  Before I do that, I was wondering if you
17   could explain to the jury what a controlled substance is?
18   A.     Yes, sir.  Maybe it would be best if I took maybe one
19   giant step or two giant steps back, because it's very
20   unclear what really even constitutes a drug, you know.  For
21   example, people say, "Is Vitamin C a food or a drug?"  Well,
22   if your mom says, "Drink your orange juice, it's good for
23   you," it's a food.  If I say, "Take Vitamin C to cure your
24   cold," it's a drug.  So let me --
25   Q.     That's fine.  Take two steps back.
```

1   A.      Yes, sir.  So in this world, there are chemicals,
2   okay.  Some of those chemicals have medicinal properties;
3   some of them don't.  Gasoline, in general, is not a good
4   drug because it doesn't do anything to meet the definition
5   of a drug.  But in general, a drug can be defined as
6   anything other than food that's used in the diagnosis,
7   mitigation, prevention of disease in man or other animals,
8   or anything that alters the structure and function of the
9   human body.  So now what we've done is taken that whole
10  degree of chemicals and subdivided them into non-drugs and
11  drugs.
12          Now, in our regulatory scheme, drugs are then
13  broken down into two categories.  What people call OTC drugs
14  or non-prescription drugs, those are the ones you can walk
15  into any gas station, supermarket, and pharmacies as well,
16  and buy without input from any health care professional.  In
17  common terms, they're very safe.  They have a wide margin of
18  safety, and not that I'm going to recommend anyone to take
19  four aspirin instead of the two, it's engineered such or
20  regulated such that if that were to happen, there is a
21  built-in safety factor.  I'm going to come back and talk
22  about that in a moment.  There are some drugs that don't
23  have that safety factor.
24          OTC drugs, over here.  Everything that you need to
25  use that drug safely and effectively is on the label because

1   you can pick it up, read it, follow those instructions, and

2   have a reasonably good chance of not hurting yourself.

3   Okay --

4   Q.    OTC -- Professor, I'm sorry to interrupt you.  OTC is

5   over the counter?

6   A.    Over the counter, yes.  We prefer in pharmacy to call

7   them non-prescription drugs because the opposite of over the

8   counter is a little specious, you know, under the counter.

9   So the other category of drugs are those, by their very

10  nature or the nature of what's being treated, requires input

11  from a qualified health professional.  Generally, that

12  health professional is a medical doctor, but as you may

13  know, dentists and other types of practitioners can

14  prescribe medications.  Veterinarians can, but not for

15  humans.  So, those drugs.

16        Then, there are prescription drugs.  You cannot

17  go -- you can't go to a pharmacy and buy penicillin.  You

18  can't go and buy high blood pressure pills.  You can't go

19  and buy cholesterol lowering drugs.  Okay, so now what we've

20  done is whittle this down to where we've got prescription

21  drugs -- and I promise, there's only one more subset --

22  actually two subsets.  A certain of those drugs have

23  qualities and properties that make them especially dangerous

24  and prone to misuse or abuse and those drugs are placed into

25  a category that generally people refer to as controlled

1    substances.  So they have all the requirements for

2    prescription drugs plus some.

3            The kinds of things that are in the controlled

4    substance categories include narcotics, okay, which you may

5    hear me refer to as opioids.  Later on, I'll explain that

6    terminology.  They may include amphetamines; they may

7    include cocaine.  In fact, there are some drugs that are in

8    controlled substance categories such that they are so

9    dangerous that they are not permitted to be used in this

10   country; heroin, for example.  Although in Great Britain,

11   heroin is used medicinally.  They don't call it heroin.

12   They call it diamorphine.  But for example, LSD, heroin, so

13   forth, are controlled substances and they are placed into a

14   special category by themselves.

15           So I hope you're still with me.  We're whittling

16   this down.  We're into this small chamber here we're calling

17   controlled substances.  Those are divided into five

18   categories with decreasing propensity for use, abuse, and

19   misuse.

20   Q.    When you say that these are dangerous drugs, am I to

21   understand that -- you've already mentioned addiction as

22   being potentially one of the dangers here.  What would some

23   of the other dangers be?

24   A.    Well, they have properties that set them apart from

25   other drugs.  You heard me mention about this margin of

1  safety with aspirin.  With some of these drugs, the margin
2  of safety is so narrow that it's almost -- it's easy to
3  shoot through this very narrow safety zone, okay.  You want
4  to make sure you're giving enough to achieve a therapeutic
5  outcome, but it's easy to shoot right through it and get
6  into the situation where side effects, drug interactions,
7  overuse, misuse, et cetera.  So the idea is with controlled
8  substances, this extra degree of scrutiny that practitioners
9  are asked to render to their patients such that they are not
10  achieving unnecessary or what are referred to as adverse
11  effects from the drugs.  Make no mistake about it, these
12  drugs do have important therapeutic properties, just like
13  any drug.  And I don't care what the drug is, they have two
14  edges.
15         Now with some drugs, one edge is very sharp and
16  the other edge is rather dull, like I said earlier.
17  Antibiotics, if you accidentally took too much antibiotic,
18  hum, maybe a little nausea or whatnot, but other drugs have
19  very sharp edges.  Narcotic drugs would be those.  They are
20  tools that the professions use to ease pain, to relieve
21  suffering, but along with that comes the demand for close
22  scrutiny of those drugs.
23         One -- let met, if I might, continue Schedule I
24  you won't see.  No one can prescribe those.
25  Q.    We talk about Schedule I, Doctor, you mean -- and

1    this is Schedule I in controlled substances?

2    A.       Yes, sir, yeah.

3    Q.       Please go ahead.

4    A.       Everything's divided and containerized but Schedule I

5    would be things like marijuana -- the crude product, okay,

6    not the medicinal type -- LSD, heroin, et cetera.

7              Now, Schedule II drugs are those that have the

8    highest degree of abuse yet they do have recognized medical

9    purposes in this country.  So things like morphine, things

10   like the derivatives of morphine, there are a whole host of

11   them.  Morphine is the granddaddy and its offspring, if you

12   looked at the pedigree, is codeine.  So if you paste a

13   little molecule on morphine, now you've got codeine.  If you

14   take a molecule off over here, you've got Hydrocodone.  If

15   you put another molecule in the middle, you got Oxycodone.

16   Now, each one of those virtually has the same qualitative

17   properties, but it may differ from the standpoint of its

18   potency.  For example, morphine is more potent that codeine.

19   Codeine lasts longer in the body.  So the chemist is always

20   trying to build a better mousetrap.  So Oxycodone is a

21   derivative of codeine and it has better oral availability.

22   It's roughly equivalent in potency to morphine.

23             Now, there are other drugs, the potency of which

24   is astounding.  There's a drug called Fentanyl.  Fentanyl is

25   80 to a hundred times more potent than morphine, so potent

1    that it can't be harnessed.  It's almost like a wild bronco,

2    you know.  And that's why oftentimes -- it's so potent that

3    if you place a patch onto the skin, it will get through the

4    skin, into the bloodstream, find its way to the brain and

5    relieve pain.  Incredibly potent, Schedule II controlled

6    substance.

7    Q.     Professor, we will get back to the particular drugs

8    you're talking about in Schedule II.  Can you tell us a

9    little bit about Schedule III drugs?

10   A.     Let me finish the II.  I kind of wandered off task,

11   and I apologize.  Schedule II drugs cannot be phoned in to

12   the pharmacy, unlike III, IV, and V.  They cannot be

13   refilled.  The theory being that if there's a continuing

14   need for those medicines, then there's a continuing need for

15   the practitioner to examine the patient and monitor, et

16   cetera.

17          Okay, IIIs, IVs, and Vs, they are in decreasing

18   order of propensity for misuse or abuse.  So Schedule III

19   would include hydrocodone when it's in combination with the

20   ingredient in Tylenol.  You may hear that sometimes as

21   Vicodin, Lortab, et cetera.

22          Valium is Schedule IV, and its first cousin,

23   Xanax, is Schedule IV.  And there's only one or two drugs in

24   Schedule 5, but those drugs, unlike Schedule II, may be

25   phoned in to the pharmacy.  They can be refilled five times,

1    a maximum of five times in six months, which ever comes

2    first.  Obviously they are -- I don't want to use the word

3    less potent.  That's not the proper metric.  But they are

4    less prone to abuse and misuse.  I might add, by the way,

5    that there's a nationwide debate right now to move

6    hydrocodone from Schedule III into Schedule II.

7    Q.      And who does set up the schedules, sir?

8    A.      They're set up by the United States Drug Enforcement

9    Administration.

10   Q.      And they are -- actually they are law?

11   A.      Oh, yes, sir.  Yeah, yes, very strict federal laws.

12   Q.      Okay.  Professor, I'm going to ask you to explain the

13   difference between generic terms and brand name terms.

14   A.      Yes, sir, that's often an area of confusion.  I hear

15   people say they don't want to take the genetic drug or the

16   geriatric drug.  No.  It's generic, and the analogy I use

17   often, like Kleenex is a brand name -- I don't see any

18   here -- facial tissues would be the generic name.

19            Now, the person that invents the drug has a 20

20   year monopoly on that drug and the name.  So we all come to

21   know drugs like Valium as the brand name from the Hoffmann

22   LaRoche.  Now it's lost its patent a long time ago, so under

23   the state laws in Florida, it's permissible to substitute.

24   So if a prescription is written as Valium, chances are the

25   patient will be dispensed Diazepam.  That's its other name,

1    and so we try to teach our pharmacy students to be

2    intimately knowledgeable so that regardless of whether

3    someone says this patient's going to get Valium -- and they

4    probably aren't going to get the brand name Valium, but they

5    will get the drug Diazepam.

6    Q.    And if I understand correctly, that's because the

7    generic name and the brand name, as you say, sometimes

8    become almost identical or similar?

9    A.    Oh, they are.  They are identical in every way,

10   shape, or form.  The reason, of course, that the patent is

11   protected is to allow the company to recoup some of the

12   research investments, or whatnot.  Once a drug loses its

13   patent, then it's -- I won't use the word -- it's anybody's

14   game because other companies, including multiple companies,

15   can now legally make and market that drug, assuming that

16   they go through the proper approval process.

17   Q.    Okay.  Doctor, I'm going to talk to you -- Professor,

18   I'm going to talk to you about some specific drugs, and the

19   first one I'm going to talk to you about is Oxycodone.  Is

20   that the generic name?

21   A.    That is correct.  Oxycodone is the generic name.

22         MR. MOLLOY:  If I might approach the witness, Your

23   Honor?

24         THE COURT:  You may.

25         MR. MOLLOY:  And hopefully I'll spell it right.

1          THE WITNESS:  I've got my grading pen.

2    BY MR. MOLLOY

3    Q.     Spell it for me; make sure I don't get caught.

4    Oxycodone.

5    A.     Yes, sir.  -D-O-N-E.

6    Q.     What does this drug do, Doctor -- I mean, Professor?

7    A.     That's okay.  Oxycodone is a derivative of morphine.

8    It's what they call semi-synthetic morphine where they'll

9    take the morphine molecule and add or subtract some

10   molecules and now what we have is something that's

11   different.  It's better absorbed.  Morphine is not very well

12   absorbed from the stomach.  That's why oftentimes it's given

13   by shot or other mechanism.  But Oxycodone is a derivative

14   of morphine, Schedule II controlled substance.

15          MR. MOLLOY:  I'm sorry, if I can approach the

16   witness freely, Your Honor?

17          THE COURT:  You may.

18   BY MR. MOLLOY

19   Q.     Okay.  It's a Schedule II?

20   A.     Yes, sir.

21   Q.     And what does it -- what does it do?

22   A.     It's a pain reliever.  It's intended to be used for

23   moderate to severe types of pain.  You'll hear me probably

24   use the term opioid.

25   Q.     Can you tell us what that means, sir?

1    A.    Yes, sir.  Morphine is -- morphine and codeine come
2    from the poppy and it's a natural product and it's referred
3    to as an opiate.  And in medicine, if you add the word O-I-D
4    at the end, it means "like".  Okay, so an opioid means it's
5    morphine-like, and so that terminology is often used to
6    describe this drug.  Others will refer to it as a narcotic
7    analgesic.  "An" means not.  "Algesia" means pain.  So it's
8    basically a pain killer.
9    Q.    When you say a pain killer, how does that operate in
10   the body on the brain, Oxycodone?
11   A.    Well, it interferes with the way the body perceives
12   the pain.  It does not interfere with the pain impulses or
13   anything else.  Just using myself as an example receiving
14   morphine after I had major surgery, it's like I knew I was
15   having pain, but I just didn't care.  It was almost like I'm
16   beating the system here.  However, when that medicine wore
17   off, it wasn't very long before I was yelling, "Nurse, more
18   medication."  But it works at receptors in the brain.
19         Now, the receptors in the brain are also subject
20   to the other side of that sword.  For example, it has the
21   tendency to de -- depress the respiratory center in the
22   brain and it has the tendency -- well, it will cause nausea
23   and vomiting.  Those are tolerable kinds of side effects,
24   but depressing that center in the brain is what causes
25   people to die from this drug.  It's a very primitive part of

1  the brain because it's reminding you, without you knowing

2  it, breathe, breathe, breathe.  And when you were a kid, you

3  got mad at your parents, you know, you were going to hold

4  your breath until you died.  As soon as you got woozy, your

5  body took over because it's automatic.  But opioids, in high

6  doses, have a tendency to wipe out that reflex and that's

7  what leads to death from these drugs.

8  Q.     Now, in talking about Oxycodone, you mentioned a

9  surgery that when it wore off, that you would -- you called,

10 "Nurse, nurse, nurse," but I'm really talking about the

11 withdrawal from that drug or from these drugs.

12 A.     Well, let me explain it this way.  I said that they

13 are very useful medications.  But when God invented drugs,

14 or if we can't go there, however they got here, there were

15 always strings tied to them.  Okay.  Don't give too much

16 morphine all at once because it could be the end of your

17 life right then and there.  Even if you give small amounts

18 of morphine for long periods of time, you know, the body is

19 a tremendously engineered machine, it's going to outfox that

20 drug and it's going to say, "Oh, yeah?  I don't need you

21 around here," and you develop tolerance to that drug.  So

22 ultimately, the kinds of drugs, the kinds of doses that

23 people might need, you know, after being on the drugs three

24 or four years would likely kill a person like me who is

25 considered to be -- the terminology is opioid naive.  I've

1    not had them.  My body is kind of not -- it's naive to that

2    drug.  So in that instance, long-term use, the body becomes

3    dependent on those drugs and when the drug is ceased, there

4    are characteristic withdrawal syndrome.  You know, one is

5    sneezing, runny nose, body aches, anxiety, diarrhea.  And

6    although it's not life-threatening -- that's a common

7    misconception.  You don't generally die from withdrawal of

8    narcotics, but patients tell me that they wish that they

9    would because it's so debilitating.  So that's the physical

10   dependence.

11          Now there is a difference between physical

12   dependence and addiction because addiction adds --

13   Q.     Go ahead.

14   A.     Okay -- adds a behavioral component and it's

15   characterized by four Cs.  There's craving, it's compulsive,

16   it's -- I knew I was going to do this.  There's another C in

17   there, but the --

18   Q.     How about chronic?

19   A.     Pardon?  Chronic, yes, sir.  I'm sorry.  And the last

20   one is loss of control.  So if you were treating a patient

21   with end of life issues, if you stopped the medicine, they

22   would have physical withdrawal but they would not be doctor

23   shopping, they would not be, sadly in my business, holding

24   up pharmacies to get the drugs.  They would not be doing

25   this behavior that essentially their entire 24 hour

1  existence focuses on getting and using the drug.  That's the

2  difference between an addict and physical dependence.

3  Q.     Now you mentioned that this was the generic name.

4  What would be a brand name that would still be Oxycodone?

5  A.     Yes, sir, the one that you hear most often is

6  Roxicodone.

7  Q.     And that is with an I?

8  A.     Yes, sir, R-O-X-I-codone.  It gets its name because

9  it's made by the pharmaceutical company, Roxanne,

10 R-O-X-A-N-N-E.  So they tabbed their name to create a little

11 bit of uniqueness to it.  So Roxicodone is a brand name that

12 is used interchangeably.  So if a prescription was written

13 for Roxicodone, there's a pretty darn good chance that the

14 patient would end up having Oxycodone by a generic form.

15          THE COURT:  Mr. Molloy, do you want to check that

16 spelling before the professor does?

17          MR. MOLLOY:  Oh, "I".  Thank you, Judge.  That's

18 why it's not facing him.

19          THE COURT:  You owe me one.

20          MR. MOLLOY:  I do; I do.

21 BY MR. MOLLOY

22 Q.     And is there any characteristic about Roxicodone in

23 terms of what it does, how long it lasts, what it's

24 prescribed for?

25 A.     It's identical in every shape, way, and form, with

1  the exception of some of the inert ingredients like the

2  color.  Sometimes the color is blue or whatnot.  Sometimes

3  they have different disintegrating agents.  But the

4  workhorse part of the molecule and the effects of it on the

5  body are identical.

6  Q.    What would be another brand name that's utilized that

7  is Oxycodone?

8  A.    Well, Oxycodone is often partnered with a second

9  drug.  That second drug is referred to as acetaminophen.  I

10 think people would know it more as Tylenol, the Tylenol

11 ingredient.  So Oxycodone with -- and I'll give you a break

12 here, you can say APAP.  That stands for acetyl para-amino

13 phenol, but we won't go there.  You put APAP.  That's the

14 designation for Tylenol --

15 Q.    That's A-P --

16 A.    A-P-A-P, all caps.

17 Q.    Now in this particular category, this Oxycodone, what

18 is Oxycontin in relation to this?

19 A.    If I might, let me give you some brand names of that

20 combination, okay?  So one of the brand names of Oxycodone

21 with Tylenol is Percocet.

22 Q.    And so Percocet -- now he's made me paranoid.

23 A.    We have remediation classes for you.

24 Q.    Okay.  So Percocet is an APAP drug and so what you're

25 saying is it partners with Oxycodone and Tylenol -- I'm

1    sorry.  You explain.

2    A.     All right.  Oxycodone is what's referred to as a

3    single entity product.  It's got nothing else in there but

4    Oxycodone.  But Percocet has Oxycodone with Tylenol.  Tylox

5    has Oxycodone with Tylenol.  Now it's also available under

6    its generic designation.  So if you look at labels from

7    bottles that have these pills on it, it will say Oxycodone,

8    slash, APAP because its patent has long since run out.

9    Q.     Where does Endocet fit in this grouping?

10   A.     Endocet is a combination of Oxycodone with Tylenol,

11   and -- and fittingly, it gets its name because it's made by

12   Endo Laboratories, E-N-D-O.  I think you probably see a

13   pattern emerging here.

14   Q.     Tell me about Oxycontin?

15   A.     Okay.  Oxycontin is Oxycodone in an extended release

16   formulation.  Now, when it's used correctly, let's say in

17   end of life issues or unremitting severe pain, these folks

18   may require immediate release, that's what this one would be

19   called at the top there, immediate release.  In other words,

20   you take it into the body.  It goes immediately into the

21   bloodstream, begins to work right here, right now, whereas

22   in some issues, when tolerance develops, you have to give

23   this stuff every two hours and it's very inconvenient.  So,

24   one of the pharmaceutical companies said let's just figure

25   out a way to put it into a tablet that will parcel out small

1    doses of the stuff over 12 hours.  And it gets its name from
2    "oxy" from Oxycodone and "contin", short for "continuous
3    release".
4    Q.    Now, is there something that is prescribed for
5    break-through pain?
6    A.    Yes.  Sometimes -- well, many times people's pain is
7    not steady.  It may wax and wane, and in those instances
8    where the pain is particularly severe, the strategy has
9    become add small doses of an immediate release type of
10   narcotic just to sort of boost what's -- what's called the
11   long-acting one.  Oxycontin, like 40 milligrams every 12
12   hours but with the provision that if the pain is
13   particularly bad, small doses of the immediate release can
14   be given.
15            Now, if it turns out you're having to give very,
16   very large doses of the break-through medicine, maybe it's
17   time to reconsider that background dose and maybe raise
18   that.
19   Q.    I see.  And so the short-term or break-through -- you
20   correct me, okay?  The short-term or break-through pain
21   medicine or prescription can be -- is it one of these or --
22   A.    Typically, it's immediate release Oxycodone, so
23   you've got Oxycontin, the continuous action one, and through
24   periods of extreme pain, patients are instructed to take
25   small doses of, usually, Oxycodone.

1    Q.    But as far as Schedule II substance, I guess under --

2    I think you said the grandfather, describing morphine, but

3    Oxycodone is basically -- well not basically, is these drugs

4    or the main element in these drugs; is that correct?

5    A.    Yes, sir.  It would be almost like giving a little

6    boost of the same drug that's there.  It's just augmenting

7    it a little bit because the pain is more intense at periods

8    throughout the day.

9    Q.    Okay.  Let's talk about, as you said, the granddaddy,

10   morphine.  What schedule is that?

11   A.    Morphine is a Schedule II controlled substance.  I

12   call it the granddaddy because all the other drugs are

13   derivatives of morphine.

14   Q.    Now, can you tell the jury what that does to your

15   body?

16   A.    Well, yes.  It does everything that Oxycodone does.

17   It has kind of a downside that it doesn't get into the brain

18   like it should.  One reason being when you take it by mouth,

19   the liver is sitting there on call waiting for foreign

20   substances to get into the body.  So whoever the on-call

21   liver guy is, he'll signal whenever he sees morphine, you

22   know, man your battle stations, here comes morphine and

23   break it up in the first, very first time it goes through

24   the liver.  So it's not the best drug to be used orally.

25   Oxycodone has the benefit of not being subject to that

1   breakdown, and so --

2   Q.      Subject to the breakdown so that Oxycodone would be,

3   I guess, gentler on the stomach?  Would that be --

4   A.      Not -- not the stomach, no.  The liver.

5   Q.      Liver.  Sorry.

6   A.      It has protective equipment that is not susceptible

7   to the hepatocytes, the liver cells trying to break it down.

8   Q.      Now you may have answered this in a different way,

9   but can you describe what morphine is and its relationship

10  to chronic pain or pain?

11  A.      Yes, it's the same as Oxycodone.  It's used for

12  moderate to severe types of pain.  It also is available in a

13  sustained release dosage form.  They call it MS Contin.  MS

14  stands for morphine sulfate.  So MS Contin is to morphine as

15  Oxycontin is to Oxycodone.  Sounds like --

16  Q.      Let me catch up with you.  MS Contin?

17  A.      Yes, sir, morphine sulfate continuous release.

18  Q.      Okay, morphine sulfate, and let me make sure I spell

19  Contin right.  It's C-O-N-T-I-N?

20  A.      Yes.

21  Q.      Describe again its relationship to morphine, itself?

22  A.      It is a formulation of the drug to release -- it's

23  kind of like those cold capsules in the old days that had

24  little beads in them.  Doesn't have beads but it's the same

25  idea.  It's formulated to release its medicine over 12

```
 1    hours.  So it is analogous to Oxycontin except instead of
 2    the work part of the molecule being Oxycodone it's morphine.
 3    Q.      Now, Percocet, I believe, is with an S.  Agent
 4    Baginski, can you hold --
 5               THE DEFENDANT:  It's with a C.
 6               THE WITNESS:  Oh, cue cards, Johnny Carson.
 7               MR. MOLLOY:  Agent Baginski, if I misspell these,
 8    would you please hold up a big thing, so that --
 9               AGENT BAGINSKI:  Got it.
10    BY MR. MOLLOY
11    Q.      Professor, I'm going to ask you now about -- you
12    mentioned Fentanyl.  Can you help me spell that?
13    A.      F-E-N-T-A-N-Y-L.
14    Q.      Excuse me, let me just get a drink of water.
15    A.      You need to see a pharmacist.
16    Q.      You described Fentanyl before as -- if you wouldn't
17    mind describing again in terms of its potency?
18    A.      It's -- it's more considered to be a totally
19    synthetic form of morphine.  If you looked at the chemical
20    structure, and I'm not going to burden you with chemical
21    structures, it doesn't have -- doesn't look the same as
22    morphine.  But in the brain, the receptor, the area where
23    these drugs work, recognizes that as not only morphine, but
24    it likes it even better than morphine because this synthetic
25    drug is, you ready, 80 to a hundred times more potent than
```

```
 1    morphine.  So as a result, it's suitable for different
 2    routes of administration.  For example, transdermal
 3    administration.
 4    Q.      Can you explain what transdermal administration?
 5    A.      Yeah, it's the so-called pain patch where medication
 6    is delivered literally through the skin, into the body, into
 7    the bloodstream, transported to the brain, and because of
 8    its engineering, will be allowing three days worth of
 9    medication.  You change the patch every three days.  But
10    just to give you an idea of how potent this stuff is,
11    morphine orally would be 30 milligrams.  Oxycodone might be
12    30 milligrams.  Fentanyl is delivered in 25 micrograms per
13    each hour or --
14    Q.      That's because of its potency?
15    A.      There are higher strengths.  I think there's 12 and a
16    half, 25, 50, 75 and a hundred.  But it's pretty potent
17    stuff.
18    Q.      And what schedule is that particular drug?
19    A.      It's a Schedule II controlled substance and the
20    advantage it has, really, is not in its potency but in its
21    convenience.  So we'll go back to that situation where you
22    have to give pills every two hours or so.  If a person's
23    pain is steady, in other words if it's the same all the
24    time, instead of giving pills every two hours or so, the
25    patch goes on, it stays there for three days -- and
```

1    sometimes patients forget they have to take the old one off

2    and put the new one on, but it provides steady pain relief.

3    But just like break-through pain with the other medicine

4    indications, it's customary to allow taking break-through

5    doses of, let's say, Oxycodone, because those periods of

6    time when the pain gets really, really bad.

7    Q.    And that's because it's -- Fentanyl, even though

8    because of its potency is a steady pain reliever?

9    A.    It's a steady.  It's what's called a background or

10   long-acting type of medication.

11   Q.    I forget how to spell when I'm up here.  So what's

12   the difference between -- I think you really explained it in

13   a sense, the difference between background medication and

14   the break-through pain, I think you've done that in a sense,

15   but I'm just asking you for --

16   A.    Yeah, sure, sure.  If patients have a steady level of

17   pain, that can be -- that can be met with steady levels of a

18   drug.  Okay, so you try to reach what would be called a

19   steady state, where the amount of medication is equal to

20   that necessary to relieve that pain.  Nothing changes.  The

21   doses aren't going up and down except in those periods

22   where, for reasons like stress or whatever the aggravating

23   factors are, it's necessary to give a little boost dose and

24   that's the break-through dose.  So some people call the

25   long-acting one the background and the other's called break-

1    through.

2    Q.      Okay.  Now, I forgot to ask you what the -- this is

3    the generic name?

4    A.      Fentanyl, yes, sir.

5    Q.      I forgot to ask you if there are brand names.

6    A.      Yes, sir.  The pain patch, and again, you're going to

7    learn that these names make a whole lot of sense, Duragesic.

8    It has a --

9    Q.      If you'd just spell that, please?

10   A.      D-U-R-A-G-E-S-I-C.

11   Q.      You were about to explain how that -- how that brand

12   name came about?

13   A.      Yes, sir, because it has a long duration and it's an

14   analgesic, Duragesic.  Now the patent has already expired on

15   these, so chances are if you were to get it today, it would

16   be called by the brand name Fentanyl transdermal system.  I

17   like Duragesic better, the name.

18   Q.      I like it better because it's easier to spell.

19   A.      Yes.

20   Q.      Now, do you have any other -- and if I understand

21   correctly, the Fentanyl and the Duragesic -- I'm sorry, the

22   Duragesic, the brand name, is that also prescribed by -- I'm

23   sorry, goes into the body by a patch?

24   A.      That particular -- Duragesic goes in as a patch.

25   Now, there are other dosage forms, other ways in which

1    Fentanyl can get into the system and one of those is called

2    the transmucosal delivery of Fentanyl, a fancy name for if

3    you -- for example, they call it the Fentanyl lollipop.  I

4    don't like that designation because it certainly isn't

5    candy, but it's a dosage form that if -- for example, it's

6    intended only for cancer pain.  It's only been approved for

7    cancer pain, where a person is in such pain and it gets to a

8    point where it's intolerable, they can lick on this thing

9    and it's so potent that small amounts of it can get absorbed

10   through the lips and under the tongue and all that.  It

11   bypasses the liver, okay.  It bypasses the liver so the

12   liver is not able to do its function and you get a boost of

13   this drug.  And that brand name, if I didn't say it already

14   is called Actiq.

15   Q.    How do you spell that, sir?

16   A.    Oh, A-C-T-I-Q.

17   Q.    And -- A-T-C-I-Q.

18   A.    It may be C-Q.

19   Q.    All right.  Right now it's going to be this spelling.

20   Okay, now is Actiq -- if I understand the Duragesic

21   Fentanyl, that's almost always by patch?

22   A.    Except in the hospital when you undergo surgery.

23   Believe it or not, even when you're knocked out at surgery,

24   your body is responding to pain and so the anesthesiologist

25   will pre-op somebody with, let's say, 50 micrograms of

1   Fentanyl by shot.  It's not available by pill because, A, it

2   doesn't get absorbed very well, and B, it's almost too

3   potent for its own good because it's hard to tame it into a

4   dosage form that would be useful.

5   Q.      That's the drug that you described -- Fentanyl is the

6   drug that you described as a wild bronco, I believe you

7   said?

8   A.      Yeah.

9   Q.      Okay.  Is Actiq almost always in the -- I know you

10  don't like the term lollipop, but in that oral form?

11  A.      Yes, sir.

12  Q.      And the generic -- okay, if you can talk about

13  Alprazolam?

14  A.      Yes, sir.  You've opened up a new little category of

15  drugs here, all right, that collectively are referred to as

16  Benzodiazepines.  That's the chemical category.  If you

17  want, you can abbreviate it.  We call it sometimes just

18  Benzos.

19  Q.      All right and --

20  A.      All right and --

21  Q.      I'm sorry.  Go ahead.

22  A.      In that category are very -- quite a number of drugs

23  that might be recognizable to this jury.  For example,

24  Valium is a Benzo.

25  Q.      And I'm sorry, what schedule are the Benzos?

```
1    A.      These are Schedule IV.

2    Q.      And I forgot to ask you before we go into the other

3    names, what, what is Benzos -- what do Benzos do?

4    A.      Okay, they do several things.  They are most commonly

5    used to treat anxiety, but they can also be used to treat

6    sleep.  Treat sleep -- to use for people who have trouble

7    sleeping.  So medically, we say they are sedative, slash,

8    hypnotic.  Now, not hypnotic like this, but hypnotic is

9    another medical term for sleeping, okay.  So for example,

10   Valium at normal typical doses is used for anxiety, but

11   sometimes if you're having a procedure in the hospital, they

12   may give you higher doses that become more hypnotic.

13   40 milligrams will pretty much put you out.  So they're

14   sedative/hypnotic.  They can also be used for panic disorder

15   and they're also sometimes used to treat seizure disorder.

16   Q.      Now, I interrupted you.  What are the other -- what

17   are some other Benzos?

18   A.      Okay.  By the way, the generic, so we can complete

19   this step --

20   Q.      Yes.

21   A.      -- is Diazepam, D-I-A-Z-E-P-A-M, Diazepam.

22   Q.      And as you made the distinction, that's the generic

23   name.  This would be the brand name?

24   A.      Yes, sir.

25   Q.      What else fits in the Benzo category?
```

```
 1   A.      Another quite common one is Xanax.  It's not
 2   Z-A-N-A-X.  It's X-A-N-A-X.  That's the brand name.  The
 3   generic name would be Alprazolam, A-L-P-R-A-Z-O-L-A-M.
 4   Q.      I may have written this incorrectly.  Alprazolam is
 5   the generic name for Xanax?
 6   A.      Yes, sir.
 7   Q.      The entire category are Benzos, full name?
 8   A.      Yes, yes.
 9   Q.      And the brand name of Diazepam is Valium?
10   A.      Correct.  And just for sake of completeness, there's
11   a whole bunch of these and the way you know them is they
12   almost all end with "pam" or "lam".  Okay, Diazepam,
13   Alprazolam, Lorazepam, Temazepam, Oxazepam, and the beat
14   goes on.  But they're all in that same category and for all
15   intents and purposes, they have the same general attributes.
16           Now, some of them are so rapidly acting that
17   they're used when you're having things like colonoscopy.
18   They also have an extra benefit that they cause amnesia, so
19   in procedures like that, amnesia is a good thing.  In
20   recreational use of these drugs, amnesia is not a good
21   thing.
22   Q.      Now, you were talking about the pams, or ending in
23   pam.  Clonazepam?
24   A.      Klonopin is --
25   Q.      Okay, let me get -- Clonazepam?
```

```
 1   A.        -Epam, I think.  I don't get cue cards.

 2   Q.        I do.  And what is -- that's the generic name?

 3   A.        Right.

 4   Q.        Have you broken down before, what is the brand name?

 5   A.        Yeah, that -- why I struggle with some of these

 6   spellings is I always call it Klonopin.  That's its brand

 7   name.  K-L-O-N-A-P-I-N?  I forgot.  Whatever.

 8   Q.        Now, what's the distinction from Klonopan to --

 9             AGENT BAGINSKI:  No, pin, P-I-N.

10   BY MR. MOLLOY

11   Q.        What's the distinction of Klonopin from, say, Xanax

12   or Valium?

13   A.        They are different in terms of their milligram

14   strength, okay.  So they're also different in some of the --

15   what they call pharmacokinetics.  Now that's just a fancy

16   word of the mathematical times in which drugs get into and

17   leave the body.  So for example, some of them are longer

18   acting than others.  But qualitatively, they're pretty much

19   in the same -- in the same basket, if you will.  Klonopin is

20   one that's used for seizure disorders.  The others generally

21   are not, except Valium, in the hospital.  If somebody's

22   having an acute seizure, it's used there.

23   Q.        Professor, I'm going to ask you to address the

24   generic drug Hydromorphone.  First of all, what does it do?

25   A.        It's in the same category of opioids, so ditto what
```

1    we've said about all the other opioids.  It is a further

2    manipulation of a molecule to make it even more potent.

3    It's -- Hydromorphone is more potent than morphine.  I think

4    about two milligrams of Hydromorphone is equal to about

5    eight milligrams of morphine.  It's more potent.  Its other

6    name is Dilaudid.

7    Q.     And that Dilaudid --

8    A.     D-I.

9    Q.     A-U?

10   A.     I-D.

11   Q.     And Dilaudid is, I'm sorry, the brand name of

12   Hydromorphone?

13   A.     Yes.

14   Q.     And I know that you've done it in part when you say

15   ditto --

16   A.     No, I --

17   Q.     If you could?

18   A.     I owe it to the jury to explain.  It is a potent

19   narcotic pain reliever.  Its intended use is to treat

20   moderate to severe pain.  It's available in oral dosage

21   forms and it's also available as an injection, but that's

22   typically used in hospitalized patients.  So it's a more

23   potent form of Oxycodone and morphine.

24   Q.     All right.  And that would be what kind of scheduled

25   drug?

1   A.      It's a Schedule II controlled substance.

2   Q.      Now I'm just going to go back to Fentanyl because of

3   what you've described as its potency.  I just want to -- I

4   only have a few more.  I want you to go a little bit and

5   talk about opioids.  I really haven't let you talk about

6   that in terms of how it -- how it relates to these and is

7   Benzos different than opioids or --

8   A.      Oh, yes; oh, yes.  Quite different; quite different.

9   Q.      Please, go ahead.

10  A.      Quite different in their chemistry, quite different

11  in their uses.  In fact, what really adds to the

12  difficulties here is the propensity of these drugs to

13  interact with one another.

14  Q.      Please talk about that.

15  A.      Yes.  So for example, one of the side effects of

16  Oxycodone is drowsiness or lethargy.  That's not usually a

17  problem if you're hospitalized or if you're at home and

18  instructed not to drive or engage in activities that require

19  your full attention and your full physical abilities.

20  However, if you add to that another drug that has

21  overlapping side effects, so for example, Xanax has a lot of

22  lethargy, it has a lot of drowsiness, and so together, there

23  are two theories.  I'll take the conservative tack.  The

24  conservative tack is that the sum of these two is one plus

25  one equals three -- excuse me, one plus one equals two, that

1  the interactions are the sum of the effects of both of

2  these.  So typically, if they're given together it requires

3  the prescriber to lower the doses of them and manage the

4  interactions.

5          Now sometimes, and I don't know, there's a third

6  drug that might be added.  So the point is drug interactions

7  are a very real possibility.  And they, when added together,

8  have that ability to suppress the respirations back here in

9  the very primitive parts of the brain.  So drug/drug

10  interactions are a key consideration when planning whatever

11  treatment strategy the patient will ultimately receive.

12          I didn't finish.  The other competing theory is

13  that they are actually what they call synergistic, so one

14  plus one equals three.  I'll take the conservative tack.

15  There is absolutely no question that one plus one equals

16  two, but I think the one plus one equals three is a -- is a

17  tempting proposition that the effects of the two together

18  are actually greater than you would predict from the similar

19  approximately mathematical sum of the two.

20  Q.     And so the combination of drugs as you've described

21  creates a whole new problem, if you would?

22  A.     Oh, absolutely.  And I would say that -- I'm not

23  going to say that's the biggest problem because any one of

24  them alone can cause serious health risks and --

25  Q.     You say any one of them alone.  You mean the pain

1   medication?

2   A.      Certainly Oxycodone alone has the ability to kill a

3   person.  Xanax alone has the possibility -- especially if

4   combined with alcohol.  That's kind of a witch's brew if you

5   start getting these drugs and someone consumes them with

6   alcohol.  So that's what makes this such a big problem, is

7   that people tend to use more than they should or they are

8   prescribed more than would be typically reasonable, and

9   it's -- it's a tightrope.  No reference to the guy crossing

10  the Niagara, but it is a tightrope because you're trying to

11  achieve adequate pain relief, adequate symptom relief but

12  avoid those things that make these drugs dangerous.

13  Q.      Now, continuing your examples, let's say with

14  Fentanyl, would you prescribe that with any other opioid?

15  A.      You could.  And by the way, I want to make this

16  crystal clear, you're using the term "you" I think in a

17  generic sense because I don't have the ability.  I'm not

18  licensed to prescribe these drugs.  I'm not authorized but

19  I'm presuming when you say "you", you mean a --

20  Q.      I mean universal.

21  A.      Yes.

22  Q.      How about this, pain medication doctor?

23  A.      Or any doctor.

24  Q.      Any doctor, okay.

25  A.      When they are, when -- let's just use the past tense.

```
 1    When they are prescribed together, Fentanyl can be augmented

 2    with the break-through doses of Oxycodone.  It would not

 3    make any sense, however, to give two of the long-acting.  It

 4    would make no sense whatsoever to give Fentanyl patch and

 5    Oxycontin because they're both essentially doing the same

 6    thing and it's duplicative and any time you get two drugs in

 7    the system, it's more difficult to manage than if you're

 8    using just one.

 9              MR. MOLLOY:  Thank you, Professor.  Hold on just

10    one second if you wouldn't mind.  Your Honor, may I have a

11    moment?

12              THE COURT:  You may.

13              (Discussion off record)

14    BY MR. MOLLOY

15    Q.    Just one other area.  Can you describe to the jury

16    what is -- what are referred to as early refills or -- you

17    go ahead from that.

18    A.    Yes, sir.  In fact, you -- the jury may have heard

19    that in August, a new system went into effect in our state.

20    It's called a prescription drug monitoring program.

21    Essentially, it's a database that brings together all the

22    prescription activity for patients, because up to this

23    point, you know, pharmacies, for the most part, don't have

24    computer systems that talk to one another.  So that system

25    allows a pharmacist, when he's presented a prescription,
```

```
 1   just to take a quick look-see, see whether or not he's --
 2   the patient might be getting this at another pharmacy or it
 3   might be too early for a refill.  So typically, most doctors
 4   write prescriptions for a month's worth of medication and if
 5   that month's worth of medication, let's say, is 60 tablets
 6   of Oxycontin and they're supposed to take it every 12 hours,
 7   that's enough medicine to last a month.
 8           One of the red flags that pharmacists use is when
 9   people start coming in asking for more medication or even
10   bringing a new prescription 15 days instead of a full month.
11   Now, there can be an explanation for that.  The patient's
12   pain may have accelerated and the doctor may have instructed
13   them to take two instead of one.  But typically, when that
14   happens it's the best practice to reissue a prescription
15   because overuse would result in running out of the medicine
16   prematurely and asking for early refills or, since
17   Schedule IIs can't be refilled, early new fills is what I
18   call them.
19   Q.    I see.  And again, what would the pharmacist do or
20   what should the pharmacist do when presented with the early
21   refill or -- how did you refer to it?
22   A.    New fills.  I just made that up, by the way.  I'll
23   use that.  I like it, though.
24   Q.    Okay, the new fills.  Let's say the pharmacist
25   noticed, in the same example that you gave that it's
```

1    supposed to be prescribed for a month and there is the

2    patient presenting -- I'm not saying the patient of the

3    pharmacist, patient of a doctor presenting the -- another

4    prescription halfway through the month?

5    A.     Yeah, that would be what I would call a red flag.

6    There are many other red flags, because you see, in this day

7    and time, pharmacists have been thrust into a difficult

8    situation because we're -- we didn't go to police academy,

9    we went to pharmacy school, but yet we're asked to evaluate

10   the legitimacy of a prescription, sometimes without having

11   complete information, and that leads me to the answer to

12   your question.  So if there is a doubt, pharmacists are

13   taught at University of Florida and other schools that if

14   there's a question about that prescription at all, they are

15   to phone the prescribing practitioner and discuss it with

16   him or her to the point where the pharmacist's concerns are

17   alleviated and that prescription is filled.

18          On the contrary, there may be no resolution to

19   that concern and pharmacists have a legal duty not to fill a

20   prescription that she or he believes was not issued in the

21   usual course of medical practice.  So that puts us in a

22   precarious situation.

23          In most instances, the prescribing professions and

24   pharmacists have a very historic and very functional

25   relationship.  Most of the time those issues can be

1    resolved.   Sometimes they cannot.   There are other

2    responsibilities that pharmacists have in -- in looking at a

3    prescription.   So for example, if it looks like it's been

4    altered, huh-uh, no, you can't fill that prescription.

5    There are other red flags.

6           What's happened now is most pharmacists have taken

7    to filling prescriptions for controlled substances only the

8    patients that they know or have done business with in the

9    past, and do not prescribe outside of certain geographic

10   areas.   So --

11   Q.     When you say that, not prescribing for -- or not

12   accepting prescriptions for like out-of-town patients?

13   A.     Well, yeah.   I'll give you a very clear example.

14   There are cases where patients from Kentucky and Tennessee

15   travel to Broward County and Palm Beach County to see pain

16   specialists there, come back with prescriptions for large

17   quantities of controlled substances and stop in a pharmacy,

18   let's say, in the Orlando area.   They've paid cash for it.

19   Now when I say cash, these drugs can be very expensive.

20   80 -- a hundred, 80-milligram Oxycontin sells in the

21   pharmacy for about $1,500, and many times, these

22   transactions are done in cash.   I've never seen $1,500 in

23   U.S. currency in my whole life, I don't think.   But these

24   are all what are called red flags.

25           Now conceivably, these red flags could be

1    resolved.  Many times, they are not.  So pharmacists have

2    taken on this reluctantly, taken on this responsibility to

3    make sure that in the -- in the bottom line, that patients

4    don't receive medications that are going to hurt them or

5    hurt others.  It's a historic relationship.  I call it the

6    three P's, patient, pharmacist, physician.  A triad of P's.

7    Q.      I notice defense counsel nodding vigorously when

8    the -- when you testified that the pharmacist also has

9    responsibility in the, as you put it, the triangle.  If I

10   understand correctly, however, the pharmacists do not have

11   the ability to write out prescriptions?

12   A.      Not legally, no, sir.

13   Q.      They're not allowed to write out prescriptions.

14   However, doctors are allowed to write prescriptions?

15   A.      Yes, sir, they are.

16   Q.      And they are allowed to write prescriptions, say for

17   I guess what we call them, the new fills or the early fills?

18   A.      Yes, sir.

19   Q.      And you say that the pharmacist is put, when those

20   prescriptions, when those dangerous prescriptions are

21   written out, the pharmacist is put in a very precarious

22   position?

23   A.      Yes, sir.

24   Q.      And so often, those pharmacists will call the

25   doctor's office and attempt to get information; is that

1    correct?

2    A.       That is correct.  And that information may or may not

3    resolve that pharmacist's concerns.

4             Now, I'll give you two ends of the spectrum, and

5    I've seen personally, as a pharmacist, both ends of the

6    spectrum.  "Mr. Pharmacist, I really appreciate your

7    calling, you know, in second thought, that dose is a little

8    bit higher."

9    Q.       Talking about -- I'm sorry to interrupt you.  What

10   we're talking about, we're talking about a conversation

11   between the pharmacist and the doctor?

12   A.       That's correct.  Now, one of the problems in the busy

13   practice of medicine and pharmacy today is getting the

14   attention of that practitioner.

15   Q.       The doctor?

16   A.       Yes.  The other end of the spectrum, and I personally

17   have heard this, is, "Who do you think you are?  If you want

18   to prescribe drugs, go to medical school and do it like I

19   did."  I've even heard, let's say, a little more salty

20   language from supposed professionals on the other end of the

21   line.  But I would -- I've still a little pollyanna in me

22   and hope that most of those conversations would be on the

23   positive side of things.

24   Q.       But if you do hear, "I'm the doctor, go ahead and

25   fill the prescription," what is the pharmacist -- does the

1  pharmacist then, based on what the doctor says, go ahead and

2  fill the prescription?

3  A.      No, no, absolutely not.  I have seen matters in which

4  pharmacists tried to use that as a shield, claiming that,

5  I'm just a stupid pharmacist and all I do is carry out

6  orders, and I would remind you that history is littered with

7  situations where people have done horrendous things in

8  claiming they were simply following orders.

9  Q.      What if the pharmacist can't get through to the

10  doctor?  What if the doctor's situation is set up so that

11  they have staff that basically tell the pharmacist what the

12  doctor says?

13  A.      Well, those are two questions, so if I can take them

14  separately, I think it will be clear.  If it's after hours,

15  most medical offices have a call service or whatnot.  But in

16  the instance that they cannot make contact, pharmacists are

17  taught that they don't fill a prescription that's likely or

18  possibly going to cause harm to that patient, because my

19  ultimate responsibility is not to the doctor.  My ultimate

20  responsibility is to that person who's trusting me on the

21  basis of my education, training, experience to take care of

22  them in the very same manner that a doctor takes care of her

23  patients or his patients.  So I've got to do everything in

24  my power to keep from allowing that to have a bad outcome,

25  to have a bad ending.

1            The other instance is somewhat problematic because

2    in busy medical offices, some people are delegated the

3    authority to approve those kinds of things and we teach that

4    that's not an acceptable thing when you're talking about

5    Schedule II controlled substances.  And there are all kinds

6    of work-around that people have done and you know, to -- to

7    disrupt that flow of information between pharmacist and

8    physician.

9    Q.    Lastly, Doctor, you're talking about this progress,

10   this triangle.  Where does this start?  Does it start with

11   the doctor writing out the prescription?

12   A.    Yes, sir.  Clearly, if there was no issue or if the

13   prescription was typical and felt to be within, you know,

14   the usual practice of medicine, there would be no discussion

15   and the patients would get the medicine they need, they

16   would be instructed by the pharmacist on how to use it, and

17   hopefully they would get the desired outcome, which is, in

18   this instance, relief of pain and the ability to return as

19   close to normal to the daily activities of life.  That's the

20   goal.

21            MR. MOLLOY:  No further questions.

22            THE COURT:  Ms. Fox?

23            MS. FOX:  Your Honor, I will be proceeding.  Would

24   you like to take the morning break now or should I proceed?

25            THE COURT:  We got started a little bit late.  Are

```
1   you ready for a break?  Nobody?
2           MS. FOX:  Ready to proceed, Your Honor.  Thank
3   you.
4           THE COURT:  You may proceed.
5                       CROSS EXAMINATION
6   BY MS. FOX
7   Q.      Good morning, Professor Doering.
8   A.      Good morning.
9   Q.      I'm Amira Fox.  I represent Debra Roggow.  Professor
10  Doering, I don't believe you reviewed any of these files in
11  this case that are sitting here?
12  A.      No, ma'am, I did not.
13  Q.      And it's not your position to sit here as a -- to
14  give any kind of opinion on the standard of care of whether
15  or not it went outside of that in a civil type of arena; is
16  it?
17  A.      Absolutely not.
18  Q.      In fact, what you are here to do is just testify
19  about what these different types of medications are, where
20  they fall in the controlled substance schedule, et cetera?
21          MR. MOLLOY:  I'm sorry to interrupt, Ms. Fox.  I
22  have an objection, not to this one, this question, but to --
23  I have an objection.  Sorry.  Can we hear it at sidebar?
24          THE COURT:  Sure.
25          (At sidebar, Court, counsel, and defendant
```

1    present)

2          MR. MOLLOY:  Your Honor, I'm sure it wasn't done

3    intentionally, the same way Mr. Hollander didn't do it

4    intentionally, but we're talking about standard of care and

5    we're talking about a civil standard of care.  I don't want

6    any confusion in regard to that and I'm certainly not asking

7    Ms. Fox to go back, but I'm asking those standards be --

8    that's not really where we're going.  We're not talking

9    about a civil action.  My objection is to the use of

10   standard of care or civil action.

11          THE COURT:  In this context, the objection's

12   overruled.  The question was the doctor was not here to talk

13   about those kinds of things, which he agreed.  Do you intend

14   to pursue that further?

15          MS. FOX:  No, Your Honor.  Moving on.

16          THE COURT:  Okay.

17          MR. MOLLOY:  No problem.  Thank you, Judge.

18          (Sidebar concluded)

19          THE COURT:  You may proceed.

20          MS. FOX:  Thank you, Your Honor.

21   BY MS. FOX:

22   Q.     And along those lines, Professor Doering, you've

23   never met any of the patients that are listed in this case;

24   have you?

25   A.     I think I was sitting in the witness room with some,

1    but no, I've not met them nor have I talked about any of the

2    matters in this case.  No, I have not.

3    Q.    You didn't have any conversation with them about the

4    case?

5    A.    Not at all.

6    Q.    Now, do you testify regularly for the Government in

7    these types of cases?

8    A.    I certainly do, yes.

9    Q.    And were you paid a fee to come here today and

10   testify?

11   A.    I haven't been paid yet.  They'll get my calling card

12   when it's all done.

13   Q.    Are you hoping to be paid a fee?

14   A.    Yeah, and I think the Government's good for it, I

15   hope.

16   Q.    And that's for reviewing documents and preparing your

17   testimony, perhaps going over it with the attorneys?

18   A.    That's correct, yes, ma'am.

19   Q.    And what is your -- how much time have you spent on

20   this case?

21   A.    You know, that's a good question.  I'm a much better

22   pharmacist than I am a bookkeeper.  I would say it's in

23   excess of 15 to 20 hours or so.

24   Q.    Do you include that with the time spent waiting in

25   court or is that reviewing documentation?

```
 1   A.      The former.

 2   Q.      Waiting in court?

 3   A.      Yes, ma'am.  My time's valuable, just like yours and

 4   everybody else's.

 5   Q.      I agree, absolutely.  How much of the time do you

 6   think was spent actually reviewing any documentation that

 7   you received?

 8   A.      15 hours or so, and writing reports and conferring

 9   with counsel in this matter.  I think what you're saying,

10   too, is real work rather than sitting work?

11   Q.      Yes, sir.

12   A.      Yeah.

13   Q.      Thank you.  Now, are you -- I think you've already

14   told the jury this, but you're not currently an active

15   dispensing pharmacist?

16   A.      That is correct.

17   Q.      When was the last time that you were an active

18   dispensing pharmacist?

19   A.      I imagine it was 30 years ago.

20   Q.      So you've been in academia since that time?

21   A.      Yeah.  I felt I could have a greater impact on

22   teaching others the correct way to practice pharmacy than on

23   a one-to-one basis, and kind of quickly found what I thought

24   was my niche in academia.

25   Q.      Have you ever published any books or any articles
```

1    that involve pain management?

2    A.      I published chapters in the most prominent textbook

3    in pharmacy on drugs of abuse but from the perspective of

4    assuming they ended up in the wrong hands, how people abuse

5    them, why they abuse them, what the dangers are.  So to

6    answer your question, no, I don't consider myself an expert

7    in pain management, per se.

8    Q.      In the pain medications, you have some expertise in

9    talking about how they react with the human body?

10   A.      Yes, and -- and in doing so, I understand very

11   clearly about the tenets of modern practice of pain

12   management, but obviously, I'm not bound by those because,

13   A, I don't write prescriptions, and B, that's not my

14   profession.  My profession is to know the drugs and

15   hopefully instruct this jury today on what they need to

16   consider when they go into their deliberations.

17   Q.      There are a great number of pain medications on the

18   market; aren't there?

19   A.      Yes, ma'am, there are.

20   Q.      And in your experience with pharmacy, do you believe

21   that one of the greatest complaints you hear from people is

22   that they are in a great amount of pain?

23   A.      That is true.  Pain is considered to be one of the

24   most difficult things because you can't measure pain.  You

25   can't take a blood sample, you can't do an x-ray -- well,

1    you can, but it's a subjective finding and every patient

2    responds differently to pain medicine.

3    Q.    And every individual would have to be examined and by

4    a physician and in order to determine what would work best

5    for them.  Do you agree with that?

6    A.    Yes.  That's one of the reasons why they don't allow

7    prescriptions to be phoned in because it's the best way to

8    try to force a face-to-face relationship between patient and

9    practitioner.

10   Q.    And do you agree that a patient, in order to be able

11   to obtain medication, should sit down and talk through their

12   problems with their doctor?

13   A.    In addition to other means of making a diagnosis,

14   yes.  A careful history and physical exam is important.

15   Q.    And to come up with a treatment plan for treating the

16   person?

17   A.    Come up with a diagnosis first, and then a treatment

18   plan, yes, ma'am.

19   Q.    And perhaps use other things besides pain medications

20   to try to control pain?

21   A.    Correct, such as physical therapy, such as nerve

22   blocks and other types of interventions in addition to

23   medications.  Medication is not the only way.  It's not the

24   only leg on that particular stool that holds up that

25   proposition.

1    Q.      And there's many, many legs that go into seeing a

2    pain patient and determining what may be best for them; is

3    that right?

4    A.      I would agree, yes, ma'am.

5    Q.      Now you talked a little bit I think about tolerance

6    to medications when you were describing the opioids and the

7    different medications, and do patients have a responsibility

8    to take what's given to them correctly?

9    A.      Oh, yes.  This is what we in pharmacy used to call it

10   compliance, but we changed it.  A more kinder and gentler --

11   a kinder and gentler word we now call adherence.  Compliance

12   used to be finger wagging, "Now don't you take too much of

13   that."  Now it's called adherence because I want you to

14   adhere to what your doctor has -- has prescribed for you.

15   So there are such things as over-adherence.  There's

16   under-adherence and there's non-adherence.

17          Now with this category of drugs, generally the

18   tendency is for people to take more than they were

19   instructed to take.

20   Q.      As far as the tolerance goes, that's the body's --

21   that's what the body does over time when they build up a

22   tolerance to a certain medication, that they need more of it

23   in order to have the same effect on their body.  Am I saying

24   that correctly?

25   A.      That's correct.  That's that miracle that I told you

1    about, told the jury about earlier.  The body has a way of

2    adjusting and once -- it's kind of a -- I remember in Mad

3    Magazine Spy versus Spy, you know, it's like one guy gains a

4    little ground on the other, and then so forth, so on.  So

5    tolerance kind of follows that dictum.

6    Q.    And particularly with opioid medications, I believe

7    you said it would be natural to build up a tolerance to

8    them?

9    A.    That is correct.

10   Q.    So that you would need more of the medication over

11   time in order to have the same effect on the -- to help the

12   pain that some of these patients are in?

13   A.    That's absolutely correct.

14   Q.    Now, let me ask you, let's say there's a -- we've

15   talked a lot about the opioids and we talked a little bit

16   about different treatments.  Are there patients in your

17   experience who've tried -- for instance, somebody with a

18   serious back injury, who's tried many forms of treatment,

19   such as physical therapy, TENS unit perhaps?

20   A.    Surgery.

21   Q.    Surgery, exactly, epidural blocks, other types of

22   injections and they are not functioning well in their daily

23   life.  Are there some patients who are like that who have no

24   other relief other than through pain medication, opioids?

25   A.    That is correct.

1  Q.     All right.  And do you see that quite -- or have you

2  seen that quite frequently in your experience?

3  A.     Well, I'm going to convolute one of your earlier

4  questions.  I'm not a pain management doctor so I don't see

5  patients directly in this context.

6  Q.     But in your experience of your being a professor and

7  instructing students and things that come up in real life,

8  is that one of the things that you expect to see and that

9  you instructed your students, they are going to see those

10  type of patients in a pharmacy?

11  A.     Yes, ma'am.

12  Q.     If you -- if you saw somebody in a pharmacy setting

13  and they were on pain medication, even if it was a large

14  dose and they seemed to be functioning well, able to go to

15  work, able to take care of their children, would you

16  consider that they are tolerating the medication well and

17  able to function well?

18  A.     No, because there's -- there's a variable that we

19  haven't talked about quite yet and that is the market on the

20  street for drugs of this category is brisk.  So a single

21  Oxycodone 30-milligram tablet on the street may command $50

22  for a single pill.  So one of the difficulties is

23  ascertaining whether that individual is actually taking the

24  medicine and not diverting it for monetary gains or whatnot.

25  So when you -- your hypothetical was if they're functioning

1    well.  You know, it's conceivable that they're functioning

2    so well that they don't need the drugs and they're selling

3    them to somebody else.

4    Q.    Let me -- let me change my hypothetical slightly to

5    if you saw -- if, in my hypothetical, if you'd seen a

6    patient over time who was not on pain medication and

7    appeared to be in a great deal of pain coming into the

8    pharmacy saying, hey, you know, can you help me, is there

9    something you can suggest over-the-counter and their life,

10   you know, they come in, they're limping, their life seems to

11   be very -- they tell you their life is very difficult and

12   you see them start on opioids and over time you see them to

13   prove improve, to function, does that change your answer?

14   A.    Yes, it does.  I would be happy for the patient.  I

15   mean, that's the goal here.  I don't want to create the

16   misapprehension that these drugs are poison.  They aren't

17   poison except when they're used in a poisonous way, and if

18   everything works the way it should, the patients resume as

19   close to normal daily functioning without side effects that

20   would make life almost worse than the pain, itself.

21   Q.    And you talked a little bit -- in going right from

22   what you just said, you talked a little bit about the side

23   effects of medication and you said some of these pain

24   medications certainly do have some side effects; is that

25   correct?

```
1   A.      Yeah.   One I didn't mention that is commensurate with
2   every use of opioids is constipation.   In fact, in the old
3   days, maybe some of the more mature juror members may
4   remember something called -- oh, yeah -- oh, this is a
5   senior moment.
6   Q.      Milk of Magnesia?
7   A.      No, no, the stuff --
8           MR. MOLLOY:   Cod liver oil?
9           THE WITNESS:   No, no, no.   This is what you used
10  to take for --
11          THE COURT:   Wait a second, it's up to him.   This
12  is not a group thing.
13          THE WITNESS:   I'm sorry, Your Honor.   I'm having a
14  senior moment.
15          MS. FOX:   That's okay.
16          THE WITNESS:   Anyhow you'd go to the pharmacy and
17  buy a one ounce bottle of this stuff and take it for
18  diarrhea because it has opium in it.   Its real name is
19  camphorated opium tincture because opioids tend to make your
20  GI track stop in its tracks, and that's a common side effect
21  of opiates.
22  BY MS. FOX
23  Q.      And a lot of the side effects of opioids go away over
24  time in two to three weeks, lot of times, the sleepiness
25  effect goes away once the body gets used to it?
```

1    A.      Yes, they can, yes.

2    Q.      I believe constipation is one of the ones that

3    doesn't go away; is that correct?

4    A.      That's correct.  That's why it's almost -- it's

5    almost compulsory to give a laxative regimen along with it.

6    Otherwise, they will have severe constipation.

7    Q.      And I want to talk to you a little bit more.  You

8    gave a very good explanation I believe about the differences

9    between addiction and dependence to pain medication.  If

10   somebody's on pain medication for a long period of time and

11   they're going upward in their doses over a long period of

12   time, would you consider that person to necessarily be

13   addicted to the drug?

14   A.      Not necessarily.  I would have to know a lot more

15   about that circumstance.  But early refills or new fills,

16   drug seeking behaviors, which the dog ate it, my wife washed

17   it in my britches, my car was stolen, my purse was

18   ransacked, and all of those things are what are usually

19   referred to as drug seeking behaviors.  In fact, it's common

20   for doctors to have what they call pain agreements which

21   would outline the conditions that would require that patient

22   to be terminated from the practice.  One of them is drug

23   seeking behaviors.

24   Q.      And do you -- have you -- do you have any idea, as

25   far as the difference between being dependent or -- let me

1  ask you this.  If you were addicted, I believe you said that

2  you -- your life becomes controlled by trying to get more of

3  the pain medication; is that right?

4  A.     That's correct.  The behavioral component is

5  typically what separates the two, because with physical

6  dependence, if you don't get the drug, you will have craving

7  and you will -- it would also be chronic and it will also

8  be -- it might not be as compulsive but compulsive and lack

9  of control kind of go hand in hand.

10  Q.     So somebody who appears to present regularly with no

11  control problems would be somebody who would not be showing

12  the signs of an addict; is that correct?

13  A.     That is typically correct, yes.

14  Q.     Do you have a percentage on the amount of people who

15  really are -- I know there's a lot of misunderstanding

16  between the terms addiction and dependence; do you agree

17  with that?

18  A.     I do.

19  Q.     Probably the general public does not understand that

20  dependence does not equal addiction and the terms are used

21  very interchangeably incorrectly?

22  A.     That is correct, yes.

23  Q.     And do you believe that it's actually a very small

24  population that are -- is actually addicted rather than

25  dependent?

```
1    A.      Yes.   I smile only because either you have -- are
2    familiar with my previous testimony or you're fixing to give
3    me a number here.
4    Q.      Do you have a number for us?
5    A.      Last time I think it was like 1.5 percent.  A very
6    small number, a very small number.
7    Q.      Are actually addicted rather than dependent?
8    A.      That's correct.
9    Q.      And it's a very -- I think you already told me this,
10   there's a huge misunderstanding about those terms?
11   A.      That is correct.
12   Q.      Now, in your experience as a pharmacist, when
13   somebody's in a lot of pain, that can cause a lot of anxiety
14   to the person; do you agree with that?
15   A.      That's a major component of pain is anxiety, yes.
16   Q.      And so it would not be at all unusual to see a person
17   in pain and being prescribed pain medication to also be
18   prescribed an anti-anxiety medication?
19   A.      On the surface, that would make sense, but in the
20   alternative, it seems if you relieve the pain then the
21   anxiety would also be relieved.  What we're doing here is
22   walking on a knife edge because you don't want to fill
23   somebody up with medications that have more chance of
24   causing harm than doing good.  But I will admit to you it's
25   not uncommon for pain medicines to be combined with an
```

1    anti-anxiety medication.

2    Q.      Would you agree with me that there are some people

3    that have had such devastating events in their life who may

4    need anti-anxiety medication, especially if they are in a

5    great deal of pain even if the pain is being halfway

6    controlled by the opioid medication?

7    A.      I would agree with that. and dovetailing to your

8    earlier comment, I can make no statements whatsoever about

9    those circumstances being in any patients in this matter.

10   But in a general sense, you are absolutely right.

11   Q.      And in fact, Klonopin, Clonazepam can be used for

12   things such as someone who has torticollis and has

13   spasticity?

14   A.      That is correct, yes.

15   Q.      And that can be very helpful when used in conjunction

16   with an opioid or pain medication in helping that patient;

17   correct?

18   A.      In those circumstances, that would be reasonable.

19   Q.      And now I'm going to dare to go into this territory

20   where you talked about being conservative and synergistic.

21   Is that an example of that, where two medications could work

22   together to compliment each other or enhance each other for

23   treatment?

24   A.      Yes.  And I will put the same stipulation, there is

25   great debate as to whether, for example, the combination of

1    two medicines is better than either one of them -- well,

2    certainly better than either one of them separately.  That

3    would be synergistic.  You get really more bang for your

4    buck when you combine these two.  In a manner of speaking,

5    Percocet is -- Percocet is an example of using drugs that

6    work by two different strategies, okay.  The opioid,

7    Oxycodone, to relieve pain centrally, and the Tylenol

8    ingredient to relieve pain by a different mechanism and at

9    least the pain relief is additive.  Some argue that it's

10   greater than what you would expect from simply adding up the

11   two.

12   Q.     And do you agree with me, and I think you do from

13   your statements, what you just told us about synergistic

14   activity of the drugs and whether or not they enhance each

15   other, that each individual patient would have to be

16   examined, have a physical history, a diagnosis as you said,

17   a treatment plan in order -- and especially going through

18   their history and what's worked before, in order to

19   determine whether or not the pain medications might work

20   synergistically for that patient?

21   A.     Yes.  In fact, that is absolutely true.  I mean,

22   people's past history can be a great teacher, you know.

23   "Have you had this before?

24            "Yeah.

25            "What did you get?  How did that work?"

1              You do have to be careful, though, because

2      patients sometimes can manipulate naive doctors into giving

3      them the precise answers that would lead to a prescribing

4      decision for the -- for the coveted drug as opposed to --

5      well, a good example would be what they call non-steroidal

6      anti-inflammatories like ibuprofen, which is a very

7      effective pain reliever and the doc would say, "So, are you

8      allergic to any medicines?

9              "Yeah, I can't take ibuprofen, I'm allergic to

10     this, I'm allergic to that, but I can take that one called

11     Oxycontin."

12             You see, so the physician learns through

13     experience to listen to that history but also filter that

14     information with his or her knowledge and experience.

15     Q.     And also certainly to do a physical examination on

16     the patient to see if they respond in certain ways to pain

17     that they're claiming they have to see if they can tell,

18     like a diagnostic test, try other things, all of that would

19     go into that determination that the physician had to make;

20     right?

21     A.     Right, a qualified physician.  And I'll say for the

22     third time, I'm not qualified, but I can answer that

23     question, yes, that's what they do.

24     Q.     Now, you talked a little bit and gave us some history

25     on these different pain medications and is my statement --

1    do you agree with my statement that in the medical field and

2    the field of these prescriptions and these pain medications,

3    what is right today may be wrong tomorrow?  Is that an

4    accurate statement?

5    A.     I smile once again because you may have heard that

6    before somewhere, yes.  Those are my words precisely, and if

7    you don't like change, don't go into medicine because what's

8    right today can be wrong tomorrow.  And what's wrong

9    tomorrow can be -- what's wrong today can be right tomorrow.

10   Q.     And it's a very, very dynamic field, especially as

11   it's gone through time with the -- with the opioid use for

12   pain medications; isn't that true?

13   A.     That's entertaining because morphine is one of the

14   oldest drugs that we have, dating back to when the earth

15   first cooled, you know.  And so yet we're still learning new

16   things about morphine that we didn't know throughout the

17   ages.

18   Q.     And in fact, you even said there's a nationwide

19   debate to move Hydrocodone to Schedule II that's currently

20   going on because every day something new is discovered and

21   it's very difficult to look back in time and say, well, this

22   should have been done and that should have been done, and

23   with all these new discoveries being made every day, even

24   today?

25   A.     Yes.  Obviously, hindsight is 20/20 and every action

1    has an equal and sometimes unintended action.  Hydrocodone

2    is being debated to be moved because people are dying right

3    and left from that drug and they want to sort of clamp down.

4    However, that would have effects over here for people who do

5    have legitimate needs for these drugs who would have to see

6    a doctor every month because they're not refillable.  So

7    that debate rages on as we speak today.

8    Q.    And then along those lines, isn't there a huge debate

9    in this country regarding the -- how do you balance these

10   patients who need large amounts of pain medication with

11   the -- with the issue of diversion and things like that?

12   How do you take the pain medication away from these people

13   without making them go through massive withdrawal, try to

14   find another doctor in the environment that we're in; isn't

15   that a huge debate in this country right now?

16   A.    Yes, ma'am, it is.

17   Q.    And also, I think another thing I want to ask you

18   about, is there also going on in this country a lot of

19   genetic testing that has just come to light about the way

20   the body absorbs and filters the opioids in particular?  I

21   believe you were -- find my note here, the way people

22   metabolize opioids, is that another thing that's just coming

23   to light now that they're studying?

24           MR. MOLLOY:  Objection.

25           THE COURT:  Basis?

1          MR. MOLLOY:  Relevance.

2          THE COURT:  Overruled.

3   BY MS. FOX:

4   Q.    You can answer, Professor.

5   A.    Yes.  That's led to a new area of study in pharmacy.

6   Once again, verifying what I said is when you think you

7   know -- you think you got all the answers, they change all

8   the questions.  So one of the questions that's being changed

9   now is, each and every one of us probably metabolize -- no,

10  scratch the "probably" -- metabolize certain drugs

11  differently than other people.  There may be a day that

12  comes when you have a card similar to your credit card, a

13  chip card where you (indicating) and your DNA will tell you

14  which drugs are handled by your body in one way or another.

15  We're not there yet but that's an emerging science.

16  Q.    And just -- I just want to ask you one more area

17  along those lines.  You talked about the long-acting

18  opioids, I believe, and the short-acting opioids.  Did I

19  understand you to say that it is common to use those

20  together?  You use the long-acting for over time and the

21  short-acting or immediate release for break-through pain; is

22  that correct?

23  A.    That's correct.  I did make one qualifying comment,

24  though, that the break-through medications usually are given

25  in very small doses because you've pretty much got it

1    sighted in or you've pretty much got it nailed with the

2    background drug.  So there shouldn't be excursions, you

3    know, wild excursions with that break-through pain.  But

4    that is a concept that's well accepted in terms of managing

5    chronic pain.

6    Q.    And it's well accepted that Oxycontin, the long-

7    acting, could be given with Oxycodone, the short-acting; is

8    that correct?

9    A.    That's correct.  Now as a pharmacist, I would want to

10   know the circumstances, I would want to know the quantities,

11   I would want to know the strengths, and there may be a point

12   in time where, as a pharmacist, I would say, "Huh-uh, no,

13   you know, that's way too much of the break-through med,"

14   or -- and initiate that conversation that counsel asked me

15   about.

16   Q.    And in fact, I believe you stated very, very clearly,

17   if you thought as a pharmacist that the amounts were

18   inappropriate, that you would refuse to fill the

19   prescription, that that's the duty of a pharmacist to refuse

20   to fill?

21   A.    That's the duty as I see it.  Now, I want to make it

22   clear also that I am not the conscience of the practice of

23   pharmacy and I do know that pharmacists sometimes don't

24   practice the same brand of pharmacy that I taught them in

25   pharmacy school.  Sometimes I see them on the defense table

1    as well.

2    Q.     Okay.  And as far as the short-acting and long-acting

3    goes, in your experience with pharmacy, is it very common to

4    see a patient who has been prescribed one type of medication

5    such as long-acting and the insurance company has dictated

6    that they need to be on a different medication and they

7    don't like the expense of long-acting?

8    A.     That is true.  And in the world in which we live,

9    medicine is -- has been -- what should I say -- infused with

10   a political and economic overtone that make practice

11   sometimes difficult for doctors.  Formularies and preferred

12   drugs, and so forth, it's a difficult world.

13   Q.     And when you say formularies and preferred drugs, I

14   believe a formulary is the list of medications that a --

15   medications a person can get that will be covered by

16   insurance; is that correct?

17   A.     That's correct.  And I'm going to assume for a moment

18   that the members of this jury have had prescriptions filled

19   and I would also presume that many times they've presented

20   that prescription only to learn that their insurance policy

21   doesn't cover Nexium so you have to take this and that.  So

22   it ends up in a phone call and so forth.  So the objective

23   of formularies is to keep the cost of medicine down as much

24   as possible.

25   Q.     For the insurance company?

 1   A.     Yeah, and ultimately for whoever the insurance

 2   company is benefiting.  I mean, the insurance companies only

 3   carry out the mandates of their client.  For example, my

 4   health care is through the State of Florida and Blue Cross

 5   and Blue Shield is the insurance company.  Blue Cross

 6   doesn't make the rules.  The State of Florida makes the

 7   rules through the insurance company.

 8   Q.     And some of the -- would you agree with me that some

 9   of the long-acting opioid medication that's much more

10   expensive has been removed from formularies and made it

11   necessary for doctors to have to prescribe short-acting and

12   bigger doses?

13   A.     Yes.  And there's another reason that the use of

14   Oxycontin has fallen way off.  There are at least three

15   reasons.  One that you just cited.  Two, the company has

16   reformulated the Oxycontin because in previous times,

17   abusers would take that medicine, grind it up and foil the

18   12-hour mechanism and draw it up into a syringe, inject it

19   or, this is not a pleasant word snorting the drug.  Nasal

20   insufflation is the right word, or otherwise bypassing that

21   12 hour dosage form.  The company made it now such that if

22   you try to do that, it turns into a gummy substance which

23   you can't get the active ingredient.

24          The third reason is -- what is the third reason?

25   Paregoric, by the way, is the answer to that earlier

1    question.  Paregoric.

2    Q.      Thank you.

3    A.      Sorry, little late.  Also those who abuse these drugs

4    sometimes ask for immediate release Oxycontin -- Oxycodone

5    for the reasons they can't abuse that stuff anymore.  It

6    turns into a nasty mass that can't be abused.

7    Q.      I want to ask you about -- you didn't talk to us

8    about the off label use of medications.  Could you tell the

9    jury what it means and whether it's acceptable to give a

10   medication off label.  What does that mean?

11   A.      Yes.  This is a very important concept that people

12   talk sometimes about the FDA approving the use of -- or

13   approving what doctors can prescribe.  No, the FDA approves

14   drugs and they outline the conditions under which those

15   drugs have been proven safe and effective.  It does not --

16   it does acknowledge that there are other uses to which drugs

17   can be put that are legitimate, and so forth, but have not

18   gone under that very rigorous process of approval.  So

19   therefore, those are called off label.  Now, not the label

20   on the medicine, but the label is that rolled-up piece of

21   paper called a package inserted.

22           There are some historic drugs that were first off

23   label.  Rogaine, the hair growing drug, was a high blood

24   pressure medicine and then when people were treated for high

25   blood pressure, they looked like cuddly little teddy bears.

1   Their blood pressure went down but esthetically it wasn't

2   very pleasing.  Now that led to approval of that drug, okay.

3          Another one, and I don't want to go into detail

4   here, but the one we see on TV with people sitting in a

5   bathtub looking out over the Pacific Ocean waiting for that

6   moment, okay, that was an off label use.  It was a high

7   blood pressure pill, but there was obviously more money in

8   that other use than high blood pressure.

9   Q.    Isn't even aspirin -- is that an example?

10  A.    Yeah, the use of aspirin for heart protection, it's

11  not -- you don't look at the bottle and say, take it to

12  protect your heart, because if you look at the label, it

13  says take, the mini aspirin, 81 milligrams, take eight

14  tablets every four hours for your headache.  Doesn't say

15  anything about the heart.  That's referred to as an off

16  label use of a drug.

17  Q.    And if a physician -- and I think this happens all

18  the time, a physician says to a patient, listen, you know,

19  take an aspirin every day also, they're actually using that

20  drug off label and you could even say non-FDA approved for

21  its use; is that right?

22  A.    That is absolutely correct.  And what it does, when a

23  doctor uses a drug off label, it puts the burden squarely on

24  the shoulders of that practitioner, because the drug

25  companies, "Wait a minute, we didn't say it was supposed to

1   be used for that."  So there are off label uses that are
2   reasonable.  In fact, there are some off label uses of a
3   drug that are standard of care.  However, there are also
4   outrageous things that as a pharmacist, I have to say, "No,
5   huh-uh, not on my watch."
6   Q.    And again, if you saw something that you considered
7   to be that way as a pharmacist and you believe this is the
8   way all pharmacists should practice, doesn't the DEA require
9   that a pharmacist refuse a prescription if they believe that
10  there's going to be harm to the patient?
11  A.    No.  The language is pretty clear.  It's in -- I'm
12  not good with the laws -- Code of Federal Regulations 1306
13  Subsection 4 that says a pharmacist has an equal and
14  corresponding responsibility not to fill a prescription that
15  he knows or should have known was not issued in the usual
16  course of medical practice.  So it says that if the decision
17  has been made by the pharmacist that it was not issued in
18  the usual course of professional practice, that pharmacist
19  is subject to the long arm of the law and so that's the kind
20  of language that causes pharmacists' hair to stand up on the
21  back of their necks because they don't want to get in
22  trouble.
23  Q.    But the language used is whether or not the
24  prescription is in the usual course of practice?
25  A.    In the judgment of that pharmacist.

1           MS. FOX:  Correct.  All right.  Thank you very

2   much, Professor Doering.

3           THE WITNESS:  Thank you.

4           MR. MOLLOY:  Just a few questions.

5           THE COURT:  Mr. Molloy?

6                    REDIRECT EXAMINATION

7   BY MR. MOLLOY

8   Q.      Professor, you talked about the pharmacist's

9   responsibility?

10  A.      Yes, sir.

11  Q.      The doctor can't hide behind the pharmacist.  The

12  doctor still has the responsibility to her patients?

13  A.      Yes.  They're equal responsibilities.  Now it doesn't

14  mean that the parameters are equal because I'm not in a

15  position to do a physical exam or an MRI.  But there are

16  equal responsibilities in a general sort of way.

17  Q.      And so when one person, meaning a doctor, is not

18  living up to that responsibility, you can't just push the

19  responsibility onto the pharmacist; is that correct?

20  A.      No, absolutely not.  And you know, most of the times,

21  you try not to square off in some kind of show-down of

22  sorts.  But when -- when the dust settles, I've got a

23  responsibility and I frankly don't care what the doctor says

24  or does.  If in my heart of hearts I know that that

25  prescription is not issued in the usual course of medical

1    practice or not in the best interest of that patient, game

2    over.

3    Q.       And the doctor should know that as well?

4    A.       Yes, sir.

5    Q.       Matter of fact, you do not have the ability to order

6    a urinalysis of a patient?

7    A.       No, sir, I do not.  Except there are some home drug

8    tests that -- but that's --

9    Q.       You don't have the power to order that?

10   A.       Not order it, no, sir.  No, sir.  I see what you're

11   saying.  No, sir, I don't.

12   Q.       You don't have the power to order the patient to get

13   an MRI?

14   A.       No, sir, I do not.

15   Q.       You don't have the power to order a patient to go to

16   psychiatric counseling?

17   A.       No, sir.

18   Q.       And if a doctor's prescribing outside the course, I

19   believe the defense attorney, Ms. Fox said, if a doctor is

20   prescribing outside the course of professional practice, it

21   doesn't make any difference at all if the patient is

22   addicted or dependent on that drug?

23   A.       That's correct.

24           MR. MOLLOY:  Nothing further.

25           THE COURT:  Ms. Fox?

1          MS. FOX:  No other questions, Your Honor.  Thank

2    you.

3          THE COURT:  You may stand down.  Thank you.  Let's

4    take a morning recess, 15 minutes.  Please do not discuss

5    the case among yourselves or allow anyone to discuss it with

6    you or in your presence.  15 minutes.

7          COURT SECURITY OFFICER:  All rise for the jury.

8          (Jury out)

9          THE COURT:  All right, 15 minutes.

10          (Recess from 11:15 a.m. to 11:33 a.m.)

11          (EXCERPT concluded)

12

13                         CERTIFICATE

14    I CERTIFY THAT THE FOREGOING TRANSCRIPT IS A TRUE AND

15    ACCURATE TRANSCRIPT FROM AN EXCERPT OF THE ORIGINAL

16    STENOGRAPHIC RECORD IN THE ABOVE-ENTITLED MATTER.

17

18          Dated this 4th day of January, 2013.

19

20                         /s/ R. Joy Stancel
                         _____
21                              R. JOY STANCEL, RMR-CRR
                         FEDERAL OFFICIAL COURT REPORTER

22

23

24

25