UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO. 2:11-CR-114-FTM-29SPC

---

THE UNITED STATES OF AMERICA,

          Plaintiff,

vs.                                          Fort Myers, Florida
                                             June 13, 2012
DEBRA ROGGOW,                                9:30 A.M.

          Defendant.

---

TRANSCRIPT OF EXCERPT OF JURY TRIAL DAY 2 of 10
(Cross Examination of Theodore Parran, Jr.)

BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT JUDGE


FOR THE GOVERNMENT:      Office of the United States Attorney
                         U.S. Courthouse
                         2110 First Street, Room 3-137
                         Fort Myers, Florida  33901
                         239/461-2200
                         BY:  DOUGLAS MOLLOY, A.U.S.A.


FOR THE DEFENDANT:       Fox & Ramunni, PA
                         2211 Widman Way, Suite 250
                         Fort Myers, Florida  33901
                         239/791-3900
                         BY:  AMIRA DAJANI FOX

                         Hollander & Hanuka
                         2325 Stanford Court
                         Naples, Florida  34112
                         239/530-1800
                         BY:  LEE HOLLANDER

```
1   APPEARANCES (Cont'd)

2                        The J. Bolen Group, LLC
                         14875 Buttermilk Road
3                        Lenoir, TN  37771
                         865/368-3472
4                        BY:  JENNIFER BOLEN

5
    REPORTED BY:         R. JOY STANCEL, RMR-CRR
6                        Federal Official Court Reporter
                         U.S. Courthouse
7                        2110 First Street
                         Fort Myers, Florida  33901
8                        239/461-2064

9

10                        I N D E X

11  WITNESS              DIRECT  CROSS  REDIRECT  RECROSS

12  Theodore Parran, Jr.        --       3

13

14               E X H I B I T   I N D E X

15  NUMBER                                      PAGE

16  Defense A1    Brooks Prescription 12/16/8      29

17  Defense A2    Brooks Prescription 1/2/9        39

18  Defense A3    Brooks Rx Profiles              36

19  Defense A4    Brooks Prescription 2/3/9        42

20  Defense A5    Brooks Prescriptions 3/2/9       46

21  Defense A6    Brooks Prescriptions 4/20 & 5/26 51

22  Defense A7    Brooks Envelope & Prescriptions 5/26/9  54

23  Defense A8, A9, A10   Brooks Prescriptions     56

24

25
```

PARRAN - CROSS

```
 1              (Call to Order of the Court)
 2              (Proceedings took place that are not included in
 3    this excerpt, after which, proceedings continued as
 4    follows:)
 5              MR. MOLLOY:  Your Honor, the Government would call
 6    Dr. Ted Parran.
 7              THE COURT:  Come forward, please.
 8              DEPUTY CLERK:  If you would, raise your right
 9    hand, please.
10              (The Witness is Sworn)
11              DEPUTY CLERK:  You may be seated.  If you would,
12    state your full name, spelling your last.
13              THE WITNESS:  Theodore Vandoren Parran,
14    P-A-R-R-A-N, Jr.
15                      THEODORE V. PARRAN, JR.,
16         a witness herein, after having been duly sworn,
17         was examined and testified under oath as follows:
18              (Proceedings took place, to include Direct
19    Examination, that are not included in this excerpt, after
20    which, proceedings continued as follows:)
21              THE COURT:  Ms. Bolen, you may proceed.
22              MS. BOLEN:  Thank you, Your Honor.
23                      CROSS EXAMINATION
24    BY MS. BOLEN
25    Q.    Parran, my name is Jennifer Bolen.  We've not met
```

PARRAN - CROSS

1    before; have we, sir?

2    A.      I don't believe so.

3    Q.      There are four major academies in this country

4    related to pain management.  The American Pain Society, the

5    American Academy of Pain Medicine, American Academy of Pain

6    Management, and the American Society of Pain Educators.

7    Which of those do you belong to?

8    A.      I don't belong to any of those.

9    Q.      Now, are you familiar with the guidelines for expert

10   witness qualifications and testimony, generally, in your

11   profession?  They do exist; correct?

12   A.      Yes.

13   Q.      All right.  And the part of the responsibilities of

14   an expert witness is to give honest, unbiased, responsible

15   testimony; correct?

16   A.      Yes.

17   Q.      All right.  And pain medicine physicians who

18   generally serve as experts in litigation should only do so

19   within the boundaries of their training; is that correct?

20   A.      Physicians who give testimony should give testimony

21   within the boundaries of their -- their clinical skills.

22   Q.      All right.  And you're not calling yourself a pain

23   management physician; are you?

24   A.      I'm an internal medicine physician who has worked

25   with pain management clinics on and off since 1985.

1    Q.     All right.  And are you a front line pain management

2    professional?  Do you have your own solo practice on the

3    front line?

4    A.     I do not run a pain management office or clinic,

5    myself, no.

6    Q.     Okay.  You're, in fact, based with the university; is

7    that correct?  With lots of resources and --

8    A.     I've been based or I am based with the university.

9    I've been based with a -- with the VA and I've been based

10   with actually St. Vincent Charity Hospital, which has

11   precious few resource.

12   Q.     You still haven't operated your own practice with

13   regard to pain management; correct?

14   A.     Correct.

15   Q.     Now, when you do a review as an expert, it's your

16   intent to be thorough and accurate; correct?

17   A.     Yes.

18   Q.     All right.  And you pore over the information sent to

19   you from the Government; is that correct?

20   A.     I try to review the medical records, as I mentioned

21   this morning, as carefully as I can.

22   Q.     All right.  We'll talk about that in a minute.  You

23   understand that you shouldn't exclude relevant information;

24   right, sir?

25   A.     I try to form my opinions based upon the information

1     in the medical records.

2     Q.     Right.  And you're looking backwards at the events

3     that you're looking at in the records; correct?

4     A.     That's certainly true.

5     Q.     You didn't see the patients in person?

6            MR. MOLLOY:  Excuse me, if the witness could

7     answer the question before the next question.

8            MS. BOLEN:  I'm sorry, I thought he did, Your

9     Honor.  I'm a little hard of hearing.  If he could not drop

10    his voice off, that would help.

11           THE COURT:  If the witness would use the

12    microphone and you give him a chance, make sure he got the

13    answer out.

14           MS. BOLEN:  Yes, sir.

15           THE COURT:  I don't know what the last question

16    and answer was, so why don't you repeat that, if you would.

17           MS. BOLEN:  Yes, sir.

18    BY MS. BOLEN

19    Q.     When you review medical records, you're looking

20    backward; correct?

21    A.     Yes.

22    Q.     You weren't there with the physician and the patient

23    at the time of the visits; correct?

24    A.     Certainly not.

25    Q.     You didn't speak with the other doctors involved in

PARRAN - CROSS

1    sending referrals to Dr. Roggow; did you?

2    A.      No.

3    Q.      All right.  And you didn't get a chance to interview

4    the patients at the time that they were making their pain

5    complaints to Dr. Roggow; correct?

6    A.      I have neither interviewed the patients at that time

7    nor reviewed any of their investigation notes or anything.

8    Q.      So would it be fair to say that there's a little bit

9    of then and now going on in terms of the review of the

10   information related to the patient files in this particular

11   case?

12   A.      Well, I'm reviewing the patient files now and the

13   patient files were written then.  But that's all that I

14   would agree with.

15   Q.      All right.  Would you agree that you're looking

16   backwards at information over a substantial period of time?

17   A.      Several years, yeah.

18   Q.      All right.  Now, you also agree with me that it is a

19   responsibility of an expert to be truthful and impartial;

20   correct?

21   A.      Yes.

22   Q.      You say you've worked for the Government in the past;

23   is that correct?

24   A.      Yes.

25   Q.      You, in fact, have been investigated at one point in

PARRAN - CROSS

1   your career by the Government but that investigation was

2   dropped; correct?

3   A.      The investigation --

4               MR. MOLLOY:  I'll object, Your Honor.

5               THE COURT:  Come to sidebar, please.

6               (At sidebar, Court, counsel, and defendant

7   present)

8               THE COURT:  Tell me what this is all about.

9               MS. BOLEN:  The witness has been investigated by

10  the U.S. Attorney's Office in Cleveland, Ohio, his home

11  area, for billing fraud in connection with his management of

12  patients in the field that he's testified about.  The

13  investigation, as I understand it, was dropped, but it was

14  occurring at the time that this witness was testifying for

15  the Government in several cases, to include criminal cases.

16              THE COURT:  When was this?

17              MS. BOLEN:  I'd have to go back and double check

18  my notes, but I believe, Your Honor, it was in the 2007 and

19  '8 time range.  So it is within the scope of the indictment.

20  I might be off by a year but it certainly is within the

21  scope of the indictment.  It's not a reach back.

22              THE COURT:  It certainly is.  The indictment

23  wasn't returned until 2011.  The conduct that the defendant

24  is charged with obviously precedes that.  Mr. Molloy?

25              MR. MOLLOY:  Well Your Honor, the -- an indictment

1   was not returned.  It has no effect on his, you know,

2   reading of the evidence.  He's under no -- you know, under

3   no obligation to -- I'm not saying it right.  It's hard to

4   see the relevancy of the investigation that was dropped long

5   before he reviewed the file.

6           THE COURT:  Anything else?

7           MS. BOLEN:  I just wanted to say I think this goes

8   to potential bias and credibility of this witness.

9   Obviously he's being paid by the Government.  I can set more

10  foundation on that if you'd like, but that's -- benefit of

11  dropped charges are certainly something that the jury should

12  be able to consider over the long period that this doctor's

13  accusing defendant Roggow of this misconduct.

14          THE COURT:  You may certainly elicit testimony the

15  doctor is being paid.  Absent more of a foundation you may

16  not elicit testimony as to what -- whether he was

17  investigated and the result of that investigation that

18  predates his retention in this case by a number of years.

19  If you wish to lay a foundation, you may do that.  I'll let

20  you do that after 5:00 outside the jury's view, but it's not

21  apparent to me that there's any conceivable bias that's

22  being elicited.  If you've got a factual basis that says

23  otherwise, I'll listen to it but you haven't proffered it

24  yet.

25          MS. BOLEN:  Yes, sir.

1          MR. MOLLOY:  Excuse me, folks.  I don't usually do
2    this but I'm going to ask that that question be stricken for
3    in the jury's hearing.
4          THE COURT:  Do you want to strike the question?  I
5    don't think it was answered; was it?
6          MR. MOLLOY:  No, it wasn't.  It might be a moot
7    point, I'm not sure it's something that can be -- it can't
8    be stricken from the record if it's been asked.
9          THE COURT:  Well, I told them in my opening that
10   they should not infer anything from a question that goes
11   unanswered.
12         MS. BOLEN:  I'll just go into something else.
13         THE COURT:  Seems to me that's going to -- if I
14   tell them disregard the question, that probably highlights
15   it more than --
16         MR. MOLLOY:  That's what I want to do, Judge.  I'd
17   like it highlighted.
18         THE COURT:  Okay.
19         (Sidebar concluded)
20         THE COURT:  The objection is sustained.  The jury
21   is instructed they should disregard the question, which was
22   not answered.  You may proceed.
23   BY MS. BOLEN:
24   Q.    Dr. Parran, when were you first contacted by the
25   Government to review the records in this case?

1   A.      Probably in -- sometime during last fall.  It was

2   probably September or October, something like that.  I

3   typically take -- I'm typically behind in a lot of the

4   things that I do and so it usually takes me a few months in

5   order to review records and get a report.

6   Q.      All right.  Who first contacted you?

7   A.      I believe it was DEA Agent Baginski, I believe.

8   Q.      Did you receive any -- I'm sorry?

9   A.      I believe.

10  Q.      All right.  Did you receive any written communication

11  from her at that time in, let's say, late fall of 2011?

12  A.      I received a phone call and then I received an email

13  from her, and it was some weeks after that before I received

14  the medical records.

15  Q.      Did you bring that email with you today?

16  A.      No.

17  Q.      Did you bring the medical records you reviewed with

18  you today?

19  A.      No.

20  Q.      Did the records come in the form of patient charts or

21  did they come in another form, such as an electronic CD or

22  something like that?

23  A.      I believe that these records came on a -- on a series

24  of CDs.

25  Q.      Did you reply to the Agent's email?

1  A.     Oh, I'm sure I did, yeah.

2              MS. BOLEN:  Your Honor, I'd ask at this time that

3  that email be produced.

4              THE COURT:  Come to sidebar.

5              (At sidebar, Court, counsel, and defendant

6  present)

7              THE COURT:  Counsel, from here on out, you are

8  forbidden to call for the production of items in front of

9  this jury.

10             MS. BOLEN:  I'm sorry, Your Honor.

11             THE COURT:  If you are implying that it should

12  have been produced and it wasn't or other otherwise, you may

13  not do that in front of the jury.  If you wish to make an

14  issue, you may approach sidebar or do it a different time.

15  That's improper in my view.

16             MS. BOLEN:  Yes, sir; yes, sir.

17             THE COURT:  Now, what about the document?

18             MR. MOLLOY:  I don't have it.  I can -- if the

19  Court is, if you would like me to --

20             MR. HOLLANDER:  Well, if -- I'm sorry.

21             MR. MOLLOY:  I'm sorry, Your Honor.  I'm not aware

22  of the mechanisms that were utilized to get the doctor.  I

23  can go back to Agent Baginski who is right now busy

24  arranging witnesses if the Court wishes.

25             THE COURT:  Was there any reason it wasn't

PARRAN - CROSS

 1   produced?

 2           MR. MOLLOY:  No, sir.  I don't know that there is

 3   any reason to produce it and I would have complied with any

 4   request for it.

 5           MR. HOLLANDER:  We did make a request and it was

 6   denied by the magistrate, was one of the dockets -- one of

 7   the motions that the magistrate denied, for whatever was

 8   sent to the doctor for review and the reason it was denied

 9   is because the Government represented all documents had been

10   produced.

11           THE COURT:  That's not what we're talking about

12   here, as I understand it.  The request was for the

13   production of the email from the Agent, not what the witness

14   was sent in terms of the defendant's records.  I don't see

15   those as being the same.

16           MS. BOLEN:  I thought it was within the scope.  I

17   understood it was within the scope.

18           THE COURT:  I'm sorry?

19           MS. BOLEN:  I understood it was within the scope

20   of the request, based on our communication.

21           MR. HOLLANDER:  I -- it was for everything

22   reviewed.  I didn't know that there was a separate email.

23   We were never informed of this, other than I assumed it was

24   the records and I want to know what records, what specific

25   exhibit was reviewed.  Now all the sudden there's an email.

1    It may just be, hi, we'll be sending you the stuff, or it

2    may be more involved than that.  Apparently, there's some

3    other documents that were sent post report that came out on

4    his direct earlier, but for right now, I'd just ask the

5    Court if we could see the email, since that was pre-report.

6              THE COURT:  Any objection to production of that

7    email?

8              MR. MOLLOY:  No.

9              THE COURT:  All right.  The request is granted.

10   You ask your agent to find it.  I don't know if she has it

11   now.  You probably don't know if she has it now or not.

12             MR. MOLLOY:  I didn't know how she provided it.

13   Your Honor, I'm going to ask that the demand be stricken.

14             THE COURT:  Tell me what you mean by that.

15             MR. MOLLOY:  The defense counsel asked that the

16   Government produce the document and I'm going to ask that

17   that be stricken.

18             THE COURT:  In terms of telling the jury

19   something?

20             MR. MOLLOY:  That's correct.

21             THE COURT:  What do you want me to tell the jury?

22             MR. MOLLOY:  That they may disregard the demand.

23             THE COURT:  I frankly don't remember the words

24   that you used when you said demand, produced, whatever.

25             MS. BOLEN:  I said, Your Honor, may we have a copy

PARRAN - CROSS

1   produced.  I believe that's what we said and you know, I'm
2   thinking it's --
3           THE COURT:  The request to strike the demand to
4   the extent that it's a question the Court instruct the jury
5   of something will be denied.  If it happens again, you may
6   get a different ruling, but I don't think the jury's going
7   to attach much significance to this by the time we finish.
8           MS. BOLEN:  Your Honor, if I may, I don't want to
9   play this game of back and forth.  It's my intention there
10  were a lot of sticky notes in the records that we received.
11  We've identified the agent's handwriting on those sticky
12  notes.  I have no idea if they were sent that way to
13  Dr. Parran or not.  I think it's a fair line of questioning
14  but I don't also want to explore it and incur the Court's
15  ire, because it is a good faith question and I understood
16  that they were covered under the requests that we made
17  earlier, prior to my entry into the case, for what was
18  produced to the witness and alls we received are copies but
19  the copies also have the sticky notes in them.
20          THE COURT:  I frankly don't understand what the
21  dilemma --
22          MS. BOLEN:  The dilemma is the sticky notes are
23  directive language from the agent in looking at the records.
24  I'm dancing a fine line here and I don't want to look like
25  I'm playing games.  I can go to a completely different line

1    of questioning, not waste anymore time, and we can take

2    these issues up after the jury today if we need to.

3            THE COURT:  I don't see that as being the same

4    issue.  If there is a sticky note on a file that's from the

5    agent to this witness, I think you can inquire about it.  If

6    that -- is that what your concern is?

7            MS. BOLEN:  I don't know whether he saw them or

8    not and I don't want to make its look like the Government's

9    withholding anything.  That's not the accusation.  I'm just

10   simply asking for things I thought were covered in an order.

11           THE COURT:  I don't know if he saw them either.  I

12   presume that's the point of the question is to determine

13   whether he saw them or not.

14           MS. BOLEN:  Yes, it is.

15           THE COURT:  Am I missing something?

16           MS. BOLEN:  No.  I'm just being overly cautious

17   because of what you said before.  I really am trying to do

18   this in good faith and it could show something --

19           THE COURT:  I don't see the issue now.

20           MS. BOLEN:  No problem.  Thank you.

21           (Sidebar concluded)

22           THE COURT:  You may proceed.

23   BY MS. BOLEN

24   Q.    Would you describe to the jury, please, what you

25   received in connection with this review you were asked to

1   do?

2   A.     So I received, I believe, a phone call and then some

3   time after that, an email.  Sometime quite a while after

4   that, matter of a few to several weeks, I received the

5   medical records scanned onto disks, I believe.  Then

6   sometime after that -- and again, I apologize about the

7   chronology, but sometime after that, I received some -- some

8   email attachments.  One was an investigation report of an

9   interview with, I think, a couple of pharmacists.  There may

10  have been -- there may have also been a report of an

11  interview with a physician on there.  I received some

12  pharmacy profiles, I believe, from CVS.

13  Q.     By pharmacy profiles, you're referring to printouts

14  that the pharmacies keep, that log?

15  A.     Yes.

16  Q.     Medications that they fill for various drugs

17  including controlled drugs?

18  A.     Yes, yes.

19  Q.     Okay.  How many different shipments of material did

20  you get from the Government; do you know?

21  A.     I believe I got the charts and I believe everything

22  else that -- that arrived I believe came as an email

23  attachment.

24  Q.     And were each one of those sent by the agent in this

25  case?

PARRAN - CROSS

1    A.      I'm pretty sure they were sent by the agent.  Now,

2    just recently, because I'd never really -- I'd never spoken

3    with the prosecutors until a conference call, a video

4    conference call that we did probably four weeks ago or so

5    for a couple of hours.  And after that, after that video

6    conference call, I did receive three CVs and a report that I

7    believe the defense had provided to the prosecution.  I got

8    those as email attachments probably two weeks ago.

9    Q.      And by CVs you mean curriculum vitae?

10   A.      Yes.

11   Q.      The things that doctors keep that lists everything

12   that they've done, published, et cetera?

13   A.      Yes, yes.

14   Q.      You don't publish for any of the pain journals; do

15   you?  Journal of Opioid Management --

16   A.      I've been asked recently to contribute to a series

17   in -- in a pain journal.  I haven't gotten around to writing

18   that article yet, but based on a presentation that I made to

19   the National Association of Medicaid Pharmacy Administrators

20   regarding the prudent prescribing of controlled drugs, I've

21   been asked to provide an article and an editorial for one of

22   the pain journals.

23   Q.      And those Medicaid pharmacy directors, et cetera,

24   those are the people that actually review requests for

25   overrides for quantities and deal with formularies and that

PARRAN - CROSS

1    sort of thing for the Medicaid and perhaps even Medicare

2    plan if they're involved in the conference; correct?

3    A.      That was the conference I was at, but the person who

4    asked me to -- to write an article and write an editorial is

5    one of the editors of the pain journal who also was there

6    presenting at that conference.

7    Q.      Which pain journal?

8    A.      Oh, goodness.  I'd have to pull up my email to let

9    you know.  It's -- I'd have to pull up my email to let you

10   know.

11   Q.      That's all right.  It's fair to say that this was

12   after the time that you submitted your report to the

13   Government?

14   A.      I presented at this conference in November -- no, in

15   February of 2012, and I believe I submitted my report in

16   January, late January of 2012.  So it was close to the same

17   time, but after.

18   Q.      But certainly after the events and the allegations

19   before the jury; correct?

20   A.      Absolutely.

21   Q.      You're not licensed in Florida; right?

22   A.      Right.

23   Q.      And have you ever taken time before this case to

24   review the Florida standards on pain management for

25   osteopathic physicians?

PARRAN - CROSS

1    A.      I've -- I have been asked to review the Florida
2    standards, the state medical board standards regarding pain
3    management for Florida physicians in the past regarding
4    other cases.  I was not specifically asked to review that
5    regarding this case.
6    Q.      All right.  You're not a board certified physical
7    medicine and rehab physician; are you?
8    A.      No.   Internal medicine.
9    Q.      Now, I want to ask you a couple of basic questions
10   here, Dr. Parran.  With regard to the quantities of
11   controlled medications, there's nothing in the federal law
12   that limits the quantity of the controlled medication; is
13   there?  No number in the law?
14   A.      Certainly not that I'm aware of, no.
15   Q.      And there's nothing like that in the Florida law that
16   you've reviewed in connection with your other work as an
17   expert?
18   A.      Yeah, in neither the Florida law nor the medical
19   board guidelines or rules.
20   Q.      And in fact, with regard to any of the four pain
21   management organizations that you don't belong to, are you
22   generally aware of whether or not any of those organizations
23   have published guidelines setting any quantities on
24   prescribing?
25   A.      No, there certainly have been guidelines published

PARRAN - CROSS

```
 1   but nothing -- nothing in terms of, you know, a person can't
 2   go above certain amounts of opiates.
 3   Q.     Correct.  Nothing about going above certain levels;
 4   right?
 5   A.     Right.
 6   Q.     Nothing about combinations of certain medications,
 7   correct, in terms of quantities or whether you can do it or
 8   not do it?
 9   A.     Correct.
10   Q.     And certainly nothing about the length of time that a
11   patient may be prescribed a controlled medication?
12   A.     Most certainly not.
13   Q.     Now when you reviewed the materials that were sent to
14   you, you looked at all of the information in the chart;
15   correct?
16   A.     I looked at all of the information that was sent to
17   me.
18   Q.     You made an effort to write down that information in
19   the report you used to refresh your recollection here today;
20   correct?
21   A.     I tried to indicate areas that were the most
22   important for me to try to remember here today.
23   Q.     But you wrote down the relevant information as it
24   ties into your expert opinion; correct?
25   A.     No.  I wrote down important information that I wanted
```

PARRAN - CROSS

1   to be sure to talk about today, but there was lots and lots

2   of relevant information in those medical records that I

3   didn't write down.

4   Q.     There were a lot of records that you looked at; fair

5   statement?

6   A.     These were some thick medical records.

7   Q.     All right.  Some cases, there were two charts or two

8   volumes on particular patients?

9   A.     Yes, on at least one patient and I believe more.

10   Q.     All right.  Do you recall looking at both volumes of

11   the chart on Lori Corrochano?

12   A.     Again, I don't remember.  I looked at these records

13   probably in November and December.

14   Q.     You only looked at the charts for Jeff Giompalo,

15   Susan Helton, Mr. Tony Brooks, Lori Corrochano and -- I know

16   I'm missing one -- Mr. Farabee; correct?

17   A.     Yes, yes.

18   Q.     And you did not look at the ones for any of the other

19   patients being Patricia Scott, some of the other ones that

20   we've heard about today?

21   A.     I don't believe I've heard about other patients.

22   Q.     Five only?

23   A.     Today.  I believe I -- I believe I only reviewed five

24   patient charts.

25          MS. BOLEN:  Your Honor, may I have the projector

PARRAN - CROSS

1    turned on at this point in time?

2              THE COURT:  You may.

3              (Pause in place)

4    BY MS. BOLEN

5    Q.     Dr. Parran, do you recall testifying to the issuance

6    or alleged issuance of multiple early refills in connection

7    with Mr. Tony Brooks?

8    A.     Yes.

9    Q.     Focusing your attention on December 16th of 2008, if

10   I recall your testimony, you stated that that prescription

11   was ten days early; correct?

12   A.     December 8th of when?

13   Q.     December 16th of 2008.

14   A.     Okay, let me find that.  Yeah, that's what I wrote

15   down in my notes.

16   Q.     All righty.  And that's what you testified to;

17   correct, sir?

18   A.     Yes.

19   Q.     All righty.  Now, when we look at prescriptions, they

20   have different information on it, do they not?  They have

21   the patient's name?

22   A.     Yes.

23   Q.     And they have a date; correct?

24   A.     Yes.

25   Q.     A signature?

PARRAN - CROSS

1   A.      Yes.

2   Q.      And in the middle, they generally have the name of

3   the drug and the instructions as to what dosage, how they're

4   supposed to be taken, and the quantity to be filled;

5   correct?

6   A.      Yes.

7   Q.      And you testified earlier, sir, if I recall, that

8   it's not illegal to mail prescriptions; right?

9   A.      No, it's certainly not.  And especially with

10  Schedule II it often, often is done.

11  Q.      Is that something you've done, yourself, mail

12  prescriptions to patients?

13  A.      You know, I don't believe I've mailed prescriptions

14  to patients, but I have faxed a Schedule II prescription to

15  a pharmacy and then mailed the hard copy in follow-up to the

16  pharmacy because they always need the hard copy.  So I have

17  mailed Schedule II prescriptions but I don't believe to

18  patients.

19  Q.      And that's part of your practice in Ohio; right?

20  A.      Yes.

21  Q.      And with regard to early refills, you've

22  characterized 12/16/08 as a ten day early refill; correct?

23  A.      Yes.

24          MS. BOLEN:  I want to -- Your Honor, if I may

25  approach the witness with Defense Exhibit A1 for

PARRAN - CROSS

1   identification?

2           THE COURT:  You may.

3           MS. BOLEN:  And I don't have an extra copy of that

4   so I'll go back and forth, if that's okay, Your Honor.

5           THE COURT:  That works.

6   BY MS. BOLEN

7   Q.     Now Dr. Parran, look at the prescription date on

8   Defense Exhibit A1.  I believe it's the last page of that

9   exhibit.  You see that there?

10  A.     Prescription date is --

11          THE COURT:  Doctor, don't publish what's on the

12  document yet.  It's not been admitted.  You can testify if

13  you see it or not.

14  BY MS. BOLEN

15  Q.     Do you see the date there?

16  A.     Yes.

17  Q.     Is this one of the prescriptions you testified about

18  earlier today?

19  A.     Yes.

20          MS. BOLEN:  Your Honor, may I publish this to the

21  jury at this point, please?

22          MR. MOLLOY:  May I voir dire the witness on this

23  particular piece of evidence?

24          THE COURT:  You may.

25          MR. MOLLOY:  May I approach the witness in order

PARRAN - CROSS

```
 1    to obtain it?
 2              THE COURT:  Yes.
 3                      VOIR DIRE EXAMINATION
 4    BY MR. MOLLOY
 5    Q.    Doctor, you indicated that you recognized this
 6    particular document as part of your -- if I remember right,
 7    recognized this document, it's three pages long, as part of
 8    your examination of the patient records; is that right?
 9    A.    I recognize it as a prescription to the -- to the
10    patient, Mr. Brooks, and she asked me if I recognized the
11    date on there.
12    Q.    But this particular receipt, this particular one,
13    does it stand out in your mind?  Is it something that you
14    recognize as specifically being something that you have
15    seen?
16    A.    No.
17              MR. MOLLOY:  No questions.
18              THE COURT:  All right, any objection to Exhibit --
19    is it A1 you said?
20              MS. BOLEN:  I'll move it in, Your Honor, at this
21    time.  Yes, sir, A1.
22              MR. MOLLOY:  Your Honor, I'm going to object.  He
23    has no specific recollection of this particular piece of
24    evidence.
25              THE COURT:  All right, come to sidebar, please.
```

1              (At sidebar, Court, counsel, and defendant

2     present)

3              THE COURT:  All right.  Do I correctly assume this

4     is going to be a pattern objection if she does similar

5     activity with the other portions of the file?

6              MR. MOLLOY:  Yes, sir.

7              THE COURT:  All right.  Proffer to me where this

8     came from.

9              MS. BOLEN:  Yes, sir.  It came from the materials

10    produced by the Government in discovery.  It is excerpts

11    from prescription records in Tony Brooks' file.  Anything

12    that we're handling is coming from the discovery produced by

13    the Government.  It's my understanding that this is the same

14    material that was produced to Dr. Parran on the CDs, just

15    like we received.  We took the time to go and copy them and

16    print them out.

17             And this would be a pattern.  I would be going

18    through several of these, and they are exact copies of the

19    records, and in lieu of introducing the entire patient

20    record, we went and got the excerpts, much like the

21    Government's doing the summary.

22             Now, I don't have any problem putting these

23    patient records in, I think that that would be a long and

24    involved process.  So you know, it's my understanding he

25    reviewed these things, he received them from the

PARRAN - CROSS

```
 1   Government --
 2            THE COURT:  Keep your voice down.
 3            MS. BOLEN:  I'm sorry I was speaking loud.
 4   Received them from the Government and he reviewed them.
 5   Whether or not he recalls an individual page, that's not
 6   really our problem.  I think we have a right to ask these
 7   questions of him.  He's alleged early refills.  Every one of
 8   these is going to represent that it's not an early refill.
 9   He referred extensively to this patient, reading his entire
10   report on these dates.
11            THE COURT:  Is it the lack of authentication?
12            MR. MOLLOY:  No, sir.
13            THE COURT:  All right.  So it is essentially
14   conceded these are the medical records that were obtained
15   from the defendant?
16            MS. BOLEN:  We stipulated to it as well.
17            MR. MOLLOY:  Yes, sir.
18            THE COURT:  And so tell me again what the basis
19   for the objection is, I guess.  These are coming in somehow,
20   because it's not fair otherwise.  And whether -- whether
21   that means the entire original medical record comes in as
22   opposed to copies, that would be fine, but I'm not going to
23   allow an expert to testify at length saying he's reviewed
24   voluminous records and then have the defense stymied from
25   cross examining any individual record because he says I
```

```
 1   can't remember individually.

 2               MS. BOLEN:  Which he said repeatedly.

 3               MR. MOLLOY:  I'll withdraw the objection.

 4               THE COURT:  All right.

 5               MS. BOLEN:  I'm sorry, I wanted to apologize for

 6   not moving before I asked to publish.

 7               THE COURT:  Okay.  I'll deal with it.

 8               MS. BOLEN:  Thank you.

 9               (Sidebar concluded)

10               THE COURT:  Defendant's Exhibit A1 will be

11   admitted.

12               (Defense Exhibit A1 admitted)

13               MS. BOLEN:  Your Honor, may I publish this to the

14   jury, please?

15               THE COURT:  Using the overhead, you may.

16               MS. BOLEN:  Yes, sir.

17               THE COURT:  Yes.

18               MS. BOLEN:  I'll try not to destroy the integrity

19   of it there.

20   BY MS. BOLEN

21   Q.    Dr. Parran, can you see that, please?

22   A.    Yes.

23   Q.    The date -- the name on the prescription is what,

24   please?

25   A.    Tony Brooks.
```

PARRAN - CROSS

1    Q.    And is Dr. Roggow's name on that prescription?

2    A.    Yes.

3    Q.    And the date underneath Mr. Brooks' name is what?

4    A.    December 16th.

5    Q.    Of what year?

6    A.    2008.

7    Q.    This is one of the ones you testified to; correct?

8    A.    Yes.

9    Q.    In the top left-hand corner of each prescription

10   where I'm pointing, is there a date listed there?

11   A.    It says 12/24/08.

12   Q.    Do you have any idea what that date means?

13   A.    No.

14   Q.    When you work as a physician, do you sometimes put

15   release dates on prescriptions?

16   A.    Release dates are written "do not fill before" and

17   then a date, yes.

18   Q.    But that's your practice in Ohio; correct?

19   A.    That's what is required.  It's on the DEA's web site.

20   Q.    Do you have a copy or an article with you that shows

21   exactly that language?

22   A.    It's in their frequently asked questions, I believe

23   question in 2009 --

24   Q.    You're talking about do not fill -- I'm sorry.

25            MR. MOLLOY:  Objection.

PARRAN - CROSS

```
1              THE COURT:  You need to let each other speak
2    individually.
3              MS. BOLEN:  I'm really having a hard time hearing
4    because of the equipment, Your Honor.  Maybe I could stand
5    over here to hear him.
6              THE WITNESS:  I'll speak up.
7              THE COURT:  That's fine.
8              THE WITNESS:  So the ability to write do not
9    refill before a certain date for Schedule II prescriptions
10   that were going to be written as multiple refills was
11   clarified by the DEA on their web site, on their frequently
12   asked questions web site.  I believe it was in 2009.
13   BY MS. BOLEN
14   Q.    Okay.  So you're talking about a time period when DEA
15   went and clarified the ability of a physician to write
16   multiple prescriptions for Schedule II controlled substances
17   at the same time for a patient but have different release
18   dates on them; correct?
19   A.    Yes.
20   Q.    And that's allowed conduct; correct?
21   A.    It is allowed conduct, yes.
22   Q.    Now turning to, if we could, please, the -- let's go
23   back to that page right there.  What's on the top part of
24   those prescriptions in the copy?  What does it appear to be
25   to you, sir?
```

PARRAN - CROSS

1  A.      It looks like the patient's address.

2  Q.      Suggesting that something might be mailed; correct?

3  A.      Yes.

4  Q.      And on the bottom part of the copy there, do you see

5  the word "mail" and a date?

6  A.      Mailed 12/19/08.

7  Q.      So that certainly would purport to be three days

8  after the actual issue date of the prescription of

9  December 16th, 2008; correct?

10  A.      Yes.

11  Q.      You see the front part of this, looks like a

12  certified mail delivery receipt?

13  A.      Yes.

14  Q.      You see the date box there, date of delivery?

15  A.      Date of delivery, I think it's 12 -- that may be

16  20/08.   I think it's 20.

17  Q.      12/20/08.  So now we're about four days after the

18  date you called a ten day early prescription in your

19  testimony; you see that, sir?

20  A.      Yes.

21  Q.      You testified that you earlier had also received

22  pharmacy records to review from the Government; is that

23  correct?

24  A.      I did receive pharmacy records.  I received them, I

25  believe -- I'm not sure of the chronology, but I believe

PARRAN - CROSS

1    after reviewing the medical records.

2    Q.     Do you recall getting any prescription summaries from

3    or related to Mr. Tony Brooks?

4    A.     I do not recall that no.

5    Q.     Is that because you received a volume of information,

6    quite a few pieces of paper?

7    A.     No, the -- the pharmacy profiles were an email

8    attachment so there wasn't a -- there weren't a lot of

9    pieces of paper.

10   Q.     What information did you use to make your judgment

11   that this was an early refill?

12   A.     Based upon when the prescription was written and

13   based upon the following prescription which also was written

14   even earlier.

15   Q.     Let's go back and review the dates then.  You

16   testified that this was issued on 12/16/08; correct?

17   A.     Yes.

18   Q.     We just looked at an exhibit that shows the

19   prescription was issued on 12/16/08; correct?

20   A.     Yes.

21   Q.     And we also just looked at an exhibit that showed,

22   same exhibit actually, Defense Exhibit A1, that shows that

23   this prescription was mailed on December 19th of 2008;

24   correct?  Do I need to put that back up for you?

25   A.     Yes, mailed on the 19th, I believe.

PARRAN - CROSS

| | |
|---|---|
| 1 | MS. BOLEN:  Yes, if I, may Your Honor republish |
| 2 | this to the jury? |
| 3 | THE COURT:  You may. |
| 4 | BY MS. BOLEN |
| 5 | Q.    Defense Exhibit A1 on the bottom there Dr. Parran |
| 6 | where it says mailed 12/19 of '08? |
| 7 | A.    Yes. |
| 8 | Q.    And then we talked about the receipt indicating the |
| 9 | date of delivery of 12/20 of '08? |
| 10 | A.    Yes. |
| 11 | Q.    That's not in your report that you testified to; is |
| 12 | it, sir? |
| 13 | A.    No, it's not. |
| 14 | Q.    And logic would tell us that if somebody received a |
| 15 | prescription on 12/20/08, they had to fill that prescription |
| 16 | on or after that date; correct? |
| 17 | A.    Yes. |
| 18 | Q.    And you don't have any independent recollection of |
| 19 | reviewing prescription fill documents on Mr. Tony Brooks; do |
| 20 | you? |
| 21 | A.    No, I do not. |
| 22 | MS. BOLEN:  Your Honor may I approach the witness? |
| 23 | THE COURT:  You may. |
| 24 | BY MS. BOLEN |
| 25 | Q.    Mr. Parran, I'm showing you what's been marked for |

1    identification as Defense Exhibit A3 and I'd ask you not to

2    read anything out loud.  I'd ask you to look and see on

3    there if you find any information that might refresh your

4    recollection as to reviewing pharmacy records with a fill

5    date on this prescription issued to Tony Brooks and received

6    by him on December 20th of 2008.

7    A.     I'm not sure of your question.

8    Q.     Without discussing what's in the document in front of

9    you, would you please look to the date, there's a set of

10   dates in there, and see if there's anything on that piece of

11   paper, Defense Exhibit A3 that would refresh your

12   recollection as to whether you've seen any pharmacy records

13   on Tony Brooks for this particular prescription you

14   testified about in your direct?

15   A.     I don't remember looking at pharmacy profile

16   regarding this.

17   Q.     But you did receive a set of pharmacy profiles from

18   the Government; correct?

19   A.     I did receive some pharmacy profiles from the

20   Government.  But I do not -- I do not recall reviewing this

21   pharmacy profile.

22   Q.     Is there information on there about Mr. Tony Brooks?

23   A.     It appears to be Tony Brooks' pharmacy profile.

24   Q.     And are you telling this Court that you did not ever

25   review anything from Mr. Tony Brooks or that you can't

PARRAN - CROSS

```
 1   remember whether you reviewed anything from Mr. Tony Brooks
 2   in terms of pharmacy profiles?
 3   A.      The latter.
 4   Q.      You just can't remember whether you did or not?
 5   A.      Right.
 6            MS. BOLEN:  Your Honor, at this time, we'd offer
 7   Defense Exhibit A3.
 8            THE COURT:  Any objections?
 9            MR. MOLLOY:  None.
10            THE COURT:  All right, Exhibit --
11            MS. BOLEN:  Your Honor may I approach?
12            THE COURT:  Exhibit A3 will be admitted.  You may
13   approach and you may publish.
14            (Defense Exhibit A3 admitted)
15            MS. BOLEN:  Thank you, sir.
16   BY MS. BOLEN
17   Q.     All right, Dr. Parran, Defense Exhibit A3, I'm
18   pointing to a name on this document.  Does that say Tony
19   Brooks?
20   A.     Yes, it does.
21   Q.     All right.  And in the top part of the page, does it
22   say Rx profiles?
23   A.     Rx profiles from something Family Pharmacy.
24   Q.     All righty.
25            THE COURT:  Can the jury read that?  You can zoom,
```

PARRAN - CROSS

1    at least the machine can zoom.  There you go.

2    BY MS. BOLEN

3    Q.    And do you see the entry for 12/26/08?

4    A.    Yes, I do, 12/26/08 for Morphine Sulfate Immediate

5    Release and Morphine Sulfate Extended Release.

6    Q.    And those are the prescriptions that you talked about

7    in your direct as being early refills?

8    A.    It's -- as, yes, being early prescriptions on the

9    16th of December.

10   Q.    The prescriptions were issued on the 16th of December

11   but appear to be filled on the 26th of December; is that

12   correct?

13   A.    Yes, they were filled ten days later.

14   Q.    So that's not really a ten day early refill; is it,

15   Dr. Parran?

16   A.    No, it was a ten day early prescription and a normal

17   refill.

18   Q.    Let's go, then, to -- do you recall testifying about

19   Mr. Brooks' 14 day early refill on January 2 of 2009?

20   A.    Yes.

21   Q.    And you characterized that as an early refill;

22   correct, sir?

23   A.    I testified to that as an early prescription that was

24   mailed in, yes.

25   Q.    Do you recall being asked whether or not there were

PARRAN - CROSS

```
 1   early refills in connection with Mr. Brooks' prescription?
 2   A.     Yes, I thought there were many.
 3          MS. BOLEN:  Your Honor, may I approach, please?
 4          THE COURT:  You may.  I assume you've shown
 5   defense counsel what you're going to show the witness?
 6          MR. MOLLOY:  I'm kind of the prosecutor, Judge.
 7          THE COURT:  Yes, you are.
 8          MS. BOLEN:  Your Honor, may I approach?
 9          THE COURT:  You may.
10   BY MS. BOLEN
11   Q.     Dr. Parran, I'd ask you to take a look at Defense
12   Exhibit A2, and without going into it, do you recall seeing
13   prescriptions relating to Tony Brooks that are characterized
14   in that document?
15   A.     Yes.
16          MS. BOLEN:  Your Honor, we'd offer Defense
17   Exhibit A2 into evidence.
18          THE COURT:  Any objections?
19          MR. MOLLOY:  No objections.  Quick voir dire?
20                  VOIR DIRE EXAMINATION
21   BY MR. MOLLOY
22   Q.     Defense counsel, I believe, showed you -- I guess
23   it's Page 3?
24   A.     Yes.
25   Q.     Now, if I understand correctly, your testimony was
```

PARRAN - CROSS

1    that that's when the prescription was written?  Just trying

2    to see, does that purport to be when the prescription was

3    actually filled or the date that it was -- was written?

4    A.    There --

5    Q.    I'm just a little confused on the date.

6    A.    There are different dates but the prescription was

7    written on a specific date, similar to my testimony.

8    Actually, a day earlier -- no, maybe not.  No, on the day

9    that I indicated.

10          MR. MOLLOY:  I have no objection, just so that the

11   jury could see what date he's referring to.  I think

12   counsel's going to publish it anyway, but I'd ask her just

13   to point out what date he's referring to for the future.

14          THE COURT:  All right, Defendant's Exhibit A2 will

15   be admitted and may be published.

16          (Defense Exhibit A2 admitted)

17          MS. BOLEN:  Your Honor, may I approach?

18          THE COURT:  Yes.

19   BY MS. BOLEN

20   Q.    Dr. Parran, your direct testimony was that this

21   prescription was written on 1/2/09.  Do you recall that,

22   sir?

23   A.    Yes.

24   Q.    Two prescriptions here for MSIR 30-milligram and

25   Oramorph 60-milligram; correct?

PARRAN - CROSS

1    A.      Yes.

2    Q.      One being a long-acting and one being a short-acting;

3    correct?

4    A.      Yes.

5    Q.      Both of these are dated the same date, January 2nd?

6    A.      Yes.

7    Q.      And once again, the bottom of Defense Exhibit A2, you

8    see the "to be mailed" instruction?

9    A.      Yes.  It says to be mailed on January 19th of 2009.

10   Q.      All right.  After January 2nd of 2009; correct?

11   A.      Yes.

12   Q.      And then the second page of that exhibit, Defense

13   Exhibit A2, you see the date of delivery in the top

14   right-hand corner of that box, please?

15   A.      The date of delivery is before the date of mail.

16   Q.      With a four instead of a nine; is that correct?

17   A.      Yes.

18   Q.      It's not inconceivable to transfer or transpose 4s

19   and 9s; is it?

20   A.      I don't know.

21   Q.      People make mistakes with numbers like that; don't

22   they, sir, in reading them?

23   A.      Again, I don't know.

24   Q.      You don't know whether it's a mistake here, but

25   you're not trying to tell the jury that people don't make

PARRAN - CROSS

1   mistakes, doctors don't make mistakes with numbers

2   sometimes?

3   A.     Certainly I'm not trying to say that.

4          MS. BOLEN:  Okay.  And Your Honor, may I approach

5   once more -- actually, I'm just going to republish if I

6   might on Defense Exhibit A3.

7          THE COURT:  You may.

8   BY MS. BOLEN

9   Q.    Dr. Parran, back to Defense Exhibit A3, which are the

10  pharmacy profiles, looking in the middle of the page there

11  on Tony Brooks', do you see a fill date for Morphine Sulfate

12  Extended Release 60 milligrams and a fill date for Morphine

13  Sulfate Immediate Release 30 milligrams?

14  A.     Yes, I do.  It's January 26th of 2009, which -- which

15  would be exactly one month after the December 26th of 2008,

16  from the previous prescription.

17  Q.     We've got a prescription date, a release date, mail

18  date and then a fill date; correct, sir?

19  A.     Yes.

20         MS. BOLEN:  Your Honor, may I approach?

21         THE COURT:  You may, you may preach freely.

22         MS. BOLEN:  Regularly is that what you said.

23         THE COURT:  Freely, without asking permission each

24  time.

25

PARRAN - CROSS

```
1    BY MS. BOLEN
2    Q.     Dr. Parran, let me show you what's been marked for
3    identification as Defense Exhibit A4.  Do you recall
4    testifying that you evaluated Mr. Tony Brooks' charts and
5    that there were some gaps that appeared to occur in the
6    March 2nd, 2009, to April 20th, 2009, time frame?
7    A.     Yes.
8    Q.     Do you recall reviewing prescriptions relating to
9    Tony Brooks?
10   A.     Yes.  In my review, I -- I was not able to find
11   prescriptions that related to that time frame.
12          MS. BOLEN:  Your Honor, I'd offer Defense
13   Exhibit A4, please.
14          THE COURT:  Any objections?
15          MR. MOLLOY:  No.
16          THE COURT:  A4 will be admitted.
17          (Defense Exhibit A4 admitted)
18          MS. BOLEN:  May I publish it to the jury, Your
19   Honor?
20          THE COURT:  You may.
21   BY MS. BOLEN
22   Q.     Once again, Dr. Parran, with regard to Defense
23   Exhibit A4, we're dealing with a prescription on the last
24   page written by Dr. Roggow or appearing to be written by
25   Dr. Roggow; correct?
```

1   A.      Yes.

2   Q.      And the date on this prescription?

3   A.      February 3rd of 2009.

4   Q.      And once again, for Oramorph 60-milligram and MSIR

5   30-milligram; correct?

6   A.      Yes.

7   Q.      The bottom part of that page of the exhibit where it

8   says mailed, what's the date of the mail, please?

9   A.      February 17th of 2009.

10  Q.      And then turning forward one page, certified mail, do

11  you see the date of delivery there?

12  A.      Yes, February 18th of 2009.

13  Q.      And then on Defense Exhibit A3, the pharmacy

14  records --

15  A.      So on the pharmacy records, it says February 26th of

16  2009, for each of the two prescriptions.

17  Q.      Representing the fill date for those prescriptions

18  that you testified were early refills in your direct;

19  correct, sir?

20  A.      I don't believe I testified about any early refills

21  after January 2nd of 2009.

22  Q.      That wasn't my question, sir.  Do you recall

23  testifying in direct that there were early refills in Tony

24  Brooks' chart?

25  A.      There were early refills -- yes, I testified that

PARRAN - CROSS

```
 1    there were early prescriptions in Tony Brooks' chart which I
 2    interpreted as early refills.  I don't believe I testified
 3    about -- I don't believe I specifically talked about that
 4    prescription.
 5    Q.    We're not really dealing with early refills; are we,
 6    Dr. Parran?
 7    A.    No.  The refills, based on the pharmacy profile, line
 8    up once a month.
 9    Q.    But you did testify to a gap; is that correct?
10    A.    Yes, I did.
11    Q.    Let me show you, Dr. Parran, what's been marked for
12    identification as Defense Exhibit A4.  If you'll just take a
13    look at that for a minute.  Is that another prescription
14    related to Mr. Tony Brooks?
15    A.    Yes, this is a prescription related to Mr. Brooks.
16    Q.    If you'd just not go into detail yet on that, please.
17    Does it relate to the time frame of your testimony on direct
18    in terms of the gap that you talked about between March and
19    April of 2009?
20    A.    Yes, it does.
21    Q.    And you testified that this gap was a horrible thing
22    because the person should have been without medication for
23    at least two and a half weeks; is that correct, sir?
24    A.    Well, I said that the -- that the gap was something
25    that a physician would need to reconcile in order to safely
```

1    continue to prescribe on the April 20th.

2    Q.     You talked about the horrible withdrawal symptoms

3    that somebody on this amount of morphine would be in if they

4    were without their prescriptions; is that correct, sir?

5    A.     Yes, yes.  People would certainly have horrible

6    withdrawal on this amount of morphine if they were two weeks

7    without their prescription.

8    Q.     If they were two weeks without the prescription;

9    correct?

10   A.     Yes.

11   Q.     There's no evidence in Mr. Brooks' file that he was

12   in the hospital or in any way participating in withdrawal

13   treatment during this gap that you testified about; is

14   there?

15   A.     No.

16          MS. BOLEN:  Your Honor, move Defense Exhibit A --

17          THE COURT:  You said 4 but it should be 5, I

18   suspect.

19          MS. BOLEN:  5 into evidence.

20          MR. MOLLOY:  Just two questions on voir dire.

21          THE COURT:  You may.

22                    VOIR DIRE EXAMINATION

23   BY MR. MOLLOY

24   Q.     Doctor, the prescription -- not the date it's filled,

25   but the prescription is dated what date?  The date it was

PARRAN - CROSS

1    requested, day it was written out, what date is that?

2    A.    I don't know if I'm allowed to say what date it is if

3    it isn't in evidence yet.

4                MR. MOLLOY:  That's a good point.

5                THE COURT:  I'm glad someone knows the rules.

6                THE WITNESS:  Once burned twice cautious.

7                MR. MOLLOY:  I'll withdraw the question.

8                THE COURT:  Okay.  Any objection?  Mr. Molloy, any

9    objection to A5?

10               MR. MOLLOY:  No.

11               THE COURT:  A5 will be admitted and may be

12   published.

13               (Defense Exhibit A5 admitted)

14   BY MS. BOLEN

15   Q.    Dr. Parran, the prescriptions are both to Tony

16   Brooks; correct?

17   A.    Yes.

18   Q.    One for Oramorph 60-milligram, one for MSIR

19   30-milligram; correct?

20   A.    Yes.

21   Q.    Both dated March 2nd of 2009; correct?

22   A.    Yes.

23   Q.    The top of this particular exhibit, Defense

24   Exhibit A5, has a copy of Mr. Brooks' driver's license;

25   correct?

PARRAN - CROSS

1    A.      Yes.

2    Q.      It has a date there 3/23 of '09; you see that?

3    A.      Yes.

4    Q.      Might that, sir, be consistent with a release date to

5    the patient based on the pattern we've just been looking at?

6    A.      Again, I -- I have -- I have no idea.

7    Q.      Do you have any reason to believe that that would be

8    an inconsistent pattern based on the four or five exhibits

9    we've just gone through; do you?

10   A.      The exhibit you showed me before had a -- had a date

11   written on the prescription, itself.  As you can see on this

12   prescription, it's -- it's written on there.  So I'm not

13   sure what that means but --

14   Q.      I'm not sure what you just said, but there are two

15   sets of dates on this prescription; are there not?

16   March 2nd of 2009; correct?

17   A.      March 2nd and in the upper corner it says March 20th

18   of 2009, and then written on the sheet it says March 23rd,

19   2009.

20   Q.      Help me figure out where we're seeing March 20th,

21   2009, other than that tab?

22   A.      Oh, gosh, your hand was almost right on it.  Right in

23   the upper -- upper left-hand corner.

24           THE COURT:  Doctor --

25           THE WITNESS:  Look at the prescription, itself.

PARRAN - CROSS

1              THE COURT:  Hang on a second, Doctor, Dr. Parran,

2      over here.  If you touch the screen, you'll put a mark on

3      there.  So touch where it is you want to direct counsel's

4      attention to.

5      BY MS. BOLEN

6      Q.      Right here?

7      A.      Yeah.  I've got really cold hands so it doesn't --

8      hey, right where you showed me.

9      Q.      3/20 of '09, that's where you're seeing that date

10     sir?

11     A.      Yes, yes.

12     Q.      Other date on this is 3/23 of '09; correct?

13     A.      Yes.

14     Q.      So it appears to be a prescription within the time

15     frame that you thought there was a gap or you testified

16     there was a gap, making it a horrendous occasion for this

17     patient; correct?

18     A.       It appears that -- that this would indicate that the

19     prescription may have been released to the patient right in

20     the middle of that gap.

21     Q.      Let me go back to Defense Exhibit Number A3, the

22     pharmacy profile.

23     A.      Okay.

24              THE COURT:  There should be a clear button on the

25     screen, on the monitor.

1              MS. BOLEN:  I don't remember hitting that part.

2    Oh, clear.  You know, we're all so electronically

3    coordinated here.  How about undo, can we try that one?

4              DEPUTY CLERK:  It's also not on there, it's on the

5    screen.  No, it's adding --

6              THE COURT:  I'm sorry I suggested it.

7              DEPUTY CLERK:  It's not helping.  Try it on his.

8    Let me see if there's anything on the -- it's not working.

9              THE COURT:  It's not working, okay.

10             MR. MOLLOY:  If I might talk with defense counsel?

11             THE COURT:  Sure, while we try and clean the

12   machine up.

13             (Pause in place)

14   BY MS. BOLEN

15   Q.    All right.  Do we see a prescription date for fill on

16   3/26 of '09, sir, in Defense Exhibit A3?

17   A.    Yes.  Hang on -- can you put it back up there?

18   Q.    We see one for Morphine Sulfate Immediate Release; is

19   that correct?

20   A.    Yes, but not for the -- not for the slow release

21   Morphine Sulfate.

22   Q.    All right.  But there appears to be a prescription

23   filled by Mr. Brooks in the time that there was a gap;

24   correct?  And there were three prescriptions filled in a

25   timely fashion before that, indicating that the patient was

PARRAN - CROSS

1   not likely without his medicine, at least part of the time
2   that you were talking about; correct?
3   A.      Yes, on the pharmacy profile, the -- the actual dates
4   of medicines being filled line up once a month.  During the
5   gap, it appears that a -- that a prescription was filled for
6   the -- probably about 30 percent of the morphine.  The
7   Immediate Release was about 30 percent of his daily morphine
8   dose.
9   Q.      But once again, not indicating any sort of early
10  refill; correct?
11  A.      Yeah, it -- correct.  It was -- it was right on time.
12  Q.      Now, you're aware, sir, that Mr. Tony Brooks had an
13  office visit on April 22nd of 2009; correct?
14  A.      I wrote April 20th, but it could well be April 22nd.
15  Q.      Let me show you what has been marked as Defense
16  Exhibit A6.  It's actually a two-part exhibit.  Looks like
17  it came apart.  Take a look at that.  Is that one of the
18  prescriptions relevant to the April of 2009 time frame with
19  Mr. Tony Brooks?
20  A.      It's -- yeah.  The first page is a Tony Brooks
21  prescription, two prescriptions.  The second page is also --
22  are different prescriptions for Tony Brooks.
23  Q.      All relevant to the time frame when you testified
24  that there was a gap in his receipt of medication from
25  Dr. Roggow; correct?

1    A.    Not correct.  The first one was written on

2    April 20th -- I'm not supposed to say this -- and the second

3    one was May 26th.

4            MS. BOLEN:  Your Honor, I'll offer Defense

5    Exhibit A6 into evidence.

6            THE COURT:  Any objections?

7            MR. MOLLOY:  No objections, just so he can finish

8    his answer.

9            THE COURT:  A6 will be admitted.

10           (Defense Exhibit A6 admitted)

11   BY MS. BOLEN

12   Q.    Dr. Parran, you testified that during the period --

13   and I believe you were looking at your report at the time,

14   during the period of March 2nd, 2009, through April 20th,

15   2009, there should have been some prescriptions or

16   medications for this patient; correct?

17   A.    Right.  I said -- I said that -- that prescriptions

18   were written on April 20th of 2009 and it appeared to me

19   that there should have been a two and a half week gap in

20   there.

21   Q.    But there wasn't; was there, sir?

22   A.    There -- there may have been for the slow release

23   morphine.  It appears, based on the pharmacy profile, there

24   was not a gap for the immediate release morphine.

25   Q.    We're not dealing with early refills; are we, sir?

1   A.      Again, this part that you were asking me to talk

2   about now relates to the gap, not to my comments earlier

3   about early refills.

4   Q.      So this is about the gap that you said existed and

5   would have been horribly dangerous had that been the case

6   with the patient; correct?

7   A.      Yes.

8   Q.      And Defense Exhibit A6, the part of the screen that

9   we can read, they're both for Tony Brooks' prescriptions;

10  correct?

11  A.      Yes, for April -- April 20, April 20th.

12  Q.      Right, and there's indication on the bottom of an

13  appointment for April 22nd; correct?

14  A.      April 22nd, yes.

15  Q.      And then the next part of that particular exhibit

16  indicates a -- looks like an envelope there.  Sorry I'm

17  sliding this around, flip it around.  An envelope; correct?

18  A.      Yes.

19  Q.      Made out to Tony Brooks?

20  A.      Yes.

21  Q.      From Dr. Debra Roggow?

22  A.      It says May 26th, '09.

23          MS. BOLEN:  We might be actually dealing with two

24  things.  Looks like they got stuck together.  This is a

25  separate exhibit.  That's my mistake, Your Honor.  We'll

PARRAN - CROSS

1  call this Defense Exhibit A7.  We'll just take a look at

2  that again.

3  BY MS. BOLEN

4  Q.    And tell us if this is in the time frame that you

5  testified to on your direct; correct?

6  A.    I testified in my direct, yes, to the -- I believe

7  the whole time frame of the prescribing to this patient.

8  Q.    All right.  And again, characterizing early refills,

9  gaps in medicine, that sort of thing; correct?

10  A.    I didn't provide any testimony about May 26th of

11  2009.

12  Q.    All right.  Well, is it fair to say that the item

13  before you is from Mr. Tony Brooks' file and relates to the

14  period of your expert witness review of his patient record?

15  A.    Yes.

16        MS. BOLEN:  Your Honor, we offer Defense

17  Exhibit A7.

18        THE COURT:  Any objection?

19        MR. MOLLOY:  I just want to take a look at it.

20        THE COURT:  You may.

21        MS. BOLEN:  You want me to give you the stack

22  back?  Because that's part of the stack you were looking at.

23        (Discussion off record between counsel)

24        MS. BOLEN:  Your Honor, we offer Defense

25  Exhibit A7.

1            MR. MOLLOY:  No objection.

2            THE COURT:  A7 will be admitted.

3            (Defense Exhibit A7 admitted)

4    BY MS. BOLEN

5    Q.      So Dr. Parran, in following in line with this patient

6    receiving what appears to be quite regular prescriptions

7    from Dr. Roggow without a break in care, again, we're

8    dealing with an envelope here from Dr. Roggow; correct?

9    A.      Yes.

10   Q.      With a 5/26/09 date where my finger is pointing?

11   A.      For mailed, yes.

12   Q.      And we actually have a copy of the prescriptions on

13   the side.  I'm going to move this out a second if I could so

14   we can see it a little better here.  Both dated May 26th,

15   2009; correct?

16   A.      Yes.

17   Q.      And for Oramorph 60-milligram and MSIR 30-milligram;

18   correct?

19   A.      Yes.

20   Q.      Next page of that exhibit looks like a delivery

21   receipt dated 5/28 of '09; correct, sir?

22   A.      Yes.

23   Q.      I'm going to show you, if you wouldn't mind keeping

24   them in order, Defense Exhibit A8, A9, and A10.

25   A.      Okay.

PARRAN - CROSS

1    Q.     Those are all, again, within the time frame of your

2    expert review of this particular chart?

3    A.     Yes.

4              MS. BOLEN:  Your Honor, offer Defense Exhibit A8,

5    -9, and -10.

6              THE COURT:  Any objection?

7              MR. MOLLOY:  None.

8              THE COURT:  Plaintiff's -- sorry, Defendant's

9    Exhibits A8, A9, and A10 will be admitted.

10             (Defense Exhibits A8, A9, and A10 admitted)

11             MS. BOLEN:  Your Honor, may I publish, please?

12             THE COURT:  You may.

13   BY MS. BOLEN

14   Q.     We're looking here at Defense Exhibit A8.  We're

15   dealing with two prescriptions, are we not, Dr. Parran, to

16   Tony Brooks, both dated October 9, 2009; is that correct?

17   A.     Yes.

18   Q.     One for MSIR, one for Oramorph?

19   A.     Yes.

20   Q.     And on the top part of that page, what's depicted in

21   the square with the word Amrix there?  Do you know what that

22   is?

23   A.     Amrix Extended Release capsules, professional sample.

24   Q.     That's what it says.  Do you know what it is?

25   A.     Not for sale.  Cyclobenzaprine Hydrochloride.

1  Q.     Does this appear to be a sample that may have been

2  given to Mr. Brooks in connection with these prescriptions?

3  A.     It certainly appears to be a sample that was given,

4  since doctors are required to document samples in the

5  medical record now.  I don't know anything about the date.

6  Q.     This would be some evidence, of course, that there's

7  a sample document in the file that attached to these

8  prescriptions; correct, sir?

9  A.     I have no idea.

10  Q.     And you see where it says appointment, 10/22/09?

11  A.     Yes.

12  Q.     You saw the office visit documented by Dr. Roggow for

13  10/22/09; correct?

14  A.     Yes.

15  Q.     And in your testimony, you were talking about

16  Mr. Brooks receiving a prescription ten days early in

17  connection with this 10/9/09 prescription.  Do you recall

18  that, sir?

19  A.     Yes, I did.

20  Q.     So now we have a prescription dated October 9th of

21  2009; correct?

22  A.     Yes.

23  Q.     The apparent pickup date with an appointment attached

24  to it on Defense Exhibit A8 of 10/22/09; correct?

25  A.     I have -- I have no idea what the pickup date was.

1    It does say that there's an appointment on 10/22/09.

2    Q.    All right.  And if we go back to Defense Exhibit A3,

3    excuse me -- yes, A3, the pharmacy profile, does there

4    appear to be a fill date for the prescriptions listed on

5    Defense Exhibit A8 of 10/23/09, both together, the ER

6    Morphine and the IR Morphine?

7    A.    Yes.  It's a little bit out of focus, but it looks

8    like it's 10/23/09.

9    Q.    Does that help?

10   A.    There it is.  Perfect.  Yep.

11   Q.    So there is a fill; correct?

12   A.    There is a fill on 10/23/09.

13   Q.    And it wasn't on the date that you characterized as

14   an early refill in your direct testimony; was it, sir?

15   A.    No, it was not.

16   Q.    Now, I want to just kind of diverge a minute so we

17   don't all be buried in records here.  With regard to

18   Mr. Brooks' files or any of these other files, you saw in

19   each chart a history that Dr. Roggow prepared; is that

20   correct?

21   A.    Yes.

22   Q.    And that history also included a physical exam;

23   correct?

24   A.    Yes.  There was one chart where, for whatever reason,

25   I had difficulty finding the physical exam sheet, but -- but

PARRAN - CROSS

1    in four out of five charts, there was a history sheet and a

2    physical exam sheet, and in one chart, I couldn't find the

3    physical exam one.

4    Q.    Have you ever had trouble finding the records in your

5    own chart?

6    A.    Yes, I have.

7    Q.    Not something that is unusual or weird, it happens

8    from time to time; correct?

9    A.    This is true.

10   Q.    Everybody makes a good faith effort to get the

11   documents done but things can be misfiled; is that correct?

12   A.    That is correct.

13   Q.    We don't know what happened here.  You just didn't

14   see it; is that correct?

15   A.    I -- I didn't see it.

16   Q.    Now, you also found that these physical examinations

17   were quite extensive in some occasions; were they not, sir?

18   A.    Yes, they were.

19   Q.    And in fact, the physical examinations done by

20   Dr. Roggow, they included an actual hands-on of the patient?

21   You could tell that by the notes that she wrote; is that

22   correct?

23   A.    Yes.  The -- the findings that she found and the --

24   the maneuvers that she described in the physical exam had to

25   require actually physically examining the patient.

PARRAN - CROSS

1   Q.      And that was on all of the charts that you reviewed;
2   correct?
3   A.      Yes, all of them except that one where I couldn't
4   find the sheet.
5   Q.      And she did things with them such as manipulations;
6   correct?
7   A.      Yes.  That was also described in -- in good clinical
8   detail.
9   Q.      And in fact, osteopaths are known for doing hand-on
10  type manipulations, especially those that are board
11  certified; correct?
12  A.      Yes, they are, much better than allopath type doctors
13  like myself.
14  Q.      And with regard to history and physical examination,
15  is it a fair statement to say that both of those topic or
16  subject areas were done quite well by Dr. Roggow?
17  A.      Yes, Dr. Roggow did a -- an adequate, and in every
18  case, and I would consider a thorough history in every
19  patient and physical exam.  Again, except in that one where
20  I couldn't find the sheet.
21  Q.      That's right.  She looked at past treatments that the
22  patients had tried; correct?
23  A.      Yes, she -- she looked through the -- the history of
24  the patient's pain management attempts.
25  Q.      She often got patients from other physicians;

1   correct?

2   A.      Yes.

3   Q.      And you're familiar with the term coordination of

4   care; are you not, Dr. Parran?

5   A.      Yes.

6   Q.      Coordination of care means that a doctor who has some

7   responsibility for caring for a patient is attempting to

8   keep other doctors in the loop as appropriate; correct?

9   A.      Yes.

10  Q.      Family physician might have greater coordination of

11  care responsibility, depending upon the medical condition of

12  the patient?  They might be very complicated, need to go to

13  several specialists, et cetera; correct?

14  A.      Very often, yes.

15  Q.      And when somebody like a board certified physical

16  medicine and rehab doctor receives a patient on referral,

17  say, from a neurosurgeon, you would expect to see

18  information noted in the file, at least acknowledging that

19  the patient is being overseen in some way by multiple

20  physicians; correct?

21  A.      Yes, you'd expect release of information forms and

22  information to go back and forth between the managing

23  physicians.

24  Q.      And then those things represent the bona fide or good

25  faith effort to engage in a proper doctor/patient

1    relationship with a patient; correct?

2    A.    Yes.

3    Q.    That's part of what you do?  Those are the steps;

4    correct?

5    A.    Do a history and physical, obtain prior medical

6    records, attempt to coordinate care, monitor patients, yes.

7    Q.    All right.  We'll get there in just a second.  Now,

8    with the attempt to get prior medical records, is it a fair

9    statement, Dr. Parran, that sometimes it's hard to get

10   medical records out of other doctors for a variety of

11   reasons?

12   A.    Yes.  Some practices are better at sending them and

13   other ones really are not good at all.

14   Q.    We're talking about HIPAA or privacy information

15   release forms that have to be signed and sent, et cetera;

16   correct?

17   A.    Yes.  That's pretty mundane, routinely done in

18   practice, just that some practices respond to those forms

19   better than others.

20   Q.    More quickly, they send the information on?

21   Sometimes the patient's in the loop and is part of having to

22   get the records; is that correct?

23   A.    Yes, but often not.  Usually it's doctor office to

24   doctor office.

25   Q.    It can be either way though?  There's nothing

PARRAN - CROSS

1    untoward about having it either way when you're talking

2    about prior history; correct?

3    A.    Well, patients can bring records.  I prefer it when

4    they don't.

5    Q.    Sure.

6    A.    Because I prefer to receive the records unedited from

7    the previous doctor.

8    Q.    You don't know of anything in the Florida rules that

9    would prevent Dr. Roggow from getting records from a patient

10   or from another doctor?

11   A.    There's -- there's no rule against patients

12   participating in that procedure.

13   Q.    So we have evidence in the charts that you reviewed

14   that there is information coming from the patient,

15   information coming from other physicians; correct?

16   A.    In most of the charts, yes.

17   Q.    The doctor's job is to take that information, listen

18   to the patient, do the physical exam and come up with a

19   treatment plan; correct, sir?

20   A.    Yes.

21   Q.    And in connection with the prescribing of controlled

22   medications for treatment of pain, the Florida board

23   requires that the osteopathic physician do certain things to

24   document that treatment plan; is that correct?

25   A.    Yes, there are rules and guidelines regarding

PARRAN - CROSS

1    documentation.

2    Q.     You have a set of rules in the state of Ohio; right?

3    A.     Yes.

4    Q.     And you said you were familiar with the set of rules

5    in the state of Florida; correct, sir?

6    A.     I have reviewed them in the past, yes.

7    Q.     All right.  So would it be fair to say that a

8    treatment plan should state objectives as to what steps,

9    whether they be baby or big, they're going to -- the

10   doctor's going to take with a patient; correct?

11   A.     Yes.

12   Q.     Objectives like, maybe I want to have my pain level

13   reduced from a seven to a five, or I want to hold my child

14   in my arms, those sort of things; correct?  Patient goals?

15   A.     Patient goals, goals for functional improvement, yes.

16   Q.     And also goals in connection with greater involvement

17   with the family, or whatever the patient might identify as

18   something that they desire to do in connection with their

19   pain management; correct?

20   A.     Yes.  That's -- that's absolutely a functional

21   improvement goal.  If a person functions better in the

22   family system, that's functional improvement.

23   Q.     And the treatment plan should also state whether or

24   not there will be future diagnostic evaluations; correct?

25   A.     Yes.

PARRAN - CROSS

1    Q.      And when you find evidence of information like that

2    when you review charts, that's another indication of a bona

3    fide physician/patient relationship, at least a step in that

4    direction; correct?

5    A.      Yes, that's part of the typical practice and

6    procedure of the practice of medicine.

7    Q.      Part of what you might call basic doctoring; is that

8    correct?

9    A.      Yes, it's what doctors do all day.

10   Q.      And there's nothing weird about that step in

11   connection with pain management; is there?

12   A.      No, it's just part of chronic disease management,

13   whether it's pain or anything else.

14   Q.      Something that you might do with somebody who's being

15   monitored for Coumadin because they have a blood clot

16   condition; no different?

17   A.      Coumadin or diabetes or heart failure or pain, no

18   different.

19   Q.      That monitoring and that step in that evaluation is

20   connected because the person has a diagnosis; right,

21   presumptively?

22   A.      Right.

23   Q.      And you found those diagnoses in the records that you

24   reviewed from Dr. Roggow; correct?

25   A.      Yes.

PARRAN - CROSS

1   Q.      And in fact, some of the diagnosis indicated some

2   severe conditions on the part of these patients; correct?

3   A.      Some did and some didn't.

4   Q.      And that's your opinion as somebody that doesn't do

5   front line pain management; right, sir?

6   A.      I take care of a lot of patients with pain.

7   Q.      So you have diagnosis that come from car wrecks and

8   for example, if I get the right person here -- one second,

9   please.  Your Honor, may I just inquire?

10          THE COURT:  You may.

11          (Discussion off record)

12   BY MS. BOLEN

13   Q.      One of the patient files you reviewed was for Lori

14   Corrochano; correct?

15   A.      Yes.

16   Q.      And I believe you talked about her getting additional

17   medicine during a period of 1999 to 2000 in your direct

18   testimony; do you recall that?

19   A.      I don't -- I don't remember what you're talking

20   about, but that's fine.  If you tell me --

21   Q.      Take a moment, if you need to, to look at your report

22   to refresh your recollection.

23   A.      If you'd be more clear in your question?

24   Q.      Focusing your attention on Lori Corrochano in the

25   period 1999 to 2000, just look at your report and see if

1    there's a period in there that represents that time frame.

2    A.     Oh, there -- there certainly is, yeah.

3    Q.     Obviously, without reading the document, do you

4    recall testifying that during that period that she received

5    an increase in her medication?

6    A.     Yes.

7    Q.     You recall reading in Lori Corrochano's file various

8    office notes related to some problems she was having with

9    her ankle during that time frame?

10   A.     Yes, she was anticipating ankle or foot surgery.

11   Q.     And that's because she had some hardware in her ankle

12   connected to a prior surgery that was actually coming out

13   and poking out at the bone; do you recall seeing that in the

14   office note?

15   A.     It wasn't poking out of the bone.  It was pushing

16   against the skin.

17   Q.     The skin, I'm sorry.  It's coming out in the ankle

18   here, right where it can be seen by the doctor that

19   evaluated her; correct?

20   A.     Yes.

21   Q.     It was documented in that chart; was it not, sir?

22   A.     Yes.  That was one of the reasons why they expected

23   to wean down on the medications after surgery.

24   Q.     One of the reasons that they gave her more medication

25   prior to the surgery; is it not, sir?

PARRAN - CROSS

1   A.      Yes.

2   Q.      That was documented in the notes by Dr. Roggow;

3   correct?

4   A.      Yes.

5   Q.      One of the things a doctor is supposed to do when

6   they write a controlled substance for the treatment of pain,

7   they're supposed to document their rationale; is that

8   correct, sir?

9   A.      Yes.

10  Q.      And that rationale should explain one or more

11  generally accepted indications for the use of that

12  medication; correct?

13  A.      Before prescribing any medication, but certainly

14  prescribing pain medicines.

15  Q.      The medical reason for getting the medication;

16  correct?

17  A.      Yes.

18  Q.      And you found information in the charts about that,

19  at least tied to this Lori Corrochano; correct?

20  A.      Certainly, yeah.

21  Q.      And you found it with regard to other patients

22  repeatedly in the office notes prepared by Dr. Roggow;

23  correct?

24  A.      Yes.  There were diagnoses and rationales written.

25  Q.      And that's all what you would expect to find from a

PARRAN - CROSS

1    physician exercising or attempting establishing a good faith

2    relationship with a patient; correct?

3    A.    Yes.

4    Q.    Something you would do yourself, sir; correct?

5    A.    Yes.

6    Q.    Now, when we have this treatment plan, we write it

7    down and you expect it to change from time to time; is that

8    correct?

9    A.    Yes, treatment plans often evolve over time.

10   Q.    And they evolve in different ways in terms of the

11   different treatment modalities that a doctor might order to

12   care for a patient; correct?

13   A.    Yes.

14   Q.    And by treatment modality, I'm talking about it might

15   be drug or non-drug, it could be a procedure, things, you

16   know, like that; correct?

17   A.    Yes, it could involve any of those, you know, multi-

18   factorial things involving the treatment of pain management.

19   Q.    And you would expect to see that in a file where a

20   physician's establishing a good faith relationship with the

21   patients; correct?

22   A.    I'd expect those kinds of changes in a treatment plan

23   over time, you bet, yeah.

24   Q.    And those indicate good faith to you; do they not,

25   sir?

PARRAN - CROSS

1   A.      They indicate a doctor who's working with the
2   patient, yes.
3   Q.      Establishing a bona fide relationship; correct?
4   A.      Yes.
5   Q.      And the type of treatments that a doctor prescribes
6   can depend on a lot of things; correct?
7   A.      Certainly.
8   Q.      Can depend on a patient's insurance situation?
9   A.      Yes, but you know, even if a patient has problems
10  with insurance, there's still an expectation of providing,
11  you know, good -- good quality and safe medical care.
12  Q.      That's right, sir.  You'd expect a doctor to advocate
13  for his or her patients; correct, sir?
14  A.      Yes.
15  Q.      All right.  So let's take, for example, physical
16  therapy.  Sometimes that's covered, sometimes it's not;
17  right?
18  A.      That's certainly true.
19  Q.      And sometimes doctors have to advocate for that
20  physical therapy to try to get an insurance plan to cover
21  it; correct?
22  A.      Certainly.
23  Q.      And if it's not covered, it can be expensive for a
24  patient; is that right?
25  A.      Physical therapy is very expensive.

PARRAN - CROSS

1    Q.      So when a doctor is making an advocate or taking an

2    advocate position for a patient, you'd expect to see letters

3    back and forth between the doctor and perhaps the health

4    plan or some other entity to get that covered?

5    A.      Yes.

6    Q.      And you saw indications of that in these charts that

7    you reviewed; did you not?

8    A.      Yes, I did.

9    Q.      And that, again, would be another step in connection

10   with the bona fide relationship between a physician and a

11   patient?

12   A.      Yes.

13   Q.      And that's part of the rule that Dr. Roggow is

14   required to follow, based on your understanding; is that

15   correct?

16   A.      I don't understand your last question.

17   Q.      You testified earlier that you have some familiarity

18   with the Florida rule because of your work in this state;

19   right?

20   A.      Yes.

21   Q.      And you're aware, sir, that that rule requires that

22   the doctor try different treatment modalities or at least

23   eliminate them from the patient's treatment plan?

24   A.      Yes.

25   Q.      And that's another good faith step to create a bona

1   fide physician/patient relationship?

2   A.      Yes.

3   Q.      And you found those in those records; did you not,

4   sir?

5   A.      Yes.

6   Q.      Communications in attempt to get medication dose

7   amounts adjusted with the health plan or whatever benefit

8   plan was covering the patient; correct?

9   A.      Yes.

10  Q.      And in fact, you found that there were overrides in

11  some of the patient files which indicated some advocacy on

12  Dr. Roggow's part to get the plan to approve the medication;

13  correct?

14  A.      Yes.

15  Q.      That's not uncommon in the medical world; is it?

16  A.      It's actually becoming more and more common to have

17  to try to struggle for overrides.

18  Q.      That's right.  You have to fight to get medication

19  approved or treatments approved; correct?

20  A.      Yes.

21  Q.      And that's because of the various ways that health

22  plans can structure treatment formularies and drug

23  formularies, et cetera?

24  A.      And utilize a person's benefit, yes.

25  Q.      And some people have better insurance than others;

PARRAN - CROSS

1    correct?

2    A.      That's for sure.

3    Q.      You saw evidence in the charts that you reviewed that

4    some of these patients were covered by federal programs.  Do

5    you recall that, sir?

6    A.      I believe some were covered by federal programs but I

7    didn't write that down in my report.

8    Q.      And when a patient is covered by federal programs,

9    there are often more paper hoops that have to be jumped

10   through simply because people want to make sure that the

11   treatment is appropriate and covered by the benefits the

12   patient has?

13   A.      Well actually, in the last several years, dealing

14   with the private programs, I believe -- at least in my

15   opinion -- is at least as onerous or more than the federal

16   programs.

17   Q.      It's fair to say all health plans can create a big

18   paper flow to try to have patient advocacy?

19   A.      Yes.

20   Q.      And there were examples of situations where the

21   government approved the override during the period of time

22   that you testified to in this case; correct?

23   A.      Yes.

24   Q.      Meaning that somebody at the government or somebody

25   at a health plan actually looked at the prescription request

PARRAN - CROSS

1   and approved it and sent a piece of paper in to allow or

2   notify the pharmacy that that -- that prescription would be

3   allowed; correct?

4   A.      Yes.

5   Q.      Let's talk about pharmacists for a minute,

6   Dr. Parran.  In your professional experience, you know that

7   pharmacists have a corresponding responsibility to ensure

8   that any controlled substance prescription that's presented

9   to them is for legitimate medical purpose; correct?

10  A.      Yes.  Pharmacists have a similar legal responsibility

11  for filling a prescription that a doctor has for writing it.

12  Q.      And a pharmacist can say no when they come across a

13  prescription that they don't want to fill; correct?

14  A.      They can.

15  Q.      And in fact, they're encouraged to do so by the DEA

16  and by their licensing board; correct?

17  A.      They're expected to do so, yes.

18  Q.      And when pharmacists fill prescriptions, they get

19  paid money; correct?

20  A.      Yes.

21  Q.      And the money amount depends upon the type of drug

22  that's being filled, whether it be brand or generic;

23  correct?

24  A.      I believe that pharmacists make more money on brand

25  name drugs but I'm not sure.

PARRAN - CROSS

1   Q.      Depends on the pharmacy and the formulary; would that
2   be a fair statement?
3   A.      You know, I -- I'm probably not a good person to
4   testify about how pharmacists make more money or less.
5   Q.      Would it be a fair statement that some of the branded
6   drugs are very expensive?
7   A.      They're very expensive.
8   Q.      And often you, as a physician, would advocate for a
9   patient to get a different drug if the patient couldn't
10  afford the branded medication; correct?
11  A.      That often happens.
12  Q.      And you would often do the same thing if the
13  patient's health plan said no to the branded medication,
14  you'd try to find something that was at least remotely
15  equivalent; correct?
16  A.      Yes.
17  Q.      That's not an unusual step; is it, sir?
18  A.      It's very common.
19  Q.      And you found evidence of what I would call, again,
20  advocacy in these records that you reviewed; correct?
21  A.      Regarding pharmacy profiles and --
22  Q.      Regarding dealing with medication, getting things
23  approved?
24  A.      Medication costs and getting things approved, yes.
25  Q.      And that's part of the dance of the treatment plan

1   required generally, but also in connection with the state of

2   Florida; is that right, sir?

3   A.      Yes.

4   Q.      Now, there are other requirements that a physician

5   should engage in if they're going to prescribe controlled

6   medications for the treatment of pain and one of them would

7   be to discuss the risks and benefits of the use of the

8   medication; correct?

9   A.      Yes.

10  Q.      And when a physician does that, he or she will

11  document information related to potential side effects;

12  correct?

13  A.      Yes.

14  Q.      Side effects that might include constipation;

15  correct?

16  A.      Constipation is a very common one.

17  Q.      Sedation can be one, for at least a little while;

18  correct?

19  A.      Sedation in the first week to ten days.

20  Q.      It doesn't always hang all the time with the patient;

21  correct?

22  A.      People develop fairly rapid tolerance to the sedation

23  effect of the opiates, but not very rapid tolerance to the

24  constipation effect.

25  Q.      And by constipation, the doctor might describe

PARRAN - CROSS

1  fluids, fiber, things like that; correct?

2  A.      Yes.

3  Q.      And doctors also deal with side effects to talk about

4  liver enzymes; right?  They might get those things tested to

5  make sure there's not too much Tylenol accumulating or

6  acetaminophen, excuse me, in the patient's liver; am I right

7  about that?

8  A.      Yes, the liver metabolizes acetaminophen, otherwise

9  known as Tylenol.  So if there's too much of the

10 acetaminophen in things like Percocet or the Hydrocodone

11 tablets, it can cause abnormal liver tests.  So it's

12 important to check those.

13 Q.      And acetaminophen isn't just in controlled

14 medications; right?

15 A.      No, it's in over-the-counter Tylenol and Tylenol PM,

16 and lots of other medications.

17 Q.      That's one of the reasons that a doctor would follow

18 liver enzymes, is to make sure the patient doesn't have too

19 much of that in the system where it could harm them;

20 correct?

21 A.      Yes.

22 Q.      And there is a test that's performed for that?

23 A.      Yes.

24 Q.      Is it a blood test?

25 A.      It's a blood test.

PARRAN - CROSS

1    Q.      And it gives an enzyme report?

2    A.      Liver function test.

3    Q.      Low, medium, high, normal?  How does that work?

4    A.      Normal and elevated.

5    Q.      And that is, again, part of the process of basic

6    doctoring; is it not, sir?

7    A.      It's part of the process of trying to avoid doing

8    harm while you're trying to provide comfort.

9    Q.      Right.  Sometimes the primary care physician does it;

10   correct?

11   A.      Sometimes.

12   Q.      Sometimes the internal medicine doctor does it;

13   correct?

14   A.      Sometimes.

15   Q.      Sometimes the boarded physical medicine and rehab

16   doctor does it; correct?

17   A.      Usually it's the prescribing doctor who's prescribing

18   the medications with the acetaminophen in it.

19   Q.      Now, several of the patients of the charts you

20   reviewed actually were prescribed substances that had

21   acetaminophen in it; correct?

22   A.      Most of them at one time or another.  I believe all

23   but maybe one, yeah.

24   Q.      And you were careful to go through the patient

25   records to pick out the times that Dr. Roggow actually had

PARRAN - CROSS

1    or ordered liver enzyme tests; correct?

2    A.      She periodically ordered blood work, including

3    checking the liver function tests, yes.

4    Q.      That's the right thing to do; isn't it, sir?

5    A.      Yes.

6    Q.      When she ordered it, she put a copy of it or at least

7    made a note in her own progress note; correct?

8    A.      Yes.

9    Q.      Because sometimes she wasn't the person actually

10   doing the test, somebody else was, and there was

11   communication about that?

12   A.      Sometimes that lab work came from other offices but

13   she did note it in her progress notes.

14   Q.      And coming from other offices back again to that

15   coordination of care concept; correct, sir?

16   A.      Yes.

17   Q.      Again, all part of basic doctoring; right?

18   A.      Yes.

19   Q.      All part of the steps in the bona fide physician/

20   patient relationship?

21   A.      Yes.

22   Q.      All part of the care of the individual; correct?

23   A.      Yes.

24   Q.      And again, all back tied to the Florida rule?

25   A.      Yes.

PARRAN - CROSS

1   Q.     Now, you're aware, sir, that in the state of Florida,

2   at least at the time frame of the review involved in this

3   case, there was not a prescription drug monitoring program;

4   was there?

5   A.     No, there was not.

6   Q.     You have one in Ohio; don't you?

7   A.     We have since, I believe, 2008.

8   Q.     And for purposes of the jury, a prescription drug

9   monitoring program is essentially a database that some state

10  agency has authority to gather information on and it gives

11  out information on controlled substances about what, like, I

12  went and had filled at a pharmacy; correct?

13  A.     Yes.  It's a centralized database from all the

14  pharmacies in the state that tracks all of the controlled

15  substance prescriptions filled by a given patient over a

16  certain period of time, regardless if it's come from

17  multiple different doctors.

18  Q.     And that's a valuable tool to you in Ohio; is it not,

19  sir?

20  A.     It's a very valuable tool in patient management and

21  monitoring, even initial assessment.

22  Q.     It makes the job of trying to get the patient

23  involved in one or more pharmacies a lot easier; does it

24  not?

25  A.     Oh, it certainly does that.

PARRAN - CROSS

1           MS. BOLEN:  Your Honor, I'm not sure what to do to

2   prevent the blinking light or if that's just natural.  I

3   just wanted to conserve the bulb.  I just hit off.

4           DEPUTY CLERK:  If you don't leave it on it's not

5   sending a signal --

6           MS. BOLEN:  Okay, so you turn it off, I turn it

7   back on, you turn it off?

8           DEPUTY CLERK:  You turn it on and leave it on.

9           THE COURT:  You want it back on or --

10          MS. BOLEN:  I wanted it off, sir.

11          DEPUTY CLERK:  For the day?

12          MS. BOLEN:  Yes, ma'am.

13          THE COURT:  It will take a minute to --

14          MS. BOLEN:  I just saw it blinking and I didn't

15  want it to be a distraction.

16  BY MS. BOLEN

17  Q.     So the prescription drug monitoring programs are

18  helpful; are they not?

19  A.     Yes, they are.

20  Q.     And you're aware, at least in terms of the use of

21  controlled substances for the treatment of pain, that where

22  it's possible, the physician should ask the patient to agree

23  to one pharmacy to fill the medications; correct?

24  A.     Yes.

25  Q.     In a state without a prescription drug monitoring

PARRAN - CROSS

1    program, that would be a little hard to shepherd; would it

2    not, sir?

3    A.    It's -- it's difficult to do without a -- I mean,

4    it's easy to ask the patient to agree to it.  It's more

5    difficult to follow up and ensure that the patient is

6    actually following through on that part of their bargain.

7    Q.    That's right, because without the prescription drug

8    monitoring program, you'd either have to spend a lot of time

9    on the phone trying to figure out what pharmacy or, you

10   know, hit the lottery somewhere to try to get those records;

11   correct?

12   A.    Yes.

13   Q.    And with regard to the Florida rule, again, when

14   patients might be at a higher risk for whatever reason,

15   medical condition, medication histories, abuse histories,

16   there's at least a suggestion that some form of an agreement

17   be used between the physician and the patient trying to

18   outline the dance, if you will, meaning the relationship

19   between them or what's hoped to be the relationship as it

20   develops; correct?

21   A.    Yes.  It lays down the expectations and the sort of

22   rules on both sides.

23   Q.    And you're aware, sir, that the state of Florida

24   didn't require them to be used with all patients; correct?

25   A.    I believe that the state of Florida recommends that

1    they be used in any patient that's high risk.

2    Q.    Okay.  And with regard to that, the state of Florida

3    doesn't have any recommendations with what the physician

4    should do if they run into a snag; does it?  The rules don't

5    say, if A, do B?

6    A.    No.  The rules indicate that physicians should be

7    concerned about the patient.  They should be concerned about

8    the safety of the patient, the safety of the community, and

9    they should monitor and adjust the treatment plan as we

10   discussed, but that's as far as it goes.  There's no sort of

11   specific, if this happens, you have to follow up with X, Y,

12   or Z.  That does not exist.

13   Q.    All right.  And with regard to doing the things you

14   just described, that can be done in terms of bringing a

15   patient back more frequently after a period of two or three

16   month visits, going to a one month cycle; correct?

17   A.    Yes.  Certainly one of the interventions that's

18   appropriate when a patient is beginning to become a little

19   concerning is increased monitoring, which would -- which

20   could include increased frequency of visits.

21   Q.    And there's no requirement in the Florida rules that

22   the patient has to be seen every month if they're receiving

23   a controlled substance prescription; is there?

24   A.    No.

25   Q.    In fact, that's not something that's a requirement in

PARRAN - CROSS

1   your state either; is it, sir?

2   A.      No.

3   Q.      And with regard to the, let's say, adjustment, or the

4   periodic review of the patient record, that involves a bit

5   of discretion and judgment on your part; does it not, sir?

6   A.      It involves that on the part of any physician who's

7   managing a payment, yeah.

8   Q.      And that could be tough at times; can it not, sir?

9   A.      Certainly can be.

10  Q.      Because at times you're not just managing the patient

11  and their conditions, you're managing their family and

12  managing their health plan and what coverage they have or

13  don't have, you're managing the ability to pay for things or

14  not pay for things, and you're also then managing the

15  ability to keep everything moving forward in this designed

16  treatment plan; correct?

17  A.      It's -- certainly all of those things you mentioned

18  are things that physicians have to typically and routinely

19  factor into their decision-making process.

20  Q.      And when physicians do periodic review, they keep

21  progress notes; right?

22  A.      Yes.

23  Q.      And in the connection with your review of

24  Dr. Roggow's charts for the patients, the five patients you

25  looked at, you found indications of three different types of

PARRAN - CROSS

1   ways to track the patients' interactions with the office;
2   correct?
3   A.     Hmm, I --
4   Q.     Let me ask it this way, if I might --
5   A.     Okay.
6   Q.     -- you found information that related to encounter
7   notes; correct?  Kind of a detailed running of when the
8   patient had contact with the office?
9   A.     What I call progress notes?
10  Q.     I don't know if they're what you would call --
11  A.     Office visit notes, that's what I called them.
12  Q.     That's one category, we had office visit notes?
13  A.     Yes.
14  Q.     Office visit notes were typically dictated by
15  Dr. Roggow; is that correct?
16  A.     Often, yeah.  I believe that often they were.  There
17  were some -- there were some handwritten, but there were a
18  lot of dictated office visit notes in the records.
19  Q.     It's not inappropriate to hand write a progress note;
20  is it, Dr. Parran?
21  A.     No, no, certainly, certainly not.
22  Q.     And on the charts that you reviewed, do you recall
23  seeing stamp after stamp that said dictated not read,
24  dictated not read, dictated, dictated?
25  A.     Yes.

PARRAN - CROSS

1  Q.      Some of these were signed by Dr. Roggow; correct?

2  A.      Yes.

3  Q.      Indicating that she dictated it and read it; correct?

4  A.      I -- that was the implication that I had from the

5  signature there, yeah.

6  Q.      That's not too far different from what you might do

7  in your own practice; is it, sir?

8  A.      Certainly is.

9  Q.      Nothing unusual about that; is there?

10 A.      No.

11 Q.      Nothing unusual about the handwritten notes; correct?

12 A.      No.

13 Q.      And when you do dictation, it takes a while to get it

14 back and in the file; does it not, sir?

15 A.      Yes, it can take anywhere from, you know, the next

16 day to a couple days, usually.

17 Q.      And nothing weird about that; is there?

18 A.      No, that's -- that's --

19 Q.      Okay.  And so in the charts that you reviewed, going

20 back to my initial question, your progress notes that you're

21 talking about were predominantly typed progress notes;

22 correct?

23 A.      Yes.

24 Q.      And they had a section on them that kind of went back

25 and reviewed a little bit about the patient and the history;

PARRAN - CROSS

1   right, sir?

2   A.      Yes.

3   Q.      All right.  Had a little reason for the visit;

4   correct?

5   A.      Yes.

6   Q.      And in there, it would say why the patient was coming

7   back to see the doctor that day; right?

8   A.      Right.

9   Q.      And then it had a section, maybe discussion, kind of

10  reoriented the physician and the patient as to why they were

11  getting together on that particular date; correct?

12  A.      Had some more history and the planning, yes.

13  Q.      And that's what you would expect for basic doctoring;

14  correct?

15  A.      Yes.

16  Q.      That's what you would expect in a good faith

17  relationship between a physician and a patient; correct?

18  A.      Yes.

19  Q.      And that's part of a bona fide relationship; correct?

20  A.      Yes.

21  Q.      Then you would see something called an objective

22  evaluation; right?

23  A.      Yes.

24  Q.      And an objective evaluation has a component of

25  physical examination, does it not, in connection with

1   Dr. Roggow's visits; right?

2   A.      Yes.   Typically, that's where sort of the physical

3   exam or the observable findings are.

4   Q.      So then to make it sure that we're making it clear,

5   at the beginning of the relationship, we have history and

6   physical examination; correct?

7   A.      Yes.

8   Q.      That's a big physical exam with a bigger review and a

9   lot more information; right?

10  A.      Yes.

11  Q.      Then down the road after we've done these other

12  things we just talked about, we have something called

13  periodic review; right?

14  A.      Which is more focused.

15  Q.      And again, the Florida rule doesn't say when that has

16  to happen; does it?

17  A.      No.

18  Q.      It allows the doctor to tailor it to the individual

19  circumstances as she or he sees fit in connection with their

20  bona fide physician/patient relationship; correct?

21  A.      It leaves it up to the doctor to do as he or she sees

22  fit.

23  Q.      And they document what's going on in that progress

24  note in a follow-up visit; correct?

25  A.      That's where you document what's -- what's going on

1    as the patient progresses.

2    Q.      This thing's sometimes called a SOAP note; is it not?

3    A.      They're sometimes organized under the pneumonic SOAP,

4    for Subjective which is the history and the talking kind of

5    part, Objective which is the part that's observed or done,

6    like physical exam, and then Assessment and Plan, so

7    S-O-A-P.

8    Q.      But nobody has to use that exact language; do they?

9    A.      No.

10   Q.      So if they called it reason for visit, discussion,

11   objective evaluation, that would be similar; right?

12   A.      Yes.

13   Q.      And you found that in your review of each and every

14   one of these charts; is that correct, sir?

15   A.      Oh, yes.  There were progress notes in that format in

16   each chart.

17   Q.      And in the assessment component of each of the

18   progress notes, at least in general, you found a repeat of

19   the diagnosis; correct, sir?

20   A.      Yes.

21   Q.      You found some information that gave the update of

22   how the patient was doing; correct, sir?

23   A.      Yes.  What had happened -- the sort of summary or

24   assessment of what had happened since the last office visit.

25   Q.      And you found coordination of care notes from time to

1   time where Dr. Roggow was actually cognizant of, let's say

2   for example, hypertension being followed by the patient's

3   primary care physician and would write that down in her

4   chart?

5   A.      Yes.

6   Q.      All part of a good faith relationship with the

7   patient; correct?

8   A.      Yes.

9   Q.      And then you would find a plan written in there;

10  correct?

11  A.      Yes.

12  Q.      And sometimes that plan contained, if not the note

13  itself, references to very personal things about these

14  patients; is that correct?

15  A.      Certainly the plans that I saw written down, you

16  know, described what was going on with the patient and what

17  the plan was for the next visit, or between now and the next

18  visit.

19  Q.      And you, from time to time, found indication or by

20  personal reference that Dr. Roggow had an ongoing dialogue

21  with her patients about their lives; is that correct?

22  A.      Yes.

23  Q.      So you would find indication that, let's say on Jeff

24  Giompalo, that his pain management was under control such

25  that he was able to take care of his young child as a

PARRAN - CROSS

1   full-time father during the week; correct?

2   A.      Yes.

3   Q.      That's a good thing; isn't it, sir?

4   A.      That's one of those functional improvement areas that

5   one would hope for.

6   Q.      It's also a good thing that an individual like that

7   or any of the other patients, if they were able, could

8   continue working to support their family; is that correct?

9   A.      That's certainly a goal.

10  Q.      And that's part of that functional stuff you talked

11  about earlier; right?

12  A.      Yep.

13  Q.      All right.  And sometimes when you take medicine

14  away, that can harm function; can't it?

15  A.      If you take medication away rapidly and people go

16  into withdrawal, there's basically no function.  And if you

17  take medication away because of some other reason but it's

18  more gradually decreased, even that can result in a -- a

19  decrease in a person's overall level of functioning.

20  Q.      And sir, with regard to pain management in general, I

21  think I heard you say on your direct, it's not the goal of

22  pain management to completely remove the pain; is that

23  right?  Especially chronic pain management?

24  A.      Right.  Sometimes it happens and that's great, but

25  typically the goal is in the area of function.

PARRAN - CROSS

1   Q.     But the other goal of pain management is not to sit
2   there and say, okay, your pain is better and you're doing
3   really well at a level two and we'll just take the medicine
4   away; right?
5   A.     It's not uncommon after a sustained period of time on
6   medication for pain management physicians, when patients
7   have been stable for a long time, it's actually fairly
8   common to try some small tapers of that medication in order
9   to decrease side effects and those things.  But it's
10  certainly not against any of the rules or regulations to
11  just maintain people on the same dose over time.
12  Q.     So what one physician might do in terms of attempting
13  a taper to see, another physician may say, you know what,
14  you're stable, you're doing good, we're not going to mess
15  with it right now; correct?
16  A.     Right.  Or the same physician with different patients
17  might choose either one of those.
18  Q.     And if either physician had history, physical
19  evaluation, informed consent, treatment agreement, periodic
20  reviews, documentations of why they're prescribing
21  medications or even not prescribing medications, by their
22  making a decision to taper or not taper, both of them acting
23  in basic doctoring and in a bona fide relationship; correct?
24  A.     Yes.
25          MS. BOLEN:  Your Honor, may I just have a moment?

PARRAN - CROSS

1   Have something to take a drink of water, please?

2              THE COURT:  Sure.

3              (Discussion off record)

4              MS. BOLEN:  Your Honor, I don't know the Court's

5   normal schedule in terms of breaking or stopping --

6              THE COURT:  Are you close?

7              MS. BOLEN:  How you want to handle it?

8              THE COURT:  Are you close to a convenient breaking

9   place?

10             MS. BOLEN:  I'm at a convenient breaking place,

11  Your Honor.

12             THE COURT:  Have you had enough for one day?  I'll

13  take that as unanimous.  9:00 tomorrow morning.  Please do

14  not discuss the case among yourselves or allow anyone to

15  discuss it with you or in your presence.  See you at 9:00.

16             COURT SECURITY OFFICER:  All rise, please.

17             (Jury out)

18             THE COURT:  All right, 9:00.

19             (Proceedings recessed at 5:20 p.m.)

20                         CERTIFICATE

21  I CERTIFY THAT THE FOREGOING TRANSCRIPT IS A TRUE AND
    ACCURATE TRANSCRIPT FROM AN EXCERPT OF THE ORIGINAL
22  STENOGRAPHIC RECORD IN THE ABOVE-ENTITLED MATTER.
            Dated this 23rd day of February, 2013.
23
                        /s/ R. Joy Stancel
24         _____
                    R. JOY STANCEL, RMR-CRR
25                FEDERAL OFFICIAL COURT REPORTER