```
 1                   STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                     FORT MYERS DIVISION

 3              CASE NO. 2:11-CR-114-FTM-29SPC

 4      _____

 5   THE UNITED STATES OF AMERICA,

 6              Plaintiff,

 7   vs.                              Fort Myers, Florida
                                      June 14, 2012
 8   DEBRA ROGGOW,                    9:30 A.M.

 9              Defendant.

10      _____

11      TRANSCRIPT OF EXCERPT OF JURY TRIAL DAY 3 of 10
          (Cross Examination of Theodore Parran, Jr.)
12
          BEFORE THE HONORABLE JOHN E. STEELE
13              UNITED STATES DISTRICT JUDGE

14

15
     FOR THE GOVERNMENT:     Office of the United States Attorney
16                           U.S. Courthouse
                             2110 First Street, Room 3-137
17                           Fort Myers, Florida  33901
                             239/461-2200
18                           BY:  DOUGLAS MOLLOY, A.U.S.A.

19
     FOR THE DEFENDANT:      Fox & Ramunni, PA
20                           2211 Widman Way, Suite 250
                             Fort Myers, Florida  33901
21                           239/791-3900
                             BY:  AMIRA DAJANI FOX
22
                             Hollander & Hanuka
23                           2325 Stanford Court
                             Naples, Florida  34112
24                           239/530-1800
                             BY:  LEE HOLLANDER
25
```

```
 1   APPEARANCES (Cont'd)

 2                              The J. Bolen Group, LLC
                               14875 Buttermilk Road
 3                             Lenoir, TN  37771
                               865/368-3472
 4                             BY:  JENNIFER BOLEN

 5
     REPORTED BY:              R. JOY STANCEL, RMR-CRR
 6                             Federal Official Court Reporter
                               U.S. Courthouse
 7                             2110 First Street
                               Fort Myers, Florida  33901
 8                             239/461-2064

 9

10                        I N D E X

11   WITNESS                DIRECT  CROSS  REDIRECT  RECROSS

12   Theodore Parran, Jr.      --      4      195      198

13

14                   E X H I B I T   I N D E X

15   NUMBER                                              PAGE
```

```
16   Defense A9 & A10   Prescriptions              31
     Defense A11        Brooks Progress Note 12/4/9  9
17   Defense A12        Medicare Form  11/5/9         9
     Defense A13        TENS Unit Information         9
18   Defense A14        Six Panel Drug Screen Report 13
     Defense A15        Progress Note 11/17/5        13
19   Defense A16        Treatment Agreement          22
     Defense A17        Approval of Coverage 1/23/8  26
20   Defense A18        Approval of Coverage 1/26/8  26
     Defense A19        Approval of Coverage 1/2/9   26
21   Defense D1         Farabee History              34
     Defense D1-A       Farabee Chart                38
22   Defense D1-B       Two Farabee Prescriptions    40
     Defense D2         Progress Note 8/21/9         43
23   Defense D3         Farabee Progress Note        47
     Defense D4         Progress Note 2/25/10        51
24   Defense D7         Handwritten Notes            60
     Defense D8         Lab Report                   63
25   Defense D9         Ameritox Report              65
```

EXHIBITS (Continued)

NUMBER                                                                    PAGE

Defense D10       Prescription 10/18/10                                    67
Defense D11       MRI Order                                                69
Defense D12       Prescription 12/16/10                                    72
Defense D13       Treatment Agreement                                      75
Defense E1        Patient Information 9/15/96                              79
Defense E2        Patient Information 5/10/99                              84
Defense E3        Neurologic Study                                         90
Defense E4        Progress Note 2/24/00                                    92
Defense E5        Office Visit Note 1/2/3                                  94
Defense E6        Progress Note                                            95
Defense E7        Progress Note                                            97
Defense E8        Office Visit 6/6/3                                      100
Defense E9        Office Visit 9/9/5                                      102
Defense E10       Office Visit                                            105
Defense E12       Controlled Substance Contract                          109
Defense E13       Pain Treatment Agreement                               109
Defense E14       LMHS Records                                            114
Defense E15       LMHS Records                                            118
Defense E16       LMHS Records                                            121
Defense E17       Discharge Notice                                        127
Defense E18       Baptist Hospital Record                                 127
Defense B1        Thorpe Records 4/11/6                                   132
Defense B2        Medical History Questionnaire                          135
Defense B3        Office Visit Note                                       138
Defense B4        Office Visit Note 7/27/6                                142
Defense B5        Office Visit Note 9/20/6                                144
Defense B6        Office Visit Note 1/4/7                                 148
Defense B7        Office Visit Note 2/28/7                                148
Defense B8  through B12   Office Notes 5/3/7 to 10/5/7                     151
Defense B13 through B18   Office Notes 11/07 to 9/08                       156
Defense B19 through B21   Office Notes                                     159
Defense B22 through B24   Office Notes 5/09 to 7/09                        162
Defense B25 through B29   Office Notes                                     165
Defense B39       Social Security Administration Notice                   170
Defense C1  through C13   Giompalo Prescriptions                          172
Defense C14       Dr. Diaz Document Re Giompalo                           189
Defense C15       Physician Referral Form                                 192

  1                  (Call to Order of the Court)

  2                  (Proceedings took place that are not included in

  3       this excerpt, after which, proceedings continued as

  4       follows:)

  5                  THE COURT:  Both sides ready for the jury?

  6                  MR. MOLLOY:  Yes, sir.

  7                  THE COURT:  Have the jury step in.

  8                  MR. MOLLOY:  We were able to find a second request

  9       on Dr. Parran's computer.  I've sent Agent Baginski back to

 10       her office to try to locate the initial request.

 11                  THE COURT:  Okay.

 12                  (Jury in)

 13                  COURT SECURITY OFFICER:  Please be seated.

 14                  THE COURT:  Good morning, ladies and gentlemen.

 15       And let's get the witness back, and then Ms. Bolen, I

 16       believe we're with you still.

 17                  MS. BOLEN:  Yes, sir.

 18                  THE COURT:  You may proceed.

 19                  MS. BOLEN:  Thank you, Your Honor.  Your Honor,

 20       may I approach the witness?

 21                  THE COURT:  You may.

 22                       CROSS EXAMINATION (Continued)

 23       BY MS. BOLEN

 24       Q.    Dr. Parran, I'm handing you a series of photographs

 25       marked for identification as Defense Exhibit H1.  Without

 1   going into that, you testified yesterday that you never went

 2   out to Dr. Roggow's practice; is that correct?

 3   A.      That is correct.

 4   Q.      Now, did the --

 5          MR. MOLLOY:  With the Court's permission, I'd like

 6   to see the photographs?

 7          MS. BOLEN:  Oh, yes.  Sorry.

 8          THE COURT:  Please.

 9          (Documents provided to counsel)

10          MS. BOLEN:  May I reproach, Your Honor?

11          THE COURT:  Yes.

12   BY MS. BOLEN

13   Q.      Dr. Parran, does Defense Exhibit H1 appear to be some

14   photographs of what looks like a medical practice or an

15   office building?

16   A.      Yes.  The first couple photos look like an office

17   building and then inside -- and then inside of a medical

18   practice.

19   Q.      And that's not a practice you've been to before; is

20   it, sir?

21   A.      No, it is not.

22          MS. BOLEN:  Your Honor, may I reproach?

23          THE COURT:  Yes.  You may approach freely.

24          MS. BOLEN:  Thank you, sir.

25

1   BY MS. BOLEN

2   Q.      Now yesterday, Dr. Parran, we were talking about Tony

3   Brooks earlier in my cross examination of you.  Do you

4   recall that?

5   A.      Yes.

6   Q.      And you testified that Mr. Brooks had been diagnosed

7   by Dr. Roggow with several chronically debilitating

8   problems; correct?

9   A.      Yes.

10  Q.      And one of them was Sherman's disease.  Are you

11  familiar with that?

12  A.      I don't believe that I noted Sherman's disease in

13  here.

14  Q.      "Here" meaning the report you're using?

15  A.      In my report and I'm -- I'm not familiar with

16  Sherman's disease.

17  Q.      Do you recall noting or seeing a diagnosis of lumbar

18  degenerative disk disorder with a herniated nucleus?

19  A.      Yes.

20  Q.      That was at L5 bilateral, spondylolysis; correct?

21  A.      Yes.

22  Q.      And then also a diagnosis of sciatica?

23  A.      Yes.

24  Q.      And other than the one that you're not familiar with,

25  the Sherman's disease, these particular diagnoses can

PARRAN - CROSS

```
 1   indicate severe problems with an individual's spine; is that
 2   correct, sir?
 3   A.     Yes.  And he had x-rays and MRIs to support that in
 4   the chart.
 5   Q.     Yes, sir, they were in the chart; that's right?
 6   A.     Yes, yes.
 7   Q.     Along with a written-out diagnosis?
 8   A.     Yes.
 9   Q.     And yesterday, you testified that non-drug therapies
10   were markers of a bona fide treatment relationship and plan
11   for chronic pain management.  Do you recall that?
12   A.     Yes.
13   Q.     And with regard to non-drug therapies, you did see
14   evidence of that in Mr. Brooks' file as you reviewed it;
15   correct?
16   A.     Yes.  He was referred for traction at one point.  He
17   was provided a TENS unit or prescribed a TENS unit which is
18   electrical stimulation unit to try to ease up nerve pain in
19   chronic pain situations.
20   Q.     Let me show you what I've marked for identification
21   as Defense Exhibit A12 and -13.  If you'd just take a look
22   at that for a minute.  Do those purport to be medical
23   records from Mr. Brooks' file?
24            MR. MOLLOY:  Your Honor?
25            THE COURT:  Show them to counsel, please.
```

1           MS. BOLEN:  Your Honor, I'm sorry.  These came out

2    of the Government's file.

3           THE COURT:  Still need to show him which pieces of

4    paper.

5           MS. BOLEN:  Yes, sir.

6           (Documents provided to counsel)

7           MS. BOLEN:  For the record, Your Honor, I'm going

8    to hand counsel the rest of the exhibits that I intend to

9    use for this witness.

10          THE COURT:  That's fine.

11   BY MS. BOLEN

12   Q.     Dr. Parran, again, with Defense Exhibit A11, -12, and

13   -13, do they purport to be medical records related to

14   Mr. Brooks' file?

15   A.     Yes.

16   Q.     And those are part of the file that were sent to you

17   by the agent in this case; is that correct?

18   A.     Yes.

19          MS. BOLEN:  Your Honor, we offer Government's

20   Exhibit 11, 12, and 13 [SIC].

21          THE COURT:  Any objections?

22          MR. MOLLOY:  None, Your Honor.

23          MS. BOLEN:  I said Government's exhibit because I

24   slipped.  Defense exhibit.  Excuse me.

25          THE COURT:  Defendant's A11, A12, and A13 will

1    each be admitted.

2              (Defense Exhibits A11, A12, and A13 admitted)

3    BY MS. BOLEN

4    Q.    Those items, Dr. Parran, specifically referring to

5    Defense Exhibit Number 11 being a progress note; is that

6    correct?  May I publish it, Your Honor?

7              THE COURT:  Yes.

8    BY MS. BOLEN

9    Q.    Dated 12/4/09, you see that, sir?

10   A.    Yes.

11   Q.    And Mr. Brooks is returning with his continuing

12   problems based on the diagnosis and at the bottom?  There's

13   a plan set out by Dr. Roggow; do you see that?

14   A.    Yes.

15   Q.    And the plan talks about the use of -- continued use

16   of a Saunders cervical traction; correct?

17   A.    Yes.

18   Q.    And continued use of medication regimen?

19   A.    Yes.

20   Q.    And instruction to stay active as possible within

21   normal limitations?

22   A.    Yes.

23   Q.    Something you would commonly do with an individual

24   that had problems with their spine to try to help keep them

25   functional; correct?

PARRAN - CROSS

1    A.    Yes.

2    Q.    In the bottom part of the plan, Number 4, indicates

3    the use of a Trans Electronic -- or Electric Nerve

4    Stimulation device, or a TENS unit; correct?

5    A.    Yes.

6    Q.    Are you familiar with TENS units, Dr. Parran?

7    A.    Yes, I just described a TENS unit a minute ago.

8    Q.    You've used them with patients before, or at least

9    seen patients with them?

10   A.    Yes.

11            MS. BOLEN:  And may I publish Defense Exhibit A12,

12   please, Your Honor?

13            THE COURT:  Yes.

14   BY MS. BOLEN

15   Q.    And Defense Exhibit A12 appears to be a Medicare

16   patient information form for cervical traction device;

17   correct?

18   A.    Yes.

19   Q.    Has a date of issue of 11/5/09; correct?

20   A.    Yes.

21   Q.    A lot of information in there purporting to be from

22   Dr. Roggow relating to Mr. Brooks' diagnosis; correct?

23   A.    Yes.

24   Q.    She has to answer that question to get the approval

25   from the Medicare, correct, to get the device?

1   A.    Right.  This is part of that paperwork that we talked

2   about yesterday to try to get patients various treatments.

3   Q.    All part of a bona fide physician/patient

4   relationship; correct, sir?

5   A.    Yes.

6         MR. MOLLOY:  I'm sorry to interrupt.  Can I have

7   the exhibit number of that again, please?

8         MS. BOLEN:  That would be A12.  Would you like to

9   see them when I'm finished?  Your Honor, may I give them to

10  him when I'm finished?

11        THE COURT:  If he would like.

12        MR. MOLLOY:  That's fine.

13        (Discussion off record between counsel)

14        MS. BOLEN:  May I publish Defense Exhibit A13,

15  sir?

16        THE COURT:  You may.

17  BY MS. BOLEN

18  Q.    Dr. Parran, looking at Defense Exhibit A13, do you

19  see the reference to, again, Medicare Medicaid patient

20  information, this time for that TENS unit; right?

21  A.    Yes.

22  Q.    And a TENS unit, sir, is something that has, for lack

23  of a better word, little stickies that have wires to them

24  plugged up to a wire lead to a device that might sit on a

25  pant pocket or something mobile; correct?

1   A.      Yes.

2   Q.      Or they can have one that's stationary; is that

3   correct, larger version?

4   A.      I haven't seen the stationary ones.  I've only seen

5   the mobile ones.

6   Q.      Okay.  But the one that's mobile allows the patient

7   to plug in and kind of stimulate a little electrical current

8   or massage action into the area where the stickies are put,

9   either the back, the neck, wherever they're having issues;

10  correct, sir?

11  A.      Yes.

12  Q.      Again something that would be part of a non-drug

13  treatment in the management of a chronic condition involving

14  pain of various nature?

15  A.      Yes.

16  Q.      Now yesterday, you testified about a urine drug

17  screen in the file for Mr. Brooks.  Do you recall that?

18  A.      Yes, I did.

19  Q.      And you, in fact, reviewed an office note relating to

20  that urine drug screen and the results; correct?

21  A.      Yes.

22  Q.      Dr. Parran, let me show you what I've marked for

23  identification as Defense Exhibit A14 and A15.  Do these

24  appear to be materials related to Mr. Brooks' file?

25  A.      Yes.

1   Q.     And they are in about the time frame of the urine

2   drug screen you mentioned yesterday, that being November of

3   2005?

4   A.     Let me just take a quick peek here.  Yes.

5          MS. BOLEN:  Your Honor, we'd offer Defense

6   Exhibit A14 and A15.

7          THE COURT:  Any objections?

8          MR. MOLLOY:  No, sir.

9          THE COURT:  A14 and A15 will be admitted and you

10  may publish.

11         MS. BOLEN:  Thank you.

12         (Defense Exhibits A14 and A15 admitted)

13  BY MS. BOLEN

14  Q.     Show you up on the screen, Dr. Parran, Defense

15  Exhibit A15.  This, again, is one of those progress notes

16  you reviewed; correct, sir?

17  A.     Yes, it is.

18  Q.     Dated 11/17/05; right?

19  A.     Yes.

20  Q.     And when a physician does a urine drug screen on a

21  patient, part of the basic doctoring is to put the results

22  of the information in the medical chart; correct?

23  A.     Yes.

24  Q.     That's a good thing to do; correct?

25  A.     Yes.

PARRAN - CROSS

1   Q.      And in connection with Defense Exhibit 815 -- excuse
2   me, A15, we have a plan again on the bottom; correct?
3   A.      Yes.
4   Q.      These progress notes, again, are like the SOAP note
5   that you spoke of yesterday with just a little language;
6   correct?
7   A.      Yes.
8   Q.      And in the plan, under Point 3, we see a reference to
9   the six panel urine drug screen being performed in the
10  medical office on the date of 11/17/05; is that correct?
11  A.      Yes.
12  Q.      And there's a result reported; is that correct?
13  A.      Yes.
14  Q.      And it said it was found positive for opioids as
15  expected?
16  A.      Yes.
17  Q.      And then negative for rest of class, including
18  Benzodiazepines; correct?
19  A.      Yes.
20  Q.      Tell the jury about the papers you've published in
21  the area of urine drug testing in pain management
22  specifically on that topic.
23  A.      I don't know that I've published any specific papers
24  on urine drug testing and pain management.
25  Q.      And you're not an expert in that area; are you, sir?

1   A.      Well, I review urine drug screens every day, both

2   in -- certainly in the addiction field.

3   Q.      But not an area that you've published on?

4          MR. MOLLOY:  Your Honor, if the witness would be

5   allowed to answer the question.

6          THE COURT:  Sustained.

7   A.      So I review urine drug screens every day in the

8   addiction field.  I review urine drug screens on patients

9   with addiction and pain both together every day, and I

10  review drug screens on patients who just have pain

11  management issues and don't necessarily have addiction

12  issues several times a week.

13  BY MS. BOLEN

14  Q.      Let's talk about urine drug screens for a minute.

15  That term is actually a little bit simple for the act of

16  drug testing for medications connected to pain management;

17  correct?

18  A.      Right, yes.

19  Q.      It's a simple phrase to describe what can be a rather

20  complicated process; correct?

21  A.      It certainly can be a very complicated process.

22  Q.      So in your experience with drug testing and reviewing

23  information related to drug tests, you certainly know, sir,

24  there's a distinction between a point of care screen and

25  what's done in a laboratory; correct?

1  A.     Yes.   There's point of care testing or office based

2  testing, which is generally an enzyme linked dipstick kind

3  of test, and then there's testing in a laboratory which

4  sometimes is the same enzyme linked type test and also can

5  be a confirmatory test which involves much more sensitive

6  testing.

7  Q.     And sometimes with the point of care -- let me back

8  up a second.   When you talk about point of care, you're

9  referring to something that's done in the medical practice

10  office; correct?

11  A.     Office based, so you have the results then when

12  you're seeing the patient.

13  Q.     All right.   And somebody in the physician's office

14  staff would give the patient a cup or some other collection

15  device to gather the urine; correct?

16  A.     It's highly variable depending on practices.

17  Sometimes it's heavily supervised, sometimes it's just, you

18  know, patient's given a specimen cup and asked to go and

19  provide a urine specimen.

20  Q.     There's nothing one way or another that makes that

21  anything unusual; right?

22  A.     It's highly different, depending on office practices,

23  right.

24  Q.     Offices do what they can with the resources that they

25  have, sometimes even sending patients out for collection at

1   a station outside the office; correct?

2   A.     Very often sending a person just to the laboratory to

3   get it done, yeah.

4   Q.     And with regard to the drug testing of medications

5   like Benzodiazepines, you're aware, sir, that the point of

6   care screens are not that reliable in identifying individual

7   medications in the Benzodiazepine class; is that correct?

8   A.     There is -- there's variability of the -- of the

9   enzyme linked or the point of care test kits regarding many

10  different substances, and certainly Benzos are one of them.

11           MS. BOLEN:  Your Honor, may I approach?

12           THE COURT:  You may.

13           MR. MOLLOY:  Your Honor, may I see what she's

14  approaching with?

15           THE COURT:  You may.

16           MR. MOLLOY:  Can we approach the bench?

17           THE COURT:  You may.

18           (At sidebar, Court, counsel and defendant present)

19           MR. MOLLOY:  Your Honor, I don't know what the

20  defense is proving but unless that's Tony Brooks' urine

21  deal --

22           MS. BOLEN:  I simply intend to use this as a

23  demonstrative aid for the purpose of establishing he's

24  familiar with drug screening and reports because of the

25  topic.  Because of the topic of drug screening, I felt that

PARRAN - CROSS

 1   this demonstrative aid would be helpful and just letting the

 2   jury see the point of care test, something similar.  It's

 3   not being represented as Mr. Brooks'.

 4              THE COURT:  Can I see it?

 5              MS. BOLEN:  It's a cup.

 6              THE COURT:  Urine specimen cup?

 7              MS. BOLEN:  Point of care cup, yes, sir.

 8              MR. MOLLOY:  We don't know Tony Brooks gave a

 9   urine.  I mean, we just know that he did the screen.  So

10   we'd object on the basis of relevancy.

11              THE COURT:  Overruled.  That's not to say it will

12   be admitted, but it may be used as a demonstrative exhibit

13   as to the type of specimen collection.

14              MS. BOLEN:  Yes, sir.

15              (Sidebar concluded)

16              THE COURT:  You may proceed.

17   BY MS. BOLEN

18   Q.    Dr. Parran, let me just show you what's been marked

19   for identification as Defense Exhibit I1.  Take a look at

20   that.  Is that something you've seen before, not necessarily

21   in connection with this case, but just in general?

22   A.    I haven't seen anything from this specific lab, but

23   this looks pretty typical for one of the, you know, office

24   based urine tox screen kits.

25   Q.    So it's an example of something that could be used in

1    connection with point of care drug screening; correct?

2    A.      Absolutely, yeah.

3    Q.      And the laboratory process is much more involved when

4    urine samples are sent to have either a gas chromatography

5    or liquid chromatography analysis done; is that correct?

6    A.      Yes.  If you send a tox screen to the lab, it can be

7    tested just like that, like I said, as a screen.  If you ask

8    for a confirmatory test from the lab, meaning you send a

9    specimen and ask the lab to do confirmation, they will run

10   it through a GC mass spec machine.

11   Q.      Or a liquid chromatography mass spectrometry, which

12   happens to have some higher level of sophistication;

13   correct?

14   A.      Which -- which will sort out true positives from

15   false positives, true negatives from false negatives.

16   Q.      So with regard to this Defense Exhibit I1, just as a

17   demonstrative aid, urine can be collected in here.  It has a

18   little pad that the urine runs up and it can do a plus or

19   minus, positive or negative; correct?

20   A.      Yes.

21   Q.      Doesn't identify a specific drug; correct?

22   A.      No.

23   Q.      And you're aware that these have generally higher

24   cut-off levels in terms of their ability to even detect a

25   positive or a negative result than what's done in the

PARRAN - CROSS

1    laboratory; is that correct?

2    A.      Their ability to detect a positive result, not a

3    negative result, yeah.

4    Q.      All righty.  And with regard to the point of care

5    type screens, it's been your experience, sir, has it not,

6    that sometimes you can get a result at the office and it's

7    not the same at the laboratory under their more

8    sophisticated equipment; is that correct?

9    A.      That is correct.

10   Q.      And publishing what's been admitted as Defense

11   Exhibit A14, this is the six panel drug screen report for

12   Mr. Brooks; is that correct?

13   A.      Yes.

14   Q.      And this appears to be at least somewhat related to

15   the office note which was Defense Exhibit A15; correct?

16   A.      Yes.  They have the same -- same date.

17   Q.      Now Dr. Parran, you found treatment agreements in

18   most of the records that you reviewed; is that correct?

19   A.      I didn't specifically note when I saw them.  I

20   apologize for that, but my -- my recollection is that they

21   were in every chart.

22   Q.      You reviewed five of them; correct?

23   A.      Yes.

24   Q.      And the treatment agreement is part of a suggestion

25   by the Florida Osteopathic Board in connection with patients

PARRAN - CROSS

1    that might be perceived as higher risk; correct?

2    A.      Yes.

3    Q.      And high risk can mean a variety of things, to

4    include a past history with some sort of substance abuse;

5    correct?

6    A.      Right, or medical complications or psychiatric

7    complications, yes.

8    Q.      Medication combinations, things like that; correct?

9    A.      Yes.

10   Q.      Let me show you what's been marked for identification

11   as Defense Exhibit A16.  Does that purport to be a document

12   related to Mr. Brooks' medical record?

13   A.      Yes.

14   Q.      And does that purport to be something that you've

15   seen in your review, whether you recall it individually or

16   not?

17   A.      This -- this certainly appears to have been from his

18   chart, yeah.

19          MS. BOLEN:  Your Honor, I'll offer Defense

20   Exhibit A16.

21          THE COURT:  Any objections?

22          MR. MOLLOY:  Just would like to voir dire the

23   witness.

24          THE COURT:  You may.

25

PARRAN - CROSS

| | |
|---|---|
| 1 | VOIR DIRE EXAMINATION |
| 2 | BY MR. MOLLOY |
| 3 | Q.    Doctor, I may be stating the obvious, but in regard |
| 4 | to this particular document, you weren't present when this |
| 5 | document was executed; is that correct? |
| 6 | A.    No, I was not. |
| 7 | Q.    And again, stating the obvious, you don't know |
| 8 | whether this document was explained to Mr. Brooks, or under |
| 9 | what circumstances Mr. Brooks may have signed this? |
| 10 | A.    No.  I think only Mr. Brooks could answer that.  I |
| 11 | certainly don't have any idea. |
| 12 | MR. MOLLOY:  No objection. |
| 13 | THE COURT:  A16 will be admitted and may be |
| 14 | published. |
| 15 | (Defense Exhibit A16 admitted) |
| 16 | BY MS. BOLEN |
| 17 | Q.    Dr. Parran, you don't have any reason to believe, |
| 18 | based on the records that you reviewed and the fact that you |
| 19 | just said that you saw these in each of the records, that |
| 20 | this wasn't reviewed with this patient; do you? |
| 21 | A.    I have -- I have no ability to form an opinion one |
| 22 | way or the other about that. |
| 23 | Q.    But this is an agreement for the chronic opioid |
| 24 | treatment; correct? |
| 25 | A.    Yes. |

1   Q.      And there appears to be the initials TB on it,

2   Defense Exhibit A16; correct?

3   A.      Yes.

4   Q.      And the second page of the exhibit has a listing for

5   a pharmacy in LaBelle, Florida; correct?

6   A.      Yes.

7   Q.      With, again, initials TB at the bottom of the page?

8   A.      Yes.

9   Q.      And then on the last page, 3, of the exhibit, we have

10  some information here about contacts and signatures on the

11  bottom; correct?

12  A.      Yes -- excuse me, yes.

13  Q.      Now yesterday, we talked very briefly about

14  Mr. Brooks' health insurance through Medicare.  Do you

15  remember that?

16  A.      We talked in general about private insurance and --

17  and federal insurance.  I don't know that we talked

18  specifically about Mr. Brooks being on Medicare.

19  Q.      Do you recall reading anything in Mr. Brooks' chart

20  to indicate that he was covered in some capacity by

21  Medicare?

22  A.      I didn't recall it yesterday, but you've shown me

23  paperwork today that was paperwork sent to Medicare to get

24  permission for a TENS unit and for traction, so I believe

25  that indicates that he was covered by Medicare.

PARRAN - CROSS

1   Q.      Let me show you what's been marked for identification

2   as Defense Exhibit A17, A18, and A19, have you take a look

3   at those for a moment, sir, and tell us whether or not those

4   are related to -- or say Mr. Brooks on the piece of papers?

5   A.      So these appear to be Medicare prescription plan

6   approval for coverage for morphine, morphine medications.

7   Q.      Tied to Mr. Brooks?

8   A.      Yes.

9           MS. BOLEN:  Your Honor, we'd offer Defendant's

10  Exhibit A17, -18, and -19.

11          MR. MOLLOY:  May I voir dire the witness, Your

12  Honor?

13          THE COURT:  You may.

14                  VOIR DIRE EXAMINATION

15  BY MR. MOLLOY

16  Q.      To the best of your recollection, Doctor, the

17  documents that you were just shown, were they in the patient

18  file of Mr. Brooks that you reviewed?

19  A.      Honestly, I don't -- I don't recall.

20  Q.      And these are the ones that were shown to you by the

21  defense this morning?

22  A.      Yes.

23          MR. MOLLOY:  I'm sorry, Your Honor, we're going to

24  have to object.  These documents --

25          THE COURT:  Come to sidebar.

1           (At sidebar, Court, counsel, and defendant

2     present)

3           THE COURT:  What do the documents cover?

4           MS. BOLEN:  I believe Mr. Molloy did not correctly

5     understand the witness' testimony.  These documents come

6     right from what the Government supplied.  I believe

7     Mr. Parran testified that he associates Mr. Brooks with

8     Medicare because of the TENS unit and cervical traction

9     exhibits I published earlier that I have been admitted.  I

10    don't recall the number.  I think it was around Defense

11    Exhibit A12 and -13, if I recall, sir.  So I think that's

12    what Mr. Parran was talking about when he said I showed you

13    this morning.  These came out of the Government's file and

14    if we need to, we'll go through the original record which is

15    in court and show that they've been in discovery.

16          THE COURT:  Answer my question.  Are you telling

17    me those documents came out of the file the Government

18    provided to you purporting to be Mr. Brooks' medical file

19    seized from Dr. Roggow's office.

20          MS. BOLEN:  Absolutely, sir.  Yes, sir.

21          THE COURT:  And do you have reason to not trust

22    that?

23          MR. MOLLOY:  I have no reason to -- even though I

24    don't recognize them, I have no reason to doubt defense

25    attorney.

```
 1              THE COURT:  The objection's overruled.

 2              (Sidebar concluded)

 3              THE COURT:  All right, Plaintiff's Exhibit A17,

 4    A18, and A19 are admitted and may be published.

 5              MS. BOLEN:  Your Honor, did you mean defense

 6    exhibit?  I want to make sure I heard correctly.

 7              THE COURT:  Defense exhibit.  If I didn't say

 8    defense, that's what I meant.

 9              MS. BOLEN:  Thank you.

10              (Defense Exhibits A17, A18, and A19 admitted)

11    BY MS. BOLEN

12    Q.    Dr. Parran, referring to Defense Exhibit A17, we have

13    Mr. Brooks' name on the left-hand side; correct?

14    A.    Yes.

15    Q.    We have a date of 1/23/08; correct?

16    A.    Yes.

17    Q.    What purports to be a member ID number; correct?

18    A.    Yes.

19    Q.    That's something that patients, beneficiaries, we all

20    get when we're involved with any type of health care plan;

21    correct?

22    A.    Yes.

23    Q.    We have a title of the document, Notice of Approval

24    of Coverage; correct?

25    A.    Yes.
```

PARRAN - CROSS

1    Q.      As you pointed out, the drug name morphine, and a

2    quantity limit exception with the Medicare formulary ID

3    listed; correct?

4    A.      Yes.

5    Q.      And right below the number 7636 there is a bolded

6    paragraph that says what, or sentence that says what?  Can

7    you read it?

8    A.      This request for coverage has been approved through

9    the end of the current benefit year unless otherwise

10   notified.

11   Q.      Does that suggest to you that Mr. Brooks received a

12   quantity limit exception from the government pharmacy

13   third-party administrator for morphine for the period of

14   2008?

15   A.      Yes.

16   Q.      And publishing Defense Exhibit A18, does this purport

17   to be a similar document to the one we just looked at, just

18   with a different entity listed; correct?

19   A.      Yes.

20   Q.      Once again, Tony Brooks, left-hand side?

21   A.      Yes.

22   Q.      Date is 1/26/08; correct?

23   A.      Yes.

24   Q.      Notice of Approval of Coverage; is that right?

25   A.      Yes.

1   Q.      This one is for Oramorph and it's listed --

2   A.      Yes.

3   Q.      -- as non-formulary; correct?

4   A.      Yes.

5   Q.      And non-formulary means that there is not something

6   that's normally available to a Medicare beneficiary on a

7   first line prescription but they had to get special approval

8   for it; correct?

9   A.      Yes.

10  Q.      And that's what was done here in Defense Exhibit A18;

11  correct?

12  A.      Yes.

13  Q.      And the -- right before the formulary ID 7636, what

14  does it say there?

15  A.      It says non-formulary.

16  Q.      Underneath the formulary where my finger is pointing?

17  A.      Oh, you said right before.  Right after, it says this

18  request for coverage has been approved through the end of

19  the current benefit year unless otherwise notified.

20  Q.      You have no reason to believe that Medicare otherwise

21  notified Dr. Roggow of the change in status of this approval

22  for Oramorph; do you?

23  A.      No.

24  Q.      And again, this would be the coverage for the entire

25  year on the drug Oramorph; correct?

PARRAN - CROSS

1   A.      Yes.

2   Q.      Issued by the Government; correct?

3   A.      Yes.

4   Q.      And then referring finally to Defense Exhibit A19,

5   another similar document to what we've just looked at;

6   correct?

7   A.      Yes.  Except it's January 2nd, 2009.

8   Q.      So we're now into another coverage year with the

9   Medicare plan; is that right?

10  A.      Yes.

11  Q.      And this one has a Notice of Approval of Coverage

12  once again; correct?

13  A.      Yes.

14  Q.      And in fact, it says we are pleased to inform you

15  that we have approved the following coverage that was

16  requested; right?

17  A.      Yes.

18  Q.      Something that Dr. Roggow requested on behalf of her

19  patient?

20  A.      Yes.  It requires a physician to put together, you

21  know, paperwork and advocate for that.

22  Q.      Advocacy, again, part of that bona fide

23  physician/patient relationship?

24  A.      Yes.

25  Q.      And in this case, we're talking about the drug

1    Morphine Sulfate; is that right?

2    A.    Yes.

3    Q.    And this one's listed as quantity versus time

4    exception, indicating to you that the third-party

5    administrator for the pharmacy benefits actually is looking

6    at the quantity of the drug; correct?

7    A.    Yes.

8    Q.    And in this case, they approve it; is that right?

9    A.    Yes.

10   Q.    Through the end of 2009; correct?

11   A.    Yes.

12   Q.    Once again, by the federal government?

13   A.    Yes.

14          (Discussion off record between counsel)

15          MS. BOLEN:   Your Honor -- I'm sorry.

16   BY MS. BOLEN

17   Q.    Dr. Parran, yesterday do you recall looking at two

18   prescriptions and some paperwork related to November of 2009

19   and Mr. Brooks?

20   A.    Yeah, I remember looking at some -- several

21   prescriptions for him, sure.

22   Q.    And yesterday, and I'm reshowing you what's been

23   marked for identification as Defense Exhibit A9 and -10.  Do

24   these purport to be those items related to Mr. Brooks'

25   prescription from that period of time?

1   A.     Yes.

2          MS. BOLEN:  Your Honor we offer Defense Exhibit 9

3   and 10.

4          THE COURT:  My notes reflect they're admitted, but

5   any objection?

6          MR. MOLLOY:  No.

7          THE COURT:  All right.  If they're not already

8   admitted as evidence, A9 and A10 will be admitted.

9          (Defense Exhibits A9 and A10 admitted)

10  BY MS. BOLEN

11  Q.     Yesterday, you testified that there was an alleged

12  dangerous situation where, based on your review, that

13  Mr. Brooks was without his medication for nearly three weeks

14  culminating in January of 2010.  Do you recall that, sir?

15  A.     Well, let me just review my -- my notes here

16  regarding the dates.  Yes.  Yes, January 20th, 2010.

17         MS. BOLEN:  Your Honor, may I approach and

18  retrieve an exhibit from yesterday?

19         THE COURT:  You may.

20         MS. BOLEN:  And may I publish Defense Exhibit A10?

21         THE COURT:  Yes.

22  BY MS. BOLEN

23  Q.     Dr. Parran, I'm going to zoom in here a little bit

24  and I'm showing you the prescriptions on the bottom half of

25  Defense Exhibit A10.  Can you see those clearly or should I

1    zoom in more?

2    A.     No, that's good, December 2nd, 2009.

3    Q.     That's the date of the prescription; correct?

4    A.     Yes.

5    Q.     And on the bottom, there's a signature there, at

6    least has the identifiable initials T and B; correct?

7    A.     Yes.

8    Q.     And the top, we see a driver's license and a date

9    next to it; correct?

10   A.     Yes.

11   Q.     2/18/09?

12   A.     12/18/09.

13   Q.     I'm sorry, 12/18/09, you're right.  And referring

14   back to what's been admitted into evidence as Defense

15   Exhibit A3, on Page 6 of that exhibit, do you find a fill

16   for the two prescriptions represented in Defense

17   Exhibit A10, that being Morphine Sulfate Extended Release 60

18   and Morphine Sulfate Immediate Release 30?

19   A.     Yes, from January 22nd, 2009 -- I'm sorry,

20   December 22nd, 2009.

21   Q.     And when somebody picks up some medicine of

22   December 26th of 2009, they have what appears to be a 30 day

23   supply, that would take them into January of 2010; is that

24   correct, sir?

25   A.     Yes.  Based upon the pharmacy profile, it shows that

1    the prescriptions line up monthly.

2    Q.    So would it be fair to say that it appears that

3    Mr. Brooks did, indeed, have his medicine all along and that

4    the danger you testified to and reported to the Government

5    is nonexistent based on the pharmacy profiles?

6    A.    Based on the pharmacy profiles, my concern is

7    relieved.

8    Q.    Relieved.  In other words, you retract what you said

9    that he didn't -- he wasn't without that medicine for that

10   period of time; correct?

11   A.    Well, I said I was concerned that there was a gap,

12   that there appeared to be a gap from the chart and that if

13   there was a gap, it would be dangerous to him.

14          MS. BOLEN:  Your Honor, if I might have a moment

15   to show Government counsel what I'm about to cover?

16          THE COURT:  You may.

17          (Discussion off record)

18          MS. BOLEN:  Could I have one minute, Your Honor,

19   to switch gears here?

20          THE COURT:  You may.

21          (Pause in place)

22   BY MS. BOLEN

23   Q.    Yesterday, you talked about an individual named

24   Charles Farabee; do you recall that, sir?

25   A.    Yes.

PARRAN - CROSS

1    Q.      And Mr. Farabee was one of the patient records that

2    you reviewed; correct?

3    A.      Yes.

4    Q.      I show you what's been marked for identification as

5    Defense Exhibit D1.  Do you recognize this as a document

6    that you reviewed in connection with this case?

7    A.      Yes.  This -- this appears to be an initial history

8    and physical exam.

9            MS. BOLEN:  Your Honor, we'd offered Defense

10   Exhibit D1.

11           THE COURT:  Any objections?

12           MR. MOLLOY:  None.

13           THE COURT:  D1 will be admitted and may be

14   published.

15           (Defense Exhibit D1 admitted)

16   BY MS. BOLEN

17   Q.      And publishing on the screen there, Dr. Parran, this

18   is dated July 31st of 2009; correct?

19   A.      Yes.

20   Q.      For Mr. Farabee; right?

21   A.      Yes.

22   Q.      Has an extended discussion of Mr. Farabee's history,

23   the encounter information, information that would typically

24   be gathered in the initial contact between a physician and a

25   patient?

PARRAN - CROSS

1    A.      Yes.

2    Q.      And in fact, this document is three pages long; is

3    that correct?

4    A.      Yes.

5    Q.      And on the Page 2 of Defense Exhibit D1, we see an

6    area for physical examination?

7    A.      Yes.

8    Q.      Would that indicate to you that Dr. Roggow laid hands

9    and went through the process that any normal physician would

10   do in relationship with his or her patients?

11   A.      Yes.  This is the kind of physical exam that would --

12   this is a level of detail that would require a patient to

13   be, you know, out of their clothes and in an exam gown,

14   examined in the office.

15   Q.      That's a good thing; isn't it, sir?

16   A.      Absolutely.

17   Q.      And the back page of Defense Exhibit D1, Page 3,

18   there's a plan; correct?

19   A.      Yes.

20   Q.      And in this particular encounter, we find out that

21   Mr. Farabee is taking Tramadol; correct?

22   A.      He's prescribed -- he's prescribed Tramadol, yes.

23   Q.      Let's go back to Page 1 of Defense Exhibit D1, and do

24   you see where it reports current medications?

25   A.      Yeah, it says that he takes Zoloft every day and it

PARRAN - CROSS

1    says that Tramadol doesn't work for his pain.

2    Q.     But it also says he takes Tramadol; does it not, sir?

3    A.     It says that he takes Zoloft and -- under current

4    medications at least.

5    Q.     Let me point out here.  You see where it says current

6    medications?

7    A.     Yes.

8    Q.     This reads Zoloft 75 milligrams daily?

9    A.     Oh, yes.

10   Q.     And Tramadol?

11   A.     Yes, 50 milligrams --

12   Q.     Two tablets.

13   A.     -- two tablets four times a day.

14   Q.     This patient is coming to Dr. Roggow representing

15   that he takes Tramadol?

16   A.     Yes.

17   Q.     And he's reporting to her that the medication doesn't

18   seem to be effective; correct?

19   A.     Yeah, not as effective.

20   Q.     And Page 3 of Exhibit D1, again, back to the plan,

21   correct?

22   A.     Yes.

23   Q.     Dr. Roggow, in Point 2, adds Ultram extended release

24   200-milligram; correct?

25   A.     Right.

PARRAN - CROSS

1   Q.      With an instruction to try the short-acting Ultram as
2   necessary; correct?
3   A.      Yes.
4   Q.      And Tramadol is not a scheduled medication; is that
5   right?
6   A.      No, it's not.
7   Q.      So what it appears to be is that Dr. Roggow made an
8   effort with this patient to continue on with the medication
9   he came in on, with just an additional dosing amount;
10  correct?
11  A.      Yes.
12  Q.      Nothing unusual about that; is there, sir?
13  A.      No.
14  Q.      Dr. Parran, we talked yesterday about the getting a
15  prior medical records as part of a bona fide physician/
16  patient relationship; do you recall that sir?
17  A.      Yes, we did.
18  Q.      I'm showing you what's been marked for identification
19  as Defense Exhibit 1A.  Does that purport to be records
20  relating to Mr. Brooks -- excuse me, Mr. Farabee's medical
21  chart?
22  A.      Yes.
23          MS. BOLEN:  Your Honor, we'd offer Defense
24  Exhibit 1A.
25          THE COURT:  1A?

PARRAN - CROSS

 1           MS. BOLEN:  Yes, sir.  I'm sorry, D1-A.

 2           THE COURT:  D1-A?

 3           MS. BOLEN:  Yes, sir.

 4           THE COURT:  All right, any objections?

 5           MR. MOLLOY:  None.

 6           THE COURT:  D1-A will be admitted.

 7           (Defense Exhibit D1-A admitted)

 8           MS. BOLEN:  May I publish it, Your Honor?

 9           THE COURT:  You may.

10   BY MS. BOLEN

11   Q.    First page of Defense Exhibit D1-A is dated 7/16/09;

12   is that correct?

13   A.    Yes.

14   Q.    And in this case, it's listed as to Dr. Roggow;

15   correct?

16   A.    Yes.

17   Q.    From another doctor at this Family Practice Clayton

18   Court; correct?

19   A.    Yes.

20   Q.    And it involves medical records related to Charles

21   Farabee?

22   A.    Yes.

23   Q.    Would that indicate to you that somebody inside

24   Dr. Roggow's office made a request to receive these records,

25   or at least the patient instructed it to happen?

PARRAN - CROSS

1   A.      Yes.

2   Q.      And then Pages 2, 3, and 4 of Defense Exhibit D1-A --

3   I'll show you Page 2.  You see up in the top left-hand

4   corner of this page a date of 7/16/09?

5   A.      Yes.

6   Q.      Does this purport to be from Lee Memorial Health

7   System?

8   A.      Yes.  It's actually from the Family Practice of

9   Clayton, which -- who faxed it, but the x-ray report is

10  actually from Lee Memorial Health System.

11  Q.      So this is a prior record with an x-ray report in it;

12  correct?

13  A.      Yes.

14  Q.      And that's a good thing; isn't it?

15  A.      Yes.

16  Q.      And then Page 3 of Defense Exhibit D1-A, can you tell

17  us what that is, sir?

18  A.      This fax from the same family practice office on the

19  same date is another radiology report.

20  Q.      Indicating that -- can you read what it says?

21  A.      It looks like a chest x-ray showing that the heart is

22  normal, the lungs are hyperinflated, no hilar or medial sign

23  of masses are seen.  No active cardio or pulmonary disease.

24  Q.      That would be something important for any doctor to

25  know about a patient; correct?

PARRAN - CROSS

```
1    A.      Yes, a chest x-ray report is useful information.

2    Q.      And at least showing somewhere here Mr. Farabee has

3    some current testing that's being done; correct?

4    A.      Yes.

5    Q.      Dr. Parran, let me show you what's been marked for

6    identification as Defense Exhibit D1-B and ask if you

7    recognize that as two prescriptions for diagnostic services

8    in connection with Mr. Brooks -- excuse me, Mr. Farabee's

9    medical record?

10   A.      Yes.

11           MS. BOLEN:  Your Honor, we'd offer Defense

12   Exhibit D1-B.

13           THE COURT:  Any objections?

14           MR. MOLLOY:  I'm having trouble keeping up with

15   the numbers, but no objection.

16           THE COURT:  All right, Defendant's D1-B will be

17   admitted and may be published.

18           (Defense Exhibit D1-B admitted)

19   BY MS. BOLEN

20   Q.      And on here we see two items written on

21   prescriptions; is that correct?

22   A.      Yes.

23   Q.      It's not uncommon, Dr. Parran, for a doctor to write

24   an order for a diagnostic service on a prescription pad; is

25   it?
```

1    A.      No.  It's very common.

2    Q.      That's something you've done in your career; correct?

3    A.      Yes.

4    Q.      And in connection with Defense Exhibit D1-B, we have

5    an order on the left side here for what?  Can you tell us,

6    sir?

7    A.      Looks like physical therapy three times a week, or

8    three days a week for two to four weeks.

9    Q.      And physical therapy is, again, a non-drug modality

10   of treatment that's common in chronic pain management;

11   correct?

12   A.      Yes.

13   Q.      Part of that bona fide physician/patient

14   relationship, sir?

15   A.      Yes.

16   Q.      And on the right side, we have an order for what?

17   A.      Looks like x-ray series with -- something -- angles,

18   please, for the thoracic, which is the chest, spine, through

19   the sacrum, which is the bottom of the spine, to evaluate

20   scoliosis or curvature of the spine and a motor vehicle

21   accident in 2004.

22   Q.      And does that "something" there appear to be the word

23   Cobb?  Correct?

24   A.      Yes.

25   Q.      Are you familiar with Cobb angle studies in

PARRAN - CROSS

1    connection with scoliosis?

2    A.     No, I'm not.

3    Q.     Would it be fair to say that when somebody presents

4    with at least a diagnosis or a potential diagnosis of

5    scoliosis, that you'd order an x-ray to take a look at the

6    spine to see how bad the degree or the angle is in the spine

7    change?

8    A.     Yes.  Especially if that hadn't been done before in

9    the previous studies you received, yeah.

10   Q.     All part of a bona fide physician/patient

11   relationship; correct?

12   A.     Yes.

13   Q.     Let me show you what's been marked for identification

14   as Defense Exhibit D2 and ask you once again, sir, does that

15   purport to be a progress note for Mr. Brooks' file -- excuse

16   me, Mr. Farabee's file?

17   A.     Yes, it does.

18   Q.     Is that something that you reviewed in connection

19   with your expert testimony in this case?

20   A.     Yes.

21          MS. BOLEN:  Your Honor, we'd offer Defense

22   Exhibit D2.

23          THE COURT:  Any objections?

24          MR. MOLLOY:  No, sir.

25          THE COURT:  D2 will be admitted and may be

1    published.

2           (Defense Exhibit D2 admitted)

3    BY MS. BOLEN

4    Q.    Once again, Dr. Parran, we have a progress note of

5    some detail in the medical record of Charles Farabee; is

6    that correct?

7    A.    Yes.

8    Q.    And we have a date of 8/21 of '09; correct?

9    A.    Yes.

10   Q.    And a discussion and explanation for his visit with

11   Dr. Roggow; correct?

12   A.    Yes.

13   Q.    He talks about in the first paragraph that he's a

14   busy construction supervisor on a road project; correct?

15   A.    Yes.

16   Q.    Suggesting that this patient is at least working at

17   the time of this particular note?

18   A.    Yes.

19   Q.    That would be the impression that a doctor would

20   receive based on a discussion with the patient; correct?

21   A.    Absolutely.

22   Q.    And you rely on what your patients tell you during

23   the visit; correct?

24   A.    Yes.

25   Q.    Again, it goes back into an explanation of the

 1   medication that Mr. Farabee has tried in connection with his

 2   pain management; right?

 3   A.     Yes.  This was part of the information that concerned

 4   me when I reviewed the chart.

 5   Q.     All right.  Well, let's get to that.  In this

 6   connection here, Dr. Roggow references Tramadol; correct?

 7   A.     Yes.

 8   Q.     And again, the patient is telling her he's found this

 9   to be ineffective for his pain; correct?

10   A.     Yes.

11   Q.     And then he tried a drug called Reprexain with

12   2.5-milligram, do you see that?

13   A.     Yes.

14   Q.     Do you know what Reprexain is?

15   A.     I'm actually not familiar with Reprexain.

16   Q.     Not a drug you've handed out with samples?

17   A.     I have not, no.

18   Q.     Did you look it up in the PDR before you put your

19   report together?

20   A.     No, I did not.

21   Q.     You don't know whether or not it has connection with

22   Hydrocodone; do you, sir?

23   A.     Again, I'm not familiar with Reprexain.

24   Q.     In your experience, do some of the manufacturers of

25   medications combine drugs like ibuprofen with some of the

PARRAN - CROSS

1   controlled medications to help with inflammation and pain

2   management at the same time?

3   A.      Very often.

4   Q.      Inflammation is connected to chronic pain; is it not,

5   sir?

6   A.      It can be.

7   Q.      So the use of what would be referred to as adjutant

8   medications or medications in addition to is common in pain

9   management; is it?

10  A.      Yes.

11  Q.      And you would use drugs like Celabrex; correct?

12  A.      Celabrex is one of the anti-inflammatories.

13  Q.      Vioxx, when it was on the market?

14  A.      When it was on the market.

15  Q.      Baclofen?

16  A.      Baclofen is a muscle relaxant, not an

17  anti-inflammatory.

18  Q.      Oh, that's right, I'm sorry.  You would use Tylenol,

19  ibuprofen, Aleve, those are just basic non-controlled

20  substance drugs; correct?

21  A.      That are pain relievers, yes.

22  Q.      Not necessarily in the anti-inflammatory category?

23  A.      The Tylenol isn't an anti-inflammatory.  The rest

24  are.

25  Q.      You don't know what's in Reprexain; do you?

1    A.      I don't, no.

2    Q.      Then there's a report he tried the Hydrocodone 5-500

3    and that's part of what concerned you yesterday; correct?

4    A.      Well, at the last visit, he didn't mention any of

5    this in his complete history and physical.  None of this

6    information was provided by the patient.  He didn't talk

7    about anything.  And then when he did talk about Hydrocodone

8    here, he said he took the five milligrams, felt like it

9    helped his pain a little more as you can see up there, but

10   that it upset his stomach.  And now he wants stronger

11   Hydrocodone.

12   Q.      If a medication has ibuprofen in it, could that upset

13   the stomach of somebody that has any kind of GI history?

14   A.      Ibuprofen certainly can upset the stomach.

15   Q.      All right.  And the patient is reporting this upset

16   stomach to Dr. Roggow; is that correct?

17   A.      Yes.  He says he had an upset stomach from

18   Hydrocodone five milligrams 500 and the Hydrocodone 5-500 is

19   five milligrams of Hydrocodone and 500 milligrams of

20   acetaminophen or Tylenol, which does not upset the stomach.

21   Q.      And looking back at the Reprexain, it purports to

22   have some drug in 2.5-milligram quantity with 200 milligrams

23   of something you don't know as a backup or combined

24   medication; correct, sir?

25   A.      Yes.

PARRAN - CROSS

1    Q.     Dr. Parran, let me show you what's been marked for
2    identification as Defense Exhibit D3.  Do you see this and
3    recognize it as being one of the progress notes and attached
4    report that you reviewed in connection with Mr. Farabee's
5    chart?
6    A.     Yes.
7    Q.     Dated within the time frame of your expert witness
8    report to the Government?
9    A.     Yes.
10          MS. BOLEN:  Your Honor, we'd offer Defense
11   Exhibit D3.
12          THE COURT:  Any objections?
13          MR. MOLLOY:  No, sir.
14          THE COURT:  D3 will be admitted and may be
15   published.
16          (Defense Exhibit D3 admitted)
17   BY MS. BOLEN
18   Q.     One of the things that doctors do in basic doctoring
19   with their patients would be to review side effects of
20   medication; is that correct?
21   A.     Yes.
22   Q.     A lot of medications have side effects; do they not,
23   sir?
24   A.     Nearly all.
25   Q.     We talked a little bit yesterday about constipation

PARRAN - CROSS

1   being one of them connected with the use of opioid
2   medications?
3   A.      Yes.
4   Q.      Constipation can come with other medications too; can
5   it not?
6   A.      Yes.
7   Q.      Dry mouth being a side effect at times?
8   A.      Yes.
9   Q.      Medications can have other effects on different
10  patients and it really depends on that individual; correct?
11  A.      Yes.
12  Q.      Publishing the first page of Defense Exhibit D3,
13  again, we're dealing with one of the progress notes, in this
14  case dictated but not read; correct?
15  A.      Yes.
16  Q.      Now, you see a name up here above Dr. Roggow's name;
17  do you not?
18  A.      Yes.
19  Q.      And that name is Beth Dickey with some letters after
20  her name; correct?
21  A.      Yes, nurse practitioner.
22  Q.      Do you know what the A-R means?
23  A.      No.
24  Q.      Different states have different names for their nurse
25  practitioners; correct, sir?

1    A.      I'm not sure.

2    Q.      Do you work with nurse practitioners?

3    A.      I've worked with nurse practitioners in Maryland and

4    Ohio.

5    Q.      But not in Florida; have you?

6    A.      No.

7    Q.      In this case, we have a reason for the visit where

8    Mr. Farabee indicates to Dr. Roggow that he is working

9    full-time; correct?

10   A.      Yes.

11   Q.      He's married and has three children?

12   A.      Yes.

13   Q.      Been in some accidents and has noticed pain; correct?

14   A.      Yes.

15   Q.      He's taking his Hydrocodone and reports the time that

16   he takes it; correct?

17   A.      Yes.

18   Q.      Says he really doesn't have any side effects, but he

19   does complain of dry mouth.  You see that?

20   A.      Yes.

21   Q.      Take some hot baths and soaks?

22   A.      Yes.

23   Q.      What does that indicate to you, the hot baths and

24   soaks?

25   A.      That he sits in the hot tub.

PARRAN - CROSS

1    Q.      That's helpful, non-drug treatment for pretty much

2    anybody that has pain or aches, that sort of thing?

3    A.      Certainly can be, yeah.

4    Q.      Some people might be sensitive to hot tubs; fair to

5    say?

6    A.      Yes.

7    Q.      See where it says he walks a lot at work?

8    A.      Yes.

9    Q.      Would that indicate some level of function to you?

10   A.      Yes, in addition to his, you know, working.

11   Q.      And Dr. Roggow reviews with him that his pain is

12   aggravated by certain things like bending; correct?

13   A.      Yes.

14   Q.      And that he tends to get some help from this

15   medication; correct?

16   A.      Yes.

17   Q.      And this is common, again, in the progress of the

18   relationship between a physician and a patient; correct?

19   A.      Yes.

20   Q.      Part of the basic doctoring?

21   A.      Yes.

22   Q.      Show you what's been marked for identification as

23   Defense Exhibit D4.  Do you recognize this, sir, as a

24   progress note in connection with Mr. Farabee's medical

25   record?

1   A.      Yes.

2   Q.      It's one of the progress notes that you reviewed in

3   connection with your testimony?

4   A.      Yes.

5           MS. BOLEN:  Your Honor we'd offer Defense

6   Exhibit D4.

7           THE COURT:  Any objections?

8           MR. MOLLOY:  No, sir.

9           THE COURT:  D4 will be admitted and may be

10  published.

11          (Defense Exhibit D4 admitted)

12  BY MS. BOLEN

13  Q.      Same type of progress note or similar, sir, as we've

14  seen in the past?

15  A.      Yes.

16  Q.      Just maybe different information; correct?

17  A.      Yes.

18  Q.      2/25/10?

19  A.      Yes.

20  Q.      More discussion between the physician and the patient

21  about medication, what he's doing, function in his life;

22  correct?

23  A.      Yes.

24  Q.      Talks about his family; is that correct?

25  A.      Yes.

PARRAN - CROSS

1    Q.    Now, it's not uncommon to have increased pain as

2    weather gets cooler; is it, sir?

3    A.    Certainly can.  I wasn't aware that weather got very

4    cool down here, but I'm from Ohio, so ...

5    Q.    I get that, but you don't live down here; do you?

6    A.    No.

7    Q.    You don't know when it gets cool or when it doesn't

8    or what effect it might have on Mr. Farabee; do you?

9    A.    No.

10   Q.    This note on Defense Exhibit D4 also contains an

11   indication of limits on medication; correct?

12   A.    Yes.

13   Q.    Right there, written in her note?

14   A.    Yes.

15   Q.    When you limit patients' medication, you write that

16   in your notes; don't you?

17   A.    Yes.

18   Q.    That's a good thing to do to indicate your rationale

19   on how you're treating the patient; correct?

20   A.    Yes.

21   Q.    It would seem to indicate good faith in attempting to

22   monitor a patient that she's treating; correct?

23   A.    Yes.

24   Q.    She also goes on and gives advice to use heat or ice

25   and stretching in connection with his pain management; see

PARRAN - CROSS

1    that?

2            MR. MOLLOY:  I'm sorry, just clarification, when

3    defense counsel says "she" does she mean Nurse Dickey or

4    Dr. Roggow?

5            THE COURT:  If you can clarify it?

6            MS. BOLEN:  Sure.

7    BY MS. BOLEN

8    Q.    Dr. Parran, nurse practitioners work under the

9    supervision of the doctor; is that correct?

10   A.    Yes.

11   Q.    And states have different rules relating to what type

12   of supervision has to be done; correct?

13   A.    Yes.

14   Q.    And in some states, nurse practitioners can practice

15   on their own in their own practice and a doctor can come and

16   visit them; correct?

17   A.    Yes.

18   Q.    And in other states, the doctor has to be present and

19   the nurse practitioner can see a patient; correct?

20   A.    Again, you know --

21   Q.    You're not familiar with those rules; are you?

22   A.    You know, I can tell you in Ohio, it used to be that

23   way, where the nurse practitioner had to have the patient

24   seen by the doctor.  Now nurse practitioners can be

25   independent licensed clinicians in Ohio.  So it depends on

PARRAN - CROSS

```
 1   the state.
 2   Q.    When doctors supervise nurse practitioners, is it
 3   fair to say that the nurse practitioner would sign a note
 4   that they had an encounter with the patient?
 5   A.    The nurse practitioner would be expected to sign a
 6   note when they've seen a patient and had an encounter.
 7   Q.    All right.  And the doctor would be responsible for
 8   collaboration with the nurse practitioner in connection with
 9   any care; correct?
10   A.    Depending on the state.  It could be collaboration;
11   it could be supervision.
12   Q.    And supervision, are you meaning that as something a
13   little stricter or less restrictive?
14   A.    A little more strict, yes.
15   Q.    All right.  But at least in this case, in Defense
16   Exhibit D4, we have an indication with two names on here,
17   the nurse practitioner and then Dr. Roggow; is that correct?
18   A.    Yes.
19         MR. MOLLOY:  I'm sorry, I'm still not certain if
20   defense counsel is -- I don't know which person defense
21   counsel is attributing the report's authorship to and for
22   clarification, I just don't know.
23         THE COURT:  If she wants to ask the question, she
24   may.  If not, you can cover it on redirect.
25         MR. MOLLOY:  Thank you, Judge.
```

1    BY MS. BOLEN

2    Q.     Dr. Parran, you weren't there, you don't know, do

3    you, whether or not there was collaboration between the

4    nurse practitioner and the doctor in this case?

5    A.     I don't know.

6    Q.     But you have no reason to believe that there wasn't?

7    A.     Again, I don't know.

8    Q.     Would it be fair to say, Dr. Parran, that there were

9    several typed encounter or patient notes in Mr. Farabee's

10   file?

11   A.     Yes.

12   Q.     And while we're talking about it, I started to ask

13   you this question yesterday, but I'll do it again today.

14   Isn't it a fact, sir, that in your review of Dr. Roggow's

15   medical records that you actually found three different

16   types of ways of tracking the patient through an office,

17   let's say, communication system, whether handwritten or

18   typed?

19   A.     Again, I didn't -- I didn't specifically write that

20   out for myself, so you'll have to describe what those three

21   different ways are and I can tell you whether I saw those or

22   not.

23   Q.     You reviewed the records, though; correct?

24   A.     Yes, I reviewed the records in October or November --

25   Q.     You didn't --

PARRAN - CROSS

1    A.       -- of 2011.

2    Q.       You didn't bring what you reviewed with you; correct?

3    A.       Right.  So if you would describe to me --

4    Q.       Let me ask you this, did you --

5           MR. MOLLOY:  Your Honor, I'm sorry, I move the

6    witness could answer the question.

7           THE COURT:  Let the witness finish his answer if

8    he hadn't.

9           MS. BOLEN:  Yes, sir.

10          THE COURT:  Go ahead.

11   BY MS. BOLEN

12   Q.       Did you see in Mr. Farabee's file and any of the

13   other files paperwork that actually listed simply dates and

14   whether a patient showed up or rescheduled a visit?

15   A.       Yes.

16   Q.       That's a common way of tracking encounters, just in a

17   chronological fashion between a physician and a patient;

18   correct?

19   A.       Yes.

20   Q.       Nothing unusual about that?

21   A.       No.

22   Q.       You saw that system in these records; correct?

23   A.       Yes.

24   Q.       Did you also see handwritten notes in mostly a

25   chronological fashion that appeared to be entered by various

PARRAN - CROSS

1   staff somehow connected to this medical practice?

2   A.    Yes.

3   Q.    And they would track chronologically phone calls and

4   communications between the patient and the doctor and/or her

5   staff?

6   A.    Yes, or communication from others regarding the

7   patient, yes.

8   Q.    And that's a common system used in regular, normal

9   medical practices; correct?

10  A.    Absolutely.

11  Q.    Nothing weird about that?

12  A.    No.

13  Q.    So a second system; correct?

14  A.    Yes.

15  Q.    And then the third system is the one I believe you

16  testified about which you called progress notes; is that

17  right?

18  A.    Yes, although I testified a fair amount about those

19  telephone calls as well, yeah.

20  Q.    So we do have three -- what purports to be at least

21  three systems of communication and tracking the encounter

22  between the physician and the patient?

23  A.    Yes.

24  Q.    Indicating an extensive network of supporting the

25  care of this patient?

PARRAN - CROSS

1   A.      Yes.

2   Q.      Extensive communication network, at the least?

3   A.      Yes.

4   Q.      Now yesterday, there was some discussion about your

5   concern over Mr. Farabee's Dilaudid use in combination with

6   some other prescriptions; is that correct?

7   A.      Yes.

8   Q.      That's one of the things that, at least initially,

9   has concerned you about this chart; correct?

10  A.      Yes.

11  Q.      And it's your understanding that Mr. Farabee was

12  prescribed the controlled medication, Dilaudid; right?

13  A.      Yes.

14  Q.      And it's also your testimony that you went and

15  reviewed the nurse or office staff communication notes that

16  we just described, system two?

17  A.      Yes.

18  Q.      Dr. Parran, let me show you what's been marked for

19  identification as Defense Exhibit D7.

20  A.      Yes.

21  Q.      Do you recognize that as a handwritten series of

22  notes connected to Mr. Farabee's file?

23  A.      Yes.

24  Q.      And you don't necessarily know who wrote the notes;

25  is that correct?

PARRAN - CROSS

1   A.      There are initials.

2   Q.      You'd have to know the people?

3   A.      But I don't -- I don't know.   Yeah.

4   Q.      But it is connected with Mr. Farabee; is that

5   correct?

6   A.      Yes.

7            MS. BOLEN:   Your Honor, we'd offer Defense

8   Exhibit D7.

9            THE COURT:   Any objections?

10           MR. MOLLOY:   Yes, Your Honor.   May we approach?

11           THE COURT:   You may.

12           (At sidebar, Court, counsel, and defendant

13   present)

14           MR. MOLLOY:   Your Honor, I'm not sure whether

15   defense counsel's correct or incorrect or I'm incorrect.

16   This Dilaudid refers -- is counsel suggesting this Dilaudid

17   refers to Mr. Farabee's -- well, the scenario that we

18   described is his visit to Target.

19           MS. BOLEN:   Your Honor, we're simply referring to

20   this as a series of notes in the file and I'll go into the

21   connection with the Dilaudid in a minute.

22           MR. MOLLOY:   That's fine with me.

23           THE COURT:   Okay.

24           MR. MOLLOY:   I just -- either I'm mistaken or

25   she's mistaken because the Dilaudid prescription was for 72

PARRAN - CROSS

1    in the scenario that was discussed.

2            THE COURT:  All right.  So is there an objection

3    or not an objection?

4            MR. MOLLOY:  If she's going to clarify it, that's

5    fine.

6            THE COURT:  Okay.

7            (Sidebar concluded)

8            THE COURT:  You may proceed.

9            MS. BOLEN:  May I publish Defense Exhibit D7, sir?

10           THE COURT:  Yes.  Let me formally admit D7 and you

11   may publish it.

12           (Defense Exhibit D7 admitted)

13   BY MS. BOLEN

14   Q.    Dr. Parran, this document, Defense Exhibit D7, is an

15   example of one of the series of handwritten note

16   communications within Mr. Farabee's chart; is that correct?

17   A.    Yes.

18   Q.    It was your testimony yesterday there was a

19   prescription for Dilaudid given to Mr. Farabee sometime in

20   the August 2010 time frame; is that correct?

21   A.    No, I believe I testified that he was given a

22   prescription on September 16th of 2010 for --

23   Q.    All right, September 16th, 2010?

24   A.    Yes.

25   Q.    Do you see a note in the middle of this particular

PARRAN - CROSS

1    exhibit, Defense Exhibit D7, dated 9/24/10?

2    A.      Yes.

3    Q.      See where it indicates that the patient returned the

4    Dilaudid and said he didn't like the effects of it and per

5    Dr. Roggow there was a script written for Roxicodone

6    15-milligram?

7    A.      Yes.

8    Q.      And the patient will call for an update on Monday?

9    A.      Yes.

10   Q.      And when -- it's not uncommon for patients to return

11   medication that they don't particularly like or it hasn't

12   worked for them; is it?

13   A.      It certainly can happen within a regular office

14   practice, yeah.

15   Q.      It's not a bad thing, is it, to return a controlled

16   medication to a doctor if it's not working?

17   A.      It's not a bad thing.

18   Q.      Does this indicate to you, sir, that he took the

19   Dilaudid and gave it back to somebody in this medical

20   practice?

21   A.      Yes.

22   Q.      And he received a prescription in exchange for it?

23   A.      Yes.

24   Q.      That's not something you reported to the Government

25   in connection with Mr. Farabee's case; is it, sir?

1   A.      No.   My report said that he received the prescription

2   for Dilaudid on the 16th of September and it represented a

3   huge increase in his daily opiate dose and was a danger to

4   the health and safety of the patient on that day,

5   December -- or September 16th --

6   Q.      But would the additional fact be --

7   A.      -- 2010.

8   Q.      But with the additional facts we now know that at

9   least purporting in Defense Exhibit D7 that on

10  September 24th of 2010, Mr. Farabee presented Dilaudid back

11  to this medical practice --

12  A.      I did not say that he brought the Dilaudid back.   I

13  did say on September 24th that he received the Roxicodone

14  prescription for 15 milligrams, 360 tablets.

15  Q.      Does that appear to be a fact omitted from your

16  expert review in this case?

17  A.      It -- it doesn't relate to my -- my opinion that the

18  prescription, both on the 16th and the prescription on the

19  24th were dramatically larger increased doses of opiates and

20  threatened the life and safety and health of the patient.

21  Q.      In this case, the patient brought the medicine back

22  to the practice saying he didn't like the effects; correct,

23  sir?

24  A.      Right.   So he survived the first few days of taking

25  it.

PARRAN - CROSS

1                  MS. BOLEN:  Objection, nonresponsive.

2                  THE COURT:  Overruled.

3     BY MS. BOLEN

4     Q.    Now yesterday, you also talked about some laboratory

5     testing in connection with Mr. Farabee; is that correct?

6     A.    Yes.

7     Q.    And you reviewed the lab reports in connection with

8     this file; correct?

9     A.    Yes.

10    Q.    Dr. Parran, let me show you what's been marked for

11    identification as Defense Exhibit D8.  Did you see that as

12    one of the lab reports that you reviewed in connection with

13    this chart?

14    A.    Yes.

15                 MS. BOLEN:  Your Honor, we'd offer Defense

16    Exhibit D8.

17                 THE COURT:  Any objections?

18                 MR. MOLLOY:  No, sir.

19                 THE COURT:  D8 will be admitted and may be

20    published.

21                 (Defense Exhibit D8 admitted)

22    BY MS. BOLEN

23    Q.    In this case, Page 1 of Defense Exhibit D8 has the

24    name of a laboratory in the top left-hand corner; is that

25    correct?

1   A.      Yes.

2   Q.      Mr. Farabee's name is written down in connection with

3   the request for the laboratory test; correct?

4   A.      Yes, and he also signed it.

5   Q.      And in the document, there's a date here for date

6   collected, 7/31/09.  You see that?

7   A.      Yes.

8   Q.      Does that represent a date that urine was at least

9   purported to be collected from Mr. Farabee; correct?

10  A.      Yes.

11  Q.      And at this time, we know, based on your prior

12  testimony, that Mr. Farabee reported to Dr. Roggow that he

13  was using Tramadol; correct?

14  A.      Yes.

15  Q.      And you didn't find anything in this report

16  indicating in any way that Mr. Farabee was using any other

17  medication that wasn't reported to the doctor?

18  A.      I -- I didn't -- I didn't notice it and didn't note

19  it in my report.  I'd be happy to look at the report again

20  for you if you want me to.

21  Q.      Urine drug test results are good information to have

22  in connection with a patient record; correct?

23  A.      Absolutely.

24  Q.      You have to have the order; right?

25  A.      Right.

PARRAN - CROSS

1   Q.      List the medication the patient has at least reported

2   to the clinician?

3   A.      Yes.

4   Q.      And some of it may or may not be relevant to the

5   actual testing of the drugs; is that correct?

6   A.      Yes.

7   Q.      And in this case, we have one of these in

8   Mr. Farabee's record?

9   A.      Yes.

10  Q.      Let me show you what's been marked for identification

11  as Defense Exhibit D8 [SIC].  Does this purport to be an

12  additional drug test request and report in connection with

13  Mr. Farabee's chart?

14  A.      Yes, it is.

15  Q.      And is that something you reviewed in connection with

16  your testimony?

17  A.      Yes, I -- I reviewed this tox screen as well.

18          MS. BOLEN:  Your Honor, we'd offer Defense

19  Exhibit D9.

20          THE COURT:  Any objections?

21          MR. MOLLOY:  No, sir.

22          THE COURT:  D9 will be admitted and may be

23  published.

24          (Defense Exhibit D9 admitted)

25

PARRAN - CROSS

1    BY MS. BOLEN

2    Q.    Once again, Dr. Parran, we're dealing with the

3    laboratory, Ameritox; correct?

4    A.    Yes.

5    Q.    This one has a little bit different format than the

6    one we just looked at; correct?

7    A.    Yes.

8    Q.    And we have a date collected 10/18/2010; correct?

9    A.    Yes.

10   Q.    And Page 3 of Defense Exhibit D9, we have a result;

11   is that right?

12   A.    Yes.

13   Q.    And this one is coming from the laboratory; is that

14   correct?

15   A.    Yeah.  This is not one of those office tests.  This

16   is a laboratory test.

17   Q.    I think you testified yesterday that you had some

18   concern about something in this report as I believe related

19   to the Oxycodone; is that correct?

20   A.    Yes -- excuse me, yes.

21   Q.    You don't work as a consultant for Ameritox; do you?

22   A.    No, I do not.

23   Q.    You weren't involved in any of the creation of the

24   testing methods used in connection with their testing; were

25   you?

PARRAN - CROSS

1   A.      No.

2   Q.      Dr. Parran, let me show you what's been marked for

3   identification as Defense Exhibit D10.  Do you see that and

4   recognize that as a order from -- purporting to be from

5   Dr. Roggow in connection with Mr. Farabee's case?

6   A.      Yes.

7               MS. BOLEN:  Your Honor, we'd offer Defense

8   Exhibit D10.

9               THE COURT:  Any objections?

10              MR. MOLLOY:  No, sir.

11              THE COURT:  D10 will be admitted and may be

12  published.

13              (Defense Exhibit D10 admitted)

14  BY MS. BOLEN

15  Q.      I think we've talked about this, but in connection

16  with Mr. Farabee, perhaps not.  Liver enzyme testing is

17  important when individuals are taking medications with

18  Tylenol in it; correct?

19  A.      Yes.

20  Q.      And Defense Exhibit D10, can you describe what you

21  see in this particular exhibit for the jury, please?

22  A.      Yes.  So this is a prescription.  It's dated

23  October 18th, which is -- of 2010, the same date that that

24  toxicology screen we just looked at is dated, and it's for

25  liver enzymes and some of the liver enzymes that are listed

1   are AST, ALT, and alkaline phosphatase, and it also asks for
2   a BUN which is blood urea nitrogen, and creatinine which are
3   kidney function test.
4   Q.    What does all that mean?
5   A.    It's a check of the patient's liver enzymes and to be
6   sure his kidneys are functioning well.
7   Q.    Again, something you would do in the usual course of
8   practice if somebody's using something with Tylenol in it?
9   A.    Yes, you certainly -- certainly could do that to
10  check on the liver and kidney functions, absolutely, for
11  monitoring.
12  Q.    Something you would -- I'm sorry?
13  A.    For monitoring.
14  Q.    That's thing you expect in connection with the
15  ordinary course of professional medical practice; correct?
16  A.    Yes.
17  Q.    And in fact, Dr. Parran, you did see laboratory
18  records connected to liver enzyme testing in Mr. Farabee's
19  chart; is that correct?
20  A.    Yes.
21  Q.    Now, I want to zip forward to December 6th of 2010.
22  Do you recall your testimony yesterday about Mr. Farabee and
23  his relationship with Dr. Roggow at that time?
24  A.    Yes.
25  Q.    Dr. Parran, let me show you what's been marked for

PARRAN - CROSS

1    identification as Defense Exhibit D11, two-page exhibit.  Do
2    they purport -- those pages purport to be in connection with
3    Mr. Farabee's chart?
4    A.     Yes.
5    Q.     One's a progress note and something related to it on
6    an order?
7    A.     Yes.
8              MS. BOLEN:  We'd offer Defense Exhibit D11.
9              THE COURT:  Any objections?
10             MR. MOLLOY:  No, sir.
11             THE COURT:  D11 may be admitted and published.
12             (Defense Exhibit D11 admitted)
13   BY MS. BOLEN
14   Q.     In this situation, Dr. Parran, Page 2 of Defense
15   Exhibit D11 has a date of December 6th of 2010; is that
16   correct, sir?
17   A.     Yes.
18   Q.     And an order of an MRI; correct?
19   A.     MRI with and without contrast.
20   Q.     What does that mean?
21   A.     That means the MRI is given with a dye and without a
22   dye.
23   Q.     That's something that you would expect in connection
24   with somebody reporting back pain and problems with the
25   spine to a doctor; correct?

1    A.      Yes.

2    Q.      Now, MRIs are expensive; is that right, sir?

3    A.      They're very expensive.

4    Q.      And so the doctor can't order them every month; can

5    they?

6    A.      No, and -- no.

7    Q.      And they have to be ordered with care because it is

8    an issue of health care resources; correct?

9    A.      Absolutely.

10   Q.      So in this case, we've got an MRI.  And T1 through

11   S1, what does that mean?

12   A.      That means it's for the thoracic spine, sort of from

13   the base of the neck, all the way down through the tailbone.

14   Q.      Looking at the whole spine in a very specific way; is

15   that right?

16   A.      Yes.

17   Q.      And this shows on the right-hand side somebody has

18   written, looks like, appointment, 12/6 of '10.  Correct,

19   sir?

20   A.      Yes.

21   Q.      Did you see, from time to time in the files that you

22   reviewed, voided prescriptions?

23   A.      Yes.

24   Q.      And we talked yesterday about the issue of dictation.

25   Sometimes a doctor dictates a note and because of the timing

1   of it, it may not be in the chart; correct?

2   A.      Right.  A dictated note can sometimes take time to

3   come back to the chart.

4   Q.      So for example, if a doctor saw a patient on a

5   Friday, let's say December 17th of 2010 --

6   A.      Yes.

7   Q.      -- and a note was dictated --

8   A.      Yes.

9   Q.      -- you wouldn't expect to see that note in that chart

10  necessarily by December 20th of 2010?

11  A.      I'd expect the note from Friday to certainly be

12  available on Monday, but -- well, it should be in the office

13  by Monday, but you know, then with filing paperwork in an

14  office, that might take some time.  So I'd expect it to be

15  in the chart, you know, on Monday or Tuesday or 2000 -- of

16  that following week.

17  Q.      You said of the following week?

18  A.      Of that following week, yes.

19  Q.      That wouldn't be anything weird --

20  A.      No.

21  Q.      -- if it was a day or two after that; would it?

22  A.      No.

23  Q.      Especially around a holiday; correct?

24  A.      Well, I don't know.

25  Q.      Well, December 20th of any year is within four or

1    five days of the Christmas holiday; is that correct?

2    A.      Yes.

3    Q.      I'll show you what I've marked for identification as

4    Defense Exhibit D12.  Do you recognize these prescriptions

5    in connection with Mr. Farabee's case in or about December

6    of 2010?

7    A.      Yes.

8              MS. BOLEN:  Your Honor, we'd offer Defense

9    Exhibit D12.

10             THE COURT:  Any objections?

11             MR. MOLLOY:  I don't think I have an objection,

12   Your Honor, just trying to keep up.  I just need to take a

13   look at them.

14             THE COURT:  Sure.

15             (Pause in place)

16             MR. MOLLOY:  No objection.

17             THE COURT:  D12 will be admitted and may be

18   published.

19             (Defense Exhibit D12 admitted)

20             THE COURT:  Why don't you find a convenient place

21   for a recess.

22             MS. BOLEN:  Your Honor, I am at that -- right

23   after I publish these, I think I'm there.

24             THE COURT:  Okay.

25

1   BY MS. BOLEN

2   Q.      Defense Exhibit D12, Page 1 has a prescription

3   written to Mr. Farabee; is that correct?

4   A.      Yes.

5   Q.      Looks like it says December 16th of 2010 on the

6   initial date?

7   A.      Yes.

8   Q.      Then there's a date up on the top left of

9   December 17th of '10; correct?

10  A.      Yes.

11  Q.      And this big thing that is either a checkmark or a V;

12  is that correct?

13  A.      Yes.

14  Q.      And then Page 2 of that same exhibit, similar

15  information, prescription date December 16th; correct?

16  A.      Yes.

17  Q.      Date up on the top, 12/17 of '10; correct?

18  A.      Yes.

19  Q.      And some big check or V in the prescription area;

20  correct?

21  A.      Yes.

22              MR. MOLLOY:  I'm sorry, what was that number?

23              MS. FOX:  D12.

24              MR. MOLLOY:  Thank you.

25              THE COURT:  Ready?

PARRAN - CROSS

```
 1                    MS. BOLEN:  Yes, sir.
 2                    THE COURT:  Let's take 15 minutes of a morning
 3      recess.  Please do not discuss the case among yourselves or
 4      allow anyone to discuss it with you or in your presence.
 5      About 15 minutes.
 6                    COURT SECURITY OFFICER:  All rise.
 7                    (Jury out)
 8                    (Proceedings took place that are not included in
 9      this excerpt, after which, proceedings continued as
10      follows:)
11                    THE COURT:  Both sides ready for the jury?
12                    MR. MOLLOY:  Yes, sir.
13                    MS. BOLEN:  Yes, sir.
14                    THE COURT:  Have the jury step in, please.
15                    COURT SECURITY OFFICER:  Yes, sir.
16                    (Jury in)
17                    COURT SECURITY OFFICER:  Please be seated.
18                    THE COURT:  You may proceed.
19                    MS. BOLEN:  Yes, sir.  May I have the same free up
20      and back, sir?
21                    THE COURT:  Yes.
22                    MS. BOLEN:  Thank you.
23      BY MS. BOLEN
24      Q.    Dr. Parran, let me show you what I've marked for
25      identification as Defense Exhibit D13.  Do you see that as a
```

1  document in connection with Mr. Farabee's medical record?

2  A.     Yes.

3  Q.     Is that a document you reviewed or at least think you

4  might have seen in connection with your review of his chart?

5  A.     Yes.

6          MS. BOLEN:  Your Honor, we'd offer Defense

7  Exhibit D13.

8          THE COURT:  Any objections?

9          MR. MOLLOY:  No, sir.

10          THE COURT:  D13 will be admitted and may be

11  published.

12          (Defense Exhibit D13 admitted)

13  BY MS. BOLEN

14  Q.     Dr. Parran, Defense Exhibit D13 is, again, one of

15  those pain treatment agreements; correct?

16  A.     Yes.

17  Q.     And I's a two-page document with the last page having

18  at least the name Charles Farabee on there with some

19  information about a pharmacy and a telephone number;

20  correct, sir?

21  A.     Yes.

22  Q.     I'm going to switch gears a little bit here,

23  Dr. Parran.  In the course of your time, both in academics,

24  education, and to the extent that you practice, you've

25  encountered patients that have long family stories; would

PARRAN - CROSS

1    that be fair to say?

2    A.      Yes.

3    Q.      Patients that have difficult living situations;

4    correct?

5    A.      Very often, yes.

6    Q.      And your job as a doctor is to try to kind of dance

7    around, weed through all that, and figure out how to handle

8    it as you're trying to take care of them; correct?

9    A.      Yes.

10   Q.      And while you don't practice front line pain

11   management, would it be fair to say that a pain management

12   professional, an osteopathic physician, would be challenged

13   with the same type of care and development of a relationship

14   with a patient that had those circumstances?

15   A.      Yes.

16   Q.      Sorry about that lengthy question.  Now, you did talk

17   yesterday about a Ms. Lori Corrochano.  Do you recall your

18   testimony there, sir?

19   A.      Yes.

20   Q.      And you reviewed her chart; is that right?

21   A.      Yes.

22   Q.      And this chart had quite a few records in connection

23   with it; didn't it?

24   A.      Yes.

25   Q.      It's a voluminous file, in your opinion?

PARRAN - CROSS

1   A.      Yes.

2   Q.      Meaning that there are at least -- and I think you

3   found, sir, that there was an extended relationship between

4   Ms. Corrochano and Dr. Roggow; is that fair to say?

5   A.      Yes.

6   Q.      Went over a span of many, many years; correct?

7   A.      Yes.

8   Q.      And in your review of Dr. Roggow's records relating

9   to Ms. Corrochano, you found, sir, that there were numerous

10  items of a personal nature mentioned in the progress notes;

11  correct?

12  A.      Yes.

13  Q.      Information about Ms. Corrochano's family life;

14  correct?

15  A.      Yes.

16  Q.      Information about pains and trials and tribulations;

17  correct, sir?

18  A.      Yes.

19  Q.      And that's not uncommon to have an extended

20  relationship with a patient; correct?

21  A.      Yes.

22  Q.      And it would be a mark of a good physician to get to

23  know some individual details about an individual patient;

24  correct?

25  A.      It's important for all physicians to know individual

PARRAN - CROSS

1    details about their patients.

2    Q.    That's part of establishing a trust and a valid

3    physician/patient relationship; correct?

4    A.    Yes.

5    Q.    Now, in your review of Ms. Corrochano's chart, and I

6    believe your testimony yesterday, you talked about an

7    initial office visit that went back some time to September

8    of '96.  Do you recall that testimony, sir?

9    A.    Yes.

10   Q.    And from time to time when patients come and see

11   physicians, they're asked to fill out forms and give

12   information to the physician; correct?

13   A.    Yes.

14   Q.    So they fill out whatever is being asked of them,

15   hopefully?

16   A.    Yes.

17   Q.    And then that is, you know, purportedly reviewed by

18   the physician; correct?

19   A.    Yes.

20   Q.    You, sir, would take a form filled out by a patient

21   and review it before you sat down to talk with that patient;

22   correct?

23   A.    Yes.

24   Q.    Or one of your staff members may summarize it;

25   correct?

PARRAN - CROSS

```
 1   A.      Yes.
 2   Q.      Let me show you what's been marked for identification
 3   as Defense Exhibit F1 [SIC].  It is a three-page document.
 4   Does this purport to be a medical record in connection with
 5   Ms. Corrochano's file?
 6   A.      Yes.
 7   Q.      And is it, in fact, dated in the very early part of
 8   her relationship with Dr. Roggow?
 9   A.      Yes, September of 1996.
10           MS. BOLEN:  Your Honor, we'd offer Defense
11   Exhibit E1.
12           THE COURT:  Any objections?
13           MR. MOLLOY:  No objection.
14           THE COURT:  F1 will be admitted and may be
15   published.
16           MS. BOLEN:  E, Your Honor.  I may have said F by
17   mistake.
18           THE COURT:  I'm sorry?
19           MS. BOLEN:  E, as in elephant.
20           THE COURT:  E1, I'm sorry.
21           (Defense Exhibit E1 admitted)
22   BY MS. BOLEN
23   Q.      Now, you recall your testimony yesterday, Dr. Parran,
24   that you had some issues with Ms -- Dr. Roggow's prescribing
25   of controlled medications to Ms. Corrochano?
```

1    A.      Yes.

2    Q.      And you were concerned about the combination of

3    controlled medication called Hydrocodone and a medication

4    called Soma or Carisoprodol?

5    A.      I'm concerned about Soma in general as a barbiturate

6    type medication.  And the combination I don't endorse, you

7    know, but they're both on the market and they're legal to be

8    prescribed.

9    Q.      And they are used in connection with pain management;

10   are they not, sir?

11   A.      Yes, they are.

12   Q.      And back in 1996, you're aware that Carisoprodol or

13   Soma was not a scheduled substance at the time; correct?

14   A.      Yes.  It only became a scheduled substance in the

15   last year.

16   Q.      Very recent?

17   A.      After all of the cases I reviewed in this case.

18   Q.      You recall testifying yesterday that it was -- your

19   concern was Dr. Roggow placing this particular patient onto

20   these medications; correct?

21   A.      My -- yes.  Certainly, my concern regarding

22   Dr. Roggow in this patient involved issues of early

23   prescription refills and increasing doses over time.

24   Q.      Yesterday, you told us that part of the concern was

25   that Dr. Roggow initially put this particular patient on the

PARRAN - CROSS

1    medications of Lorcet and Soma.  Do you recall that?

2    A.     I don't believe I specifically said anything about

3    initially putting her on Lorcet.  I believe the first time I

4    mentioned the Lorcet was related to a January 15th, 1998,

5    note that says we're closely monitoring Lorcet for overuse.

6           MS. BOLEN:  I have permission to publish E1; do I

7    not, Your Honor?

8           THE COURT:  You do.

9    BY MS. BOLEN

10   Q.     Let me show you what's been admitted as Defense

11   Exhibit E1, third page of that document.  Let me just back

12   up.  Let's show you Page 1.  This looks like some

13   information that would be gathered from the patient by a

14   doctor in connection with a visit; correct?

15   A.     Yes.

16   Q.     And in this case, it relates to Lori Corrochano;

17   correct?

18   A.     Yes.

19   Q.     Dated 9/15 of '96?

20   A.     Yes.

21   Q.     And she gives some information about herself,

22   actually names a referring physician?

23   A.     Yes.

24   Q.     When physicians refer, that means that they are

25   sending a patient to a particular doctor; correct?

PARRAN - CROSS

```
1   A.      Right.
2   Q.      Usually done when somebody knows somebody who has a
3   certain type of practice in a community or a specialty;
4   correct?
5   A.      Yes.
6   Q.      Not an uncommon thing at all?
7   A.      No.
8   Q.      And in this case, the patient is giving information
9   to Dr. Roggow, talking about her complaint and why she's
10  coming in for this day; correct?
11  A.      Yes.
12  Q.      Gathering a little information on the history?
13  A.      Yes.
14  Q.      Looking at her past surgical history; correct?
15  A.      Yes, that's further down.  It's off the screen, but
16  yes.
17  Q.      All right.  And then on the second page of that, we
18  get some additional information from the patient; correct?
19  A.      Yes.
20  Q.      And we have her job and, you know, she doesn't have
21  any working restrictions, just more personal information;
22  correct?
23  A.      Yes.
24  Q.      And we have an indication here that this person at
25  least says something about massage therapy three times a
```

1    week if possible; correct?

2    A.      Right.

3    Q.      Looks like waiting for the doctor to write a

4    prescription, if you look at the right-hand side there?

5    A.      Yes.

6    Q.      Now the third page, we have some information about

7    medications tried in the upper left-hand corner?

8    A.      Yes.

9    Q.      And you see two drugs listed there.  What are they,

10   sir?

11   A.      Listed as helpful, Lorcet and Soma.

12   Q.      So this is the patient coming in and telling the

13   doctor about her herself, why she's here, and some

14   medications she'd tried that have relieved her pain

15   condition; correct?

16   A.      Yes.

17   Q.      Nothing unusual about that; is there, sir?

18   A.      No.

19   Q.      Let me show you what's been marked for identification

20   as Defense Exhibit E2.  Is this another note in connection

21   with Lori Corrochano's file?

22   A.      Yes.

23   Q.      Is that something you reviewed in connection with

24   your report and work on this case?

25   A.      Yes.  It's a progress note from May 10th of 1999.

1          MS. BOLEN:  Your Honor, we'd offer Defense

2    Exhibit E2.

3          THE COURT:  Any objections?

4          MR. MOLLOY:  No, sir.

5          THE COURT:  E2 will be admitted and may be

6    published.

7          (Defense Exhibit E2 admitted)

8    BY MS. BOLEN

9    Q.    In this case, Dr. Parran, Defense Exhibit E2 is a

10   four-page exhibit with what seems to be quite a bit of

11   information on it; is that correct?

12   A.    Yes.

13   Q.    Looking at the front part of this, we have a May 10,

14   '99, date; correct?

15   A.    Yes.

16   Q.    And we look, known information about an accident in

17   March of 1999; correct?

18   A.    Yes.

19   Q.    And by this time, at least, given the records that

20   you reviewed, Ms. Corrochano had been under Dr. Roggow's

21   care, or at least in that medical practice, for, you know,

22   close to three years; would that be a fair statement?

23   A.    Yes.

24   Q.    And in this case, she's talking about a work-related

25   injury; correct?

1    A.      Yes.

2    Q.      Kind of repeating some of the information that we

3    already have in the chart, but this is commonly done to

4    reorient the doctor to the patient's situation; correct?

5    A.      Yes.

6    Q.      We have a listing of the medication; correct?

7    A.      Yes.

8    Q.      We have Lorcet alternating with Norco; is that

9    correct?

10   A.      Yes.

11   Q.      We have Soma listed there as well; right?

12   A.      Yes.

13   Q.      Now, when you go and have a patient come into your

14   office, you know, you start watching them from the minute

15   that they come into your practice; is that correct?  When

16   they come in to see you?

17   A.      Right, from observation of the patient from the time

18   that they -- that you can see them is all part of

19   information gathering.

20   Q.      That's really important in connection with any care

21   given to a patient; correct?

22   A.      Yes.

23   Q.      You want to look at the person to see how they're

24   walking; correct?

25   A.      Yes.

PARRAN - CROSS

1    Q.    Whether or not they look tired or alert; correct?

2    A.    Yes.

3    Q.    Whether or not they're acting out of a usual way

4    they've been before you before; correct?

5    A.    Yes.

6    Q.    You want to follow that history with the patient all

7    the way through; correct?

8    A.    You continue to observe them throughout the office

9    visit, yes.

10   Q.    And observations of a patient are kind of a different

11   form of an examination, but they still are integral to the

12   ongoing care; correct?

13   A.    They're actually part of the physical exam.

14   Q.    That's how it's listed and how it's trained when you

15   teach residents and fellows; correct?

16   A.    Yes.

17   Q.    It's very important; right?

18   A.    Observation of the patient is part of the physical

19   exam.

20   Q.    And then you're supposed to write that down and keep

21   track of it and if you see something that concerns you, you

22   make a change; correct?

23   A.    Well, you would note something that was different,

24   yes.

25   Q.    But you're under no obligation to make a change,

1   necessarily, if something is different; would that be fair

2   to say?

3   A.     Make a change in what?

4   Q.     Well, let's say you have a patient come in and you

5   see that they're alert and you've been treating them with

6   controlled medications and you write that down.  You're

7   under no obligation to do anything just because you see that

8   patient is alert; are you?  That's a good thing; right?

9   A.     Yes.

10  Q.     All right.  On the other hand, if you see a patient

11  that's tired and they're on the same regimen of medications

12  and you write that down, that still doesn't cause you to

13  have to make a change, necessarily, in their treatment plan;

14  correct?

15  A.     Correct.

16  Q.     That's up to the physician and the discretion;

17  correct?

18  A.     Within patient safety, yes.

19  Q.     But also within that physician's experience with the

20  patient, and everything that that physician knows about the

21  patient, walking forward in a relationship; correct?

22  A.     Yes.

23  Q.     And in this case, we go on and we get more

24  information and we actually have part of the physical exam

25  where it says she's alert and oriented.  Do you see that

1    there?

2    A.     Yes.

3    Q.     And you see a comment that she presents with her

4    usual demeanor of being tense and hyperverbal; correct?

5    A.     Yes.

6    Q.     Hyperverbal means somebody talks a lot, kind of like

7    a lawyer?

8    A.     Yes.

9    Q.     All right.  But you've encountered patients that have

10   done that; have you not, sir?

11   A.     Yes.

12   Q.     And in this situation, Dr. Roggow writes that down,

13   which is a good thing; right?

14   A.     Yes.

15   Q.     Part of the normal practice of medicine; correct?

16   A.     Yes.

17   Q.     She goes through following up this patient after a

18   motor vehicle accident and performs an extensive physical

19   examination.  It goes from Page 2 where it starts here;

20   correct?

21   A.     Yes.

22   Q.     And then on into Page 3, all the way to neurological;

23   correct?

24   A.     Yeah, except that you misspoke.  This was not a motor

25   vehicle accident.  This was a slip and fall at work.  This

PARRAN - CROSS

1   was a work-related injury from a fall, but it was an

2   accident.

3   Q.    There was an accident but she has a history of motor

4   vehicle accident, too; didn't she?

5   A.    Yes.

6   Q.    So the documentation is the best information about

7   the patient's history; right?

8   A.    Yeah, the documentation talks about her work-related

9   accident and fall.

10  Q.    All righty.  And then on Page 4 of Defense

11  Exhibit E2, we have recommendations, and then Dr. Roggow's

12  information at the bottom of that; do you see that?

13  A.    Yes.

14  Q.    And you also see an indication here on the bottom

15  relating to Workers' Compensation; is that right?

16  A.    Yes.

17  Q.    That's not uncommon when somebody has an accident at

18  work; is it, sir?

19  A.    No.

20  Q.    To involve Workers' Comp?

21  A.    It's very typical.

22  Q.    Let me show you what's been marked for identification

23  as defendants Exhibit E3 and ask if you recognize this as a

24  document in connection with Lori Corrochano's file?

25  A.    Yes.

1    Q.      And that, in fact, sir, is one of the diagnostic

2    workups that you have previously testified about that

3    appeared in many of these charts?

4    A.      Yes.

5         MS. BOLEN:   Your Honor, we'd offer Defendant's

6    Exhibit E3.

7         THE COURT:   Any objections?

8         MR. MOLLOY:   No, sir.

9         THE COURT:   E3 will be admitted and may be

10   published.

11        (Defense Exhibit E3 admitted)

12   BY MS. BOLEN

13   Q.      And just very briefly here, Dr. Parran, tell the jury

14   what this piece of paper is.

15   A.      This is a neurologic study which measures the -- the

16   way that the nerves are working in the -- in the ulnar and

17   median nerves in the arms.

18   Q.      So we've got on the bottom of this something that's

19   called a conclusion, nerve conduction study, and it says

20   normal; right?

21   A.      Nerve conduction study is normal and the EMG is

22   consistent with what's called a cervical radiculopathy,

23   which means a pinched -- pinched nerve in the neck, in the

24   cervical spine that radiates down into the arm.

25   Q.      Tell us what an EMG is.  What do those letters stand

PARRAN - CROSS

1    for?

2    A.      Electromyogram.

3    Q.      What is that process, do you know?

4    A.      Electromyogram involves shocking different muscles in

5    the arm and seeing how the transition is in terms of -- of

6    the nerve roots supplying the arm muscles.

7    Q.      And that would be important information to gather in

8    connection with somebody that has pain or is complaining of

9    pain in connection with her neck and perhaps down their arm

10   and shoulders?

11   A.      Yes.

12   Q.      And the actual way this thing is done, they stick

13   needles in the person in the particular area or somewhere on

14   their body to get the information about the particular

15   complaint; correct?

16   A.      Yes.  This is a painful study.

17   Q.      These studies are used in medical practice in the

18   usual course of medical practice; correct, sir?

19   A.      Yes.

20   Q.      Yesterday you recall testifying about

21   Ms. Corrochano's incident with her ankle?

22   A.      Yes.

23   Q.      And in fact, we talked about some hardware that she

24   had; is that correct?

25   A.      Yes.

PARRAN - CROSS

1   Q.      Let me show you what's been marked for identification

2   as Defendant's Exhibit D3 -- excuse me, E3 --

3           THE COURT:  4.

4           MS. BOLEN:  4.  Sorry.

5   A.      Yes.

6   BY MS. BOLEN

7   Q.      This is a document in connection with Corrochano's

8   care with Dr. Roggow; correct?

9   A.      Yes.

10          MS. BOLEN:  Your Honor, we'd offer Defense

11  Exhibit E4.

12          THE COURT:  Any objections?

13          MR. MOLLOY:  No, sir.

14          THE COURT:  E4 will be admitted and may be

15  published.

16          (Defense Exhibit E4 admitted)

17  BY MS. BOLEN

18  Q.      This is a progress note, Dr. Parran, dated 2/24/00;

19  correct?

20  A.      Yes.

21  Q.      And in this case, we have Dr. Roggow; correct?

22  A.      Yes.

23  Q.      Talking to the patient about her pain complaints;

24  correct?

25  A.      Yes.

1   Q.      And in the second paragraph, we have a reference to

2   this painful right foot and then a comment there.  What does

3   that comment say, right where my pen is, where it starts

4   with "there"?

5   A.      It says Lori continues to have painful right foot and

6   there is a prominence of the hardware that is readily

7   visible.  She has surgery anticipated in March.

8   Q.      And I think, as we've sort of already covered, that

9   the fact that hardware is in a person's foot and it's

10  starting to -- or bone, starting to poke out, that can be

11  very painful; can it not, sir?

12  A.      Well, a lot of people have hardware after they've had

13  orthopedic surgery.  Sometimes it's painful; often times

14  it's not.

15  Q.      Depends on the individual; correct?

16  A.      Well, depends on the individual and it -- but the

17  fact that you can see where the hardware is in an ankle

18  where there isn't muscle around it, I mean, you always see

19  where hardware is as a prominence in the ankle when a person

20  has -- had metal plates in their ankle.

21  Q.      You don't have any metal plates in your ankle; do

22  you, sir?

23  A.      No, I do not.

24  Q.      Let me show you what's been marked for identification

25  as Defense Exhibit E5.  Do you recognize that as another

1    note in connection with Ms. Corrochano's file?

2    A.      Yes.

3    Q.      This is within the time frame of the documents you

4    reviewed; correct?

5    A.      January 2nd, 2003, yes.

6              MS. BOLEN:  We offer Defense Exhibit E5.

7              MR. MOLLOY:  No objection.

8              THE COURT:  E5 will be admitted and may be

9    published.

10             (Defense Exhibit E5 admitted)

11   BY MS. BOLEN

12   Q.      In this case, we -- Dr. Parran, we have another

13   office visit.  This one dated 1/2 of '03; correct?

14   A.      Yes.

15   Q.      And here we have Lori Corrochano returning after

16   having fractured her left humerus; is that right?

17   A.      Yes.

18   Q.      And she's complaining of pain; correct?

19   A.      Absolutely, yes.

20   Q.      A fractured humerus is what part of the body?

21   A.      The humerus is here (indicating).

22   Q.      That would hurt?

23   A.      It's a very painful long bone of the body, yes.

24   Q.      She also appears, based on the note there, sir, to

25   have a bruise over her eye; is that correct?  The line where

PARRAN - CROSS

1   I'm pointing?

2   A.      Healing wound over her left eye with sutures.

3   Q.      Sutures meaning stitches?

4   A.      Yes.

5   Q.      Would stitches tend to do a little bit of bruising?

6   A.      You usually get the bruising from the fall and the

7   thing that causes the laceration, so the stitches don't

8   cause the bruise.

9   Q.      Okay, but it would be visible if it was a recent

10  injury; correct, sir?

11  A.      Yes, yes.

12  Q.      Show you what's been marked for identification as

13  Defense Exhibit E6.  It's another progress note in

14  connection with Ms. Corrochano; correct?

15  A.      Yes, it is.

16  Q.      This is, again, part of the documentation you

17  reviewed in connection with your involvement in this case;

18  correct?

19  A.      Yes.

20          MS. BOLEN:  We'd offer Defense Exhibit E6, please.

21          THE COURT:  Any objections?

22          MR. MOLLOY:  No, sir.

23          THE COURT:  E6 will be admitted and may be

24  published.

25          (Defense Exhibit E6 admitted)

1    BY MS. BOLEN

2    Q.      In this particular instance, Dr. Parran, we have the

3    patient coming back again to Dr. Roggow; correct?

4    A.      Yes.

5    Q.      Making some complaints about pain in parts of her

6    body, particularly to the upper part of her body, her

7    shoulders and her neck; correct?

8    A.      Yes.

9    Q.      And this indication here is where the patient is

10   telling the doctor that she's using ice and heat, but mostly

11   ice to address pain and inflammation; correct?

12   A.      Yes.

13   Q.      And then under current medications, we have an

14   instance of Celabrex; is that right?

15   A.      It's an anti-inflammatory, yes.

16   Q.      And then things called Lidoderm patches.  Tell us

17   what those are.

18   A.      Those are some of those skin patches that have

19   Novocaine in them or Lidocaine in them and that sort of numb

20   up the skin and help deaden the sensation of pain from that

21   area.

22   Q.      And then we have the rest of her medications that are

23   involved in this chart; is that correct?

24   A.      Yes.

25   Q.      And again, this is part of the usual course of

1    professional practice, to write this information down and

2    follow it through with the patient; correct?

3    A.    Yes.

4    Q.    Show you what's been marked for identification as

5    Defense Exhibit E7 and ask, again, if this is a progress

6    note in connection with Ms. Corrochano's file?

7    A.    Yes, it is.

8    Q.    And again, this is part of what you reviewed in

9    connection with your work on this case; correct, sir?

10   A.    Yes.

11         MS. BOLEN:  Your Honor, we'd offer Defense

12   Exhibit E7.

13         THE COURT:  Any objections?

14         MR. MOLLOY:  No, sir.

15         THE COURT:  E7 will be admitted and may be

16   published.

17         (Defense Exhibit E7 admitted)

18   BY MS. BOLEN

19   Q.    In this case, Dr. Parran, there's information that

20   Dr. Roggow got -- gathered from the patient in connection

21   with her personal life; would that be a fair statement?

22   A.    Yes.

23   Q.    And in this particular situation, we have the patient

24   coming in as represented by the record, accompanied by her

25   husband; is that correct?

PARRAN - CROSS

1    A.      Yes.

2    Q.      We have information that Ms. Corrochano suffered the

3    loss of her son who died in a motor vehicle accident; is

4    that right?

5    A.      Yes.

6    Q.      That's part of that information gathering and

7    relevant to the relationship the doctor accomplishes with

8    the patient; correct?

9    A.      Yes.

10   Q.      Important to know these things because they can

11   impact various aspects of the patient's life?

12   A.      Certainly.

13   Q.      Would it be fair to say that an individual who's lost

14   a child would certainly be under some anxiety, possibly even

15   depressed in connection with that loss?

16   A.      Very typically.

17   Q.      Not unusual to prescribe a Benzodiazepine or perhaps

18   even another type of medicine to both help with the

19   depression and just kind of help calm the nerves associated

20   with that?

21   A.      Certainly not uncommon.

22   Q.      Very traumatic component in patients' lives, as

23   you've experienced; correct?

24   A.      Absolutely.

25   Q.      Do you see down here on the bottom of the page where

1    it says "plan"?

2    A.      Yes.

3    Q.      See where it says "counseling provided"?

4    A.      Yes.

5    Q.      Sometimes when you counsel a patient, there's a lot

6    of dialogue that goes on; would that be a fair statement?

7    A.      Absolutely.

8    Q.      It's hard to capture the reality of that unless

9    you're sitting there in the room and you've got it recorded;

10   correct?

11   A.      Yes.

12   Q.      These can be very intense situations with patients;

13   right?

14   A.      Yes.

15   Q.      And you try to at least capture some of it?

16   Sometimes you write down counseling is provided?

17   A.      Yes.

18   Q.      And it's not unusual to do that; right?

19   A.      No.

20   Q.      In fact, it's a trigger to the physician if the

21   physician had to come back and look at that record, and then

22   can kind of orient to what was going on in the patient's

23   life then; correct?

24   A.      Yes.

25   Q.      Let me show you what's been marked for

PARRAN - CROSS

1   identification, Dr. Parran, as Defense Exhibit E8.  Again,

2   is this an office note in connection with Ms. Corrochano's

3   file?

4   A.    Yes.

5   Q.    Part of the ongoing continuum of Ms. Corrochano's

6   care with Dr. Roggow, please?

7   A.    Yes.

8          MS. BOLEN:  Your Honor, we offer Defense

9   Exhibit E8.

10          THE COURT:  Any objections?

11          MR. MOLLOY:  No, sir.

12          THE COURT:  E8 will be admitted and may be

13   published.

14          (Defense Exhibit E8 admitted)

15   BY MS. BOLEN

16   Q.    And here we have a office visit dated 6/6 of '03; is

17   that correct?

18   A.    Yes.

19   Q.    Similar format to everything we've been looking at in

20   this case; fair statement?

21   A.    Yes.

22   Q.    Just information typed on a page and in this case,

23   with Dr. Roggow's signature; correct?

24   A.    Yes.

25   Q.    And we have her tracking the weight of the patient,

1    fair statement?

2    A.     Yes.  This is one where the patient had fallen -- yet

3    fallen again, sprained herself again, tracked her weight.

4    Q.     And then we have a plan at the bottom; is that right?

5    A.     Yes.

6    Q.     You see where it says continue present medication

7    regimen as there have been no oversedation or untoward

8    events; right?

9    A.     Yes.

10   Q.     That's an observation the doctor's making in the

11   examining room with the patient; correct?

12   A.     That's an assessment that the doctor has made, yeah,

13   based on that office visit, yes.

14   Q.     It's an assessment the doctor makes when they are

15   present with the patient; correct, sir?

16   A.     Yes.

17   Q.     Let me show you, Dr. Parran, Defense Exhibit E9 for

18   identification.  Is this another office note in connection

19   with Ms. Corrochano's file?

20   A.     Yes, it is.

21   Q.     And this, in fact, was one of the office notes that

22   had you a little bit concerned; is that correct, sir?

23   A.     Yes, it was.

24          MS. BOLEN:  Your Honor, we'd offer Defense

25   Exhibit E9.

1          THE COURT:  Any objection?

2          MR. MOLLOY:  No, sir.

3          THE COURT:  E9 will be admitted and may be

4     published.

5          (Defense Exhibit E9 admitted)

6     BY MS. BOLEN

7     Q.    In this case, this is the office visit that is

8     connected with the concern you raised yesterday about the

9     patient's daughter and the patient with depression and

10    suicidal -- at least information as brought forth by the

11    daughter; correct?

12    A.    Yes.

13    Q.    And with regard to Defense Exhibit E9, we see the

14    date of this visit, 9/9/05; correct?

15    A.    Yes.

16    Q.    And this is a live visit between Dr. Roggow and the

17    patient, Lori Corrochano; correct?

18    A.    Yes.

19    Q.    And the first part of it, reason for visit, you see

20    where it says Lori is brought back to the office as her

21    daughter called stating that her mother was acting

22    strangely?

23    A.    Yes.

24    Q.    That's something that a doctor does when they get a

25    phone call from a family member?  They would have to respond

1    to that phone call; is that correct?

2    A.    Yes.

3    Q.    All right.  So in this case, Dr. Roggow actually

4    said, the patient needs to come in and see her, we need to

5    find out what's going on; right?

6    A.    Yes.

7    Q.    And that's something that a good doctor does with the

8    patient when this information comes in; correct?

9    A.    Would be expected of any doctor, given -- given this

10   report by a daughter.

11   Q.    Certainly something you would do; right, sir?

12   A.    I actually probably would have had the daughter call

13   911 and have the patient evaluated in the medical emergency

14   room and psychiatric emergency room immediately.

15   Q.    This is not a patient you encountered or had worked

16   with for several years; is that a fair statement?

17   A.    That certainly is.

18   Q.    And being there helps you evaluate the patient much

19   better than simply reading and looking backwards; correct,

20   sir?

21   A.    I told you what I would have done because you asked

22   me.

23   Q.    All right.  Now, you did just say that you would have

24   had her evaluated psychiatrically; is that correct?

25   A.    Medically and psychiatrically if the family said she

1    had an altered mental status and was talking about suicide.

2    Q.    You're not familiar with the addiction psychiatrists

3    in the Fort Myers area; are you, sir?

4    A.    No, I'm not.

5    Q.    But you are familiar with the standards set by the

6    federal government in connection with mental health and

7    substance abuse records; is that correct, sir?

8    A.    Yes.

9    Q.    They have a higher level of privacy associated with

10   that information; correct?

11   A.    Yes.

12   Q.    And sometimes when you have a patient that is in that

13   situation where they're involved in addiction psychiatry or,

14   you know, substance abuse treatment, when you see them in

15   your practice for internal medicine, you don't go writing

16   all the kind of stuff that they're getting treated for in

17   your records; do you?

18   A.    You actually can, as long as you are not holding

19   yourself forth as an addiction specialist providing

20   addiction treatment or as a mental health specialist

21   providing mental health treatment.  So primary care doctors,

22   or this kind of a physician certainly is permitted to put

23   information -- that sort of information in the chart.

24   Q.    You make reference to it; don't you?

25   A.    That information is able to be put in the chart.

1   Q.      And you don't know whether or not that's different

2   from state to state in terms of the additional level of

3   security that an individual state might require of these

4   records?

5   A.      This is a -- this is a federal requirement and I'm

6   not aware of any -- I'm not aware of any state requirements

7   that supersede the federal requirement regarding mental

8   health, addiction, or HIV information.

9   Q.      Would it be fair to say that a state could take the

10  federal rule and make it stricter but they couldn't be more

11  liberal, to your understanding?

12  A.      To my understanding, that's the case.

13  Q.      Show you what's been marked for identification as

14  Defense Exhibit E10 and ask if this is another note in

15  association with Ms. Corrochano's file that you've reviewed

16  in your work on this case?

17  A.      Yes, it is.

18          MS. BOLEN:  Your Honor, we'd offer Defense

19  Exhibit E10.

20          THE COURT:  Any objection?

21          MR. MOLLOY:  No, sir.

22          THE COURT:  E10 will be admitted and may be

23  published.

24          (Defense Exhibit E10 admitted)

25

PARRAN - CROSS

```
 1   BY MS. BOLEN
 2   Q.     Here we have, Dr. Parran, another office visit;
 3   correct?
 4   A.     Yes.
 5   Q.     Lori Corrochano and Dr. Roggow, but this one says --
 6   looks to be dictated and you can't see the rest, but --
 7   A.     Yes.
 8   Q.     Dictated not read is what we've been seeing when that
 9   document is not signed; correct, sir?
10   A.     Yes.
11   Q.     And here we have a periodic review which is something
12   the doctor's required to do; correct?
13   A.     Yes.
14   Q.     And we have a report.  This date is after the concern
15   issue with -- raised by Ms. Corrochano's daughter; correct?
16   A.     Yes.
17   Q.     So it's a follow-up, at least in time, to that
18   particular incident; correct?
19   A.     Yes, it's about four or five months later.
20   Q.     Okay.  And here in the paragraph labeled discussion,
21   you see where it says Lori has consulted with Dr. Ray
22   Johnson and weaned herself down successfully off of
23   medication?
24   A.     Yes.
25   Q.     You don't know what kind of doctor Dr. Ray Johnson
```

1   is; do you, sir?

2   A.      No, it doesn't say.

3         MS. BOLEN:  Your Honor, I'm almost -- I've got

4   probably another 10 exhibits to do and I don't know the

5   Court's pleasure on the lunch area.  I'm not sure what time

6   it is.  Now I know, 12:05.

7         THE COURT:  Are you getting hungry?  All right, I

8   assume this is a convenient place for a recess?

9         MS. BOLEN:  Yes, sir.

10        THE COURT:  Let's take an hour for lunch.  Please

11   do not discuss the case among yourselves or allow anyone to

12   discuss it with you or in your presence.  1:10.

13        COURT SECURITY OFFICER:  All rise.

14        (Jury out)

15        THE COURT:  We'll be in recess until 1:10.

16        (Recess from 12:05 p.m. to 1:14 p.m.)

17        THE COURT:  Both sides ready for the jury?

18        MR. MOLLOY:  Yes, sir.

19        MS. BOLEN:  Yes, Your Honor.

20        THE COURT:  Have the jury step in, please.

21        COURT SECURITY OFFICER:  Yes, sir.

22        (Jury in)

23        COURT SECURITY OFFICER:  Please be seated.

24        THE COURT:  You may proceed.

25        MS. BOLEN:  Thank you, Your Honor.

1    BY MS. BOLEN

2    Q.      Dr. Parran, before our break, we were looking at Lori

3    Corrochano's records and I want to continue with a few more

4    questions.

5    A.      Okay.

6            MS. BOLEN:  Your Honor, may I approach the

7    witness?

8            THE COURT:  Yes.

9            MS. BOLEN:  May I do so freely?

10           THE COURT:  Yes.

11           MS. BOLEN:  And these have already been shown to

12   Government counsel, Your Honor.

13   BY MS. BOLEN

14   Q.      Show you two documents marked for identification,

15   Defense Exhibit Number 12 and Defense Exhibit Number 13.  Do

16   you see these items?

17   A.      Yes.

18   Q.      And they relate to Lori Corrochano's file; is that

19   correct?

20   A.      Yes.

21   Q.      These are part of the documents you reviewed in

22   connection with your case work; right?

23   A.      Yes.

24           MS. BOLEN:  Your Honor, we offer Defense

25   Exhibit E12 and E13.

1           THE COURT:  Any objections?

2           MR. MOLLOY:  No objection.

3           THE COURT:  E12 and E13 will be admitted and may

4    be published.

5           (Defense Exhibits E12 and E13 admitted)

6    BY MS. BOLEN

7    Q.      Dr. Parran, with regard to Defense Exhibit E12, what

8    are we looking at here?

9    A.      This is entitled a Controlled Substance Contract.

10   Q.      And we have a date on it of 5/9/97; is that correct?

11   A.      Yes.

12   Q.      In what purports to be Lori Corrochano's file;

13   correct?

14   A.      Yes.

15   Q.      And second exhibit, Defense Exhibit E13, similar;

16   correct?

17   A.      Yes.

18   Q.      Different heading, Pain Treatment Agreement?

19   A.      Yes.

20   Q.      Would it be fair to say that over time, in connection

21   with these treatment agreements and things called contracts,

22   the language has changed over a number of years; is that

23   correct?

24   A.      They certainly have.

25   Q.      And that's just part of the evolution of pain

1    management and the world associated with a patient's using

2    controlled medications chronically; correct?

3    A.     Yes.

4    Q.     And on Page 12, Exhibit E13, we have a date of

5    6/28/08; correct?

6    A.     Yes.

7    Q.     And again, a written signature stating Lori

8    Corrochano; correct?

9    A.     Yes.

10   Q.     Now, yesterday I believe we had some testimony from

11   you relating to hospital visits of Ms. Corrochano during the

12   course of the treatment time period with Dr. Roggow;

13   correct?

14   A.     I'm trying to remember whether I talked about Lori

15   Corrochano's hospital visits or not.  I don't believe I did.

16   I know -- I know I talked about hospital visits of -- oh,

17   gosh, what's the other gal's name, Susan Helton.

18   Q.     All right.  Well, we'll get there in a minute.  Let's

19   focus on Ms. Corrochano for now.  Let me show you what's

20   been marked for identification as Defense Exhibit E14.

21   Would you just take a moment and look at that, sir?

22   A.     Yes.

23   Q.     Do you recall independently looking at any of the

24   hospital records in the file related to Ms. Corrochano?

25   A.     I didn't write anything down in my note, but if they

1  were in the -- if the hospital records were in the clinic

2  record, I'm sure I looked through them.

3  Q.    Was it your understanding, sir, that when you were

4  first engaged in this case that the Government was going to

5  send you some medical records related to the patients you

6  were going to review; correct?

7  A.    Yes.

8  Q.    And would it be a fair statement that the normal

9  process would be to take the medical file that the

10  Government had in its possession and just simply make copies

11  and send them to you; correct?

12  A.    Either they make copies and send them to me, or they

13  scan them, or sometimes they send the files, themselves.

14  Q.    And the truth is, you didn't get anything that looks

15  like these charts I'm holding up in my hand; did you?

16  A.    I honestly don't remember with this case.  This case

17  may have been -- it's -- well, let me go back.  It's very

18  rare for me to actually receive the medical -- the actual

19  medical records, themselves, from a prosecution team.  I --

20  Q.    You mean -- go ahead.

21  A.    I think it's only happened three times in 15 or 18

22  years that I've reviewed files.  Typically, I receive either

23  on a disk or a xerox copy of the file.  In preparation for

24  coming down here, I looked for disks or copies which would

25  be in my office.  I was unable to find those so we'd have to

PARRAN - CROSS

1    actually ask the prosecution team whether they actually sent

2    the files or -- themselves, and I went through those actual

3    medical records, or whether I got copies.

4    Q.    My point being is that you didn't get anything that

5    looks like I'm holding in my hand in this case; correct?

6              MR. MOLLOY:   I'm sorry, Your Honor, asked and

7    answered.

8              THE COURT:   Overruled.

9    A.    Although I said yesterday that it was my recollection

10   that I had received files on a disk, again in preparation

11   for coming down here, I was unable to find any disks and I

12   was unable to find any copies.  So this may well be one of

13   those cases where I actually received the records,

14   themselves.  The thing that you're holding in your hand, I

15   may well have received that and reviewed that, myself, last

16   fall, and you'll have to ask the prosecution team, based on,

17   you know, their documents or their records of what they

18   mailed me whether I actually got those documents.

19   BY MS. BOLEN

20   Q.    All right.  Dr. Parran, when doctors set up medical

21   files they also use a standard process and system; is that

22   correct?

23   A.    Yes.

24   Q.    And that's part of what any doctor trained to have

25   encounters with patients would do; correct?

1   A.      Yes.

2   Q.      Sometimes it's a hard copy chart and sometimes it's

3   an electronic?

4   A.      And sometimes these days it's both.

5   Q.      Both, yeah.  And we still haven't converted fully to

6   electronic records in this country; correct?

7   A.      True.

8   Q.      So when we set up medical charts, we put the

9   patient's name on them, we put the year, we put some other

10  information that helps the practice identify who that

11  individual is and what other information they need to follow

12  the person; correct?

13  A.      Yes.  And information related to the filing system so

14  the office can rapidly pull records out of the files when

15  they need them.

16  Q.      And get the information the doctor needs; correct?

17  A.      Yes.

18  Q.      And so there will be often tabs in the material,

19  correspondence, office notes, lab, et cetera; correct?

20  A.      Yes.

21  Q.      And were you able to tell in the materials that at

22  least you reviewed that there were kind of a file set up

23  like that, even though it might be hard to tell

24  electronically?

25  A.      Yeah.  Again, I -- I may well have looked at these

1    files, themselves, but they clearly were organized in terms

2    of an area in the record where there were results of things

3    like lab tests and those sorts of things, and

4    correspondence, et cetera, an area where there was, as you

5    mentioned this morning, the chronologic list of telephone

6    calls, you know, related to the patient, et cetera.

7    Q.    All right.  And sometimes doctors' offices will use a

8    tab called hospital reports; correct?

9    A.    Yes.  Typically, that's where discharge summaries or

10   medical records from a hospitalization will be in.

11            MS. BOLEN:  Your Honor, we'll offer Defense

12   Exhibit E14.

13            THE COURT:  Any objections?

14            MR. MOLLOY:  No, sir.

15            THE COURT:  E14 will be admitted and may be

16   published.

17            (Defense Exhibit E14 admitted)

18   BY MS. BOLEN

19   Q.    Just really quick here, Dr. Parran, this is from Lee

20   Memorial Health System; correct?

21   A.    Yes.

22   Q.    Here in Fort Myers?  We have an admit date of 6/29 of

23   '08.  You see that there?

24   A.    Yes.

25   Q.    We have an admitting physician and there's a doctor's

1    name listed there?

2    A.      Yes.

3    Q.      Admitting physician is the one, the person in the

4    hospital or the ER that has responsibility for that patient

5    coming in; correct?

6    A.      Yes.

7    Q.      And then we have the primary care physician or the

8    primary responsible physician, in this case Dr. Roggow;

9    correct?

10   A.      Well, the primary care physician would be the

11   outpatient physician who is primarily responsible for the

12   patient.

13   Q.      Not necessarily meaning a primary care or general

14   practitioner physician?

15   A.      Right, just the person in charge of the patient's

16   primary care, outpatient care, yeah.

17   Q.      In this case, she's got a chief complaint of

18   vomiting; correct?

19   A.      Yes.

20   Q.      And obviously in the first line here, history of

21   present illness, they talk about Lori Corrochano and you

22   know, frankly a myriad of complaints and different

23   chronological periods, meaning she's had several complaints

24   here; right?

25   A.      Yes.

1    Q.      She is vomiting, and if you read through here, you

2    see words like her chronic pain and she's telling the

3    hospital physician what's going on in her life, and that's a

4    typical encounter of a patient with a hospital; correct?

5    A.      Yes.

6    Q.      And here, we have a little bit of information and

7    social history and you have what purports to be the

8    statement by the patient to the admitting physician that

9    she's a daily smoker, she occasionally drinks alcohol, she

10   denies recreational drug use.   You see that there?

11   A.      Yes.

12   Q.      And you don't recall whether or not in any of

13   Ms. Corrochano's hospital visits there was anything

14   specifically focused on problems with her and her

15   medications during those visits; do you, sir?

16   A.      I don't recall those, no.

17          MS. BOLEN:   Your Honor, may I -- I'm going to

18   re-approach the witness.

19   BY MS. BOLEN

20   Q.      Let me just hand you now what's been admitted into

21   evidence as Defense Exhibit E14.   Just take a moment and

22   look through that hospital record and see if you find

23   anything in there that is tied to any type of problem or

24   concern that the admitting physician with the hospital had

25   with this patient and her medicine, other than noting that

1    she's on medicine.

2    A.      No -- well, in neither the assessment or the plan do

3    they mention anything.  The only information that might

4    indicate a concern is that -- is that they did give her a

5    dose of Dilaudid, which is that opiate that we talked about

6    yesterday, I think.  So they did give her a dose of Dilaudid

7    in the emergency room, along with her fluids and an

8    anti-nausea and anti-dizziness medicine and she got better

9    quickly.  But that's the only information that I could

10   potentially glean from there.

11   Q.      Nothing about an overdose?

12   A.      No, this was vomiting.  If this was related to

13   opiates, it would be withdrawal, which is why giving

14   Dilaudid would make her feel better because it would stop

15   withdrawal.

16   Q.      The word withdrawal is not in here, though; is it,

17   Dr. Parran?

18   A.      You asked me; I answered you.

19   Q.      Is the word withdrawal in Defense Exhibit E14?

20   A.      If the word withdrawal was in the exhibit, I would

21   have mentioned that also.

22   Q.      Thank you, sir.  Let me show you what's been marked

23   for identification as Defense Exhibit E15.  Does this

24   purport to be another hospital report relating to

25   Ms. Corrochano?

1    A.    Yes.  This is another hospital report relating to
2    this patient, yes.
3          MS. BOLEN:  Your Honor, we'd offer Defense
4    Exhibit E15.
5          THE COURT:  Any objections?
6          MR. MOLLOY:  No, sir.
7          THE COURT:  E15 will be admitted and may be
8    published.
9          (Defense Exhibit E15 admitted)
10   BY MS. BOLEN
11   Q.    This is a multi-page document, Dr. Parran, and we'll
12   walk through a little bit of it here.  If you need to see it
13   again, let me know.  Here we are dealing, again, with
14   documents that are -- purport to be from Lee Memorial Health
15   System; is that correct?
16   A.    Yes.
17   Q.    And that's a medical center here in Fort Myers.  Got
18   an admit date of 10/15 of '08.  You see that there?
19   A.    Yes.
20   Q.    Some physician not named there; correct?
21   A.    Correct.
22   Q.    You've got a chief complaint of weakness; right?
23   A.    Yes.
24   Q.    Dealing with Ms. Corrochano again; correct?
25   A.    Yes.

1    Q.     Right?  I'm going to go down here to the social

2    history.  Again, reports she does not smoke, she drinks

3    alcohol, she denies drug use; correct?

4    A.     Yes.

5    Q.     She's coming in presenting with dizziness, feeling

6    weak, no strength, loss of appetite, intermittent headaches,

7    and -- I don't know what that word is -- episodes of emesis.

8    Means -- do you know what that means?

9    A.     That's throwing up.

10   Q.     I didn't know emesis was that.

11          THE COURT:  Counsel, you may need to correct what

12   you said about social history and what the answer was.

13          THE WITNESS:  Social history is that she does

14   smoke and she does not drink or use drugs.

15   BY MS. BOLEN

16   Q.     She does smoke, she does drink alcohol, and denies

17   drugs?

18   A.     Denies drug use.

19   Q.     I'm going to go to Page 5 of Defense Exhibit E15, and

20   again, we're still dealing with Lee Memorial,

21   Ms. Corrochano, and an admit date now of 10/15 of '08;

22   correct?

23   A.     Yes.

24   Q.     With a discharge date of 10/18 of '08?

25   A.     Yes.

PARRAN - CROSS

1    Q.      Indicating that Ms. Corrochano spent some time in the

2    medical center related to a diagnosis given here of

3    hyponatremia?

4    A.      Yes.

5    Q.      Which is the low sodium issue?

6    A.      Low salt, yes.

7    Q.      Now, down here we have an explanation for that low

8    salt.  You see that there?

9    A.      Yes.

10   Q.      The low salt isn't necessarily tied to somebody

11   drinking or being an alcoholic; is it, sir?  It can be tied

12   to other things; correct?

13   A.      Oh, absolutely.  Many things can cause low salt

14   levels.

15   Q.      And in this case, we have an explanation for this

16   discharge diagnosis of low salt, provided apparently by

17   Dr. Shenoy, a nephrologist, who talks about her drinking

18   several forms of fluids throughout the day, carrot juice,

19   other fruit juices, water, and ultimately a warning about,

20   you know, be careful with your intake of fluid; correct?

21   A.      Yes.

22   Q.      The more fluid you drink, the more salt you wash out

23   of your body and depending upon the rest of the factors of

24   the individual patient, that can lead to trouble in a

25   hospital record; correct?

1    A.      Yes.

2    Q.      Show you what has been marked for identification as

3    Defense Exhibit E16 and ask you once again, does this

4    purport to be another hospital record related to

5    Ms. Corrochano?

6    A.      Yes, it is.

7    Q.      In this case, we're dealing with something from

8    August of 2009; correct?

9    A.      Yes.

10            MS. BOLEN:  Your Honor, we'll offer Defense

11   Exhibit E16.

12            THE COURT:  Any objections?

13            MR. MOLLOY:  No, sir.

14            THE COURT:  E16 will be admitted and may be

15   published.

16            (Defense Exhibit E16 admitted)

17   BY MS. BOLEN

18   Q.      In this case, Dr. Parran, we have Lee Memorial again,

19   Ms. Corrochano, and an admit date of 8/29 of '09; correct?

20   A.      Yes.

21   Q.      We have a physical examination being performed by the

22   admitting physician, or somebody that works under that

23   person's instruction; correct?

24   A.      Yes.

25   Q.      A typical workup that would be done for somebody who

1   is presenting to a hospital or medical center; correct?   In

2   connection with perhaps an emergency visit?

3   A.      Yes.

4   Q.      It doesn't say emergency on this document, though;

5   does it?

6   A.      No, it doesn't.  We might be missing the first page

7   that would have had the history on it because this sort of

8   starts right off with the physical exam.

9   Q.      See if I got a page out of order here, which is not

10  beyond the realm of possibility.  No, sir, I don't.  But all

11  right, so with your testimony, then, there would be more

12  information on the front of that; correct?

13  A.      I would expect that to be the case, yeah.

14  Q.      We do have the medical decision-making which should

15  incorporate the history on any front page; correct?

16  A.      Yes.

17  Q.      You would carry that forward and kind of explain what

18  happened; correct?

19  A.      Yes.

20  Q.      So here we have information that says she presented

21  to the emergency department with chest pain?

22  A.      Yes.

23  Q.      She said she fell on a boat on July 12th?

24  A.      Yes.

25  Q.      So we're, you know, a week and a half or so out from

1    that particular fall; correct?

2    A.      Yes.   This is the patient who had many such falls.

3    Q.      That's right.   And so we have the doctor talking

4    about the fall and the patient saying she's hiring a lawyer,

5    and she's complaining of chest discomfort and there was an

6    offer of admission of pain control and looking at cardiac

7    enzymes but nothing in here about any kind of withdrawal or

8    overdose, any such thing; correct?

9    A.      Right.   This is complaining of chest pain after a

10   fall.

11   Q.      All righty.   And so you know, when a patient would

12   present to a medical center like this, especially

13   repeatedly, you would expect there to be information

14   relating to any kind of problems with controlled

15   medications, if that was part of the patient's presentment;

16   correct?

17   A.      If --

18   Q.      It would be mentioned in the record?

19   A.      If it was a concern of the doctors who were taking

20   care of her at that time in the emergency room, you'd expect

21   it to be mentioned in a note.

22   Q.      And you would expect it to be there, too, sir, in

23   connection with any history; correct?

24   A.      Mentioned in the note is in the history, in the

25   assessment, in the plan, in that document.

1    Q.    Finally, yesterday you were talking about the end of
2    the relationship with Ms. Corrochano and Dr. Roggow.  Do you
3    remember that?
4    A.    Actually the last -- last thing I mentioned was a
5    progress note or a telephone call on July 11th of 2006,
6    saying that the patient had accidentally thrown away Xanax.
7    That was the last part of the chart that I referenced
8    yesterday.
9    Q.    So you didn't look at anything into 2010 with regards
10   to the record?
11   A.    I looked at the entire chart.  The last thing I
12   mentioned yesterday in my testimony was her throwing away
13   the Xanax in 2006.
14          MS. BOLEN:  Your Honor, may I have a moment?
15          THE COURT:  You may.
16          (Discussion off record)
17   BY MS. BOLEN
18   Q.    Dr. Parran, are you aware that this patient moved to
19   Miami at some point in time, based on your review of her
20   record?
21   A.    I -- again, I didn't write it down.  So -- so I
22   can't -- I can't say anything about that right now, unless
23   I, you know, relook at the medical record.
24   Q.    When a patient moves away, that can be relevant to
25   whether the relationship between a physician and a patient

1    continues; is that correct?

2    A.    Certainly.

3    Q.    And when patients move away from the physician,

4    there's always the concern that they might be seeking

5    treatment elsewhere and you may or may not know about that;

6    is that correct?

7    A.    It's correct, although typically if a patient moves,

8    they and their managing physician work hard on, you know, as

9    we talked about yesterday, maintaining that communication.

10   So identifying health care providers that they'll go to and

11   making sure that a reasonable proportion -- portions of this

12   medical record would go to the next health care provider so

13   that's part of the coordination of care and communication.

14   Q.    Part of the responsibility of coordination of care

15   rests on the physician's shoulders; correct?

16   A.    Yes.  If the patient tells you they're moving away,

17   you ask, "Who's going to be your doctor because I want to

18   make sure that your record gets there," and that's up to the

19   patient.

20   Q.    It's up to the patient?  The rest of the

21   responsibility is on the patient's shoulders; correct?

22   A.    Yes.

23   Q.    Are you aware that Ms. Corrochano was discharged by

24   Dr. Roggow on May 21st of 2010 for noncompliance with her

25   medication agreement?

PARRAN - CROSS

1   A.     I'd have to look at the last note to refresh my

2   memory.

3   Q.     Let me show you what's been marked for identification

4   as E16, Defense Exhibit E --

5          MR. HOLLANDER:  No, this is 17.

6          MS. BOLEN:  I'm sorry?

7          MR. HOLLANDER:  17.

8          MS. BOLEN:  17, E17.

9   BY MS. BOLEN

10  Q.     Take a look at that and see if you remember reviewing

11  that as part of Ms. Corrochano's record.

12  A.     Yes, so this is a --

13  Q.     Don't yet --

14  A.     Sorry.

15  Q.     You do remember reviewing this; correct?

16  A.     Yes.

17  Q.     And it does indicate that she was discharged from

18  that practice; correct?

19  A.     Yes, she was discharged from the practice.

20         MS. BOLEN:  Your Honor, may I have a moment?

21         THE COURT:  You may.

22         (Discussion off record)

23         MS. BOLEN:  Your Honor, we'll offer Defense

24  Exhibit E17 at this time.

25         THE COURT:  Any objections?

1          MR. MOLLOY:  I just need to remind myself what E17

2    is.

3          THE COURT:  Sure.

4          MS. BOLEN:  One moment and I'll find it and give

5    it to you.

6          MR. MOLLOY:  No objection.

7          THE COURT:  E17 will be admitted and may be

8    published.

9          (Defense Exhibit E17 admitted)

10   BY MS. BOLEN

11   Q.    Dr. Parran, let me show you what's been marked for

12   identification as Defense Exhibit E18 and ask you to take

13   just a quick look at that and see if you can tie that into

14   Lori Corrochano and her ongoing care or treatment prior to

15   the discharge from Dr. Roggow's practice.

16   A.    Yes.

17   Q.    Is that part of what you reviewed in connection with

18   your work on this case?

19   A.    Yes.

20         MS. BOLEN:  Your Honor, we'll offer Defense

21   Exhibit E18.

22         MR. MOLLOY:  No objection.

23         THE COURT:  E18 will be admitted and may be

24   published.

25         (Defense Exhibit E18 admitted)

1   BY MS. BOLEN

2   Q.      Now Dr. Parran, E18 is actually prior to the

3   discharge; is that correct?

4   A.      Yes.

5   Q.      We established --

6   A.      Yes.

7   Q.      -- the discharge date being May 21st of 2010;

8   correct?

9   A.      Yes.

10  Q.      And the date on E17 -- E18, excuse me, being

11  March 19th of 2010; correct?

12  A.      Yes.  There's also a fax date at the top of the sheet

13  that says March 17th.

14  Q.      Right where I'm pointing; correct, sir?

15  A.      It's off the --

16  Q.      I'm sorry.

17  A.      There you go, yes.

18  Q.      I could see it.  May 17th of 2010?

19  A.      You bet.

20  Q.      This is from Baptist Hospital of Miami; correct?

21  A.      Yes.

22  Q.      And this is talking about an open reduction and

23  internal fixation of a hip fracture.  Do you see that?

24  A.      Yes.

25  Q.      And the secondary and remaining pages of this

 1   document contain some education to a patient; is that

 2   correct?

 3   A.     Yes.

 4   Q.     In connection with post surgical treatment or care,

 5   even pre-surgery, to explain what's going to happen?

 6   A.     Explaining pre-surgery what to expect after a hip

 7   fracture, yes.

 8   Q.     So in looking at this, and without going into the

 9   detail, we're dealing with a document from a hospital in

10   Miami that's talking about hip surgery that Ms. Corrochano

11   had; correct?

12   A.     Hip surgery that she was -- either had or going to

13   have because of a fracture, yeah.

14   Q.     You have no reason to believe that Ms. Corrochano

15   didn't have the surgery; do you, sir?

16   A.     No, I -- I have no information other than that.

17   Q.     I'm going to shift gears at this time, Dr. Parran,

18   over to Ms. Susan Helton.  Dr. Parran, in your review of

19   Ms. Helton's records, would it be fair to say that during

20   the period 2006 to 2010 that Ms. Helton was seen by several

21   different physicians in connection with the coordination of

22   care of her medical condition?

23   A.     Yes.

24   Q.     And that's something, again, that's part of the

25   ongoing bona fide relationship between a main physician and

1   her patient; correct?

2   A.      Yes.

3   Q.      And coordinating care amongst many individuals;

4   correct?

5   A.      Yes.

6   Q.      And in fact, in the case of Ms. Helton, she had been

7   diagnosed prior to seeing Dr. Roggow with a condition called

8   torticollis; is that correct?

9   A.      Yes.

10  Q.      That can be a pretty extreme and painful condition;

11  is that right?

12  A.      It certainly can be.

13  Q.      And torticollis in this indication is something,

14  especially with Ms. Helton, she's got her neck super stiff

15  and she's having involuntary spasms and spasticity in her

16  neck that she can't control and causing her pain; correct?

17  A.      Yes.  It's a spastic condition of the neck and upper

18  shoulders.

19  Q.      Is it a fair reading of her chart, sir, that her

20  situation with her torticollis was so severe where it really

21  put her in a position where she did not drive?

22  A.      I don't know whether her not driving was contributed

23  to by her torticollis in addition to her withdrawal seizures

24  and her alcoholism.

25  Q.      And yesterday you talked about that as a fact that it

PARRAN - CROSS

1   was somewhat odd that a 57 year old woman didn't have a

2   driver's license and used an ID card; is that correct, sir?

3   A.    It is odd, yes.

4   Q.    In your review of Ms. Helton's chart, did you read a

5   neurological examination done by another Fort Myers doctor

6   named Edward Steinmetz, a neurologist?

7   A.    I did read a neurology evaluation.  I didn't write

8   down the doctor's name, yeah.

9   Q.    And that neurology evaluation had some extensive

10  history of Ms. Helton, to include her residency in New York

11  and move to Florida; correct?

12  A.    Yes.

13       MS. BOLEN:  Your Honor, I'm going to approach,

14  please.

15  BY MS. BOLEN

16  Q.    This is, Dr. Parran, Defense Exhibit B1 for

17  identification, if you'll just take a look at that for a

18  minute, and do you recall reviewing that in connection with

19  Ms. Helton's file?

20  A.    Yes.

21       MS. BOLEN:  And just for the record, B as in boy,

22  1.  Your Honor, we'll offer Defense Exhibit B1.

23       THE COURT:  Any objections?

24       MR. MOLLOY:  Yeah, just -- no, no objection.

25       THE COURT:  B1 will be admitted and may be

| | |
|---|---|
| 1 | published. |
| 2 | (Defense Exhibit B1 admitted) |
| 3 | BY MS. BOLEN |
| 4 | Q.    All right, Dr. Parran, B1 is a four-page exhibit. |
| 5 | Looking at Page 1 here, orientation to time, April 11, 2006; |
| 6 | correct? |
| 7 | A.    Yes. |
| 8 | Q.    Purports to be a neurological examination of a woman |
| 9 | named Susan Thorpe; correct? |
| 10 | A.    Yes. |
| 11 | Q.    In your review of Ms. Helton's file, did you find |
| 12 | that the -- that Ms. Helton's name actually changed over |
| 13 | time due to either marriage or divorce? |
| 14 | A.    Yes.  Susan Helton Davis Thorpe. |
| 15 | Q.    And over here we have a listing of several doctors |
| 16 | that are Neurology Associates of Lee County; correct? |
| 17 | A.    As well as a physician assistant, yes. |
| 18 | Q.    And the last page of Defense Exhibit B1, we have a |
| 19 | listing of Dr. Steinmetz.  Do you see that there? |
| 20 | A.    Yes. |
| 21 | Q.    Just not a signed copy; correct? |
| 22 | A.    Yes. |
| 23 | Q.    Not unusual for an unsigned copy to go between |
| 24 | doctors in review of medical records; correct? |
| 25 | A.    It's pretty common. |

1    Q.     Here we have a review of Ms. Helton and her situation

2    where the torticollis is discussed.  She's had some botox.

3    She has a posturing of her head, neck, and chin, with a

4    turning in the right shoulder.  So the spasms and the way

5    her neck is done is she's tilted to the right, as you

6    earlier described; correct?

7    A.     Yes.

8    Q.     They go through the history, pick up the history of

9    the seizures with the alcohol; correct?

10   A.     Yes.

11   Q.     And then when she stopped drinking, she has told this

12   physician that she had a seizure; correct?

13   A.     Yes.  A series of them, yes, three.

14   Q.     She identifies the medications that she's been on to

15   this physician, including Klonopin; correct?

16   A.     Yes.

17   Q.     Klonopin is that Benzodiazepine known as Clonazepam;

18   correct?

19   A.     Yes.

20   Q.     And she states that she'd been hospitalized; correct?

21   A.     Yes.

22   Q.     The second page of Exhibit B1 talks about her past

23   medical history again and her social history, also states

24   she's been working on Wall Street and she's had several

25   different treatments.  She's got some family conditions, a

PARRAN - CROSS

1   father with Parkinson's.  You see that there?

2   A.      Yes.

3   Q.      Again, this is a common thing with an evaluation of a

4   patient by a physician; correct?

5   A.      Yes.  This was a neurology consult, yeah.

6   Q.      On Page 3 of Defense Exhibit B1 toward the bottom,

7   you see where it says the patient's history is complicated

8   by alcohol withdrawal seizure for which she's been

9   hospitalized in New York?

10  A.      Yes.

11  Q.      And again, it talks about the Klonopin again;

12  correct?

13  A.      Yes.

14  Q.      And she says she does not drive and she did not have

15  to drive because she lived in New York; correct?

16  A.      Yes.

17  Q.      Not uncommon for people who live in New York not to

18  drive a vehicle; correct?  We don't know why she wasn't

19  driving.  We just know it's here; correct?

20  A.      Yes.

21  Q.      Then in the last page of Defense Exhibit B1, we have

22  Dr. Steinmetz talking about the disposition and how he's

23  going to handle her case.  You see that?

24  A.      Yes.

25  Q.      Pointing down to the third -- second paragraph under

PARRAN - CROSS

1    disposition and discussion, do you see where it says I've

2    renewed the Klonopin and given her a small amount of

3    Vicodin?

4    A.     Yes.

5    Q.     I'll see her in a couple of weeks?

6    A.     Yes.

7    Q.     So here's a physician that has information about a

8    patient who has a history of alcohol seizures prescribing

9    some Klonopin, the Benzodiazepine; correct?

10   A.     Yes.

11   Q.     And then also a small amount of a pain reliever to

12   start addressing the issue of the pain associated with

13   torticollis; correct?

14   A.     Yes.

15   Q.     Let me show you what's been marked for identification

16   as Defense Exhibit B2 and ask once again, is this a document

17   you reviewed in connection with this case?

18   A.     Yes.

19          MS. BOLEN:  Your Honor, we'll offer Defense

20   Exhibit B2.

21          THE COURT:  Any objections?

22          MR. MOLLOY:  None.

23          THE COURT:  B2 will be admitted and may be

24   published.

25          (Defense Exhibit B2 admitted)

1  BY MS. BOLEN

2  Q.    Dr. Parran, Defense Exhibit B2 now has the title for

3  Rehabilitation Consultants; correct?

4  A.    Yes.

5  Q.    And this has Dr. Kini, Dr. Roggow, and Dr. Hyppolite;

6  you see that there?

7  A.    Yes.

8  Q.    With a checkmark next to Dr. Hyppolite's name, does

9  that indicate to you that this might be the physician seeing

10 this patient at this time?

11 A.    Yes.  That was what I thought when I looked through

12 the chart.  But it may be that -- that the thing was

13 actually signed by Dr. Roggow.

14 Q.    All right.  Well, this document here is a medical

15 history questionnaire; correct?

16 A.    Yes.

17 Q.    And this is the patient providing information to the

18 doctor; correct?

19 A.    Yes.

20 Q.    We have a referring physician, Dr. Steinmetz?

21 A.    Yes.

22 Q.    We're connecting what we just looked at in Defense

23 Exhibit B1 to now a referral as indicated in Defense Exhibit

24 B2; correct?

25 A.    Yes.

PARRAN - CROSS

1    Q.      Page 2 of Defense Exhibit B2, we have a listing of
2    current medications; correct?
3    A.      Yes.
4    Q.      We have Lexapro and Klonopin listed; correct?
5    A.      Yes.
6    Q.      Is there another name for Lexapro that you're aware
7    of?
8    A.      There's a generic name.  I'm blocking on it, but
9    Lexapro is an antidepressant.
10   Q.      And she's listed her understanding why she takes the
11   medicine; correct?
12   A.      Correct.
13   Q.      And goes on for several pages, she gives the
14   information and this is what's used to begin the initial
15   encounter between now a doctor at Rehab Consultants and
16   Ms. Helton; correct?
17   A.      Yes.
18   Q.      Now, you just testified a moment ago that you thought
19   it was Dr. Roggow that was the Rehabilitation Consultants
20   doctor that initially saw and prescribed medication to
21   Ms. Helton; is that correct?
22   A.      That is not correct.  What I -- what I have in my
23   report is that it was my impression when I first reviewed
24   the charts that Dr. Hyppolite was the doctor who saw the
25   patient.  I do believe that Dr. Roggow's signature is at the

1    bottom of the last page of that patient history form that

2    you just showed me.  That's all that I just said.

3    Q.    Let me show you what's been marked for identification

4    as Defense Exhibit B3.  Is that one of the encounter notes

5    that you looked at in connection with this file?

6    A.    Yes.  This is an encounter note from Susan Thorpe's

7    file.

8    Q.    And it's dated, in fact, June 26th, 2006; correct?

9    A.    June 26th, yes.

10           MS. BOLEN:  Your Honor, we'll offer Defense

11   Exhibit B3.

12           THE COURT:  Any objection?

13           MR. MOLLOY:  No, sir.

14           THE COURT:  B3 will be admitted and may be

15   published.

16           (Defense Exhibit B3 admitted)

17   BY MS. BOLEN

18   Q.    This is a two-page document, Dr. Parran, the first

19   page being what we've been seeing throughout the trial,

20   format for office note here indicating the date, the

21   patient, the reason for the visit; correct?

22   A.    Yes.

23   Q.    And here we have botox injections listed for the

24   torticollis; correct?

25   A.    Yes.

1    Q.      Do you know why botox is used to treat torticollis?

2    A.      It can relieve the spasm in muscles.

3    Q.      This says under discussion she's being seen here

4    after initial visit; correct?

5    A.      Yes.  This is five days after the initial visit.

6    Q.      Talking about the initial series of botox and the

7    good results that she received; correct?

8    A.      Yes.

9    Q.      Shows that she was started on Roxicodone

10   15 milligrams P.O.  That means by mouth; correct?

11   A.      Yes.

12   Q.      Q 4 meaning every four hours?

13   A.      Yes.

14   Q.      Prn meaning as needed?

15   A.      Yes.

16   Q.      That's not an uncommon prescription for patients for

17   pain medication; is it?

18   A.      No.

19   Q.      And so this, then, is saying that at least between

20   June 21st of '06 and this visit on June 26th of '06,

21   somebody prescribed her Roxicodone; correct?

22   A.      Yes.

23   Q.      Talks about her objectively being awake and alert.

24   See that there?

25   A.      Yes.

1    Q.      Gives the weight, goes into the procedure note where

2    a botox injection was given?

3    A.      Yes.

4    Q.      The injections are done under EMG guidance.  You see

5    that there?

6    A.      Yes.

7    Q.      Does that mean they're sticking needless in with

8    needles?  You know how that works?

9    A.      The needles are attached to an electro -- to a

10   machine that senses the electrical activity from the muscle.

11   Q.      Then they find a place to do the botox injection?

12   A.      Right.

13   Q.      You don't do those things, yourself, though; do you?

14   A.      No.

15   Q.      Shows she did okay on the injections; correct?

16   A.      Yes.

17   Q.      Second page of Defense Exhibit B3, we have a continue

18   of plan for pain management?

19   A.      Yes.

20   Q.      Revisit in one month?

21   A.      Yes.

22   Q.      And the name listed there, Pierre R. Hyppolite, M.D.;

23   correct?

24   A.      Yes.

25   Q.      Now we have a second doctor aware of Ms. Helton's

PARRAN - CROSS

```
 1   situation regarding alcohol and seizures and continued
 2   prescribing of medication to treat her torticollis; correct?
 3   A.    I don't believe that this note mentioned anything
 4   about alcohol and seizures, but the previous note -- the
 5   neurology consult that's in this chart is what really talks
 6   about that.
 7   Q.    And when there's a neurology consult in a chart for a
 8   patient, the doctor's practice should be to look at that
 9   prior record?
10   A.    Yes.
11   Q.    Before encountering the patient; correct?
12   A.    Yes.
13   Q.    So you have no reason to believe --
14   A.    It just wasn't mentioned in this note.
15   Q.    You have no reason to believe that Dr. Hyppolite
16   didn't review that information; do you?
17   A.    No.
18   Q.    Let me show you what's been marked for identification
19   as Defense Exhibit B4.  Is this another office note in
20   connection with Ms. Helton's file within the same time frame
21   around July of '06?
22   A.    Yes.
23   Q.    Something you reviewed; correct?
24   A.    Yes.
25         MS. BOLEN:  We'll offer Defense Exhibit B4.
```

1                    THE COURT:  Any objections?

2                    MR. MOLLOY:  No, sir.

3                    THE COURT:  B4 will be admitted and may be

4    published.

5                    (Defense Exhibit B4 admitted)

6    BY MS. BOLEN

7    Q.    Here we have a follow-up within a month's time from

8    the last note that we looked at on Defense Exhibit B3;

9    correct, sir?

10   A.    Yes, yes.

11   Q.    This note is dated -- I'm sorry, I'm cutting it off

12   with my hand -- 7/27 of '06; correct?

13   A.    Yes.

14   Q.    Got a follow-up, standard information?

15   A.    Yes.

16   Q.    In fact, she's denying any side effects with her

17   medications; correct?

18   A.    Yes.

19   Q.    Side effects like nausea, vomiting, constipation or

20   sleepiness that are important to track as you follow

21   somebody with controlled medications especially in this type

22   of history; correct, sir?

23   A.    Yes.

24   Q.    And you have a listing of her medications?

25   A.    Yes.

1    Q.     And the second page of Defense Exhibit B4, we have a

2    plan listed; correct?

3    A.     Yes.

4    Q.     Continuing with the current pain management regimen?

5    A.     Yes.

6    Q.     Patient's telling the doctor, in this case

7    Dr. Hyppolite, that she's got adequate pain control and it's

8    allowing her to function; correct?

9    A.     Yes.

10   Q.     Now, we have a non-controlled medication or non-drug

11   modality of treatment, that being physical therapy; correct?

12   A.     Yes.

13   Q.     They do the physical therapy on patients with

14   torticollis that stretch and release therapy to help

15   lengthen the muscles, condition them, recondition them a

16   little bit, and hopefully offer some relief to the patient;

17   correct?

18   A.     Yes.

19   Q.     Let me show you what's been marked for

20   identification, Defense Exhibit B5.  Again, is this an

21   office note in connection with the continued care of

22   Ms. Helton and in the same time frame, that being around

23   September of '06?

24   A.     Yes.

25          MS. BOLEN:  Your Honor, we'll offer Defense

1    Exhibit B5.

2              THE COURT:  Any objections?

3              MR. MOLLOY:  No, sir.

4              THE COURT:  B5 will be admitted and may be

5    published.

6              (Defense Exhibit B5 admitted)

7    BY MS. BOLEN

8    Q.     This time, Dr. Parran, the note's dated 9/20 of '06;

9    correct?

10   A.     Yes.

11   Q.     And in Defense Exhibit B4, we were looking at a visit

12   in July of '06; correct?

13   A.     This is September of '06, yes.

14   Q.     I'm sorry.  The prior exhibit, Defense Exhibit B4,

15   was in July of '06?

16   A.     Yes.

17   Q.     And now we're doing what it says, a reason for

18   follow-up here on Defense Exhibit B5, two month follow-up;

19   correct?

20   A.     This is just about eight weeks after the last visit,

21   yes.

22   Q.     Eight weeks would be about two months; is that right?

23   A.     Yeah.

24   Q.     So we have the patient coming in again to be

25   reassessed for the problem; correct?

1   A.      Yes.

2   Q.      And she reports increased neck pain on a level of

3   nine out of ten; correct?

4   A.      Yes.

5   Q.      And she's having more spasms and headaches?

6   A.      Yes.

7   Q.      That's not unusual with the progression or problems

8   associated with torticollis; is it?

9   A.      It certainly can happen, although, you know, this --

10  this may well indicate one of those trials that has failed.

11  Q.      Trial of botox?

12  A.      Trial of Roxicodone and Clonazepam that's -- there's

13  worse pain with way, way, way, way, way, way, way more

14  medicine.

15  Q.      Do you treat torticollis on a regular basis, sir?

16  A.      You asked -- you asked me what this could mean.   I

17  answered your question.

18  Q.      Do you treat torticollis on a regular basis, sir?

19  A.      I certainly --

20          MR. MOLLOY:  Objection.  Relevancy.

21          THE COURT:  Overruled.

22  A.      I certainly have treated patients with torticollis.

23  BY MS. BOLEN

24  Q.      Do you treat them on a regular basis?

25  A.      If a regular basis is monthly, no.  Torticollis is a

```
 1    very rare neurologic condition.  I don't see a patient with
 2    torticollis more often than once a year or so.
 3    Q.     So in this case, we've got a two month follow-up;
 4    correct?
 5    A.     We have a two month follow-up, we --
 6    Q.     And we have a list here that she is on current
 7    medications of Roxicodone, Klonopin, which is the
 8    Clonazepam; correct?
 9    A.     Yes.
10    Q.     And the indication in Defense Exhibit B5 is she's
11    still receiving physical therapy with helpful results?
12    A.     Yes.
13    Q.     She's awake, alert, and oriented; correct?
14    A.     Yes.
15    Q.     That's a good thing; correct?
16    A.     Yes.
17    Q.     And Page 2 of Defense Exhibit B5 shows a plan to
18    start Norco; you see that there?
19    A.     Yes.
20    Q.     That's Hydrocodone; correct?
21    A.     Yes.
22    Q.     Has the information on the prescription, she's
23    allowed to take one tablet by mouth every four hours;
24    correct?
25    A.     Yes.
```

1   Q.      She's going to hold off on the Roxicodone for now?

2   A.      Yes.

3   Q.      She'll start a new muscle relaxer named Baclofen;

4   correct?

5   A.      Yes.

6   Q.      Taking tablet of 10 milligrams twice a day by mouth;

7   correct?

8   A.      Yes.

9   Q.      Continue with the Klonopin, which is Clonazepam;

10  correct?

11  A.      Yes.

12  Q.      .5 milligrams by mouth every eight hours as she needs

13  it for anxiety?

14  A.      Yes.

15  Q.      And they're planning another set of botox injections?

16  A.      Yes.

17  Q.      And now we have information about financial situation

18  where she says she's looking for assistance to help pay for

19  botox because the insurance company doesn't cover it?

20  A.      Yes.

21  Q.      Signed by Dr. Hyppolite, or purports to be his

22  signature?

23  A.      Yes.

24  Q.      Let me show you what's been marked for identification

25  Defense Exhibit B6 and B7; correct?  Show you these, and

1    take a look at them if you would.

2    A.      Okay.

3    Q.      Are these records that you reviewed in connection

4    with Ms. Helton's file?

5    A.      Yes.

6    Q.      Again, we're still talking about a progression time

7    frame forward; correct?

8    A.      Yes.

9    Q.      These are still in -- these are now in '07; correct,

10   sir?

11   A.      Yes.

12           MS. BOLEN:  Your Honor, we'll offer Defense

13   Exhibit B6 and B7.

14           THE COURT:  Any objections?

15           MR. MOLLOY:  No, sir.

16           THE COURT:  B6 and B7 will be admitted and may be

17   published.

18           (Defense Exhibit B6 and B7 admitted)

19   BY MS. BOLEN

20   Q.      And just very quickly here, we have B6, dated 1/4 of

21   '07.  See that?

22   A.      Yes.

23   Q.      And she's still being followed by, second page of

24   that exhibit, Dr. Hyppolite; correct?

25   A.      Yes.

1  Q.     We have an instruction to increase her muscle

2  relaxer?

3  A.     Yes.

4  Q.     Continue her Roxicodone; correct?

5  A.     Yes.

6  Q.     And the physical therapy?

7  A.     Yes.

8  Q.     And Defense Exhibit B7, we have a follow-up within a

9  month of 2/28 of '07?

10 A.     Yes.

11 Q.     Going to have another botox injection series.  Her

12 pain is back up again.  She's had some good results,

13 medication listed, patient's awake, alert, oriented, and

14 comfortable?

15 A.     Yes.

16 Q.     The second page of that exhibit, Defense Exhibit B7,

17 again has an assessment and a plan with an increase of

18 Roxicodone to 30 milligrams by mouth every four hours?

19 A.     Yes.

20 Q.     Continue Lunesta; is that right?  That's a sleep

21 medicine?

22 A.     Yes.

23 Q.     And continue her muscle relaxer Baclofen?

24 A.     Yes.

25 Q.     And again go back to physical therapy to help her

1   with that elasticity; right?

2   A.      Yes.

3   Q.      Again by Dr. Hyppolite?

4   A.      Yes.

5           MS. BOLEN:  Your Honor, if I might have a moment?

6   I'm pulling out a series of exhibits at this point just to

7   make it quicker.

8           THE COURT:  You may.

9           (Pause in place)

10          MS. BOLEN:  I'm ready, Your Honor.

11          THE COURT:  You may proceed.

12  BY MS. BOLEN

13  Q.      Dr. Parran, let me show you what's been marked for

14  identification, a series of exhibits, and I'll give you a

15  chance to take a look at it as Defense Exhibit B8, B9, B10,

16  B11, and B12, and tell us if these are all progress note

17  records related to Ms. Helton and whether or not you had a

18  chance to review them.

19  A.      Yes.

20          MS. BOLEN:  Your Honor, we'll offer Defense

21  Exhibit B8, -9, -10, -11, and -12.

22          THE COURT:  Any objections?

23          MR. MOLLOY:  No, sir.

24          THE COURT:  B8, -9, -10, -11, and -12 will be

25  admitted and may be published.

1                (Defense Exhibits B8, B9, B10, B11, and B12

2    admitted)

3    BY MS. BOLEN

4    Q.    Dr. Parran, would it be fair to say that these

5    exhibits that we just put into evidence cover a period in

6    2007 involving visits of Ms. Helton to see, in this case,

7    Dr. Roggow?

8    A.    Yes.

9    Q.    And publishing here the first in those exhibits,

10   Defense Exhibit B8, we have a note dated 5/3 of '07;

11   correct?

12   A.    Yes.

13   Q.    And we have a reason for the visit, Susan Helton is a

14   former patient of Dr. Hyppolite's and wishes to establish

15   with Dr. Roggow.  You see that?

16   A.    Yes.

17   Q.    Dr. Roggow goes in and actually acknowledges her

18   history, including the problems with the torticollis, the

19   relation of the botox injections, her workups, her

20   rehabilitation for alcohol, and notes that she's been sober

21   for the past couple of years?

22   A.    Yes.

23   Q.    And she talks about the injections that Ms. Helton

24   had with Dr. Hyppolite; correct?

25   A.    Yes.

1  Q.      The review of the medications is performed?

2  A.      Yes.

3  Q.      An objective evaluation is performed?

4  A.      Yes.

5  Q.      We have an assessment and a plan as we've seen

6  before; correct?

7  A.      Yes.

8  Q.      And in the plan, we have discussion with the patient

9  about a triggerpoint injection that would be taking place

10 the next day; correct?

11 A.      Yes.

12 Q.      Triggerpoints are commonly done non, let's say,

13 controlled medication therapy to help patients with certain

14 aspects of their pain management?

15 A.      Yes.

16 Q.      And they're rescheduling the botox injections?

17 A.      Yes.

18 Q.      And ordering the -- ordering physical therapy as the

19 patient can afford?

20 A.      Yes.

21 Q.      These are common steps that you would see in

22 connection with an ongoing relationship with a patient and a

23 physician; correct?

24 A.      Yes.

25 Q.      All part of a bona fide relationship in terms of, you

1    know, assessing, physical examination, that sort of thing?

2    A.    Yes.

3            MS. BOLEN:   I'm going to publish what has been

4    admitted as Defense Exhibit B12?

5            THE COURT:   You may.

6    BY MS. BOLEN

7    Q.    It's dated 10/5 of '07.  You see that there?

8    A.    Yes.

9    Q.    Again, it's a one month follow-up with the patient.

10   She's feeling better, her neck and head posture is better.

11   She's pleased with the outcomes of the botox; correct?

12   A.    Yes.

13   Q.    There's a little bit of an objective evaluation?

14   A.    Yes.

15   Q.    And then now the current medications have expanded

16   and include folic acid, iron, multivitamins.  These are

17   vitamins and supplements that can help a patient kind of get

18   everything going synergistically in their body; correct?

19   A.    Yes, they're vitamins and supplements.

20   Q.    All non-controlled medications; correct, terms of the

21   ones I named, folic acid, iron, and multivitamins?

22   A.    Yes, those -- all of them probably except for the

23   iron is probably over-the-counter and the iron is probably a

24   prescription.

25   Q.    That's stuff that you have done in your medical

1    practice; correct?

2    A.      Yes.

3    Q.      Usual course of professional practice to add those

4    things in when it's appropriate for a patient; correct?

5    A.      Sure.

6    Q.      Would it be fair to say, Dr. Parran, that in the

7    ongoing review of the information in this chart that it

8    became apparent that Dr. Roggow was adding in personal

9    information that the patient related to her about her

10   personal situation?

11   A.      Certainly.  Even in that last note we looked at,

12   there were discussions about the cost for some of the

13   treatment and those things, yeah.

14   Q.      You also reviewed notes in connection with this

15   chart, did you not, that talked about some of the problems

16   that Ms. Helton was having with her husband?

17   A.      Yes.

18   Q.      And those problems went on for some time; did they

19   not, sir?

20   A.      Yes, they did.

21   Q.      And that has -- those kind of things happen in

22   connection with physician relationships with patients

23   because things happen in people's lives; correct?

24   A.      Things happen in people's lives and people are often

25   willing to speak with their physician about their stresses

1    and worries and challenges in their life, yeah.

2    Q.    In your review, is it fair to say that Dr. Roggow

3    often recorded those items in the notes to help her keep

4    track of her relationship with her patients?

5    A.    Yes.

6    Q.    And that's the right thing to do; isn't it, sir?

7    A.    Yes.

8         MS. BOLEN:  May I have a moment, Your Honor?

9         THE COURT:  You may.

10        (Discussion off record)

11        MS. BOLEN:  I'm gathering a few more exhibits.

12        (Pause in place)

13   BY MS. BOLEN

14   Q.    Dr. Parran, I'm going to show you a series of

15   exhibits marked for identification as Defense Exhibit, all

16   in the B series, as in B in boy, B13, -14, -15, -16, -17,

17   and -18.  Let me give you an opportunity to take a look at

18   these and see if these are also part of what you reviewed in

19   connection with this case.

20   A.    Yes.

21        MS. BOLEN:  Your Honor, we'll offer Defense

22   Exhibit in the series B13 through B18.

23        THE COURT:  Any objections?

24        MR. MOLLOY:  No, sir.

25        THE COURT:  B13 through -18 will be admitted and

1    may be published.

2            (Defense Exhibits B13, B14, B15, B16, B17, and B18

3    admitted)

4    BY MS. BOLEN

5    Q.     Dr. Parran, the exhibits, B13 through -18 cover a

6    period of time of November of '07 through September of '08.

7    Is that a fair statement?

8    A.     Yes.

9    Q.     Do you need to see these again or --

10   A.     I looked at the November of '07.  I'll take your word

11   for September of '08.

12   Q.     We'll put November of '07 up there for you.

13   A.     Yes.

14   Q.     This is the note that you looked at; correct,

15   November 30th of '07?

16   A.     Yes.

17   Q.     She returned, she has neck pain and stiffness,

18   bothersome over the last week.  She's done very well.  She's

19   increasing her range of motion.  That's a good thing; isn't

20   it?

21   A.     Yes.

22   Q.     Helps her turn her neck a little more, maybe

23   straighten her head up?

24   A.     Yes.

25   Q.     She has a botox injection?

1    A.      Yes.

2    Q.      And we have a renewal -- we have EMG guidance done

3    with that; correct?  So it's --

4    A.      Yes.

5    Q.      -- a procedure being done in the office; correct?

6    A.      In-office procedure, yes.

7    Q.      It's not unusual for physicians that have training in

8    this area to do these procedures in their office; is it?

9    A.      No.

10   Q.      We have a plan for her to return in three months for

11   another injection?

12   A.      Yes.

13   Q.      And they renew the prescription; correct?

14   A.      Yes.

15   Q.      And then through the series that we've identified B13

16   through B18, she does undergo another set of botox

17   injections; is that correct?

18   A.      Yes, she did.

19   Q.      We have the same sort of documentation being put onto

20   paper by Dr. Roggow explaining what she did with this

21   patient and why; correct?

22   A.      Yes.

23   Q.      In fact, it's pretty easy to look at her rationale

24   because she puts a lot of information about what she's doing

25   and why in the chart?

1    A.    Yes.   These were progress notes that were easy to
2    track and read, yes.
3    Q.    That's what she's supposed to do; correct?
4    A.    Yes.
5                (Discussion off record between counsel)
6    BY MS. BOLEN
7    Q.    I think you mentioned yesterday as part of your
8    testimony that there was a situation where you found a note
9    where the -- Ms. Helton's husband flushed her medications;
10   correct?
11   A.    Yes.
12   Q.    This was not a one-time thing in this chart; was it,
13   sir?
14   A.    I believe -- I believe I found two incidences.   There
15   may have been more, but I believe I found two.
16   Q.    But you found other instances of a push-me/pull-you
17   relationship between Ms. Helton and her husband; correct?
18   A.    There was another progress note, I believe in
19   September, that talked about her living in a hotel and
20   having a restraining order against him for domestic
21   violence.
22   Q.    And so here in Defense Exhibit B17 dated 8/22/08, we
23   have Dr. Roggow recording what the patient's talking to her
24   about and grappling with the management of this individual;
25   correct?

1    A.      Yes.

2    Q.      And again, assessment, plan, everything's set out,

3    including the medications where everybody can read it and

4    follow it; correct?

5    A.      Yes.

6    Q.      In fact, doctors do this kind of stuff so that other

7    doctors can pick it up and look at it and just follow what's

8    happening in the relationship; correct?

9    A.      That's certainly one of the reasons, yeah.

10   Q.      Let me show you what's been marked for identification

11   as Defense Exhibit B19, B20, and B21.  Take a look at those

12   and see if you also recognize them as part of what you

13   reviewed in this case.

14   A.      Yes.

15           MS. BOLEN:  Your Honor, we'll offer Defense

16   Exhibit B19, -20, and -21.

17           THE COURT:  Any objections?

18           MR. MOLLOY:  No, sir.

19           THE COURT:  Exhibits B19 through -21 will be

20   admitted and may be published.

21           (Defense Exhibits B19, B20, and B21 admitted)

22   BY MS. BOLEN

23   Q.      Referring to Defense Exhibit B21, this is dated 3/6

24   of 2009; correct?

25   A.      Yes.

1   Q.      Two month follow-up visit?

2   A.      Yes.

3   Q.      The patient is telling Dr. Roggow that she has

4   continued to have difficulty with her husband?

5   A.      Yes.

6   Q.      He was diagnosed with bladder cancer?

7   A.      Yes.

8   Q.      Going to have surgery soon?

9   A.      Yes.

10  Q.      And he is in control of her medication, keeping it

11  locked in a trunk and doling it out to her when she asks?

12  A.      Yes.

13  Q.      Goes on to continue with an evaluation; correct?

14  A.      Yes.

15  Q.      Talking about the medication?

16  A.      Yes.

17  Q.      And there's also an indication here that this patient

18  is continuing to demonstrate increased symptoms of

19  torticollis with jerking and spasm in her neck as she talks

20  to Dr. Roggow; correct?

21  A.      Yes.

22  Q.      Severe situation with torticollis; correct?

23  A.      Increased symptoms that she's describing and

24  demonstrating.

25  Q.      Right in front of the doctor; correct?

PARRAN - CROSS

1   A.      It's happening in the office, yeah.

2   Q.      And this is a note that has Dr. Roggow's name on the

3   bottom of it; correct?

4   A.      Yes.

5   Q.      It talks about a plan to resume physical therapy, a

6   non-drug modality, to address this increase in spasms and

7   problems with her condition; correct?

8   A.      Yes.

9   Q.      That's what you would expect a doctor to do; correct?

10  A.      If it was appropriate, yes.

11  Q.      Do you think it would be appropriate with somebody

12  who's indicating increased problems with this condition to

13  have physical therapy?

14  A.      I believe we've talked about this many, many, many

15  times.  Physical therapy makes sense.  It's been reported in

16  this patient to have helped on at least two previous trials

17  and occasions.

18  Q.      Show you what's been marked for identification as

19  Defense Exhibit B22, B23, and B24, have you take a look at

20  those.  Same series of questions, did you review those in

21  connection with this case?

22  A.      Yes.

23  Q.      Those are, in fact, progress notes tied to

24  Ms. Helton's chart; correct?

25  A.      Yes.

1   Q.     We're dealing now with the time frame of May of '09

2   to July of '09; correct?

3   A.     Yes.

4             MS. BOLEN:  Your Honor, we'll offer Defense

5   Exhibit B22, B23, and B24.

6             THE COURT:  Any objections?

7             MR. MOLLOY:  Yes -- I just thought I'd wake people

8   up.  I'm sorry, Judge.  No objection.

9             THE COURT:  Wake me up again and you're in

10  trouble.  B22 through -24 will be admitted.

11            (Defense Exhibits B22, B23, and B24 admitted)

12            THE COURT:  I probably should state for the

13  record, I really wasn't asleep, but the record doesn't

14  reflect humor.  Go ahead.

15            MS. BOLEN:  May I publish it, Your Honor?

16            THE COURT:  Yes.

17            MS. BOLEN:  Thank you.

18  BY MS. BOLEN

19  Q.     Referring to Defense Exhibit B24, Dr. Parran, this is

20  an office visit, 7/17 of '09; correct?

21  A.     Yes.

22  Q.     And in this case, Ms. Helton has gone back to

23  Dr. Roggow and reporting that she's going through a formal

24  separation and eventual divorce with her husband?

25  A.     Yes.

1   Q.      These can be some tough patients to care for; right?

2   A.      Certainly.

3   Q.      And in this situation, the patient tells Dr. Roggow

4   that her husband is doling out her medication and

5   controlling when she can have her pain medication?

6   A.      Yes.

7   Q.      She finds this debilitating and she's in more pain

8   than she needs to be?

9   A.      Yes.

10  Q.      She's telling the doctor she's not going to abuse or

11  misuse her medication again, the incident happened a long

12  time ago.  She's referring back to something you testified

13  to previously; correct?

14  A.      Yes.

15  Q.      It also states that this patient has applied for

16  disability because of the severity of her condition and it's

17  likely to be awarded; correct?

18  A.      Yes.

19  Q.      That's going to be awarded under the Medicare program

20  that we have in our country; correct?

21  A.      Yes.

22  Q.      And then the plan here, Dr. Roggow gives her five

23  pills of Vicodin and a new product called Reprexain, five

24  milligrams over 200.  That's a drug you're --

25  A.      Yes.

1   Q.      That's a drug you're not familiar with; right?

2   A.      Right.

3   Q.      Did you look it up on the break?

4               MR. MOLLOY:   Objection.

5               THE COURT:   Overruled.

6   A.      I actually ate gelato for lunch over the break.

7   BY MS. BOLEN

8   Q.      She continued physical therapy, return in four to six

9   weeks, and she's going to be re-approached for various

10  therapies, in this case a vestibular assessment

11  questionnaire after the -- if or if the insurance resources

12  will allow?

13  A.      Yes.

14  Q.      Do you know what a vestibular assessment

15  questionnaire is?

16  A.      It looks like a questionnaire to assess a person's

17  balance and their function in the vestibular system of the

18  brain, which is related to the inner ear and balance in

19  order to see if she would be a candidate to do vestibular

20  testing.  The VNG I believe relates to vestibular testing.

21  Q.      That can be expensive; can it not?

22  A.      That can certainly be expensive.

23  Q.      So now we have an example of the doctor commenting on

24  the patient's need or at least recommendation for something

25  and we'll see if we get it; correct?

1   A.     Yes.

2   Q.     Let me show you what's been marked for

3   identification, Dr. Parran, a series of exhibits labeled

4   Defense B25 -- they're all in the B series, -26, -27, -28,

5   and -29, and ask you again if these are records related to

6   Susan Helton and whether you reviewed them.

7   A.     Yes.  They are related to Susan Helton and I did

8   review them.

9           MS. BOLEN:  Your Honor, we'll offer Defense

10  Exhibit B25 through B29.

11          THE COURT:  Any objections?

12          MR. MOLLOY:  No, sir.

13          THE COURT:  B25 through -29 will be admitted and

14  may be published.

15          (Defense Exhibits B25, B26, B27, B28, and B29

16  admitted)

17  BY MS. BOLEN

18  Q.     Go to B29 here, Dr. Parran.  This is an office visit

19  date on March 4th of 2010, and here we have the patient

20  coming in to the exam room to talk to Dr. Roggow?

21  A.     Yes.

22  Q.     And the patient is telling Dr. Roggow that she

23  remains with her husband and tolerates the situation.  You

24  see that?

25  A.     Yes.

1  Q.     She's acknowledging her stressful marriage and she

2  plans to separate once she has the financial resources to do

3  so?

4  A.     Yes.

5  Q.     She started her physical therapy again; correct?

6  A.     Yes.

7  Q.     And there's a therapist working with her that notices

8  she's got more muscle tension and spasm; correct?

9  A.     Yes.

10  Q.     Goes on to explain what that means.  There's an

11  evaluation; correct?

12  A.     Yes.

13  Q.     Botox is done under the procedure note; correct?

14  A.     Yes.

15  Q.     There's an assessment with the ongoing diagnoses that

16  Dr. Roggow has applied to this patient; correct?

17  A.     Yes.

18  Q.     And there's a plan set out by Dr. Roggow here;

19  correct?

20  A.     Yes.

21  Q.     All in the usual course of professional practice?

22  A.     The decision to restart this patient on Klonopin on

23  that day endangered the health and safety of the patient and

24  potentially the patient's life, given her previous near

25  fatal accidental overdose.

PARRAN - CROSS

1    Q.     Let's talk about that for a minute.  She resumed a
2    low dose of the Clonazepam; correct?
3    A.     This patient, way back in -- oh, dear, let's see.
4           MS. BOLEN:  Your Honor, I'm going to object to
5    this being nonresponsive.  The question was, she resumed a
6    low dose, not what happened way back.
7           THE COURT:  The objection's overruled.
8    A.     This patient was on a low dose of occasional and
9    intermittent Klonopin in April of 2006, and once exposed to
10   it, as a person with an addictive brain, demonstrated
11   ongoing escalation over time and that -- so -- so this
12   patient's history is a very good predicter of her future
13   behavior.  This is a -- this is a dangerous prescription to
14   write to this patient on this day, and a prescription that
15   this doctor wrote in her own chart that she wouldn't do.
16          MS. BOLEN:  Let's go to -- Your Honor, may I have
17   a moment?  I don't want to lose the exhibits.
18          THE COURT:  You may.
19          (Discussion off record)
20          MS. BOLEN:  Your Honor, may I confer with
21   Government counsel on the numbering situation here quickly?
22          THE COURT:  Certainly.
23          (Discussion off record)
24          MS. BOLEN:  Your Honor, I'm going to need a moment
25   to retrieve an exhibit I hadn't anticipated using with this

 1   witness.

 2           THE COURT:  Are you suggesting a recess?

 3           MS. BOLEN:  Sure.

 4           THE COURT:  I don't want to put words in your

 5   mouth.

 6           MS. BOLEN:  Sounds good to me.

 7           THE COURT:  Mr. Molloy?

 8           MR. MOLLOY:  Your Honor, I only have three

 9   questions for this witness on redirect.  And we have --

10           THE COURT:  Come to sidebar -- well, I'm being

11   silly.  We're going to take a recess.  We're going to do

12   sidebar without you folks here.  We'll take about ten

13   minutes.  Please do not discuss the case among yourselves or

14   allow anyone to discuss it with you or in your presence.

15           (Jury out)

16           THE COURT:  All right, anything you care to say,

17   Mr. Molloy?

18           MR. MOLLOY:  Actually, I was hoping that defense

19   counsel would be able to finish her cross examination and

20   like I said, I have three questions, but the Court has a

21   better sense.  I was hoping we'd get this witness over but

22   the Court has a better sense of when they need the break, so

23   I don't have any problem with it.

24           THE COURT:  Okay.  All right, 10 minutes.

25           (Recess from 2:30 p.m. to 2:48 p.m.)

PARRAN - CROSS

1        THE COURT:  Both sides ready for the jury?

2        MR. MOLLOY:  Yes, sir.

3        THE COURT:  Ready for the jury?

4        MS. BOLEN:  Yes, sir.

5        THE COURT:  Have the jury step in, please.

6        MR. MOLLOY:  I'll get the witness, Judge.

7        THE COURT:  Thank you.

8        (Jury in)

9        COURT SECURITY OFFICER:  Please be seated.

10        THE COURT:  You may proceed.

11        MS. BOLEN:  Thank you, Your Honor.

12   BY MS. BOLEN

13   Q.    Dr. Parran, let me show you what's been marked for

14   identification as Defense Exhibit B39.  Is this one of the

15   records you reviewed in connection with Ms. Helton's file?

16   A.    Okay.

17   Q.    Is that a yes?

18   A.    If it was in her medical record, I certainly would

19   have reviewed it, yes.

20   Q.    This is dated within the time frame, July 30th of

21   2009; correct?

22   A.    Yes.

23        MS. BOLEN:  Your Honor, we'll offer Defense

24   Exhibit B39.

25        THE COURT:  Any objections?

1         MR. MOLLOY:  No, sir.

2         THE COURT:  39, B, will be admitted and may be

3    published.

4         (Defense Exhibit B39 admitted)

5         MS. BOLEN:  Your Honor, for the record, co-counsel

6    here advised me that I was way off on the number.  I

7    actually talked to the Government's prosecutor and asked if

8    it was okay if we just went with the numbers that were on

9    the documents rather than taking any time to renumber.  We

10   just pulled a bunch out of what we were doing just to move

11   on.

12        THE COURT:  That's fine.

13   BY MS. BOLEN

14   Q.    Dr. Parran, Defense Exhibit B39 dated July 30th,

15   2009; correct, sir?

16   A.    Yes.

17   Q.    And this is addressed to Susan Davis and it says C.O.

18   Helton; correct?

19   A.    Yes.

20   Q.    And it's on the Social Security Administration's

21   letterhead, Office of Disability Adjudication and Review;

22   correct?

23   A.    Yes.

24   Q.    And they give her a notice of decision fully

25   favorable?

1    A.      Yes.

2    Q.      Defining her as disabled in connection with her

3    ability to get certain benefits provided by our country to

4    people that qualify for them; correct?

5    A.      Yes.

6    Q.      Now Dr. Parran, I want to move to patient Jeff

7    Giompalo, and you talked about him yesterday; correct?

8    A.      Yes.

9    Q.      And in fact, it was part of your review and your

10   report to this jury that, in your opinion, this patient came

11   in early for prescriptions in July through September of

12   2004; correct?

13   A.      Um, hang on just a second.  Yes, I said that he began

14   to come in with a pattern of early prescriptions between

15   July of 2004 and September of 2004.

16   Q.      And in fact, you go on and you testified that he also

17   had, in your opinion, what were characterized as early

18   prescriptions later in '04 and into 2005; correct?

19   A.      Yes, I did.

20   Q.      I'm going to show you a series of exhibits marked for

21   identification as Government's Exhibit C1 through C13,

22   inclusive.

23           REPORTER:  Defense?

24           MS. BOLEN:  Defense Exhibit, I'm sorry.

25

1    BY MS. BOLEN

2    Q.     C1 through C13, have you take a look at those and see

3    if you recognize these as prescriptions related to the

4    medical chart for Jeff Giompalo.

5    A.     Yes.

6    Q.     Each of those are prescriptions within the time frame

7    of your testimony yesterday to this jury; is that correct?

8    A.     Yes -- if I can just finish flipping through them for

9    you.  Yes.

10          MS. BOLEN:  Your Honor, we'll offer Defense

11   Exhibits C1 through C13.

12          THE COURT:  Any objections?

13          MR. MOLLOY:  No, sir.

14          THE COURT:  C1 through 13 will be admitted and may

15   be published.

16          (Defense Exhibits C1 through and including C13

17   admitted)

18   BY MS. BOLEN

19   Q.     Now Dr. Parran, yesterday we talked a little bit

20   about an early prescription and an early refill.  You recall

21   that, sir?

22   A.     Yes, I do.

23   Q.     And doctors have the ability to write a prescription

24   and release it to a patient but give instructions to fill it

25   at a later date; correct?

PARRAN - CROSS

1    A.    Yes.  Those instructions either can be given to the

2    patient, themselves, or it can be written on the

3    prescription for the pharmacist to follow.

4    Q.    And you'd have to track the dates through very

5    carefully to come up with the conclusion as to whether the

6    doctor really gave early refills to a patient; correct?

7    A.    Yes.  You need to track the dates, certainly.

8    Q.    You recall your testimony yesterday that you started

9    on references to early refills, early prescriptions for Jeff

10   Giompalo in July of 2004; correct?

11   A.    Hang on.  Yes, 2004.  I was just checking on the

12   year.

13   Q.    Referring to what's been admitted as Defense

14   Exhibit C1, we're dealing with two prescriptions and I'm

15   going to have to move it up and down, but they are in --

16   both in Jeff Giompalo's name; is that correct?

17   A.    Yes.

18   Q.    And both prescriptions are dated July 6th of 2004.

19   You see that?

20   A.    Yes.

21   Q.    The first prescription on the top of defense

22   Exhibit C1 is for Roxicodone in the brand name; correct?

23   A.    Yes.

24   Q.    And right underneath the date line, you see the words

25   there, can you read them for the jury, please?

PARRAN - CROSS

1   A.      Yes.  It says do not fill until July 16th.  So that

2   would be ten days later, of 2004.

3   Q.      All right.  And then with regard to the second

4   prescription on Defense Exhibit C1, it's dated July 6th of

5   2004; correct?

6   A.      '4, yes.

7   Q.      This one is for Percocet; correct?

8   A.      Yes.

9   Q.      And this one has a different do not fill instruction

10  on it with a different date of July 9, 2004; correct?

11  A.      This is July 9th, yes.

12  Q.      We have a different, little different cycle in the

13  medication; correct?

14  A.      Yes.

15  Q.      And then we have initials next to what purports to be

16  a driver's license for an individual in name of Jeff

17  Giompalo, and we have a date of 7/8/04; correct?

18  A.      Yes.

19  Q.      I'm going to show you what's been admitted as Defense

20  Exhibit C2, again dealing with multiple prescriptions on a

21  single page, see if I can focus it.  Here we have

22  prescriptions issued to Jeff Giompalo; correct?

23  A.      Yes.

24  Q.      By Dr. Roggow; correct?

25  A.      Yes, yes.

1    Q.    We have prescriptions that are both dated August 3rd

2    of 2004, you see that?

3    A.    I see the top one.

4    Q.    Okay, and moving it up to the bottom of Defense

5    Exhibit C2?

6    A.    Yes.

7    Q.    You see the date there, August 3rd, 2004; correct?

8    A.    Yes.

9    Q.    Both of these prescriptions have the same issuance

10   date but they have instructions regarding when they can be

11   filled; correct?

12   A.    Yes.

13   Q.    So the first prescription on the top of Defense

14   Exhibit C2, we have may fill on August 6th, 2004; correct?

15   A.    Yes.

16   Q.    And looking back at Defense Exhibit C1, you'll recall

17   that the drug Percocet, which is referenced in Defense

18   Exhibit C2, was to be filled on or about July 9th, 2004;

19   correct?

20   A.    The 9th, yes.

21   Q.    Right.  And then in Defense Exhibit C2, we have a may

22   fill on August 6th, 2004; correct?

23   A.    Yes.

24   Q.    We're talking about a three-day window, essentially,

25   which is common in connection with insurance release and

1    processing of all different types of prescriptions?

2    A.    Well, it's three days early for an additional 36

3    Percocet pills.

4    Q.    All right.  Let's look at the bottom of Defense

5    Exhibit C2 and here we have the prescription for the

6    Roxicodone to Mr. Giompalo; correct?

7    A.    Yes.

8    Q.    And we have the issuance date of August 3rd of 2004;

9    correct?

10   A.    Yes.

11   Q.    And we have a may fill on August 13th, 2004, as the

12   instruction to the pharmacist; correct?

13   A.    Yes.

14   Q.    Pharmacists are not supposed to fill prescriptions

15   like that early if they have those instructions from the

16   government -- or from the doctor; correct?

17   A.    Right.  The pharmacist is not supposed to fill it

18   before the 13th.

19   Q.    And in this case, on Defense Exhibit C2, we have a

20   signature and a date of 8/4/04.  Do you see that there?

21   A.    Yes.

22   Q.    Show you what's been admitted as Defense Exhibit C3.

23   Again, a two-part series of prescriptions.  You can see the

24   top of one and the whole of the second -- top one here on

25   Defense Exhibit C3 addressed to Jeff Giompalo; correct?

1    A.    Yes.

2    Q.    And you have August 30th of 2004; correct?

3    A.    Yes.

4    Q.    And then just for following through, you have the

5    similar prescription on the bottom, August 30th, 2004;

6    correct?

7    A.    Yes.

8    Q.    Both of these prescriptions contain an actual

9    instruction for an early release of the medication in this

10   situation; correct?

11   A.    Yes.

12   Q.    And we have information on here that on 9/2 of '04,

13   it looks like these medications were released; correct?

14   A.    Were picked up, it looks like, by the patient.

15   Q.    Picked up and then they would presumptively go

16   somewhere to fill them; correct?

17   A.    Yes.

18   Q.    And the instruction that the doctor is giving to the

19   pharmacy is that she has approved this early release and if

20   we went back in the file, we might find that reason;

21   correct?

22   A.    Yes.

23   Q.    Now, looking at what's been admitted as Defense

24   Exhibit C4, again to Jeff Giompalo, we have two

25   prescriptions dated September 29th of '04.  The top one I'm

1    pointing to.  You see that, sir?

2    A.     Yes.

3    Q.     Sliding down to the bottom part of this exhibit, same

4    date for issuance, September 29; 2004; correct?

5    A.     Yes.

6    Q.     And in this situation, the top prescription has a do

7    not fill instruction of October 1, 2004; correct?

8    A.     Yes.

9    Q.     This is an attempt, as doctors do, to control when

10   the patient can get their medication; correct?

11   A.     Yes.

12   Q.     We have a pickup date or release date of 9/30/04;

13   correct?

14   A.     Yes.

15   Q.     Looking at what's been admitted as Defense

16   Exhibit C5, again additional prescriptions for Jeff

17   Giompalo, focusing in there on the top prescription in this

18   exhibit, the issuance date is October 21, 2004; correct?

19   A.     Yes.

20   Q.     This is for the drug Roxicodone; correct?

21   A.     Yes.

22   Q.     And then the bottom one we have the same date,

23   October 21, 2004; correct?

24   A.     Yes.

25   Q.     We have a do not fill instruction to the pharmacist

1    for October 29, 2004; correct?

2    A.      On that, but not on the 720 Roxicodone above.

3    Q.      And would that be fair to say that it's tied to the

4    cycle that the Roxicodone's on versus the Percocet; correct?

5    A.      No, the last Roxicodone prescription was allowed to

6    be filled on September 30th.  This is a Roxicodone that's

7    written on October 21st.  That's a week early.  Now, it's

8    picked up on 10/25, so the pickup date isn't quite a week

9    early, but it's still several days early.

10   Q.      It's within that three to four day insurance window;

11   isn't it, Dr. Parran?

12   A.      At 720 pills a throw per month, that's a huge amount

13   of Roxicodone.

14   Q.      And the pharmacist shouldn't be filling this

15   prescription until at least on or after the date given by

16   the doctor; correct?

17   A.      The pharmacist shouldn't fill the Percocet

18   prescription until the day that it says do not fill until.

19   Q.      Looking at what's been admitted as Defense

20   Exhibit C6, here we have another set of prescriptions again

21   to Jeff Giompalo.  The top one, you see the date there,

22   November 18th of 2004?

23   A.      Yes.

24   Q.      And we have a may fill date of November 19th, 2004,

25   with the Percocet; correct?

PARRAN - CROSS

1    A.      Right.

2    Q.      And then on the bottom prescription in Defense

3    Exhibit C6 you have the same issuance date November 18th,

4    2004?

5    A.      Yes.

6    Q.      And a may fill November 19th, 2004; correct?

7    A.      So incidentally, that Percocet prescription, if you

8    look at November -- don't fill until November 19th of 2004,

9    and you look to see when the last Percocet was allowed to be

10   filled, that's also less than a month.

11   Q.      And less than a month around a holiday period in this

12   country; correct, sir?

13   A.      Halloween isn't that critical of a holiday.

14   Q.      We're looking at November 19th of 2004; are we not,

15   sir?

16   A.      I'm talking about the interval from late October

17   until mid November.

18   Q.      I would like to refer you to the exhibit that's up on

19   the screen before this jury, which is Defense Exhibit C6.

20   It's referring to prescriptions issued on November 18th,

21   2004; correct, sir?

22   A.      Yes.

23   Q.      And it's also referring to instructions by Dr. Roggow

24   to the pharmacist as to when this patient can fill this

25   medication; correct?

1   A.      Yes, the next day.

2   Q.      And -- go ahead, I'm sorry.

3   A.      I said yes, the next day.

4   Q.      And November 19th is reasonably close to the

5   Thanksgiving holiday in this country; is it not, sir?

6   A.      I don't know when Thanksgiving fell in 2004.

7   Q.      I'm going to show you what's been admitted as Defense

8   Exhibit C7.  Here we're dealing with additional

9   prescriptions to Jeff Giompalo; correct?

10  A.      Yes, yes.

11  Q.      In this case, the prescriptions are both dated

12  December 14th, 2004; correct?

13  A.      Yes.

14  Q.      I'll move it up so you can see the bottom

15  prescription.  Says December 14th; correct?

16  A.      Yes.

17  Q.      And in this situation, the top prescription on

18  Defense Exhibit C7 has an instruction to may fill

19  December 17, 2004; correct?

20  A.      Yes.

21  Q.      This one's for Roxicodone; right?

22  A.      Yes.

23  Q.      And the bottom prescription on the same exhibit, same

24  instruction; correct?

25  A.      Yes.

1    Q.      And this one is for Percocet; correct?

2    A.      Yes.

3    Q.      Now we appear to have the medication on a similar

4    cycle; correct?

5    A.      Yes.

6    Q.      And we have a pickup date listed of 12/15/04?

7    A.      Yes.

8    Q.      Referring to what's been admitted as Defense

9    Exhibit C8, now we're into the '05 time frame that you

10   referenced yesterday indicating early refills or early

11   prescriptions, in this case, we have prescriptions issued

12   again to Jeff Giompalo for April 15th, 2005.  Can you see

13   that, sir?  I'll move it down a little bit.

14   A.      Yes.

15   Q.      All right.  Or is it April 5?  I can't really see it,

16   myself?

17   A.      It's April 5th.

18   Q.      And that's --

19   A.      Do not fill until April 8th.

20   Q.      I was reading the L in April as a 1 instead of an L;

21   correct?

22   A.      Yes.

23   Q.      The bottom prescription in Defense Exhibit C8,

24   essentially the same thing, dealing with an April 5th date

25   and instruction to fill April 8th or later; correct?

1    A.      Yes.

2    Q.      And these are Percocet and Roxicodone?

3    A.      Yes.

4    Q.      Purport to be picked up by somebody with Jeff

5    Giompalo's driver's license and what we have to be 4/7 of

6    '05; correct?

7    A.      Yes.

8    Q.      Let me show you what's been admitted into evidence as

9    Defense Exhibit C9, again in this 2005 time frame that you

10   spoke about yesterday.  We're dealing with two prescriptions

11   to Jeff Giompalo; correct?

12   A.      Yes.

13   Q.      And in this case, we have both prescriptions dated

14   May 3rd, 2005?

15   A.      Yes.

16   Q.      There's the one on the bottom.  It also says May 3rd;

17   correct?

18   A.      Yes.

19   Q.      And in this case, we have prescriptions, top one

20   Roxicodone, bottom one Percocet; correct?

21   A.      Yes.

22   Q.      And we have instructions on both prescriptions that

23   these should not be filled until May 6th, 2005; correct?

24   A.      Yes.

25   Q.      And we have what purports to be a release or a pickup

1    date of 5/5 of '05; correct?

2    A.      Yes.

3    Q.      Show you what's been admitted into evidence as

4    Defense Exhibit C10.  This time we can read them together.

5    Two prescriptions, both issued to Jeff Giompalo.  You see

6    that?

7    A.      Yes.

8    Q.      And they're both dated May 24, 2005; correct?

9    A.      I believe it's the 26th.

10   Q.      The initial -- the initial re --

11   A.      Oh, I'm sorry.  Yes, the date is the 24th and the

12   release date is the 26th.

13   Q.      And it says early refill on this one; doesn't it?

14   A.      It sure does.

15   Q.      Okay.  And when you looked through the file, you

16   would look for an explanation as to why a doctor might

17   actually go ahead and release something and label it as an

18   early refill; correct?

19   A.      It's -- it's an early refill.

20   Q.      All right.  And it was picked up on the 26th?

21   A.      Yes.

22   Q.      Let me show you what's been admitted into evidence as

23   Defense Exhibit C11.  Did you look at this in connection

24   with the prescriptions?

25   A.      Yes.  This is Carnival EXOTIC VALOR.

1    Q.      That's a cruise ship; isn't it, Doctor?

2    A.      With a pier and May 29th, 2005.

3    Q.      So it purports to be a ticket for somebody named Jeff

4    Giompalo, Lynn Giompalo, Kayla Giompalo, and Brandon

5    Giompalo to report at the port of Miami to get on a ship on

6    Sunday, May 29, 2005; correct?

7    A.      Yes.

8    Q.      Show you what's been admitted into evidence as

9    Defense Exhibit C12.  Back this one out a little bit.  There

10   are two prescriptions on this document; are there not, sir?

11   Little harder to read.  I'll focus in on each in just a

12   second.

13   A.      Yes, yes.

14   Q.      Let's take the top prescription first.  The top

15   prescription is in Jeff Giompalo's name; correct?

16   A.      Yes.

17   Q.      And then we see a date, an issuance date of June 28th

18   of 2005.  You see that, sir?

19   A.      Yes.

20   Q.      Okay.  And then the bottom prescription we have the

21   same date, June 28, 2005; correct?

22   A.      Yes.

23   Q.      And one is for Roxicodone and the other one's for

24   Percocet; right, sir?

25   A.      Yes.

1    Q.    And then on the right-hand side on this piece of

2    paper, it says may release, with a date of 7/1/05.  You see

3    that, sir?

4    A.    Yes.

5    Q.    And then there's another date on the paper, a little

6    bit earlier, that says 6/29/05; correct?

7    A.    Yes.  So the prescriptions were written on the 28th

8    and appears they were picked up on the 29th.

9    Q.    And then the release or fill date would be on or

10   about July 1st, 2005; correct?

11   A.    The "may release" would never wind up in a pharmacy.

12   Q.    All right.  Now finally, Defense Exhibit C13, we have

13   two prescriptions, again bearing Jeff Giompalo's name.  Both

14   have issuance dates of July 21st, 2005; is that correct?

15   A.    Yes.

16   Q.    One for Roxicodone, one for Percocet; correct?

17   A.    Yes.

18   Q.    And in the right-hand part of Defense Exhibit C13, we

19   have a may release date of 7/29 of '05; correct?

20   A.    Yes.

21   Q.    All representing a cycle of prescriptions and fill

22   instructions from Dr. Roggow to the pharmacist in connection

23   with this patient, Jeff Giompalo; correct?

24   A.    Yes.

25         MS. BOLEN:  Your Honor, I need just a few minutes

 1   here -- not really that many minutes.
 2              THE COURT:  Okay.
 3              MS. BOLEN:  And Your Honor, I'm not sure if the
 4   Government counsel needs the overhead, but I am done with
 5   it, just for --
 6              THE COURT:  You can go ahead and turn that off
 7   then.
 8              MS. BOLEN:  Your Honor, may I confer with counsel?
 9              THE COURT:  You may.
10              MS. BOLEN:  I may not be done.  I've been
11   instructed I may not be done.  I was trying to be.
12              (Discussion off record)
13              MS. BOLEN:  Your Honor, this might take a minute
14   or two, if they want to stretch or --
15              THE COURT:  Sure.  If you need to stand and
16   stretch, feel free.
17              (Discussion off record)
18              MS. BOLEN:  Brenda, we're not done, I'm sorry,
19   with the overhead.  Your Honor, I'm ready to proceed.
20              THE COURT:  You may do so.
21   BY MS. BOLEN
22   Q.    Now Dr. Parran, yesterday you testified that Jeff
23   Giompalo was seen by a neurologist early in his management
24   and care related to pain complaint; is that correct?
25   A.    Yes.

1    Q.      And you talked about reading a note that indicated

2    that the doctor expressed grave concern about Mr. Giompalo's

3    medications; is that correct?

4    A.      Yes.

5    Q.      I'll show you what's been marked for identification

6    as Defense Exhibit C14 and see if you had a chance to read

7    this document during your review of Mr. Giompalo's charts.

8    A.      Yes.

9            MS. BOLEN:  Your Honor, we'll offer Defense

10   Exhibit C14.

11           THE COURT:  Any objections?

12           MR. MOLLOY:  Just need to look at it, Judge.

13           (Discussion off record)

14           THE COURT:  Mr. Molloy?

15           MR. MOLLOY:  I'm sorry, just -- just a quick

16   voir dire.

17                    VOIR DIRE EXAMINATION

18   BY MR. MOLLOY

19   Q.      Dr. Parran, you indicated that you did see this when

20   you were making your evaluation?

21   A.      I believe I did.

22   Q.      Is there anything about this particular document, if

23   you had a little bit of time to study it, where you could

24   say with some assurance that you have?  I understand you

25   reviewed a lot of papers, but --

1    A.    It -- my only question is whether this is an

2    additional neurologic evaluation or additional evaluation

3    than the one that I referenced in my report.

4    Q.    So just if I understand, you cannot say with any

5    certainty that you reviewed this?

6    A.    I believe I reviewed everything that was available in

7    the medical records.

8              MR. MOLLOY:  Then I don't have an objection.

9              THE COURT:  All right.  C14 will be admitted and

10    may be published.

11              (Defense Exhibit C14 admitted)

12    BY MS. BOLEN

13    Q.    This is a three-page document from Dr. Christina Diaz

14    regarding Mr. Giompalo and directed to another Fort Myers

15    doctor of osteopathic medicine; is that correct, sir?

16    A.    You have to --

17    Q.    I'm sorry.  We've got a date of July 13th of 2001 on

18    the letter; do we not, sir?

19    A.    Right, July 13th of 2001, and it's to a Joseph

20    Hobson, Osteopath.

21    Q.    D.O. means Doctor of Osteopathic medicine; correct?

22    A.    Yes.

23    Q.    And it's regarding the patient, Jeff Giompalo;

24    correct?

25    A.    Yes.

1   Q.     And the third page of that exhibit, just to keep

2   context --

3   A.     Is a Dr. Diaz, yes.

4   Q.     All right.  Now, the first page of Defense

5   Exhibit 14, Dear Joe, I had the pleasure of seeing Jeff

6   Giompalo in neurological re-evaluation in the office.  My

7   findings are as follows.  Complaint, history and physical of

8   present illness, and then there's a section here where it

9   talks about the medicine.  It just says, "I expressed some

10  discomfort with Valium and Vicodin which there are frequent

11  calls for.  I've discussed this with Jeff as an indication

12  of the amount of pain that he is still experiencing."  Is

13  that a fair reading of that exhibit, Defense Exhibit C14?

14  A.     Yes.

15  Q.     And this goes on to, again, do a review, look at some

16  medical history in brief fashion, some social information;

17  correct?

18  A.     It goes on to say that they're uncomfortable about

19  the frequency of his calls to the office, and it goes on to

20  say that they will lessen the medication by using a

21  tricyclic antidepressant, and he appears to agree with this.

22  Q.     In fact, it says he's going to attempt to lessen

23  medication through the continued use of the tricyclic with a

24  Vicodin and Valium on an as needed basis; correct?

25  A.     Yes.

PARRAN - CROSS

1    Q.     And in fact, on Page 2 of the Defense Exhibit C --

2    C14 -- or am I in D?  I can't remember; I just blanked.

3    C14, the bottom part in the comments says that he's going to

4    continue with limited quantities of Valium and Vicodin;

5    correct?

6    A.     Yes.

7    Q.     And then Page 3 of that same document, Defense

8    Exhibit C14, again refers to physical therapy; correct?

9    A.     Yeah.  That was the non-medication long-term

10   treatment of the headache pain that they referred earlier.

11   Q.     And in fact, the follow-up is a two month visit; is

12   that right?

13   A.     Yes.

14   Q.     Come back in two months?

15   A.     Yes.

16          (Discussion off record between counsel)

17   BY MS. BOLEN

18   Q.     Let me show you what's been marked for identification

19   as Defense Exhibit C15 and ask if this is also one of the

20   documents you reviewed in connection with Mr. Giompalo's

21   file.

22   A.     Yes.

23          MS. BOLEN:  Your Honor, we'll offer Defense

24   Exhibit C15.

25          THE COURT:  Any objections?

1              MR. MOLLOY:  No, sir.

2              THE COURT:  C15 will be admitted and may be

3    published.

4              (Defense Exhibit C15 admitted)

5    BY MS. BOLEN

6    Q.    In this case, Dr. Parran, we're dealing with a

7    primary care physician referral authorization form.  Is that

8    what it says?

9    A.    Yes.

10   Q.    And it's dated 9/11 -- it's kind of squiggly.  I read

11   that as '01.  Would that be fair?

12   A.    Yes, I believe that's what it is.

13   Q.    And the patient's name is Jeff Giompalo; correct?

14   A.    Yes.

15   Q.    And in this case, Jeff is being referred to Dr. Debra

16   Roggow; correct?

17   A.    Yes.

18   Q.    With a request for her to assume care for his

19   problems of the headaches and the neck pain; correct?

20   A.    Yes.

21   Q.    So we've essentially got a doctor whose name appears

22   to be stamped on the bottom of Defense Exhibit C15 and a

23   signature there asking that Dr. Roggow take over this

24   patient's care; correct?

25   A.    Yes.  I interpret that as that Joseph Hobson's

1    signature, the primary care doctor referred to in the

2    previous consult.

3    Q.    And that's a primary care doctor who is in Fort

4    Myers, Florida, referring to Dr. Debra Roggow; correct?

5    A.    Yes.  That's what I concluded.

6          MS. BOLEN:  Your Honor, just one second, please.

7          (Pause in place)

8    BY MS. BOLEN

9    Q.    Dr. Parran, you testified yesterday early that you do

10   education across this country for medical residents and

11   fellows, is that correct, sir?

12   A.    For practitioners as well as teaching and residency

13   programs, yeah.

14   Q.    And you go out around the country at different times

15   and present live or you may present through some electronic

16   means; is that correct?

17   A.    Mostly it's live presentation.  I think I did do

18   one -- I think I did one electronic presentation for

19   Medscape.

20   Q.    Do you recall, sir, giving a presentation in audio

21   form to individual practitioners in Waltham, Massachusetts,

22   in May of 2008?  The title is Opioid Therapies for Patients

23   with Chronic Pain.

24   A.    I believe that that was an in-person live

25   presentation.  It may have been taped and made available to

1  practitioners after the -- after the face-to-face
2  conference.
3  Q.    And in connection with that presentation, Dr. Parran,
4  you often impart your educational knowledge by talking about
5  things you've encountered in your practice; is that correct,
6  sir?
7  A.    I frequently use clinical situations to illustrate
8  points, yes.
9  Q.    And in fact, you've used clinical situations where
10  you, yourself, have written a prescription to a nurse for a
11  controlled substance without having a physician/patient
12  relationship with her; correct?
13  A.    Oh, absolutely.  As a medical intern at Baltimore
14  City Hospital in September of 1982.
15  Q.    And you've told your students that sometimes it's
16  hard to say no to patients because of the complicated
17  relationship between a physician and a patient?
18  A.    It's challenging to say no, but it's absolutely
19  essential when the patient's health and safety is at risk.
20  Q.    And you learned that over the course of your career,
21  is that correct, from when you wrote that prescription to a
22  patient you didn't have a relationship with to now; correct?
23  A.    Certainly all doctors learn things over the course of
24  their career.  I learned that one very rapidly.
25            MS. BOLEN:  No further questions, Your Honor.

1    Pass the witness.

2              THE COURT:  Mr. Molloy, any redirect?

3              MR. MOLLOY:  Just three questions.

4                    REDIRECT EXAMINATION

5    BY MR. MOLLOY

6    Q.    Doctor, there was discussion in the cross examination

7    as to what an early prescription or early obtaining of

8    prescription is.  What is your definition of getting a

9    prescription early?

10   A.    Getting a prescription early is getting a

11   prescription before the time frame outlined in the previous

12   prescription is completed so that there are extra

13   medications around.

14   Q.    In determining, as you testified, that the

15   defendant's practice was outside the scope of professional

16   practice, were your concerns in making that determination,

17   were your concerns about, as you've described it, the

18   dangerous and potentially harmful to safety and welfare of

19   patients, in the medical practice of this defendant, were

20   your concerns about that dangerous and potentially

21   harmful -- concerns that you've described, were they based

22   on the doctor's office notes, occasional physical exams,

23   botox injections, or recommendations for tests, or was your

24   main concern in making that determination, as you described

25   it, the out-of-control, relentless prescribing of

 1   dangerously high doses of addictive pain medications to red

 2   light or at risk patients?

 3          MS. BOLEN:  Your Honor, I object to leading and to

 4   counsel testifying.  I don't believe this witness has

 5   testified to that.

 6          THE COURT:  The leading part will be sustained.

 7   BY MR. MOLLOY

 8   Q.     I'm asking which one it is.

 9   A.     It is the latter.

10          THE COURT:  I'm sorry, Mr. Molloy, you need to

11   reask the question.  I sustained that one.  Try again.

12   BY MR. MOLLOY

13   Q.     Were your concerns in determining -- I'm sorry.  Were

14   your conclusions determined about your concerns of --

15   regarding the office notes that counsel has asked you about,

16   the physical exams that counsel has asked you about, the

17   botox injections that counsel has asked you about, or the

18   recommendations for tests that counsel has asked you about,

19   or were your concerns with the prescribing of highly

20   addictive narcotics?

21          MS. BOLEN:  Objection, leading, Your Honor.

22          THE COURT:  Sustained.

23   BY MR. MOLLOY

24   Q.     What was your main concern in determining that

25   defendant's practice was outside the scope of professional

1  practice?

2  A.     My main concerns were this, a physician can do many

3  things and document them in their medical record that relate

4  to providing medical care for a patient.  But a physician

5  cannot prospectively prescribe controlled substances in a

6  way that endangers the health and safety and potentially

7  life of a patient.  So my concerns, as I read through the

8  medical records and formed my opinion in the case that you

9  refer to, specifically Susan Helton, my concerns began at

10  the very beginning of the chart, hearing about the

11  controlled drug prescribing at high doses over an extended

12  period of time to a patient with a substantial history of

13  severe alcoholism.  My concerns were borne out with

14  decreasing function on the part of the patient described by

15  another physician as being barely able to walk outside of

16  the house, in a person who presented with neck spasms,

17  dysfunction in interpersonal life, including a divorce,

18  separation, living outside of the home, dysfunction in close

19  love relationships, including significant others feeling the

20  need to flush medications down the toilet as the only way --

21  or flush medications down the toilet as an intervention,

22  dysfunction and increasing dysfunction that resulted in an

23  admission to the hospital with severe hyponatremia or low

24  blood salt.  This is the patient I talked about hyponatremia

25  in, not the other female patient we talked about this

 1    morning.  And no prescribed medicines in her urine, and no

 2    withdrawal, and less than one month later, continuing the

 3    prescribing, a patient who presented to the emergency room

 4    with an accidental near fatal overdose.

 5         My concerns about the prescribing don't relate to

 6    vitamin prescriptions and botox injections and thorough

 7    progress notes.  My concerns relate to ongoing and

 8    relentless prescribing despite obvious deterioration to the

 9    point of near death on the part of a patient.

10         MR. MOLLOY:  Nothing further.

11         THE COURT:  Any recross, Ms. Bolen?

12         MS. BOLEN:  Your Honor, I think I have one

13    question, if I might just have a second.

14         THE COURT:  You may.

15         (Discussion off record)

16                    RECROSS EXAMINATION

17    BY MS. BOLEN

18    Q.   Dr. Parran, you understand the difference between a

19    diagnosis and a differential diagnosis; do you not, sir?

20         MR. MOLLOY:  I'm going to object, Your Honor, it's

21    beyond the scope.

22         MS. BOLEN:  May we approach?

23         THE COURT:  I'll overrule it.  I'll allow

24    Government counsel to re-redirect if necessary.

25    A.   Yes, a diagnosis is the diagnosis that a doctor forms

1    as the -- as the name of the disease or the condition that

2    the doctor believes the doctor is treating.  A differential

3    diagnosis is something that tends to be formed earlier.  So

4    if -- if a doctor is interviewing a patient and doing a

5    physical exam on a patient, a doctor might form a

6    differential diagnosis of the patient has the following

7    concerns or complaints or symptoms, and the differential

8    diagnosis, the possible things that this might be are A, B,

9    C, and D.  That's the differential diagnosis.  I think it

10   might be one of these four.

11           And then usually with further workup or further

12   evaluation, the doctor narrows it down to one diagnosis,

13   which is the -- which is the thing that the doctor says

14   they're treating.

15   BY MS. BOLEN

16   Q.    Sometimes those things take time to develop; correct?

17   A.     It certainly can take time to move from a -- a list

18   of differential diagnoses that you form the first time

19   you're seeing a patient, or the first time a new complaint

20   presents, to narrowing that down to the actual diagnosis

21   that you believe you're treating, yes.

22   Q.    And there can be many explanations for the conduct of

23   why an individual ended up in a hospital, especially in the

24   instance of a husband throwing medications away; correct?

25   A.     There can be many reasons why a patient would be in a

```
 1    hospital for whatever the diagnoses are involved, yes.
 2              MS. BOLEN:  Thank you.
 3              THE COURT:  Mr. Molloy?
 4              MR. MOLLOY:  No, I ask that this witness be
 5    excused.
 6              THE COURT:  All right.  You may stand down and you
 7    may be excused.
 8              (Witness excused, Excerpt concluded)
 9
10                       CERTIFICATE
11    I CERTIFY THAT THE FOREGOING TRANSCRIPT IS A TRUE AND
12    ACCURATE TRANSCRIPT FROM AN EXCERPT OF THE ORIGINAL
13    STENOGRAPHIC RECORD IN THE ABOVE-ENTITLED MATTER.
14
15        Dated this 23rd day of February, 2013.
16
17                    /s/ R. Joy Stancel
                    _____
18                      R. JOY STANCEL, RMR-CRR
                    FEDERAL OFFICIAL COURT REPORTER
19
20
21
22
23
24
25
```